**STATE OF ALABAMA**
MONTGOMERY COUNTY CIRCUIT COURT

---

BLUECROSS AND BLUESHIELD OF ALABAMA; and
BLUECROSS AND BLUESHIELD OF MICHIGAN,

       **Plaintiffs,**

   v.

TAP PHARMACEUTICAL PRODUCTS INC. (formerly known as TAP HOLDINGS, INC.); ABBOTT LABORATORIES; TAKEDA PHARMACEUTICAL COMPANY LIMITED (formerly known as TAKEDA CHEMICAL INDUSTRIES, LTD.); TAKEDA AMERICA HOLDINGS, INC., ONCOLOGY SUPPLY; AMERISOURCE BERGEN SPECIALTY GROUP; AMERISOURCE BERGEN CORPORATION; FICTITIOUS DEFENDANTS, the identities of which are unknown to Plaintiffs, and through the exercise of due diligence cannot be known to Plaintiffs at this time, but who will be added as defendants by amendment as necessary upon Plaintiffs' identifying them, A-Z, intending to refer those entities or persons that committed any of the acts and/or omissions of which the named Defendants are alleged herein to have committed; AA-ZZ, intending to refer to those persons or entities that conspired to commit any of the acts and/or omissions of which the named Defendants are alleged herein to have committed; AAA-ZZZ, intending to refer to those persons or entities that have committed any acts or omissions that have proximately caused injury and damage to Plaintiffs as alleged herein,

       **Defendants.**

FILE NO. _Cv-06 - 1350_

**COMPLAINT**

**JURY TRIAL DEMANDED**



---

## SUMMONS

This service by certified mail of this summons is initiated upon the written request of plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

NOTICE TO:     **TAP Pharmaceutical Products, Inc.**
               **675 N Field Drive**
               **Lake Forest, IL 60045-4832**

    The Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the Complaint, to KIMBERLY R. WEST, ESQ. and/or SHANIN SPECTER, ESQ. and/or DONALD E. HAVILAND, JR., ESQ., the lawyers for the plaintiff, whose addresses are:

WALLACE, JORDAN, RATLIFF & BRANDT, Post Office Box 530910, Birmingham, Alabama 35253 and KLINE & SPECTER 1525 Locust St 19th Flr Philadelphia, PA 19102.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT OF DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

CLERK OF THE COURT

DATED:____05/23/06____

## STATE OF ALABAMA
### MONTGOMERY COUNTY CIRCUIT COURT

BLUECROSS AND BLUESHIELD OF ALABAMA; and
BLUECROSS AND BLUESHIELD OF MICHIGAN,

         Plaintiffs,

v.

TAP PHARMACEUTICAL PRODUCTS INC. (formerly
known as TAP HOLDINGS, INC.); ABBOTT
LABORATORIES; TAKEDA PHARMACEUTICAL
COMPANY LIMITED (formerly known as TAKEDA
CHEMICAL INDUSTRIES, LTD.); TAKEDA AMERICA
HOLDINGS, INC., ONCOLOGY SUPPLY;
AMERISOURCE BERGEN SPECIALTY GROUP;
AMERISOURCE BERGEN CORPORATION;
FICTITIOUS DEFENDANTS, the identities of which
are unknown to Plaintiffs, and through the exercise
of due diligence cannot be known to Plaintiffs at this
time, but who will be added as defendants by
amendment as necessary upon Plaintiffs' identifying
them, A-Z, intending to refer those entities or
persons that committed any of the acts and/or
omissions of which the named Defendants are
alleged herein to have committed; AA-ZZ,
intending to refer to those persons or entities that
conspired to commit any of the acts and/or
omissions of which the named Defendants are
alleged herein to have committed; AAA-ZZZ,
intending to refer to those persons or entities that
have committed any acts or omissions that have
proximately caused injury and damage to Plaintiffs
as alleged herein,

         Defendants.

FILE NO. CV-06-1350

## COMPLAINT

JURY TRIAL DEMANDED



## COMPLAINT

Plaintiffs, BlueCross and BlueShield of Alabama ("BCBS Alabama") and BlueCross and BlueShield of Michigan ("BCBS Michigan"), by their attorneys, bring this Complaint to obtain declaratory relief, damages, costs of suit, attorneys' fees and other appropriate relief from the Defendants, TAP Pharmaceutical Products Inc. (formerly known as TAP Holdings, Inc.) ("TAP"), Abbott Laboratories ("Abbott"), Takeda Pharmaceutical Company Limited (formerly known as Takeda Chemical Industries, Ltd.) ("Takeda"), Takeda America Holdings, Inc. ("Takeda America") (collectively referred to as "the Manufacturer Defendants"), Oncology Supply, Amerisource Bergen Specialty Group ("ABSG"), Amerisource Bergen Corporation ("ABC") (hereinafter collectively referred to as "the Wholesaler Defendants"), Fictitious Defendants A-Z, AA-ZZ, AAA-ZZZ (hereinafter collectively referred to as including "the Doctor Defendants"), Plaintiffs complain and allege, upon information and belief, as follows:

## NATURE OF ACTION AND BACKGROUND

1.    This case is brought by Plaintiffs to recover monies overpaid for Lupron® prescribed to their insureds as a result of Defendants' fraudulent scheme and conspiracy detailed herein.

2.    Defendants, Abbott, Takeda and TAP are the manufacturers, marketers, sellers and distributors of Lupron®. TAP is a wholly-owned joint venture of Abbott and Takeda America. Takeda America is a wholly-owned subsidiary of Takeda. (TAP, Abbott and Takeda are hereinafter collectively referred to as "the Manufacturer Defendants").

3.    Defendants Oncology Supply and ABSG are wholly owned subsidiary companies of Defendant ABC. At all times material hereto, the Wholesaler Defendants were in the business of receiving and distributing prescription drugs, like Lupron®, to purchasers located throughout Alabama and the country.

2

4.     Fictitious Defendants A-ZZZ, include, but are not limited to, medical providers located throughout the State of Alabama (the "Doctor Defendants"). At all times material hereto, the Doctor Defendants were in the business of treating cancer patients who were plan beneficiaries of insurance plans offered by Plaintiffs. Each of these Doctor Defendants treated Plaintiffs' plan beneficiaries with Lupron® and thereafter sought and received reimbursement for the Lupron® from Plaintiffs at the inflated prices described herein.

5.     References to the Defendants in this Complaint include the Manufacturer Defendants, the Wholesaler Defendants and Fictitious Defendants, including the Doctor Defendants. All allegations as to the acts or omissions of any Defendant include the acts or omissions of any agent, employee, representative, or co-conspirator of that Defendant, the acts or omissions of Fictitious Defendants A-ZZZ, and the acts of omissions of any agent, employee, representative, or co-conspirator of Fictitious Defendants A-ZZZ.

6.     In late September 2001, TAP agreed to plead guilty to federal criminal fraud charges for, among other things, conspiring to violate the Prescription Drug Marketing Act ("PDMA"), 21 U.S.C. §§ 331(t) and 333(b), by, *inter alia*, providing free samples of Lupron® to medical providers throughout the country knowing and expecting that they would bill patients and insurance carriers, like Plaintiffs, for such Lupron®. This conspiracy was in violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to commit offense or to defraud United States). *See* Plea Agreement, dated September 28, 2001, between the United States Department of Justice, the United States Attorney for the District of Massachusetts and TAP, with attached Criminal Information, attached hereto as Exhibit "A;" *see also* further details *infra*.

3

7.     Abbott and Takeda also were investigated by the federal government in connection with the charges to which TAP pled guilty and each entered into a Side Letter Agreement with the federal government in connection with same, through which the federal government agreed to decline further prosecution of TAP and its parent companies, Abbott and Takeda, in consideration of the guilty plea. *See* Side Letter Agreements with Abbott and Takeda, attached hereto as Exhibits "B" and "C," respectively; *see also* further details *infra*.

8.     On or before October 3, 2001, TAP, in conjunction with its plea, agreed to pay a $290 million criminal fine, the largest criminal fine ever up to that time in a U.S. health-care fraud prosecution case, according to the United States Department of Justice. Additionally, the Manufacturer Defendants agreed to settle civil claims brought by the federal government for $559.5 million and those brought by the fifty states and the District of Columbia for $25.5 million. *See* Exhibit "A," at ¶¶ 3, 10; *see also* Settlement Agreement and Release, attached hereto as Exhibit "D," at ¶ 1, at pp. 6-7. Including interest, TAP paid in excess of $900 million in criminal fines and civil penalties. *See also* further details *infra*.

9.     Several medical providers also have pleaded guilty to federal Criminal Informations charging them with participating in the nationwide conspiracy with TAP to bill for free samples of Lupron®. These providers include: Rodney A. Mannion, M.D., of Laporte and Michigan City, Indiana; Joel Olstein, M.D. of Lewiston, Maine; Joseph Spinella, M.D., of Bristol, Connecticut; and Jacob Zamstein, M.D. of Hartford and Bloomfield, Connecticut. *See* further details, *infra*. *See* Criminal Information and Judgment for each attached hereto collectively as Exhibit "E."

10.     During the period from at least 1991 through the present - the exact dates of which are unknown to Plaintiffs - Defendants, among themselves and with other entities and individuals,

4

created and implemented a fraudulent marketing, pricing and sales scheme designed to increase the sales and market share of Lupron® and to maximize Defendants' profits at the expense of federal and state governments' insurance programs, Lupron® patients and their private insurers, like Plaintiffs, who were caused to overpay substantial amounts of money for the Lupron®. The improper marketing, pricing and sales practices relate to, *inter alia*, the following: (a) providing free samples of Lupron® to medical providers and encouraging them to bill the government and private insurers, like Plaintiffs, for such free samples; (b) inflating the average wholesale price ("AWP") for Lupron® (*i.e.*, the rate upon which reimbursements under government assistance programs, like Medicare and Medicaid, and certain private insurance programs, like those administered by Plaintiffs, were set), far above the price at which medical providers were charged for Lupron®, thereby creating a profit margin or spread for medical providers and marketing that spread; (c) providing other unlawful financial inducements to medical providers to prescribe Lupron®; (d) organizing and administering a "diversionary black market" for Lupron® by which the Manufacturer Defendants provided excess Lupron® at low costs to the Doctor Defendants who, in turn, unlawfully resold the Lupron® to the Wholesaler Defendants for re-sale to others, and (d) conspiring to conceal the aforementioned fraudulent marketing and sales tactics and the true costs which providers were paying for Lupron®.

11.    The scheme was grounded in the Manufacturer Defendants' ability to control, as part of their sales and marketing strategies, not only the amount that they charged to medical providers, like the Doctor Defendants, but also how much reimbursement would be made to said providers under government assistance programs and private insurance programs for Lupron®, like those administered by Plaintiffs, through the AWP reimbursement benchmark. The Manufacturer Defendants deliberately marketed and promoted the sale of Lupron® based on the availability of

5

inflated payments made by government assistance programs, private insurers (like Plaintiffs) and patients (like Plaintiffs' insureds), which were based upon the inflated AWPs set by the Manufacturer Defendants.

12.    The amount by which the price the Manufacturer Defendants set as the AWP exceeded the actual cost of Lupron® charged to medical providers, like the Doctor Defendants, was often referred to by the Manufacturer Defendants [and their competitors] in internal documents as a "spread," "Return-To-Practice," "RTP," "return-on-investment," and "profit." This "spread" or "RTP" (which, in the case of free samples, was the full AWP for the Lupron®) was used by the Manufacturer Defendants to create a profit-based incentive for medical providers, like the Doctor Defendants, to prescribe Lupron®.

13.    The Manufacturer Defendants even prepared side-by-side comparisons of the spreads available on Lupron® versus their competitors' drugs, like Zoladex®. These comparisons were used as a marketing and sales pitch to medical providers, like the Doctor Defendants. These Defendants further advised medical providers that their continuing to profit from the RTP was dependent upon their concealment of the significantly lower prices that they were actually paying for the Lupron®. As a result, while the medical providers and the Manufacturer Defendants have reaped these profits, Plaintiffs and others have paid tens of millions of dollars in inflated drug prices.

14.    In the case of the Doctor Defendants, some of which were the Defendants best customers in the State of Alabama, the Manufacturer Defendants provided huge discounts on the cost of Lupron® through direct contract prices which had the effect of vastly increasing the spreads or RTP available for these doctors when they sought reimbursement from Plaintiffs at the inflated AWPs.

15.    In addition to marketing the spread as a profit-based incentive, according to the various Criminal Informations and Defendants' internal documents, the Manufacturer Defendants provided doctors, such as those listed at paragraph 8, *supra*, with free samples and other financial incentives as inducements to increase their usage of Lupron®. *See, e.g.*, Exhibit "E," at Mannion Information at ¶ 10 ("The core objective of this conspiracy for all participants was to obtain money from the patient's health care insurers through the prescription of Lupron. It was an objective of [TAP] in this conspiracy to provide free doses or samples of Lupron Depot, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot."). It is believed and therefore averred that one or more of the Doctor Defendants named herein received free Lupron® from the Manufacturer Defendants and thereafter unlawfully billed Plaintiffs for such Lupron®.

16.    Such financial incentives, like free samples, RTP and other inducements, were designed to cause and did cause medical providers, like the Doctor Defendants, to prescribe Lupron® for their patients over cheaper competitor drugs, such as Zoladex®, and over cheaper alternative and equally efficacious courses of treatment, like orchiectomy.

17.    The United States Government sought to and did recover its portion of the fraudulent charges, which represents between 75-80% of the overpayments caused by Defendants, depending upon whether a patient was covered by a government assistance program and which program covered him/her. For instance, CHAMPUS, a government assistance program for those who served in the military, provided reimbursement of 75% of the cost of Lupron®, while Medicare, the government assistance program for senior citizens, provided reimbursement of 80% of the cost.

7

18.    In acknowledging that the plea and civil settlement were not designed to compensate the "other victims" of the fraud other than the federal and state governments, the Assistant United States Attorney noted:

> There are two categories of other victims, *insurance companies* and a small number of individuals who had no supplemental insurance.... So the bulk of the unaddressed co-payments were [monies] that would have been paid to doctors *by other insurers* besides Medicare and Medicaid.

*See* Disposition dated December 6, 2001 from *United States v. TAP Pharmaceutical Products, Inc.,* Crim. No. 01-10354-WGY (D. Mass.) (emphasis supplied), attached hereto as Exhibit "F," at 19-20.

19.    Numerous class actions and individual actions were commenced throughout the country in the wake of TAP's criminal plea in 2001 which all sought to recover the proper compensation for the "other victims" of TAP's crime, including the patients and private insurance companies.

20.    Respecting Lupron® that was administered to Medicare and CHAMPUS patients, 20-25% of the medical provider charges were paid by patients and private insurers, like Plaintiffs. The vast majority of the 20-25% Lupron® payments – often 80%, but sometimes up to 100% – were borne by private insurers, like Plaintiffs. These overpayments for Lupron® were based, in whole or in part, upon the AWP for Lupron®.

21.    In connection with the government's recitation of the facts supporting the guilty plea, the Assistant United States Attorney stated and TAP agreed:

> Medicare and **other insurance companies** base their payment in many respects for Lupron for prostate cancer based off published industry pricing done in a Red Book, a book called the Red Book. And it's premised on the published average wholesale price for the

8

product. The published average wholesale price for Lupron in the 1990's ranged from in the mid 300's to almost $600.

Insurance companies for the most part paid 80 percent of that. A lot of patients have supplemental insurance to cover their own copayment. Most of the Lupron was **paid for by insurance companies** throughout the 1990's....

TAP in the early 1990's was trying to push its product to urologists and others in lieu of doctors recommending to their patients other treatment for prostate cancer. To get doctors to switch from their treatment modes from surgery to the pharmaceutical product TAP began offering doctors free samples. In the early 1990's, '91, '92, '93, it was a fairly institutional program. If a doctor bought ten, he would get one free sample. For the really good customers, if the doctor bought five he would get one free sample. It was the expectation of those in TAP's management who set up this program that the doctor would take the free sample, prescribe it, and bill it to the patient.

\*   \*   \*

[U]rologists in private practice had the ability, and indeed this was the system, [TAP] sold the product to the urologist, the urologist then resold it to his patient, the patient then **had the insurance company pay for it.**

\*   \*   \*

[A] top officer at the American Urology Association informed the top executives [th]at TAP's program of providing free samples to doctors as an inducement for doctors to purchase and prescribe greater amounts of Lupron that they were at risk of prosecution because doctors were taking free drugs and prescribing them and then **billing the patients and their insurers** for it.

\*   \*   \*

Many sales reps used the product to help doctors who were having problems paying their bills with the clear expectation that the doctor would take the free drug, bill it, and then use the money that the doctor **received from the patient's insurance company** to pay off the bill to TAP.

See Arraignment and Plea dated October 16, 2001 from *United States v. TAP Pharmaceutical Products, Inc.*, Crim. No. 01-10354-WGY (D. Mass.), attached hereto as Exhibit "G," at 31-36 (emphasis added).

9

22.     The majority of the private party cases brought by consumers and insurers in federal courts or removed to federal courts respecting Lupron® were consolidated for pre-trial purposes and transferred by the Judicial Panel on Multidistrict Litigation ("JPML" or "the Panel") to *In re Lupron Marketing and Sales Practices Litigation*, MDL 1430 (D. Mass.).  The first such nationwide consumer class action case was filed in Boston in May 2001.  A proposed settlement of that class action – which was reached initially without input from the undersigned Plaintiffs' counsel – was proffered to and preliminarily approved by the Honorable Richard G. Stearns on November 24, 2004.  A copy of the Order Granting Preliminary Approval of Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class and Scheduling Fairness Hearing, dated November 24, 2004 is attached hereto as Exhibit "H."

23.     According to the Class definition, Plaintiffs were included as settlement class members in MDL 1430.  The Court defined the nationwide settlement Class as follows:

> All individual persons or entities who, during the Class Period, made Lupron® Purchases.  Excluded from the class are the Settling Health Plans; Defendants, their respective present and former, direct and indirect, parents, subsidiaries, divisions, partners and affiliates; and the United States government, its officers, agents, agencies and departments, and all other government entities' claims, to the extent that they previously released their claims pursuant to the 2001 Settlement Agreement and Release resolving the matter of *United States v. TAP Pharmaceutical Products, Inc.* (D. Mass.) and related litigation.

*See* Exhibit "H," at 6.  The MDL 1430 Court also noted that "[t]his includes all individual Consumers and Third Party Payors as those terms are defined in the Class Agreement." *Id.*

24.     Each Plaintiff hereunder is a "Third Party Payor" or "TPP" as per the definition contained in the Settlement Agreement and Release proffered in MDL 1430:

10

"Third Party Payor" or "TPP" means a private or governmental entity that was at risk by contract to pay all of part of the cost of Lupron prescribed, provided or administered in the United States for individual beneficiaries of the TPP's prescription drug or health coverage. ... A claim may be made pursuant to this Class Agreement on behalf of a TPP Class Member by an agent thereof, including the third-party administrator of the TPP Class Member's prescription drug or health benefit plan, if the TPP Class Member authorizes the agent to make such a claim.

*See* Settlement Agreement and Release, a copy of which is attached hereto as Exhibit "I," at ¶ 2(ll) at p. 15.

25.    Because Plaintiffs did not find the MDL 1430 settlement to be a fair, reasonable, and adequate resolution of their claims, they elected to opt-out of that settlement class, as was their constitutional right and as was expressly contemplated and allowed for by the MDL Court's November 24, 2004 Order, which provided:

Any member of the nationwide Lupron® Purchaser Class who wishes to be excluded from the nationwide Lupron® Purchaser Class shall mail a written notice of exclusion to the Claims Administrator so that it is received no later than April 1, 2005,.... For Third Party Payors, the notice of exclusion must also include a signed certification containing the following language:

The undersigned individual hereby represents that he/she has authority to sign and submit this notice of exclusion on behalf of the above-named class member.

The undersigned also certifies that he/she has not received any advice from the parties to this litigation or their attorneys concerning his/her or the class member's fiduciary obligations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1100, *et seq.*, or other laws governing their obligations to any class member. The undersigned understands that by submitting this notice of exclusion, the class member identified above will not be entitled to

11

received any proceeds of the Class Settlement Fund. By affixing my signature below, I certify under penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

If the person providing a certification in the notice of exclusion is not a duly authorized officer, director or employee of the TPP Class Member requesting exclusion (if a corporation), or a general partner or duly authorized employee of the TPP Class Member requesting exclusion (if a partnership), he/she must attach written evidence of the TPP Class Member's grant of authority to him/her to execute the notice of exclusion on its behalf. In addition, for purposes of implementing the Class Agreement, including *inter alia* 1) the calculation of the amount of the TAP Refund (as described in the Class Agreement), 2) the SHP Group Reversion Amount, and 3) whether the termination contingency referenced in the Class Agreement has been met, each TPP Class Member requesting exclusion shall be required to set forth in the Exclusion Form the amounts paid for Lupron during the 2000 through 2001 time period.
Class Opt-Outs shall not be bound by the Class Agreement, the Settlement, or the Final Order and Judgment.

*See* Exhibit "H," at pp. 10-11.

26.     Plaintiffs filed their respective notices of exclusion on March 28, 2005 and May 23, 2005 (Amended Notice) for BCBS Alabama and on March 28, 2005 for BCBS Michigan, in compliance with the MDL 1430 Court's November 24, 2004 Order, reporting that they had paid approximately $16,270,574.88 and $34,561,273.73, respectively, for Lupron® for the period January 1, 2000 through December 31, 2001 – the two years for which Lupron® purchase data was required for the notice of exclusion. *See* letters to Claims Administrator seeking exclusion for BCBS Alabama and BCBS Michigan, attached as Exhibit "J."

27.     The MDL Court's final Order approving the settlement on May 12, 2005 explicitly ruled that BCBS Alabama and BCBS Michigan had properly opted-out of the national settlement.

The Order did not become final until August 26, 2005. *See* Orders dated May 12, 2005 and August 26, 2005, attached collectively as Exhibit "K."

28.     Plaintiffs have not been compensated for their losses – which are in the tens of millions of dollars before trebling – and, indeed, as per the Settlement and Release, TAP has received or will be receiving a financial credit from the settlement proceeds in the amount it was obligated to pay under the settlement related to Plaintiffs' claims:

> In the event that any TPP Class Members submit valid and timely requests to opt-out of the Lupron® Purchaser Class pursuant to this Class Agreement and do not thereafter participate in the SHP Agreement, TAP shall be entitled to a refund from the TPP Settlement Pool in an amount equal to the percentage of Lupron® Purchases made by such TPP Opt-Out(s) (calculated in the same manner as the SHPRCP, described in paragraph 2(ff) to this Class Agreement) multiplied by one hundred ten million dollars ($110,000,000) (the "TAP Refund").

*See* Exhibit "I," at ¶ 11 at p. 23.  It is believed and therefore averred that the proceeds of the credit TAP received to account for the claims of Plaintiffs herein exceeds $6 million.

29.     Thus, Plaintiffs commence this action to recover their respective portions of their uncompensated losses as a result of TAP's crime, and the fraudulent scheme and conspiracy detailed herein.  Since all other patients and insurance companies have been fairly compensated for their losses, Plaintiffs simply seek to recover for the overcharge payments they made for Lupron® on behalf of their insureds, an amount which exceeds greatly the more than $6 million credit Defendant TAP already has recovered to account for the claims asserted herein.

## PARTIES

30.    Plaintiff BCBS Alabama is a not-for-profit health care services corporation organized under the laws of the State of Alabama and licensed to do and doing business in the State of Alabama with its principal place of business at 450 Riverchase Parkway East, Birmingham, Alabama. Plaintiff BCBS Alabama and its wholly owned subsidiaries Preferred Care Services, Cahaba Benefit Administrators, and United Trust Insurance Company (collectively "BCBS Alabama") provide health care financing benefits, including prescription drug coverage, through a variety of arrangements, including health indemnity coverage, managed care coverage, and plan administration.  BCBS Alabama covers approximately 3.3 million Americans.

31.    During the period relevant to this Complaint, BCBS Alabama was and is a payer for Lupron® on behalf of its beneficiaries, subscribers and insureds.  For the period January 1, 2000 through December 31, 2001 - the exemplar period for the notice of exclusion filed in MDL 1430 – BCBS Alabama paid and administered approximately $16,270,574.88 for Lupron® prescribed to its beneficiaries, subscribers and insureds.

32.    During the period relevant to this Complaint, BCBS Alabama paid for Lupron® prescribed to its beneficiaries, subscribers and insureds based upon AWP.

33.    Plaintiff BCBS Michigan is a not-for-profit health care services corporation organized under the laws of the State of Michigan and licensed to do and doing business in the State of Michigan with its principal place of business at 600 LaFayette East, Detroit, Michigan.  Plaintiff BCBS Michigan and its wholly owned subsidiary Blue Care Network (collectively "BCBS Michigan") provide health care financing benefits, including prescription drug coverage, through a

14

variety of arrangements, including health indemnity coverage, managed care coverage, and plan administration. BCBS Michigan covers approximately 4.8 million Americans.

34.    During the period relevant to this Complaint, BCBS Michigan was and is a payer for Lupron® on behalf of its beneficiaries, subscribers and insureds. For the exemplar period January 1, 2000 through December 31, 2001, BCBS Michigan paid and administered approximately $34,561,273.73 for Lupron® prescribed to its beneficiaries, subscribers and insureds.

35.    During the period relevant to this Complaint BCBS Michigan paid for Lupron® prescribed to its beneficiaries, subscribers and insureds based upon AWP.

36.    Plaintiffs are independent licensees of the Blue Cross and Blue Shield Association. Each Plaintiff provides various types of coverage, including full coverage with no co-insurance, coverage that includes a co-payment by the patient and retiree employee benefit supplemental insurance/Medigap coverage for senior citizens receiving Medicare benefits.

37.    Defendant Abbott is a highly diversified health care corporation, the principal business of which is the discovery, development, manufacture, distribution and sale of a broad and diversified line of health care products and services. Abbott's business includes pharmaceuticals, nutritionals, hospital products, and diagnostics. Abbott's world headquarters is located in Abbott Park, Illinois. The company employs over 60,000 people and reported sales of over $19.6 billion for the fiscal year ending December 31, 2004.

38.    Defendant Takeda Pharmaceutical Company, Ltd. is the English name that Takeda Chemical Industries, Ltd. adopted in June 2004 and is a Japanese company with its principal place of business in Japan. Takeda Pharmaceutical Company, Ltd. and Takeda Chemical Industries, Ltd. are individually and collectively referred to herein as "Takeda."

15

39.     Takeda is and has been for years Japan's largest pharmaceutical company and is among the largest in the world.  Headquartered in Osaka, Japan, Takeda discovers, develops, manufactures, markets, distributes and sells a broad range of pharmaceutical products.  Takeda's net sales for Financial Year 2004 were $10.2 billion.

40.     Takeda Pharmaceuticals North America ("TPNA"), a wholly-owned subsidiary of Takeda, was created to take advantage of Takeda's growing, international presence.  TPNA's U.S. headquarters is in Lincolnshire, Illinois.

41.     Takeda also owns 100% of the voting stock of Defendant Takeda America Holdings, Inc. ("Takeda America"), it wholly-owned subsidiary or affiliate.  Takeda America is a New York corporation with its principal place of business in New York, New York.

42.     Defendant TAP was first formed as an equal partnership between Takeda and Abbott in 1977 and is now a joint venture which Abbott and Takeda America own equally, each parent company owning 50% of TAP's stock.  Takeda's officers, directors, and managers control and exercise Takeda America's rights and powers incident to Takeda America's stock ownership in TAP. TAP's United States headquarters is located at 675 North Field Drive, Lake Forest, Illinois 60045. Abbott and the Manufacturer Defendants, together with their subsidiary, TAP, develop, manufacture, distribute, market and sell pharmaceutical products for the United States and Canada.  One of these products is leuprolide acetate (for depot suspension), a synthetic analog of naturally occurring gonadotropin-releasing hormone (Gn RH or LH-RH).  The brand name for the drug is Lupron® or Lupron Depot® (a sustained release form of Lupron®) (collectively referred to herein as "Lupron®").

43.     According to Abbott's Form 10-K filed March 2, 2005, Lupron® is sold directly to physicians, retailers, wholesalers, health care facilities, and government agencies.  It is manufactured

16

by Takeda in Japan and, by agreement between the companies, it is distributed throughout the United States, including Alabama, from Abbott-owned distribution centers. TAP's primary marketing efforts are focused on securing the use of Lupron® by physicians.

44.    The Fictitious Defendants A-ZZZ, includes the Doctor Defendants, medical providers located throughout the State of Alabama . At all times material hereto, the Doctor Defendants were in the business of treating cancer patients who were plan beneficiaries of insurance plans offered by Plaintiffs. Each of these Doctor Defendants treated Plaintiffs' plan beneficiaries with Lupron® and thereafter sought and received reimbursement for the Lupron® from Plaintiffs.

45.    The sales of Lupron® were highly successful as a result of the fraudulent scheme and conspiracy alleged herein. In 1989, TAP lost approximately $25 million on Lupron®. In 1991, however, TAP made approximately $125 million, and by 1998, the total revenues from Lupron® sales through Medicare alone was $584 million consisting of approximately 80% paid by the federal government ($467 million) and 20% paid by insurers, like Plaintiffs, and patients ($117 million). TAP's total sales revenue in 1998 was $2.06 billion. Such exponential growth was made possible only by the scheme.

46.    The Defendants named in this Complaint include all of their predecessor entities and all of their past and present component, subsidiary and affiliate entities.

47.    The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

17

## JURISDICTION AND VENUE

48.    Plaintiffs bring this action pursuant to state common law and statutes.  No federal claim is asserted.

49.    This Court has subject matter jurisdiction pursuant to Ala. Code § 12-11-30 because this is an action for damages which exceeds $10,000, exclusive of interest, costs and attorneys' fees.

50.    No aspect of the claims asserted in this Complaint is brought pursuant to any federal law, including either the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA") or the Medicare Act, 42 U.S.C. § 1395, and thus no federal question is raised by any of the claims asserted.  To the extent any of Plaintiffs' claims or factual allegations herein may be construed to have stated any claim under federal law, such claim is expressly and undeniably disavowed and disclaimed by Plaintiffs.  Moreover, to the extent any of Plaintiffs' claims or factual allegations herein are urged by any Defendant to have stated any claim under federal law, Plaintiffs expressly disavow such claims or allegations and reserve the right to modify this Complaint to conform their claims and/or they authorize the court to do so by Order based upon this express disclaimer of any federal right or remedy.

51.    This Court has jurisdiction over the Manufacturer Defendants because they are corporations regulated under the laws of the State of Alabama and do sufficient business in, have sufficient minimum contacts with, or otherwise intentionally availed themselves of the markets of the State of Alabama through the promotion, marketing, sale and distribution of Lupron® and other drugs and products in Alabama.

52.    This Court has jurisdiction over the Wholesaler Defendants because they are corporations regulated under the laws of the State of Alabama and do sufficient business in, have

18

sufficient minimum contacts with, or otherwise intentionally availed themselves of the markets of the State of Alabama through the promotion, marketing, sale and distribution of Lupron® and other drugs and products from within and without Alabama.

53.    This Court has jurisdiction over the Doctor Defendants included within the Fictitious Defendants because they are all businesses located within, doing business in and regulated under the laws of the State of Alabama.

54.    Defendants have submitted to the jurisdiction of Alabama under AL. R. CIV. P. 4.2 through the transaction of business, commission of tortious acts, and other conduct as more particularly described herein

55.    Venue is proper in this Court since Plaintiffs paid for Lupron® prescribed by doctors and hospitals located in this County and a substantial part of the events of omissions giving rise to these claims occurred in this County, Ala. Code § 6-3-7(a), one or more of the Defendants are located in this County, *see* Ala. Code § 6-3-6, and otherwise engaged in the transactions which form the basis of this action in this County, and because both Plaintiffs agree to this venue. Venue is further proper in this Court  because Plaintiffs assert rights to relief arising out of the same transaction or occurrence, the existence of a substantial number of questions of law or material fact common to both Plaintiffs will arise in the action, such questions will predominate over individualized questions pertaining to each Plaintiff, the action can be maintained more efficiently and economically for all parties than if prosecuted separately, and the interest of justice supports the joinder of the parties as plaintiffs in one action.  Venue is also proper pursuant to Ala. R. Civ. P. 82(c).

## FACTUAL ALLEGATIONS

56.    There are hundreds of thousands of men in the United States who have prostate cancer. The hormone, testosterone, naturally produced by men, promotes the growth and spread of prostate cancer. One method of treatment of prostate cancer has been the suppression or elimination of testosterone in men suffering from that disease. Testosterone in a man suffering from prostate cancer can be eliminated through the surgical removal of the testicles by a procedure called an orchiectomy. Alternatively, a man's production of testosterone can be suppressed through the administration of a drug that acts to suppress testosterone production, such as Lupron® or Zoladex® (a direct competitor of Lupron®).

57.    In the 1980s, Defendants Abbott, Takeda and TAP began marketing Lupron® as a treatment for prostate cancer. In marketing Lupron®, these Defendants employed and maintained extensive marketing and sales departments. Since at least the early 1990's, these Defendants primarily sold and provided Lupron® to medical providers across the country.

58.    Lupron® and Lupron Depot® are used principally for the palliative treatment of advanced prostate cancer in men, the treatment of endometriosis, infertility and anemia caused by uterine fibroids in women, and the treatment of central precocious puberty in children.

59.    Lupron® is administered to patients in liquid form by intramuscular injection, typically in the buttocks or arm, by a physician or a nurse under the supervision of a physician. At various times in the 1990s, and continuing to the present, Lupron® was available in daily, one-month, three-month and four-month doses. It is typical that a patient whose prostate cancer is being treated with Lupron® would receive regular injections of Lupron® for the remainder of his life.

## THE MEDICARE INSURANCE PROGRAM'S USE OF AWP AS A BENCHMARK [AND PLAINTIFFS' MEDIGAP COVERAGE IN CONNECTION THEREWITH]

60.    In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

61.    The U.S. Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the funding, administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of HHS and is directly responsible for the administration of the Medicare Program, among others. Formerly HCFA and currently CMS, in discharging those responsibilities, contracted with private insurance companies, known as intermediaries and carriers, to receive, review, and pay appropriate claims for reimbursement for the provision of care to Medicare beneficiaries.

62.    The Medicare Program, as a general matter, did not cover the cost of prescription pharmaceuticals which a Medicare beneficiary obtained pursuant to a prescription and thereafter self-administered (e.g., by swallowing the drug in liquid or pill form). However, Medicare Part B did and does cover some drugs, including injectables administered by a medical provider. Since Lupron® is an injectable drug, it is covered under Medicare Part B.

63.    In determining the amount it would pay, Medicare calculated the "allowed" amount for the drug based upon the payment methodology set forth in 42 C.F.R. §405.517, which regulation was published in the Federal Register on November 25, 1991 and became effective on or about January 1, 1992.

21

64.     Prior to January 1, 1998, the Medicare Part B allowed amount for injections of Lupron® was on the basis of the lower of the "estimated acquisition cost" ("EAC") or the national "average wholesale price" ("AWP") for the drug. The EAC for a drug was to be determined based on surveys of the actual invoice prices paid for the drug, taking into consideration "factors such as inventory, waste and spoilage." The AWP was reported in *The Red Book* and other pricing publications and databases used by the pharmaceutical industry. Historically, it has been the AWP that has been used as a basis for Medicare reimbursement for prescription drugs.

65.     Upon information and belief, all of the Defendants, along with other pharmaceutical drug companies, physicians and physician groups actively sought to prevent HCFA from collecting surveys of actual invoice prices paid for drugs from which EACs were to be calculated, which resulted in default to the use of the AWP.

66.     On January 1, 1998, Medicare Part B was changed to provide that the allowed amount would be based upon the lower of the actual charge on the Medicare claim for benefits or 95 percent of the AWP for the drug.

67.     Effective January 1, 2004 through December 31, 2004, the Medicare allowed amount was changed from 95 percent of the AWP for the drug to the lesser of the actual charge on the claim for program benefits or 85 percent of the AWP determined as of April 1, 2003.

68.     On January 1, 2005, the Medicare allowed amount calculation for certain Part B drugs, including Lupron®, changed and became based upon the average selling price ("ASP") plus 6 percent.

69.     Medicare Part B has reimbursed medical providers, like the Doctor Defendants, at 80% of the allowable amount for prescription drugs, regardless of the manner for calculating the

22

allowable amount. The remaining 20% was paid by the Medicare beneficiary and/or his/her Medigap carrier, like the Plaintiffs, and is called the "co-payment" amount. Accordingly, respecting all Medicare beneficiaries for which Plaintiffs provided Medigap coverage, Plaintiffs paid some or all of the inflated co-payment amount for Lupron®.

70.     The Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry publications, such as the *Red Book*, *Blue Book*, or *Medispan*, as the basis for reimbursement. Historically, Medicare used the AWP published in *Red Book*.

71.     The *Red Book* published AWPs for the various dose forms of Lupron®, as well as the competitor drug Zoladex® and many other drugs. In periodically announcing the AWP for Lupron®, the *Red Book* simply published the prices that were supplied by the Manufacturer Defendants. These Defendants knew that they could and did directly control and raise the AWP for Lupron® at any time by simply forwarding to the *Red Book*, a new and higher AWP.

72.     On May 23, 1999, *The Chicago Tribune* reported that a spokesman for the publisher of the *Red Book*, Medical Economics Co., stated that the AWP for Lupron® that appears in the *Red Book* is supplied by TAP. In fact, in a June 1996 Dow Jones News Article, it was reported that Phil Southerd, an associate product manager of the *Red Book*, stated that the *Red Book* merely publishes prices that are faxed right from the manufacturer.

73.     There are significant discrepancies between the AWP set by the Manufacturer Defendants for Lupron® in the *Red Book* for reimbursement under Medicare and the prices charged for Lupron® by the Manufacturer Defendants to physicians, like the Doctor Defendants. The AWP for Lupron® set by the Manufacturer Defendants is neither an "average" nor "wholesale."

23

74.     Therefore, since Medicare calculated the allowable using the AWP for Lupron, 80% of which allowable Medicare paid, Plaintiffs paid up to 20% of the remainder of the allowable for all Medicare beneficiaries for which Plaintiffs provided Medigap coverage, based upon the AWP for Lupron®.

75.     Thus, Defendants' conspiracy to artificially inflate the AWP for Lupron® above the actual average wholesale price directly caused Plaintiffs to substantially overpay for the Lupron® received by patients for whom Plaintiffs provided Medigap coverage.

### PLAINTIFFS' OTHER PRIVATE ASSISTANCE PROGRAMS' UTILIZATION OF AWP AS A BENCHMARK

76.     In addition to their Medigap programs, respecting which Plaintiffs are obligated to pay based upon AWP since Medicare sets the allowable based upon AWP, Plaintiffs also used AWP as an industry standard benchmark to determine the amount of reimbursement respecting other programs administered by Plaintiffs under which they provided coverage to patients throughout Alabama and elsewhere.

77.     Plaintiffs reasonably relied upon the fact that the government chose AWP as a benchmark for reimbursement of Medicare Part B drugs in relying upon AWP as a benchmark for Plaintiffs' reimbursement of Lupron® and other drugs under their insurance programs.

78.     Thus, respecting non-Medicare insureds of Plaintiffs who were prescribed Lupron®, such as men under the age of sixty-five with prostate cancer, women with endometriosis, fertility problems and anemia caused by uterine fibroids and children with precocious puberty, Plaintiffs similarly overpaid for Lupron® based upon its inflated AWP.

24

79.     Therefore, the Manufacturer Defendants' fraudulent scheme and conspiracy to artificially inflate the AWP for Lupron® above the actual wholesale price, to sell it to medical providers, like the Doctor Defendants, at substantially lower cost and to market that spread as a financial incentive to medical providers directly caused Plaintiffs to overpay substantially respecting Lupron® received by their non-Medicare insureds.  When the medical providers, like the Doctor Defendants billed Plaintiffs at the AWP for Lupron®, and Plaintiffs paid the inflated AWP, the fraud was complete and Plaintiffs' damage therefrom was realized.

## DEFENDANTS' FRAUDULENT CONDUCT

### ARTIFICIALLY INFLATING THE AVERAGE WHOLESALE PRICE

80.     From at least 1991, through at least January 2005, the Manufacturer Defendants deliberately and intentionally charged medical providers across the United States, including those in Alabama, like the Doctor Defendants, prices for Lupron® substantially less than the AWP that Manufacturer Defendants had reported to *Red Book* for government and private assistance reimbursement. In conjunction therewith, the Manufacturer Defendants also told medical providers, including the Doctor Defendants, to bill government and private assistance programs, including Plaintiffs, at or above the AWP then published in the *Red Book* and related publications.  The Manufacturer Defendants knew and understood that government assistance programs and private insurers, like Plaintiffs, relied upon the AWP published in *Red Book* and other publications and would reimburse doctors based upon that AWP, if the doctor billed at or above the AWP.

81.     By controlling both the cost to the medical provider for Lupron® and the amount which the provider would receive in AWP-based reimbursements, the Manufacturer Defendants were

25

able to control the spread or the profit to the medical providers, like Doctor Defendants, which Defendants dubbed "Return-to Practice" or "RTP."

82.     This profit potential was created and marketed by the Manufacturer Defendants to influence medical providers' decisions to select Lupron® over other similar drugs, like Zoladex®, and other treatments and thereby increase the Manufacturer Defendants' market share and revenues from increased sales and sales at higher prices.

83.     To further incentivize medical providers to prescribe Lupron® – either to encourage them to switch to Lupron® from a competitor drug or to prevent them from switching to a competitor drug – the Manufacturer Defendants, periodically throughout the relevant time period, increased the RTP for medical providers by offering deeper discounts off of AWP to the medical providers and/or by increasing the AWP for Lupron®, as reported in *Red Book*. The Doctor-Defendant named herein received such deeper discounts.

84.     The profit to these medical providers, as well as the increased market share and resultant profits to the Manufacturer Defendants, were funded by government assistance programs, like Medicare, private assistance programs, like Plaintiffs, and patients, through their payments of the inflated AWP for Lupron®, resulting from Defendants' overall fraudulent scheme and conspiracy.

85.     According to Criminal Informations filed against several doctors and internal company documents, the Manufacturer Defendants referred to this inflated profit, and the corresponding inducement to the physicians, as their "Return to Practice" program, among other names. The Manufacturer Defendants referred to the profit that the doctor could obtain by prescribing Lupron® and billing the government and private insurers and patients at the published AWP as money going to the doctor from "[Defendants'] Checkbook." These Defendants knew and

26

understood that, because the government and private assistance programs relied upon the *Red Book* to establish AWPs, and because Defendants could precisely control the AWP as published in the *Red Book*, they could increase the AWP whenever they so desired to create greater profit for their physician-customers, like the Doctor Defendants, from the payments by insurers like Plaintiffs. Accordingly, the Manufacturer Defendants could control the amount of the financial incentive, or "Return to Practice," that a physician would receive by prescribing Lupron® to their patients and billing insurers and patients at the AWP established by Defendants. *See, e.g.,* Information of *United States of America v. Spinella* (D. Mass.) at Exhibit "E," at ¶ 15.

86.    For example, the Criminal Information against Dr. Spinella states that, on or about August 24, 1995, in an attempt to get Dr. Spinella to reverse his decision to prescribe Zoladex®, rather than Lupron®, an employee of the Manufacturer Defendants left at his office a document created by the Manufacturer Defendants demonstrating to the doctor the amount of profit that he could earn through Defendants' "Return to Practice" program from the prescription of Lupron®. Specifically, the document showed that Dr. Spinella could earn as much as $7,000 per year more by using Lupron® instead of Zoladex®. *Id.* at ¶ 22.

87.    The increase of $7,000 per year was based on the "spread" between Dr. Spinella's actual costs and the artificially inflated AWP set by the Manufacturer Defendants for Lupron®, as compared to the spread between the doctor's cost for Zoladex® and the AWP for Zoladex®.

88.    The Manufacturer Defendants' marketing and sales documents, which were prepared and disseminated to their employees and agents, calculated the spread for Lupron® as the amount between the AWP and various discount levels off the already discounted List Price which were being offered to Defendants' customer-doctors. For example, in 1996, the Manufacturer Defendants

27

prepared marketing materials for medical providers showing how they could make money by purchasing Lupron® from Defendants. As their marketing and sales materials indicated, in 1996, the AWP for Lupron® as reported for Medicare reimbursement was $515.63. However, in 1996, the actual price paid by the medical providers, including the Doctor Defendants, to the Manufacturer Defendants for Lupron® ranged from a high of only $412.50 to a low of $350.81, if volume discounts were achieved.

89.    The AWP's reported by TAP to the *Red Book* for monthly injections of Lupron® 7.5 mg were as follows:

|      | AVERAGE WHOLESALE PRICE |
| --- | --- |
| 1992 | $418.75 - $437.50 |
| 1993 | $451.25 |
| 1994 | $463.75 |
| 1995 | $477.50 - $496.25 |
| 1996 | $496.25 - $515.63 |
| 1997 | $515.63 - $540.63 |
| 1998 | $566.88 - $594.65 |
| 1999 | $596.65 - $623.79 |
| 2000 | $623.79 |

90.    Other documents created and disseminated by the Manufacturer Defendants compared the AWPs and the actual "costs" for Lupron® and Zoladex® so that medical providers, like the Doctor Defendants, could easily see the different "Return-to-Practice" amounts available for different levels of purchases and so they could see that Lupron® was more profitable.

28

91.     The Manufacturer Defendants used the artificially inflated AWP as a means of marketing Lupron®.  Specifically, when employees of the Manufacturer Defendants talked to providers about their choice of using Lupron®, rather than Defendants' competitor medication, Zoladex®, these Defendants emphasized that, because the AWP for Lupron® was high, the monetary return to the providers was better if they used Lupron®. Internal documents from the Manufacturer Defendants specifically show that they used the spread to create greater demand for Lupron®. One such internal document stated:

> As we have also discussed, Northwest Iowa Urology is very upset about the allowable not going up. I personally met with the doctors to discuss the issue 4/17. The physicians have started using Zoladex but would stop if the allowable issue was taken care of.

92.     During the period covered by this Complaint, the published AWP for Lupron®, and thus the resultant allowable, continued to increase each year. The price paid by the doctors continued to decrease. The published AWP went from $437.57 in 1992 to $623.79 in 2001 (for a one-month equivalent dosage).  During this same time period, the actual cost of the drug to the provider decreased substantially.  In 1993, the actual average sales price to physicians, like the Doctor Defendants, was $340.00.  In 1999, the actual average sales price was only $207.00.  The Manufacturer and Doctor Defendants consistently misrepresented to Plaintiffs that the actual average wholesale price for Lupron® was increasing, while in practice, the Manufacturer Defendants consistently and significantly reduced the price to the providers like the Doctor Defendants for the drug.  But all Defendants took steps to fraudulently conceal these facts from Plaintiffs, the government and the public.

93.    The scheme achieved its goal for Defendants. In 1991, total Medicare payments for Lupron® were $72 million. By 1998, Medicare paid almost $458 million for Lupron®.

94.    The benefit of Defendants' illegal marketing and sales scheme is shown in increased market share and sales of Lupron®. In 2000, Lupron® sales were nearly $800 million as compared to $584 million in 1998. Most of the revenue obtained from Lupron® was from reimbursement from government and private assistance programs, like Plaintiffs.

### USE OF FREE SAMPLES

95.    The Manufacturer Defendants, through their employees and agents, also provided free samples of Lupron® to medical providers, like the Doctor Defendants, and others, like the Wholesaler Defendants. In some years, sales representatives of TAP were provided with free samples for distribution worth approximately $40,000. These free samples were used to offset the total cost associated with Lupron® purchases, thereby increasing the spread. Moreover, the Manufacturer Defendants specifically told medical providers, like the Doctor Defendants, that they could and should bill government and private assistance programs for the free samples. Thus, the Manufacturer Defendants were aware that medical providers were billing government and private assistance programs for the free samples.

96.    One of the Manufacturer Defendants' sales representatives called on Dr. Joseph Spinella in 1995 and reported to a District Manager employed by Defendants in Massachusetts. That District Manager supervised a number of the Manufacturer Defendants' sales representatives who called upon urologists in Connecticut, Massachusetts, Maine and Rhode Island. From time to time, beginning in or about 1995, that Massachusetts District Manager informed Defendants' sales representatives that free doses of Lupron® could be offered to physicians to induce them to prescribe

30

Lupron® to their patients and to keep them from switching patients to Zoladex®. Defendants' sales representatives, supervised by that same District Manager, sent to the District Manager so-called Weekly Activity Reports and sales call notes, or portions thereof, which contained requests by physicians for samples, and the offer and delivery of samples to physicians to keep and to maintain their Lupron® business. *Id.*

97.     The Criminal Information against Dr. Olstein specifically alleges "the core objective of this conspiracy for all participants was to obtain money from the **patient's health care insurers** through the prescription of Lupron®. It was the objective of [TAP] in this conspiracy to provide free doses or samples of Lupron Depot®, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot®." *See* Information of *United States of America v. Olstein* (D. Mass.) at Exhibit "E," at ¶ 10 (emphasis added).

98.     Upon information and belief, this free sample fraud aspect of the conspiracy was not limited to New England, but, was part of the nationwide conspiracy that included Alabama.

## OTHER FINANCIAL INDUCEMENTS

99.     The Manufacturer Defendants also have provided and/or arranged for many other financial inducements to stimulate sales of Lupron® at the expense of Plaintiffs. Such inducements included, but were not limited to, kickbacks which consisted of free Lupron®, trips to resorts, free consulting services to doctors and other customers, and debt forgiveness, among other things.

100.    These other financial inducements were used in conjunction with the promotion of the spread on Lupron® to persuade doctors to prescribe Lupron® over other drugs and other treatments in order to increase the Manufacturer Defendants' market share, and ultimately, their profits.

31

101.    Upon information and belief, this aspect of the fraudulent scheme and conspiracy also was perpetrated on a nationwide scale, which included Alabama.

## THE "DIVERSIONARY BLACK MARKET" FOR LUPRON

102.    The Manufacturer Defendants also set up a network to handle the flow of "black market" Lupron. This was done as a stopgap effort to prevent declining sales that would have resulted from the federal government's efforts to rein in the high cost of Lupron® in Alabama and other States. All the Defendants named herein participated in this scheme to further defraud Lupron purchasers, like Plaintiffs.

103.    In around 1998, the federal government began adopting a reimbursement protocol under Medicare known as the "Least Costly Alternative" [or "LCA"] method for determining reimbursement. LCA was first adopted in South Carolina and Florida, but quickly spread to other States, like Alabama. Pursuant to LCA, Medicare carriers would only reimburse the "least costly" of "alternative" medications. In the case of Lupron, the "least costly" alternative medication was Zoladex. Historically, the AWP for Zoladex was at least $100 less than the AWP for Lupron. Consequently, under LCA, since Lupron and Zoladex were therapeutically equivalent drugs, Medicare would only pay for Zoladex in LCA States. In most States, patients were "grandfathered" for their existing therapies such that doctors could continue prescribing Lupron to existing patients and seeking reimbursement at the Lupron AWP.

104.    As soon as LCA began being implemented in southern states, doctors starting switching [or threatening to switch] to Zoladex to preserve and/or increase their Return to Practice. TAP, responded to the threat by providing massive amounts of free Lupron to doctors in LCA states, knowing and expecting that the doctors would bill unlawfully for the free Lupron. TAP also

32

provided even deeper discounts to doctors in LCA states, by actively working with doctors to set up buying groups which could achieve the highest contract discounts TAP was offering. Lastly, TAP allowed doctors in LCA states to buy excess Lupron and to re-sell it through a diversion network that TAP orchestrated and approved of via the Wholesaler Defendants.

105.    It is unlawful for doctors to "wholesale" and re-sell prescription drugs without a license.  Nevertheless, doctors throughout Alabama and the country bought massive amounts of excess Lupron and re-sold the same to the Wholesaler-Defendants through former TAP employees and others.  It is believe and therefore averred that the Doctor Defendants named herein participated in the diversion black market described herein by buying excess Lupron from TAP and re-selling through the Wholesaler Defendants and others.

106.    This diversion black market was set up through direct meetings and communications between the Manufacturer Defendants and the Wholesaler Defendants.

107.    The Manufacturer Defendants benefitted from the diversion black market because it allowed them to overcome the potentially devastating effects of LCA by having them provide excess Lupron as a means to provide further profits to doctors who might otherwise switch to Zoladex because of the greater RTP potential in the wake of LCA. The Manufacturer Defendants policed and controlled the diversion conduct in an effort to channel the diverted Lupron to the Wholesaler Defendants. The Manufacturer Defendants instituted lawsuits throughout the country against doctors and wholesalers who were not part of their approved network.   However, as evidence of the conspiracy alleged herein, the Manufacturer Defendants never sought to sue or otherwise act to stop either the Wholesaler Defendants or any of the Doctor Defendants named herein from engaged in the re-sale of diverted Lupron.

108.    It is believed and therefore averred that the Doctor Defendants benefitted from the diversion black market by being able to re-sell Lupron for substantial profit.

109.    It is believed and therefore averred that the Wholesaler Defendants benefitted from the diversion black market by being able to purchase Lupron at substantial discounts, far below the "wholesale acquisition cost" TAP would otherwise sell the Lupron to them for, and then re-selling the Lupron at higher prices for substantial profit.

110.    Plaintiffs were harmed by this aspect of the fraudulent scheme and conspiracy because, *inter alia*, the diversion black market kept doctors in Alabama and other LCA States buying Lupron and seeking reimbursement at the inflated Lupron AWP [via the grandfather provision of LCA], as opposed to switching to the lower priced and lower reimbursed Zoladex. Had doctors in LCA States switched to Zoladex, as would be expected a as result of LCA, Plaintiffs would have saved at least $100 per injection of Zoladex as opposed to Lupron.

## DEFENDANTS' CONSPIRACY AND CONCEALMENT

111.    In order to prevent the discovery of their unlawful marketing, sales and diversion practices, the Defendants conspired and agreed among themselves and with others [ie other doctors who were reaping the benefits of such fraudulent marketing tactics, and other pharmaceutical companies who were employing similar marketing tactics] to prevent the government, private insurance programs, like Plaintiffs, and patients from discovering their scheme so that they could maintain their profits from Lupron.

112.    While the medical providers, like the Doctor Defendants, were a necessary component of Defendants' scheme, they did not control the setting of the AWP or certain other aspects of the scheme. For example, in April 2001, Dr. Joel Olstein, a Lewiston, Maine urologist,

34

was charged with conspiring with TAP to bill insurance companies for free samples of Lupron®. In a telephone interview with Dr. Olstein, conducted by Chicago Tribune reporter Bruce Japsen on April 11, 2001, Dr. Olstein said that he planned to plead guilty in exchange for his cooperation in the investigation. He explained, "my plea is a conspiracy with TAP.... Did they tell me what to do? On some level there was some understanding.... For every new patient I started on Lupron®, they provided me a free dose of the drug." He added, "they wanted me to carefully track how many new patients I started on Lupron® and we kept lists. Anybody in practice knows how to bill for free samples."

113.    TAP, in its training materials for its sales representatives, instructed its representatives to warn physician customers not to discuss the discounts off of AWP and contract pricing with other doctors because doing so could potentially put their profits in jeopardy.

> Doctor, by discussing your costs of Lupron with other physicians, you run the risk of that information getting back to HCFA. If HCFA then realizes that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amount you may charge.

TAP realized the importance of concealing its fraudulent marketing scheme, expressly recognizing that "[i]f word is leaked back to HCFA/Medicare that the cost of Lupron is going down, they very well may take steps in reducing [the] allowable." *See* excerpt from "Big Mac Attack," attached hereto as Exhibit "L."

114.    Additionally, Defendants conspired with other pharmaceutical companies to conceal the fraudulent marketing tactics being employed. As noted by the federal government in its Sentencing Memorandum of the United States, filed in *United States of America v. TAP*

35

*Pharmaceutical Products, Inc.*, No. 01-CR-10354-WGY (D. Mass.), TAP concealed both its

fraudulent marketing and that of its competitor.

> [I]n 1995, TAP, in a moment of delicious irony, accused its competitor, the manufacturer of Zoladex, with providing inducements to physicians in violation of the Medicare fraud and abuse laws, to include the fact that employees of the competitor were giving free samples to doctors to encourage them to switch from Lupron to Zoladex. The competitor, in turn, accused TAP of the very same conduct. Top employees from the two companies met in a summit meeting to discuss this exchange of criminal allegations. Did the serious allegations curb TAP's conduct? Did TAP, aware of allegations that its employees had engaged in criminal conduct, undertake expeditiously to stop the behavior, to train its employees in the rules and to enforce their adherence to the rules? Did either company, in possession of information that a competitor was violating the rules, report the conduct to prosecutive authorities in an effort to clean up the industry? Unfortunately, the answer to all of these questions is no: TAP, cognizant of the rules and having been accused of violations, simply carried on its business as it always had, full criminal speed ahead.

*See* Sentencing Memorandum of the United States, attached as Exhibit "M," at pp. 62-63.

115.    Defendants conspired and agreed to accomplish the fraudulent scheme set forth herein

in order to increase the sales of and profitability from Lupron®, and committed acts in furtherance

of this conspiracy which are outlined in this Complaint.

116.    Defendants actively concealed their conduct, thereby precluding Plaintiffs from

uncovering Defendants' wrongdoing sooner.

117.    In furtherance of this scheme to defraud government and private assistance programs,

like Plaintiffs, Defendants created a centralized national marketing and sales plan which was

implemented through their employees and agents throughout the country, including those in

Alabama, in the following manner, among others:

36

a.     Setting actual prices at which Lupron® was sold;

b.     Setting the AWP in the *Red Book* and other similar publications which was materially greater than the actual price to physicians for Lupron®;

c.     Contacting the *Red Book* and other industry publications for the purpose of setting and controlling the listed AWP;

d.     Sending information to or otherwise contacting medical providers about both the *Red Book* quoted AWP and the actual cost to the providers for Lupron®;

e.     Creating and disseminating marketing and sales materials that showed the spread between the actual cost to the provider and the reported AWP for Lupron®;

f.     Creating and disseminating marketing and sales materials that demonstrated the spread or profit to the provider from prescribing Lupron® as compared to the profit from other competitor drugs and treatments;

g.     Creating and disseminating marketing and sales materials for medical providers discussing how the use of free samples could increase their profits;

h.     Creating and disseminating marketing and sales materials for medical providers discussing other financial inducements available from Defendants in connection with the providers choosing to prescribe Lupron®;

i.     Inducing Plaintiffs to pay inflated co-payments for Lupron® based upon the inflated AWP;

j.     Engaging in the diversionary black market form Lupron;

37

k.     Receiving the proceeds and benefits of their fraudulent scheme in the form of increased market share and resultant profits; and

l.     Distributing portions of the proceeds and benefits of their fraudulent scheme to medical providers in the form of free samples, deep discounts off of the AWP for Lupron® and other financial inducements.

118.    Defendants concealed their fraudulent conduct from the Plaintiffs by controlling the process by which the AWP was set and the actual reported AWPs. Defendants also prevented Plaintiffs from knowing what the actual costs were for Lupron® to the providers which Plaintiffs were reimbursing, and they failed to inform Plaintiffs of the usage of free samples and of their providing other financial incentives to medical providers to induce them to use Lupron® rather than other less costly, but equally viable treatments. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing.

119.    Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, they did not receive inquiry notice or learn of the factual basis for their claims in this Complaint or their injuries suffered therefrom until TAP's guilty plea and until the cases of which Plaintiffs formerly were class members were filed. And by the tolling principles applicable in class action cases of which Plaintiffs were a part [before opting out], the statutes of limitations that apply to the claims asserted herein have been tolled such that these claims are timely asserted by Plaintiffs.

## INDICTMENTS AND GUILTY PLEAS

### INDICTMENT AND GUILTY PLEA OF TAP AND RELATED AGREEMENTS REACHED WITH THE GOVERNMENT BY ABBOTT AND TAKEDA

120.    As noted above in late September, 2001, TAP agreed to plead guilty to a Criminal

Information charging it with a conspiracy to violate the PDMA. *See* Plea Agreement, with attached

Criminal Information, attached hereto as Exhibit "A." The Information to which TAP pled guilty

provides, *inter alia*, as follows:

> 5.    At all times material to this Information, it was a crime, in violation of Title 21, United States Code, Sections 331(t) and 333 (b) for an employee of a company engaged in the lawful distribution of drugs to provide a drug sample free of charge to a physician, with the intention and expectation that the physician would use that sample in the treatment of a patient and thereafter seek and receive reimbursement for that drug sample which had been provided to the physician free of charge.

> 6.    Beginning in or about 1991 and continuing to in or about 1998, the defendant TAP, through its employees, provided to certain physicians thousands of free samples of the drug Lupron®, knowing and expecting that those physicians would prescribe and administer those drug samples to their patients and thereafter seek and receive reimbursement for those free samples.

*See* Exhibit "A," at Information at ¶¶ 5-6.

121.    This Plea Agreement provides that TAP agreed to plead guilty to the crime charged

in the Information, and that TAP "expressly and unequivocally admit[ted] that it knowingly,

intentionally and willfully committed the crime charged...." *Id.* at Plea Agreement at ¶1. The

government agreed to decline further prosecution of TAP and its parent companies, Abbott and

Takeda, in consideration for the guilty plea. *Id.* at ¶ 4.

122.    The Judgment entered in the criminal case against TAP expressly prohibits TAP, as well as Abbott and Takeda, as shareholders of TAP, from disparaging TAP's guilty plea. *See* Judgment at Exhibit "N." Specifically, under "Continuation of Conditions of Probation," the Judgment provides: "[n]either the defendant corporation nor the principal shareholders are to disparage the sentence of this Court." *Id.* at 3 (emphasis added)

123.    The Plea Agreement also states that Abbott and Takeda entered into "Side Letter Agreements" with the government regarding their own liability for the charged conspiracy. *See* Plea Agreement, at Exhibit "A," at ¶¶ 4, 10. These Side Agreements evidence that Abbott and Takeda were subject to the federal criminal investigation and were parties to the guilty plea and settlement. *See* Side Letter Agreements of Abbott and Takeda at Exhibits "B" and "C." Indeed, Abbott's and Takeda's consent to the guilty plea was clearly required because TAP's Board of Directors was comprised of an equal number of executives from both Abbott and Takeda. This consent was codified in a formal consent executed by the Board of Directors. *See* Action taken by Unanimous Consent of the Directors of TAP Pharmaceutical Products, Inc., dated September 13, 2001, at Exhibit "O."

124.    Moreover, in exchange for cooperation from Abbott and Takeda in the ongoing investigation and any criminal trial, the government agreed not to prosecute Abbott and Takeda. *See* Exhibits "B" and "C," at ¶ b. The language was identical in each Side Letter Agreement. Abbott's Side Letter Agreement reads as follows:

> The United States hereby declines prosecution of Abbott Laboratories for the following:

*   *   *

40

(3)     **for conduct by, or attributable to, Abbott** not
otherwise described in this paragraph which was
known to the U.S. Attorney in Massachusetts or
Connecticut prior to the date of execution of this letter
and which concerned the sale, pricing and marketing
of the drug Lupron® in all of its dose forms....

\*   \*   \*

It is understood among the parties to this Side Letter
Agreement that the United State's promise not to
prosecute Abbott is dependent upon and subject to
TAP fulfilling its obligations in the Settlement
Agreement and in the TAP plea agreement.

*See* Exhibit "B," at ¶ a (emphasis supplied).

125.    The Plea Agreement also provided that the government would be relieved of its

promise not to prosecute Abbott or Takeda if TAP breached any material provision of the Plea

Agreement. *See* Exhibit "A," at Plea Agreement, at ¶ 4. These documents clearly establish the direct

roles that Abbott and Takeda played in the resolution of the criminal charges against both them and

TAP, and their intimate involvement in the federal criminal investigation and proceedings.

126.    The Plea Agreement also indicates that "[c]ontemporaneous with the execution of this

agreement, TAP shall enter into a Corporate Integrity Agreement...." *See id.*, at Plea Agreement, at

¶ 2. This Corporate Integrity Agreement ("CIA") was executed by TAP on September 28, 2001 and

provides, *inter alia*, that by January 31, 2002, TAP was required to implement a "Code of Conduct"

and "Policies and Procedures" regarding, among other things, "the calculation and reporting of

accurate prices for Government Reimbursed Products [including Lupron®] to certain entities,

including the Centers for Medicare & Medicaid Services ("CMS"), the State Medicaid Programs,

and drug price reporting services on which the government agencies rely (*e.g.*, First Data Bank Inc.,

41

the *Red Book*, etc.)." *See* CIA, ¶ 2, attached hereto as Exhibit "P." These new "Policies and Procedures," mandating that Defendants report accurate prices going forward, demonstrate the inaccuracy of the prices previously reported by Defendants, as alleged herein.

127.   The "Policies and Procedures" also required "the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 353 ...." *See* CIA, at Exhibit "P," at Section III B,¶1, ¶ 2d. These new "Policies and Procedures," mandating that TAP properly track drug samples going forward, demonstrate the insufficiency and inaccuracy of TAP's drug sample tracking policies and procedures in the past, as alleged herein.

128.   On December 6, 2001, the criminal court entered judgment on TAP's guilty plea, and placed TAP on probation for five years. *See* Judgment at Exhibit "N." Consistent with TAP's plea, the Judgment held that TAP pled guilty to a one-count criminal offense – conspiracy under 18 U.S.C. § 371 to violate the PDMA [21 U.S.C. §§ 331(t) and 333(b)] by causing the sale of drug samples. *Id.* at Exhibit "N"; *see also* Plea Agreement, at Exhibit "A," ¶ 1 (wherein TAP waived indictment and pled guilty to the Information charging TAP with conspiracy to violate the PDMA).

129.   Specifically, TAP agreed to plead guilty to a conspiracy in violation of the PDMA and ultimately to pay in excess of $900 million. These Defendants agreed that the fraudulent pricing and marketing of Lupron® took place during the period 1991 through 1998.

130.   The fines paid consisted of a $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to be paid to the fifty (50) states and the District of Columbia, plus interest.

42

131.    Indeed, in a related Lupron® case, *Walker v. TAP Pharmaceutical Products, Inc.*, C.A. No. CPM-L-682-01 (Super. Ct., Law Div., Cape May Co., NJ), in response to allegations in that Complaint regarding TAP's plea, TAP admitted as follows:

> [O]n or before October 3, 2001, TAP Pharmaceutical Products Inc., agreed to plead guilty to a one-count Information for conspiracy to violate the PDMA and to pay a $290 million criminal fine. TAP further admits that representatives of the United States Department of Justice have stated that the $290 million paid by TAP is the largest criminal fine in a U.S. health care fraud prosecution. TAP further admits that it entered into a civil settlement agreement with the United States in which it paid approximately $559.5 million to the United States. TAP admits that it entered into a civil settlement agreement with the fifty states and the District of Columbia in which it agreed to pay approximately $25.5 million. TAP further admits that it agreed to pay the government interest on the civil settlement amount commencing on September 4, 2001, and that the amounts it has paid to the federal and state governments total approximately $884 million.

*See* TAP's Answer in *Walker*, ¶ 8, at Exhibit "Q."

132.    The financials of Abbott and Takeda reveal that they actually set aside reserves and ultimately paid the fine for TAP's guilty plea. *See* excerpts from various financial reports of Abbott and Takeda, attached hereto as Exhibits "R" and "S," respectively.

133.    In exchange for Defendants' agreement to settle the government's claims, the government agreed not to further prosecute TAP or to exclude TAP from participating in Medicare and other government assistance programs.

134.    In addition to the fines, and as a further condition of the settlement, Defendants Abbott, Takeda and TAP agreed to report the true price of Lupron® to the government and to allow regular auditing of their sales and marketing practices.

I

43

### NDICTMENTS AND GUILTY PLEAS OF DOCTORS

135.    The following medical providers have all pleaded guilty to participation in the conspiracy to which TAP pled guilty:

    a.    Dr. Joseph S. Olstein of Lewiston, Maine;

    b.    Dr. Rodney Mannion of LaPorte and Michigan City, Indiana;

    c.    Dr. Jacob Zamstein of Bloomfield, Connecticut; and

    d.    Dr. Joseph Spinella of Bristol, Connecticut.

*See* Exhibit "E" and ¶¶ 8, 10, 83-85, 93-96, 110, *supra*.

136.    Each of these doctors admitted to participating in the nationwide conspiracy with Defendants to bill government and private insurance programs and patients for free Lupron®, including so-called free samples, free goods and/or Lupron® provided to providers at no cost as part of a volume discount, *i.e.*, TAP's "Buy 10, get 1 free" and "Buy 5, get 1 free" programs.

137.    According to the Informations to which these doctors pled guilty, they received anywhere from $15,000 to $70,000 from billing for the free samples of Lupron® provided by Defendants.

138.    Upon information and belief, Plaintiffs submit that hundreds of other doctors around the country, including the Doctor Defendants and others throughout Alabama, also participated in the fraudulent scheme and conspiracy respecting billing for free Lupron®, which conspiracy was self-concealing due to the nature of the conduct and Defendants' failure to properly label Lupron® given to providers at no cost.

44

## DEFENDANTS' UNLAWFUL CONDUCT IN ALABAMA
## AND THROUGHOUT THE COUNTRY

139.    By virtue of Defendants' agreement to plead guilty to a conspiracy to violate the PDMA, and to pay fines to resolve both criminal and civil charges against them, it is clear that their conduct had a nationwide effect both upon residents and consumers in Alabama and throughout the country and thus, such conduct had an effect upon their insurers, like Plaintiffs.

140.    Defendants' guilty plea and settlement included the sum of $25.5 million to be paid to the 50 states and the District of Columbia to resolve civil liabilities.  Accordingly, Defendants have agreed that their unlawful conduct and conspiracy has affected residents and consumers and their insurers throughout the 50 states and the District of Columbia, including Alabama.

141.    In addition, a number of urologists in the states of Indiana, Connecticut, and Maine have all pleaded guilty to participating in the conspiracy to which TAP pled guilty.  In addition, several other urologists and doctors have told newspapers that TAP representatives contacted them and explained to them how much money they could make by charging the AWP for Lupron®.  These doctors and medical care providers practice in states such as South Carolina, Kentucky, Illinois, and Wisconsin, among others.

142.    In January, 2001, the United States Attorney's Office in Connecticut filed charges against two (2) Florida doctors who ordered excess supplies of Lupron® and then resold them at higher prices in other states, according to court papers.  The two urologists agreed to forfeit $1.1 million to the federal government.

143.    Finally, it is believed and therefore averred that sales presentations made by TAP employees included a company-supplied program that listed how much doctors could collect if they

billed government and private insurance programs and patients for free samples. It is further believed, and therefore averred, that such presentations were given to doctors and medical care providers throughout the country, including those in Alabama, by sales employees of TAP.

## TOLLING OF THE STATUTE OF LIMITATIONS

144.    Plaintiffs had no knowledge of the conspiracy, concerted action and other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until early October, 2001 when it was announced that TAP agreed to plead guilty to a conspiracy to violate the PDMA. Plaintiffs could not have discovered the conspiracy, concerted action or other unlawful conduct alleged herein at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy. These techniques of secrecy included, but were not limited to, secret meetings and communications, misstatements about the AWP, and other conduct alleged herein.

145.    Further, Plaintiffs were members of the nationwide Class in *In re Lupron Marketing and Sales Practices Litigation*, MDL 1430 (D. Mass.), which was certified in conjunction with a proposed settlement on November 24, 2004. Plaintiffs timely opted out of that Class, and elected, as they were permitted under the certification of that Class pursuant to Fed. R. Civ. P. 23(b)(3) and pursuant to the terms of the settlement, to exclude themselves from the Class and the settlement and to pursue their own action against Defendants.

146.    In addition, Plaintiffs were members of the nationwide Class that was certified on April 24, 2003 in *Stetser, et al. v. TAP Pharmaceutical Products, Inc., et al.*, No. 1-CV-5268 (Gen'l Ct. of Justice, Super. Ct. Div., New Hanover Co., N.C.) and the nationwide Class that was certified

46

in *Clark, et al. v. TAP Pharmaceutical Products, Inc., et al.*, No. 5-02-0316 (Circuit Ct, Williamson Co., Ill.) on March 12, 2002.

147.    Plaintiffs' claims against Defendants were tolled from the filing in May 2001 of the first nationwide Class Action Complaint related to the alleged fraud concerning Lupron® until Plaintiffs' timely opt outs of the certified Settlement Class in MDL 1430 were deemed effective *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351-52 (1983); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974); *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974).

148.    By reason of the foregoing, the claims of Plaintiffs are timely under any applicable statute of limitations (as tolled by the filing of the nationwide class action complaints), pursuant to the discovery rule and the doctrine of fraudulent concealment.

149.    The Defendants have been aware of their unlawful conduct and conspiracy since at least 1991, and probably prior thereto.

150.    Despite this knowledge and awareness, the Defendants continued to promote and sell Lupron® at artificially inflated prices.

151.    The Defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the Plaintiffs and others.

## COUNT I

### UNJUST ENRICHMENT

152.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 149 hereof as if fully set forth here and further allege as follows.

153.    By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits, including substantial profits, which were conferred upon Defendants by Plaintiffs, under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

154.    Defendants have collected payments for Lupron® from Plaintiffs that vastly exceeded the payments to which Defendants were entitled as a matter of law.  Moreover, Defendants have admitted that they unlawfully inflated the price of Lupron® paid by Plaintiffs and supplied medical providers with free samples of Lupron® and encouraged them to charge Plaintiffs and patients for such samples, in violation of the PDMA and other federal and state laws.

155.    These payments made by Plaintiffs for this benefit to the Defendants was erroneously made, and would not have been made under the terms of the plans administered by Plaintiffs had the true facts regarding the inflation of Lupron®'s AWP been know to Plaintiffs.

156.    Defendants should not, in equity and good conscience, be allowed to retain the profits they reaped from these payments.

157.    Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by Plaintiffs.

158.    Defendants should therefore be required to disgorge their profits from the overpayment for Lupron® by Plaintiffs in an amount to be determined at trial, through the Court's imposition of a constructive trust or otherwise.

48

159.    Plaintiffs have no remedy at law to prevent Defendants from continuing the inequitable conduct alleged herein.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT II

### FRAUD

160.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 157 hereof as if fully set forth here and further allege as follows.

161.    By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the Plaintiffs and others.

162.    These Defendants intended that Plaintiffs and others would rely on their statements and representations with respect to the inflated AWP, among other things, to the detriment of Plaintiffs. Plaintiffs did in fact reasonably and justifiably rely on the false representations and statements of these Defendants and suffered injury and damages thereby, as more fully set forth herein.

163.    These Defendants urged and encouraged medical providers to bill Plaintiffs at or above the AWP for Lupron® rather than at a price related to the amount which the provider paid for the Lupron®.

164.    In addition, these Defendants concealed and suppressed material facts about their unlawful agreements and discussions with one another and others, and they concealed and suppressed their unlawful acts and omissions as set forth more fully herein. Among other things, these Defendants concealed and suppressed the fact that the AWPs upon which the amounts paid for

49

Lupron® by Plaintiffs were based were artificially inflated, thereby causing Plaintiffs to pay more for Lupron® than they otherwise would have.

165.    Plaintiffs were unaware of the above-referenced facts, and would not have paid the artificially inflated prices for Lupron® that they did had they known of the facts Defendants concealed and suppressed.

166.    As a direct and proximate result of Defendants' fraudulent conduct, and the concealment and suppression of material facts by Defendants, Plaintiffs have suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT III

### VIOLATION OF CONSUMER PROTECTION STATUTES

167.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 164 hereof as if fully set forth here and further allege as follows.

168.    Plaintiffs are "persons" as defined by Ala. Code § 8-19-3(3). Alabama provides that persons have a private right of action under Ala. Code § 8-19-10 for monetary damages caused by other person(s) who have committed one or more of the acts or practices declared unlawful at Ala. Code § 8-19-5.

169.    As described above, in the conduct of trade or commerce, the Defendants have engaged in unfair methods of competition or unfair and deceptive acts or practices in violation of Alabama's Deceptive Trade Practices Act, *Alabama Code* § 8-19-5, including, but not limited to, the following:

50

a.  representing to Plaintiffs, their insureds, members, beneficiaries and participants, and the general public that the Lupron was safe and fit for their intended, prescribed and foreseeable uses, knowing that these representations were false;

b.  marketing, advertising and selling Lupron through the use of misleading, incomplete and deceptive advertising, promotion and product information; and

c.  engaging in conduct likely to deceive Plaintiffs, their insureds, members, beneficiaries, and participants, and the general public, and by engaging in acts and practices with the intent to induce Plaintiffs, their insureds, members, beneficiaries, participants, and the general public to prescribe and use Lupron.

170.  The conduct described above constitutes deceptive and unfair methods of competition, all impacting the public interest, in violation of *Alabama Code* § 8-19-5.

171.  As a direct and proximate result of such wrongful activity, Plaintiffs' insureds, members, beneficiaries and participants have suffered and will continue to suffer substantial damages.

172.  Plaintiffs have complied with the written demand requirements of *Alabama Code* § 8-19-10(e).

173.  Pursuant to *Alabama Code* § 8-19-10, Plaintiffs are entitled to recover three times the amount of actual damages sustained, the costs of bringing this action and reasonable attorneys' fees.

174.  In addition, as described above, the Defendants have violated the Michigan Consumer Protection Act, *Michigan Compiled Laws* 445.901, *et seq.*, by knowingly, or with reason to know, engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

175.  Plaintiff BCBS Michigan is a "person" as defined in *Michigan Compiled Laws* 445.902(c).

51

176.    The Defendants are "persons" as defined in *Michigan Compiled Laws* 445.902(c).

177.    The Defendants' above-described conduct constitutes unfair, unconscionable or deceptive methods, acts or practices in the conduct of trade or commerce as defined by *Michigan Compiled Laws* § 445.903 including, but not limited to the following:

    a.    engaging in misrepresentation, suppression and misinformation concerning Lupron;

    b.    suppressing, misrepresenting and failing to reveal material facts related to the Lupron (§ 445.903(1)(s));

    c.    suppressing, misrepresenting and failing to reveal material facts related to Lupron(§ 445.903(1)(s));

    d.    charging BCBS Michigan a price that was grossly in excess of the price at which physicians bought Lupron (§ 445.903(1)(z));

    e.    failing to reveal facts that were material to the sale of Lupron, particularly regarding its cost, in light of the representations made by the Defendants regarding its cost for its intended, foreseeable uses (§ 445.903(1)(cc)).

178.    As a direct and proximate result of the Defendants' unlawful, unfair and fraudulent acts, Plaintiff BCBS Michigan suffered significant losses and will continue to do so.

179.    The Defendants' above-described conduct was a willful and knowing violation of Michigan's Consumer Protection Act.

180.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff BCBS Michigan is entitled to an award of all damages including, but not limited to its losses, the Defendants' ill-gotten profits, punitive damages, interest and costs of suit including, but not limited to, attorneys' fees and expenses.

181.    By the misrepresentations and non-disclosure of material facts alleged above, the Defendants deceived and continue to deceive Plaintiffs. This conduct constitutes unlawful, unfair,

deceptive and fraudulent business practices within the meaning of the aforementioned state consumer protection statutes.

182.   In addition, the Defendants' use of media to promote the sale of Lupron® through false and deceptive representations as alleged above constitutes unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of the aforementioned state consumer protection statutes.

183.   As part of their guilty plea and payment of fines and money for civil liabilities, Defendants Abbott, Takeda and TAP agreed to pay the sum of $25.5 million in civil liabilities to fifty states and the District of Columbia. Such admission of liability and payment of civil liabilities to the states and the District of Columbia warrants the application of the laws of the states of Alabama and Michigan to Defendants in this Court.

184.   As a result of the Defendants' unfair and deceptive trade practices in Alabama, Plaintiffs have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT IV

### CIVIL CONSPIRACY

185.   Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 182 hereof as if fully set forth here and further allege as follows.

186.   Beginning at least as early as 1991, the exact date being unknown to Plaintiffs, and continuing thereafter until at least October, 2001, Defendants and their co-conspirators engaged in a continuing conspiracy to violate the PDMA and to defraud the Plaintiffs by causing Plaintiffs and

53

others to pay more for Lupron® than they otherwise would have in the absence of Defendants' conspiracy.

187.    According to the United States Department of Justice, on or before October 3, 2001, Defendant TAP agreed to plead guilty to a federal conspiracy to violate the PDMA and to pay a $290 million criminal fine, the largest criminal fine ever in a U.S. health-care fraud prosecution case up until that time. Additionally, these Defendants agreed to settle the government's claims for a total of $875 million, plus interest, which consisted of the $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to fifty states and the District of Columbia.

188.    Pursuant to their widespread conspiracy alleged herein and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to defraud the Plaintiffs and others. Those activities include the following:

(a)    Defendants discussed and agreed among themselves and with their co-conspirators that they would inflate the AWP for Lupron®;

(b)    Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free samples to medical providers and encourage medical providers to charge for such samples;

(c)    Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other financial inducements and incentives to medical providers to prescribe Lupron® instead of competitor drugs, such as Zoladex;

54

(d)      Defendants discussed and agreed among themselves that they would market and promote the spread or the RTP between the AWP and the actual cost for Lupron® as an incentive for medical providers to prescribe Lupron® instead of competitor drugs, such as Zoladex; and

(e)      Defendants discussed and agreed among themselves and with their co-conspirators that they would conceal all of these fraudulent marketing tactics.

189.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy, and an agreement, with knowledge of the injury and damage it would cause to Plaintiffs and others and with intent to cause such injuries or with reckless disregard for the consequences.

190.    As a direct and proximate result of Defendants' conspiracy as alleged herein, Plaintiffs have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT V

### AIDING & ABETTING/FACILITATING

191.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 188 hereof as if fully set forth here and further allege as follows.

192.    Defendants acted with knowledge of their wrongdoing, and that of medical providers throughout the country, as set forth in this Complaint, and they provided substantial assistance or encouragement to medical providers in the commission of the fraud on Plaintiffs.

193.    Defendants' conduct was a substantial factor in causing the resulting fraud and other tortious conduct alleged herein.

194.    Defendants had actual knowledge of the fraud and other tortious conduct being effectuated on Plaintiffs, and of their respective roles in furthering such fraud and tortious conduct.

195.    TAP's Plea Agreement and the Side Letter Agreements entered into by Abbott and Takeda represent their respective acknowledgments of their wrongdoing.

196.    Through discovery in the cases of Stetser and MDL 1430, the knowledge of TAP and other Defendants of the fraud and other tortious conduct alleged herein has been revealed.

197.    As a direct and proximate result of Defendants' aiding and abetting/facilitating as alleged herein, Plaintiffs have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that Court:

a.    Enter judgment against all Defendants for the violations alleged herein;

b.    Award the actual damages incurred by Plaintiffs as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

c.    Award treble damages or multiple damages by operation of law;

d.    Award an amount equal to the amount that Defendants have been unjustly enriched;

e.    Award Plaintiffs the costs of this action, including reasonable attorney's fees, and, where applicable, expert fees; and

f.    Award such other and further relief as the Court may deem just under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this cause. This the **12th** day of **May, 2006.**

Respectfully submitted

_Pamela Slate / Kim_
Pamela B. Slate
SLATE, KENNEDY LLC
166 Commerce Street, Suite 350
Montgomery, AL 36104
(334)262-3300 telephone
(334)252-3301 facsimile

_Kimberly West_
Kimberly R. West
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
P.O. Box 530910
Birmingham, AL 35298
(205)870-0555 telephone
(205)871-7534 facsimile

Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
KLINE & SPECTER
A PROFESSIONAL CORPORATION
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
(215) 772-1000 telephone
(215) 735-0957 facsimile

ATTORNEYS FOR PLAINTIFFS
BLUE CROSS AND BLUE SHIELD OF ALABAMA AND
BLUE CROSS AND BLUE SHIELD OF MICHIGAN

57

**PLEASE SERVE THE FOLLOWING DEFENDANTS BY CERTIFIED MAIL AT THE LISTED ADDRESSES:**

TAP Pharmaceutical Products, Inc.
675 N Field Drive
Lake Forest, IL 60045-4832

Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL 60064-3500

Takeda Pharmaceutical Co. Ltd.
475 Half Day Road
Suite 500
Lincolnshire, IL 60069-2934

Takeda America Holdings, Inc.
767 3rd Ave
New York, NY 10017-2023

Oncology Supply
2801 Horace Shepard Drive
Dothan, AL 36303-1038

Amerisource Bergen Specialty Group
4006 Belt Line Road, Suite 115
Addison, Texas 75001

Amerisource Bergen Corporation
1300 Morris Drive Suite 100
Chesterbrook, PA 19087

**PURSUANT TO ALA. CODE § 8-19-10(d), PLEASE ALSO MAIL A COPY OF THIS COMPLAINT TO:**

Troy King, Attorney General
Office of the Attorney General
Alabama State House
11 South Union Street, Third Floor
Montgomery, AL  36130

and

Ellen Brooks, District Attorney
Office of the District Attorney of Montgomery County, Alabama
P.O. Box 1667
Montgomery, Alabama  36102-1667

## STATE OF ALABAMA
## MONTGOMERY COUNTY CIRCUIT COURT

BLUECROSS AND BLUESHIELD OF ALABAMA; and
BLUECROSS AND BLUESHIELD OF MICHIGAN,

        **Plaintiffs,**

    v.

TAP PHARMACEUTICAL PRODUCTS INC. (formerly
known as TAP HOLDINGS, INC.); ABBOTT
LABORATORIES; TAKEDA PHARMACEUTICAL
COMPANY LIMITED (formerly known as TAKEDA
CHEMICAL INDUSTRIES, LTD.); TAKEDA AMERICA
HOLDINGS, INC., ONCOLOGY SUPPLY COMPANY;
AMERISOURCE BERGEN SPECIALTY GROUP;
AMERISOURCE BERGEN CORPORATION;
FICTITIOUS DEFENDANTS, the identities of which
are unknown to Plaintiffs, and through the exercise
of due diligence cannot be known to Plaintiffs at this
time, but who will be added as defendants by
amendment as necessary upon Plaintiffs' identifying
them, A-Z, intending to refer to those entities or
persons that committed any of the acts and/or
omissions of which the named Defendants are
alleged herein to have committed; AA-ZZ,
intending to refer to those persons or entities that
conspired to commit any of the acts and/or
omissions of which the named Defendants are
alleged herein to have committed; AAA-ZZZ,
intending to refer to those persons or entities that
have committed any acts or omissions that have
proximately caused injury and damage to Plaintiffs
as alleged herein,

        Defendants.

**FILE NO. CV-06-1350**

## FIRST AMENDED
## COMPLAINT

**JURY TRIAL DEMANDED**

---

### SUMMONS

    This service by certified mail of this summons is initiated upon the written request of plaintiff's attorney pursuant to the Alabama Rules of Civil Procedure.

    NOTICE TO:        **TAP Pharmaceutical Products, Inc.**
                        **675 N Field Drive**
                        **Lake Forest, IL 60045-4832**

    The First Amended Complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the First Amended Complaint, to KIMBERLY R.

WEST, ESQ. and/or SHANIN SPECTER, ESQ. and/or DONALD E. HAVILAND, JR., ESQ., the lawyers for the plaintiff, whose addresses are:  WALLACE, JORDAN, RATLIFF & BRANDT, Post Office Box 530910, Birmingham, Alabama 35253 and KLINE & SPECTER 1525 Locust St 19th Flr Philadelphia, PA 19102.

THIS ANSWER MUST BE MAILED OR DELIVERED WITHIN THIRTY (30) DAYS FROM THE DATE OF DELIVERY OF THIS SUMMONS AND COMPLAINT AS EVIDENCED BY THE RETURN RECEIPT, OR A JUDGMENT OF DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.  You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

CLERK OF THE COURT

DATED: 05/23/06

STATE OF ALABAMA
MONTGOMERY COUNTY CIRCUIT COURT

BLUECROSS AND BLUESHIELD OF ALABAMA; and
BLUECROSS AND BLUESHIELD OF MICHIGAN,

      Plaintiffs,

      v.

TAP PHARMACEUTICAL PRODUCTS INC. (formerly
known as TAP HOLDINGS, INC.); ABBOTT
LABORATORIES; TAKEDA PHARMACEUTICAL
COMPANY LIMITED (formerly known as TAKEDA
CHEMICAL INDUSTRIES, LTD.); TAKEDA AMERICA
HOLDINGS, INC., ONCOLOGY SUPPLY COMPANY;
AMERISOURCE BERGEN SPECIALTY GROUP;
AMERISOURCE BERGEN CORPORATION;
FICTITIOUS DEFENDANTS, the identities of which
are unknown to Plaintiffs, and through the exercise
of due diligence cannot be known to Plaintiffs at this
time, but who will be added as defendants by
amendment as necessary upon Plaintiffs' identifying
them, A-Z, intending to refer those entities or
persons that committed any of the acts and/or
omissions of which the named Defendants are
alleged herein to have committed; AA-ZZ,
intending to refer to those persons or entities that
conspired to commit any of the acts and/or
omissions of which the named Defendants are
alleged herein to have committed; AAA-ZZZ,
intending to refer to those persons or entities that
have committed any acts or omissions that have
proximately caused injury and damage to Plaintiffs
as alleged herein,

      Defendants.

FILE NO. CV2006-1350

**FIRST AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY
2006 MAY 15 PM 2:19

## FIRST AMENDED COMPLAINT

Plaintiffs, BlueCross and BlueShield of Alabama ("BCBS Alabama") and BlueCross and BlueShield of Michigan ("BCBS Michigan"), by their attorneys, bring this First Amended Complaint to obtain declaratory relief, damages, costs of suit, attorneys' fees and other appropriate relief from the Defendants, TAP Pharmaceutical Products Inc. (formerly known as TAP Holdings, Inc.) ("TAP"), Abbott Laboratories ("Abbott"), Takeda Pharmaceutical Company Limited (formerly known as Takeda Chemical Industries, Ltd.) ("Takeda"), Takeda America Holdings, Inc. ("Takeda America") (collectively referred to as "the Manufacturer Defendants"), Oncology Supply Company, ("OSC"), Amerisource Bergen Specialty Group ("ABSG"), Amerisource Bergen Corporation ("ABC") (collectively referred to as "the Wholesaler Defendants"), Fictitious Defendants A-Z, AA-ZZ, AAA-ZZZ (collectively referred to as including "the Doctor Defendants"). Plaintiffs complain and allege, upon information and belief, as follows:

## NATURE OF ACTION AND BACKGROUND

1.     This case is brought by Plaintiffs to recover monies overpaid for Lupron® prescribed to their insureds as a result of Defendants' fraudulent scheme and conspiracy detailed herein.

2.     Defendants, Abbott, Takeda and TAP are the manufacturers, marketers, sellers and distributors of Lupron®. TAP is a wholly-owned joint venture of Abbott and Takeda America. Takeda America is a wholly-owned subsidiary of Takeda. (TAP, Abbott and Takeda are hereinafter collectively referred to as "the Manufacturer Defendants").

3.     Defendant OSC is a member company of Defendant ABSG, which is a subsidiary of Defendant ABC. At all times material hereto, the Wholesaler Defendants were in the business of receiving and distributing prescription drugs, like Lupron®, to purchasers located throughout Alabama and the country.

2

4.     Fictitious Defendants A-ZZZ, include, but are not limited to, medical providers located throughout the State of Alabama and the country (the "Doctor Defendants"). At all times material hereto, the Doctor Defendants were in the business of treating cancer patients who were plan beneficiaries of insurance plans offered by Plaintiffs. Each of these Doctor Defendants treated Plaintiffs' plan beneficiaries with Lupron® and thereafter sought and received reimbursement for the Lupron® from Plaintiffs at the inflated prices described herein.

5.     References to the Defendants in this Complaint include the Manufacturer Defendants, the Wholesaler Defendants and Fictitious Defendants, including the Doctor Defendants. All allegations as to the acts or omissions of any Defendant include the acts or omissions of any agent, employee, representative, or co-conspirator of that Defendant, the acts or omissions of Fictitious Defendants A-ZZZ, and the acts of omissions of any agent, employee, representative, or co-conspirator of Fictitious Defendants A-ZZZ.

6.     In late September 2001, TAP agreed to plead guilty to federal criminal fraud charges for, among other things, conspiring to violate the Prescription Drug Marketing Act ("PDMA"), 21 U.S.C. §§ 331(t) and 333(b), by, *inter alia*, providing free samples of Lupron® to medical providers throughout the country knowing and expecting that they would bill patients and insurance carriers, like Plaintiffs, for such Lupron®. This conspiracy was in violation of the federal conspiracy statute, 18 U.S.C. § 371 (Conspiracy to commit offense or to defraud United States). *See* Plea Agreement, dated September 28, 2001, between the United States Department of Justice, the United States Attorney for the District of Massachusetts and TAP, with attached Criminal Information, Exhibit "A;" *see also* further details *infra*.[1]

---

[1]All Exhibits referenced herein are those attached to the Original Complaint.

3

7.      Abbott and Takeda also were investigated by the federal government in connection with the charges to which TAP pled guilty and each entered into a Side Letter Agreement with the federal government in connection with the same, through which the federal government agreed to decline further prosecution of TAP and its parent companies, Abbott and Takeda, in consideration of the guilty plea. *See* Side Letter Agreements with Abbott and Takeda, Exhibits "B" and "C," respectively; *see also* further details *infra*.

8.      On or before October 3, 2001, TAP, in conjunction with its plea, agreed to pay a $290 million criminal fine, the largest criminal fine ever up to that time in a U.S. health-care fraud prosecution case, according to the United States Department of Justice.  Additionally, the Manufacturer Defendants agreed to settle civil claims brought by the federal government for $559.5 million and those brought by the fifty states and the District of Columbia for $25.5 million. *See* Exhibit "A," at ¶¶ 3, 10; *see also* Settlement Agreement and Release, Exhibit "D," at ¶ 1, at pp. 6-7. Including interest, TAP paid in excess of $900 million in criminal fines and civil penalties. *See also* further details *infra*.

9.      Several medical providers also have pleaded guilty to federal Criminal Informations charging them with participating in the nationwide conspiracy with TAP to bill for free samples of Lupron®.  These providers include: Rodney A. Mannion, M.D., of Laporte and Michigan City, Indiana; Joel Olstein, M.D. of Lewiston, Maine; Joseph Spinella, M.D., of Bristol, Connecticut; and Jacob Zamstein, M.D. of Hartford and Bloomfield, Connecticut. *See* further details, *infra*. *See* Criminal Information and Judgment for each, collectively Exhibit "E."

10.     During the period from at least 1991 through the present - the exact dates of which are unknown to Plaintiffs - Defendants, among themselves and with other entities and individuals,

4

created and implemented a fraudulent marketing, pricing and sales scheme designed to increase the sales and market share of Lupron® and to maximize Defendants' profits at the expense of federal and state governments' insurance programs, Lupron® patients and their private insurers, like Plaintiffs, who were caused to overpay substantial amounts of money for Lupron®. The improper marketing, pricing and sales practices relate to, *inter alia*, the following: (a) providing free samples of Lupron® to medical providers and encouraging them to bill the government and private insurers, like Plaintiffs, for such free samples; (b) inflating the average wholesale price ("AWP") for Lupron® (*i.e.*, the rate upon which reimbursements under government assistance programs, like Medicare and Medicaid, and certain private insurance programs, like those administered by Plaintiffs, were set), far above the price at which medical providers were charged for Lupron®, thereby creating a profit margin or spread for medical providers and marketing that spread; (c) providing other unlawful financial inducements to medical providers to prescribe Lupron®; (d) organizing and administering a "diversionary black market" for Lupron® by which the Manufacturer Defendants provided excess Lupron® at low costs to the Doctor Defendants who, in turn, unlawfully resold Lupron® to the Wholesaler Defendants for re-sale to others, and (e) conspiring to conceal the aforementioned fraudulent marketing and sales tactics and the true costs which providers were paying for Lupron®.

11.    The scheme was grounded in the Manufacturer Defendants' ability to control, as part of their sales and marketing strategies, not only the amount that they charged to medical providers, like the Doctor Defendants, but also how much reimbursement would be made to said providers under government assistance programs and private insurance programs for Lupron®, like those administered by Plaintiffs, through the AWP reimbursement benchmark. The Manufacturer Defendants deliberately marketed and promoted the sale of Lupron® based on the availability of

5

inflated payments made by government assistance programs, private insurers (like Plaintiffs) and patients (like Plaintiffs' insureds), which were based upon the inflated AWPs set by the Manufacturer Defendants.

12.    The amount by which the price the Manufacturer Defendants set as the AWP exceeded the actual cost of Lupron® charged to medical providers, like the Doctor Defendants, was often referred to by the Manufacturer Defendants [and their competitors] in internal documents as a "spread," "Return-To-Practice," "RTP," "return-on-investment," and "profit." This "spread" or "RTP" (which, in the case of free samples, was the full AWP for the Lupron®) was used by the Manufacturer Defendants to create a profit-based incentive for medical providers, like the Doctor Defendants, to prescribe Lupron®.

13.    The Manufacturer Defendants even prepared side-by-side comparisons of the spreads available on Lupron® versus their competitors' drugs, like Zoladex®. These comparisons were used as a marketing and sales pitch to medical providers, like the Doctor Defendants. These Defendants further advised medical providers that their continuing to profit from the RTP was dependent upon their concealment of the significantly lower prices that they were actually paying for the Lupron®. As a result, while the medical providers and the Manufacturer Defendants have reaped these profits, Plaintiffs and others have paid tens of millions of dollars in inflated drug prices.

14.    In the case of the Doctor Defendants, some of which were the Defendants' best customers in the State of Alabama and the country, the Manufacturer Defendants provided huge discounts on the cost of Lupron® through direct contract prices which had the effect of vastly increasing the spreads or RTP available for these doctors when they sought reimbursement from Plaintiffs at the inflated AWPs.

6

15.     In addition to marketing the spread as a profit-based incentive, according to the various Criminal Informations and Defendants' internal documents, the Manufacturer Defendants provided doctors, such as those listed at paragraph 9, *supra*, with free samples and other financial incentives as inducements to increase their usage of Lupron®. *See, e.g.*, Exhibit "E," at Mannion Information at ¶ 10 ("The core objective of this conspiracy for all participants was to obtain money from the patient's health care insurers through the prescription of Lupron. It was an objective of [TAP] in this conspiracy to provide free doses or samples of Lupron Depot, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot."). It is believed and therefore averred that one or more of the Doctor Defendants received free Lupron® from the Manufacturer Defendants and thereafter unlawfully billed Plaintiffs for such Lupron®.

16.     Such financial incentives, like free samples, RTP and other inducements, were designed to cause and did cause medical providers, like the Doctor Defendants, to prescribe Lupron® for their patients over cheaper competitor drugs, such as Zoladex®, and over cheaper alternative and equally efficacious courses of treatment, like orchiectomy.

17.     The United States Government sought to and did recover its portion of the fraudulent charges, which represents between 75-80% of the overpayments caused by Defendants, depending upon whether a patient was covered by a government assistance program and which program covered him/her. For instance, CHAMPUS, a government assistance program for those who served in the military, provided reimbursement of 75% of the cost of Lupron®, while Medicare, the government assistance program for senior citizens, provided reimbursement of 80% of the cost.

7

18.     In acknowledging that the plea and civil settlement were not designed to compensate the "other victims" of the fraud other than the federal and state governments, the Assistant United States Attorney noted:

> There are two categories of other victims, *insurance companies* and a small number of individuals who had no supplemental insurance.... So the bulk of the unaddressed co-payments were [monies] that would have been paid to doctors *by other insurers* besides Medicare and Medicaid.

*See* Disposition dated December 6, 2001 from *United States v. TAP Pharmaceutical Products, Inc.*, Crim. No. 01-10354-WGY (D. Mass.) (emphasis supplied), Exhibit "F," at 19-20.

19.     Numerous class actions and individual actions were commenced throughout the country in the wake of TAP's criminal plea in 2001 which all sought to recover the proper compensation for the "other victims" of TAP's crime, including the patients and private insurance companies.

20.     Respecting Lupron® that was administered to Medicare and CHAMPUS patients, 20-25% of the medical provider charges were paid by patients and private insurers, like Plaintiffs. The vast majority of the 20-25% Lupron® payments – often 80%, but sometimes up to 100% – were borne by private insurers, like Plaintiffs. These overpayments for Lupron® were based, in whole or in part, upon the AWP for Lupron®.

21.     In connection with the government's recitation of the facts supporting the guilty plea, the Assistant United States Attorney stated and TAP agreed:

> Medicare and **other insurance companies** base their payment in many respects for Lupron for prostate cancer based off published industry pricing done in a Red Book, a book called the Red Book. And it's premised on the published average wholesale price for the

8

product. The published average wholesale price for Lupron in the 1990's ranged from in the mid 300's to almost $600.

Insurance companies for the most part paid 80 percent of that. A lot of patients have supplemental insurance to cover their own copayment. Most of the Lupron was **paid for by insurance companies** throughout the 1990's....

TAP in the early 1990's was trying to push its product to urologists and others in lieu of doctors recommending to their patients other treatment for prostate cancer. To get doctors to switch from their treatment modes from surgery to the pharmaceutical product TAP began offering doctors free samples. In the early 1990's, '91, '92, '93, it was a fairly institutional program. If a doctor bought ten, he would get one free sample. For the really good customers, if the doctor bought five he would get one free sample. It was the expectation of those in TAP's management who set up this program that the doctor would take the free sample, prescribe it, and bill it to the patient.

\* \* \*

[U]rologists in private practice had the ability, and indeed this was the system, [TAP] sold the product to the urologist, the urologist then resold it to his patient, the patient then **had the insurance company pay for it.**

\* \* \*

[A] top officer at the American Urology Association informed the top executives [th]at TAP's program of providing free samples to doctors as an inducement for doctors to purchase and prescribe greater amounts of Lupron that they were at risk of prosecution because doctors were taking free drugs and prescribing them and then **billing the patients and their insurers** for it.

\* \* \*

Many sales reps used the product to help doctors who were having problems paying their bills with the clear expectation that the doctor would take the free drug, bill it, and then use the money that the doctor **received from the patient's insurance company** to pay off the bill to TAP.

See Arraignment and Plea dated October 16, 2001 from *United States v. TAP Pharmaceutical Products, Inc.*, Crim. No. 01-10354-WGY (D. Mass.) Exhibit "G," at 31-36 (emphasis added).

22.     The majority of the private party cases brought by consumers and insurers in federal courts or removed to federal courts respecting Lupron® were consolidated for pre-trial purposes and transferred by the Judicial Panel on Multidistrict Litigation ("JPML" or "the Panel") to *In re Lupron Marketing and Sales Practices Litigation*, MDL 1430 (D. Mass.).  The first such nationwide consumer class action case was filed in Boston in May 2001.  A proposed settlement of that class action – which was reached initially without input from the undersigned Plaintiffs' counsel – was proffered to and preliminarily approved by the Honorable Richard G. Stearns on November 24, 2004. *See* Order Granting Preliminary Approval of Settlement, Certifying Class for Purposes of Settlement, Directing Notice to the Class and Scheduling Fairness Hearing, dated November 24, 2004, Exhibit "H."

23.     According to the Class definition, Plaintiffs were included as settlement class members in MDL 1430.  The Court defined the nationwide settlement Class as follows:

> All individual persons or entities who, during the Class Period, made Lupron® Purchases. Excluded from the class are the Settling Health Plans; Defendants, their respective present and former, direct and indirect, parents, subsidiaries, divisions, partners and affiliates; and the United States government, its officers, agents, agencies and departments, and all other government entities' claims, to the extent that they previously released their claims pursuant to the 2001 Settlement Agreement and Release resolving the matter of *United States v. TAP Pharmaceutical Products, Inc.* (D. Mass.) and related litigation.

Exhibit "H," at 6.  The MDL 1430 Court also noted that "[t]his includes all individual Consumers and Third Party Payors as those terms are defined in the Class Agreement." *Id.*

24.     Each Plaintiff hereunder is a "Third Party Payor" or "TPP" as per the definition contained in the Settlement Agreement and Release proffered in MDL 1430:

10

"Third Party Payor" or "TPP" means a private or governmental entity that was at risk by contract to pay all of part of the cost of Lupron prescribed, provided or administered in the United States for individual beneficiaries of the TPP's prescription drug or health coverage. ... A claim may be made pursuant to this Class Agreement on behalf of a TPP Class Member by an agent thereof, including the third-party administrator of the TPP Class Member's prescription drug or health benefit plan, if the TPP Class Member authorizes the agent to make such a claim.

*See* Settlement Agreement and Release, Exhibit "I," at ¶ 2(ll) at p. 15.

25.    Because Plaintiffs did not find the MDL 1430 settlement to be a fair, reasonable, and adequate resolution of their claims, they elected to opt-out of that settlement class, as was their constitutional right and as was expressly contemplated and allowed for by the MDL Court's November 24, 2004 Order, which provided:

Any member of the nationwide Lupron® Purchaser Class who wishes to be excluded from the nationwide Lupron® Purchaser Class shall mail a written notice of exclusion to the Claims Administrator so that it is received no later than April 1, 2005,.... For Third Party Payors, the notice of exclusion must also include a signed certification containing the following language:

The undersigned individual hereby represents that he/she has authority to sign and submit this notice of exclusion on behalf of the above-named class member.

The undersigned also certifies that he/she has not received any advice from the parties to this litigation or their attorneys concerning his/her or the class member's fiduciary obligations under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1100, *et seq.*, or other laws governing their obligations to any class member. The undersigned understands that by submitting this notice of exclusion, the class member identified above will not be entitled to received any proceeds of the Class Settlement Fund. By affixing my signature below, I certify under

11

penalty of perjury that the foregoing is true and correct. 28 U.S.C. § 1746.

If the person providing a certification in the notice of exclusion is not a duly authorized officer, director or employee of the TPP Class Member requesting exclusion (if a corporation), or a general partner or duly authorized employee of the TPP Class Member requesting exclusion (if a partnership), he/she must attach written evidence of the TPP Class Member's grant of authority to him/her to execute the notice of exclusion on its behalf. In addition, for purposes of implementing the Class Agreement, including *inter alia* 1) the calculation of the amount of the TAP Refund (as described in the Class Agreement), 2) the SHP Group Reversion Amount, and 3) whether the termination contingency referenced in the Class Agreement has been met, each TPP Class Member requesting exclusion shall be required to set forth in the Exclusion Form the amounts paid for Lupron during the 2000 through 2001 time period.

Class Opt-Outs shall not be bound by the Class Agreement, the Settlement, or the Final Order and Judgment.

*See* Exhibit "H," at pp. 10-11.

26.    Plaintiffs filed their respective notices of exclusion on March 28, 2005 and May 23, 2005 (Amended Notice) for BCBS Alabama and on March 28, 2005 for BCBS Michigan, in compliance with the MDL 1430 Court's November 24, 2004 Order, reporting that they had paid approximately $16,270,574.88 and $34,561,273.73, respectively, for Lupron® for the period January 1, 2000 through December 31, 2001 – the two years for which Lupron® purchase data was required for the notice of exclusion. *See* letters to Claims Administrator seeking exclusion for BCBS Alabama and BCBS Michigan, Exhibit "J."

27.    The MDL Court's final Order approving the settlement on May 12, 2005 explicitly ruled that BCBS Alabama and BCBS Michigan had properly opted-out of the national settlement. The Order did not become final until August 26, 2005. *See* Orders dated May 12, 2005 and August 26, 2005, collectively Exhibit "K."

12

28.     Plaintiffs have not been compensated for their losses – which are in the tens of
millions of dollars before trebling – and, indeed, as per the Settlement and Release, TAP has
received or will be receiving a financial credit from the settlement proceeds in the amount it was
obligated to pay under the settlement related to Plaintiffs' claims:

> In the event that any TPP Class Members submit valid and timely
> requests to opt-out of the Lupron® Purchaser Class pursuant to this
> Class Agreement and do not thereafter participate in the SHP
> Agreement, TAP shall be entitled to a refund from the TPP
> Settlement Pool in an amount equal to the percentage of Lupron®
> Purchases made by such TPP Opt-Out(s) (calculated in the same
> manner as the SHPRCP, described in paragraph 2(ff) to this Class
> Agreement) multiplied by one hundred ten million dollars
> ($110,000,000) (the "TAP Refund").

*See* Exhibit "I," at ¶ 11 at p. 23.  It is believed and therefore averred that the proceeds of the credit

TAP received to account for the claims of Plaintiffs herein exceeds $6 million.

29.     Thus, Plaintiffs commence this action to recover their respective portions of their
uncompensated losses as a result of TAP's crime, and the fraudulent scheme and conspiracy detailed
herein.  Since all other patients and insurance companies have been fairly compensated for their
losses, Plaintiffs simply seek to recover for the overcharge payments they made for Lupron® on
behalf of their insureds, an amount which exceeds greatly the more than $6 million credit Defendant
TAP already has recovered to account for the claims asserted herein.

## PARTIES

30.    Plaintiff BCBS Alabama is a not-for-profit health care services corporation organized under the laws of the State of Alabama and licensed to do and doing business in the State of Alabama with its principal place of business at 450 Riverchase Parkway East, Birmingham, Alabama. Plaintiff BCBS Alabama and its wholly owned subsidiaries Preferred Care Services, Cahaba Benefit Administrators, and United Trust Insurance Company (collectively "BCBS Alabama") provide health care financing benefits, including prescription drug coverage, through a variety of arrangements, including health indemnity coverage, managed care coverage, and plan administration.  BCBS Alabama covers approximately 3.3 million Americans.

31.    During the period relevant to this Complaint, BCBS Alabama was and is a payer for Lupron® on behalf of its beneficiaries, subscribers and insureds.  For the period January 1, 2000 through December 31, 2001 - the exemplar period for the notice of exclusion filed in MDL 1430 – BCBS Alabama paid and administered approximately $16,270,574.88 for Lupron® prescribed to its beneficiaries, subscribers and insureds.

32.    During the period relevant to this Complaint, BCBS Alabama paid for Lupron® prescribed to its beneficiaries, subscribers and insureds based upon AWP.  BCBS Alabama paid for Lupron prescribed by physicians and hospitals in Montgomery County, Alabama, as well as throughout the State of Alabama and the country.

33.    Plaintiff BCBS Michigan is a not-for-profit health care services corporation organized under the laws of the State of Michigan and licensed to do and doing business in the State of Michigan with its principal place of business at 600 LaFayette East, Detroit, Michigan.  Plaintiff BCBS Michigan and its wholly owned subsidiary Blue Care Network (collectively "BCBS

14

Michigan") provide health care financing benefits, including prescription drug coverage, through a variety of arrangements, including health indemnity coverage, managed care coverage, and plan administration. BCBS Michigan covers approximately 4.8 million Americans.

34.     During the period relevant to this Complaint, BCBS Michigan was and is a payer for Lupron® on behalf of its beneficiaries, subscribers and insureds. For the exemplar period January 1, 2000 through December 31, 2001, BCBS Michigan paid and administered approximately $34,561,273.73 for Lupron® prescribed to its beneficiaries, subscribers and insureds.

35.     During the period relevant to this Complaint BCBS Michigan paid for Lupron® prescribed to its beneficiaries, subscribers and insureds based upon AWP. BCBS Michigan paid for Lupron prescribed by physicians and hospitals in Montgomery County, Alabama, as well as throughout the State of Alabama and the country.

36.     Plaintiffs are independent licensees of the Blue Cross and Blue Shield Association. Each Plaintiff provides various types of coverage, including full coverage with no co-insurance, coverage that includes a co-payment by the patient and retiree employee benefit supplemental insurance/Medigap coverage for senior citizens receiving Medicare benefits.

37.     Defendant Abbott is a highly diversified health care corporation, the principal business of which is the discovery, development, manufacture, distribution and sale of a broad and diversified line of health care products and services. Abbott's business includes pharmaceuticals, nutritionals, hospital products, and diagnostics. Abbott's world headquarters is located in Abbott Park, Illinois. The company employs over 60,000 people and reported sales of over $19.6 billion for the fiscal year ending December 31, 2004.

15

38.    Defendant Takeda Pharmaceutical Company, Ltd. is the English name that Takeda Chemical Industries, Ltd. adopted in June 2004 and is a Japanese company with its principal place of business in Japan. Takeda Pharmaceutical Company, Ltd. and Takeda Chemical Industries, Ltd. are individually and collectively referred to herein as "Takeda."

39.    Takeda is and has been for years Japan's largest pharmaceutical company and is among the largest in the world. Headquartered in Osaka, Japan, Takeda discovers, develops, manufactures, markets, distributes and sells a broad range of pharmaceutical products. Takeda's net sales for Financial Year 2004 were $10.2 billion.

40.    Takeda owns 100% of the voting stock of Defendant Takeda America Holdings, Inc. ("Takeda America"), its wholly-owned subsidiary or affiliate. Takeda America is a New York corporation with its principal place of business in New York, New York.

41.    Defendant TAP was first formed as an equal partnership between Takeda and Abbott in 1977 and is now a joint venture which Abbott and Takeda America own equally, each parent company owning 50% of TAP's stock. Takeda's officers, directors, and managers control and exercise Takeda America's rights and powers incident to Takeda America's stock ownership in TAP. TAP's United States headquarters is located at 675 North Field Drive, Lake Forest, Illinois 60045. Abbott and the Manufacturer Defendants, together with their subsidiary, TAP, develop, manufacture, distribute, market and sell pharmaceutical products for the United States and Canada. One of these products is leuprolide acetate (for depot suspension), a synthetic analog of naturally occurring gonadotropin-releasing hormone (Gn RH or LH-RH). The brand name for the drug is Lupron® or Lupron Depot® (a sustained release form of Lupron®) (collectively referred to herein as "Lupron®").

16

42.    According to Abbott's Form 10-K filed March 2, 2005, Lupron® is sold directly to physicians, retailers, wholesalers, health care facilities, and government agencies. It is manufactured by Takeda in Japan and, by agreement between the companies, it is distributed throughout the United States, including Alabama, from Abbott-owned distribution centers. TAP's primary marketing efforts are focused on securing the use of Lupron® by physicians.

43.    Defendant OSC has its principal place of business in Alabama. Defendants ABC and ABSG have their principal places of business in, respectively, Pennsylvania and Texas.

44.    The Fictitious Defendants A-ZZZ include the Doctor Defendants, medical providers located throughout the State of Alabama and the country . At all times material hereto, the Doctor Defendants were in the business of treating cancer patients who were plan beneficiaries of insurance plans offered by Plaintiffs. Each of these Doctor Defendants treated Plaintiffs' plan beneficiaries with Lupron® and thereafter sought and received reimbursement for the Lupron® from Plaintiffs.

45.    The sales of Lupron® were highly successful as a result of the fraudulent scheme and conspiracy alleged herein. In 1989, TAP lost approximately $25 million on Lupron®. In 1991, however, TAP made approximately $125 million, and by 1998, the total revenues from Lupron® sales through Medicare alone was $584 million consisting of approximately 80% paid by the federal government ($467 million) and 20% paid by insurers, like Plaintiffs, and patients ($117 million). TAP's total sales revenue in 1998 was $2.06 billion. Such exponential growth was made possible only by this scheme.

46.    The Defendants named in this Complaint include all of their predecessor entities and all of their past and present component, subsidiary and affiliate entities.

17

47.    The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

## JURISDICTION AND VENUE

48.    Plaintiffs bring this action pursuant to state common law and statutes.  No federal claim is asserted.

49.    This Court has subject matter jurisdiction pursuant to Ala. Code § 12-11-30 because this is an action for damages which exceeds $10,000, exclusive of interest, costs and attorneys' fees.

50.    No aspect of the claims asserted in this Complaint is brought pursuant to any federal law, including either the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA") or the Medicare Act, 42 U.S.C. § 1395, and thus no federal question is raised by any of the claims asserted.  To the extent any of Plaintiffs' claims or factual allegations herein may be construed to have stated any claim under federal law, such claim is expressly and undeniably disavowed and disclaimed by Plaintiffs.  Moreover, to the extent any of Plaintiffs' claims or factual allegations herein are urged by any Defendant to have stated any claim under federal law, Plaintiffs expressly disavow such claims or allegations and reserve the right to modify this Complaint to conform their claims and/or they authorize the court to do so by Order based upon this express disclaimer of any federal right or remedy.

51.    This Court has jurisdiction over the Manufacturer Defendants because they are corporations regulated under the laws of the State of Alabama and do sufficient business in, have

sufficient minimum contacts with, or otherwise intentionally availed themselves of the markets of the State of Alabama through the promotion, marketing, sale and distribution of Lupron® and other drugs and products in Alabama.

52.    This Court has jurisdiction over the Wholesaler Defendants because they are corporations regulated under the laws of the State of Alabama and do sufficient business in, have sufficient minimum contacts with, or otherwise intentionally availed themselves of the markets of the State of Alabama through the promotion, marketing, sale and distribution of Lupron® and other drugs and products from within and without Alabama.

53.    This Court has jurisdiction over the Doctor Defendants included within the Fictitious Defendants because they are businesses located within, doing business in and regulated under the laws of the State of Alabama.

54.    Defendants have submitted to the jurisdiction of Alabama under AL. R. CIV. P. 4.2 through the transaction of business, commission of tortious acts, and other conduct as more particularly described herein

55.    Venue is proper in this Court since Plaintiffs paid for Lupron® prescribed by doctors and hospitals located in this County and a substantial part of the events or omissions giving rise to these claims occurred in this County, one or more of the Defendants was doing business in this County by agent at the time of the accrual of the causes of action alleged herein, are otherwise engaged in the transactions which form the basis of this action in this County, and because both Plaintiffs agree to this venue. Venue is further proper in this Court because Plaintiffs assert rights to relief arising out of the same transaction or occurrence, the existence of a substantial number of questions of law or material fact common to both Plaintiffs will arise in the action, such questions

19

will predominate over individualized questions pertaining to each Plaintiff, the action can be maintained more efficiently and economically for all parties than if prosecuted separately, and the interest of justice supports the joinder of the parties as plaintiffs in one action. Venue is also proper pursuant to Ala. R. Civ. P. 82(c).

## FACTUAL ALLEGATIONS

56. There are hundreds of thousands of men in the United States who have prostate cancer. The hormone, testosterone, naturally produced by men, promotes the growth and spread of prostate cancer. One method of treatment of prostate cancer has been the suppression or elimination of testosterone in men suffering from that disease. Testosterone in a man suffering from prostate cancer can be eliminated through the surgical removal of the testicles by a procedure called an orchiectomy. Alternatively, a man's production of testosterone can be suppressed through the administration of a drug that acts to suppress testosterone production, such as Lupron® or Zoladex® (a direct competitor of Lupron®).

57. In the 1980s, Defendants Abbott, Takeda and TAP began marketing Lupron® as a treatment for prostate cancer. In marketing Lupron®, these Defendants employed and maintained extensive marketing and sales departments. Since at least the early 1990's, these Defendants primarily sold and provided Lupron® to medical providers across the country.

58. Lupron® and Lupron Depot® are used principally for the palliative treatment of advanced prostate cancer in men, the treatment of endometriosis, infertility and anemia caused by uterine fibroids in women, and the treatment of central precocious puberty in children.

59. Lupron® is administered to patients in liquid form by intramuscular injection, typically in the buttocks or arm, by a physician or a nurse under the supervision of a physician. At

various times in the 1990s, and continuing to the present, Lupron® was available in daily, one-month, three-month and four-month doses. It is typical that a patient whose prostate cancer is being treated with Lupron® would receive regular injections of Lupron® for the remainder of his life.

### THE MEDICARE INSURANCE PROGRAM'S USE OF AWP AS A BENCHMARK [AND PLAINTIFFS' MEDIGAP COVERAGE IN CONNECTION THEREWITH]

60.   In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

61.   The U.S. Department of Health and Human Services ("HHS") is an agency of the United States and is responsible for the funding, administration and supervision of the Medicare Program. The Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), is a division of HHS and is directly responsible for the administration of the Medicare Program, among others. Formerly HCFA and currently CMS, in discharging those responsibilities, contracted with private insurance companies, known as intermediaries and carriers, to receive, review, and pay appropriate claims for reimbursement for the provision of care to Medicare beneficiaries.

62.   The Medicare Program, as a general matter, did not cover the cost of prescription pharmaceuticals which a Medicare beneficiary obtained pursuant to a prescription and thereafter self-administered (*e.g.*, by swallowing the drug in liquid or pill form). However, Medicare Part B did and does cover some drugs, including injectables administered by a medical provider. Since Lupron® is an injectable drug, it is covered under Medicare Part B.

63.   In determining the amount it would pay, Medicare calculated the "allowed" amount for the drug based upon the payment methodology set forth in 42 C.F.R. §405.517, which regulation

21

was published in the Federal Register on November 25, 1991 and became effective on or about January 1, 1992.

64.    Prior to January 1, 1998, the Medicare Part B allowed amount for injections of Lupron® was on the basis of the lower of the "estimated acquisition cost" ("EAC") or the national "average wholesale price" ("AWP") for the drug. The EAC for a drug was to be determined based on surveys of the actual invoice prices paid for the drug, taking into consideration "factors such as inventory, waste and spoilage." The AWP was reported in *The Red Book* and other pricing publications and databases used by the pharmaceutical industry. Historically, it has been the AWP that has been used as a basis for Medicare reimbursement for prescription drugs.

65.    Upon information and belief, all of the Defendants, along with other pharmaceutical drug companies, physicians and physician groups actively sought to prevent HCFA from collecting surveys of actual invoice prices paid for drugs from which EACs were to be calculated, which resulted in default to the use of the AWP.

66.    On January 1, 1998, Medicare Part B was changed to provide that the allowed amount would be based upon the lower of the actual charge on the Medicare claim for benefits or 95 percent of the AWP for the drug.

67.    Effective January 1, 2004 through December 31, 2004, the Medicare allowed amount was changed from 95 percent of the AWP for the drug to the lesser of the actual charge on the claim for program benefits or 85 percent of the AWP determined as of April 1, 2003.

68.    On January 1, 2005, the Medicare allowed amount calculation for certain Part B drugs, including Lupron®, changed and became based upon the average selling price ("ASP") plus 6 percent.

22

69.    Medicare Part B has reimbursed medical providers, like the Doctor Defendants, at 80% of the allowable amount for prescription drugs, regardless of the manner for calculating the allowable amount. The remaining 20% was paid by the Medicare beneficiary and/or his/her Medigap carrier, like the Plaintiffs, and is called the "co-payment" amount. Accordingly, respecting all Medicare beneficiaries for which Plaintiffs provided Medigap coverage, Plaintiffs paid some or all of the inflated co-payment amount for Lupron®.

70.    The Medicare Program has publicly announced that it would use the AWP published in pharmaceutical industry publications, such as the *Red Book, Blue Book*, or *Medispan*, as the basis for reimbursement. Historically, Medicare used the AWP published in *Red Book.*

71.    The *Red Book* published AWPs for the various dose forms of Lupron®, as well as the competitor drug Zoladex® and many other drugs. In periodically announcing the AWP for Lupron®, the *Red Book* simply published the prices that were supplied by the Manufacturer Defendants. These Defendants knew that they could and did directly control and raise the AWP for Lupron® at any time by simply forwarding to the *Red Book*, a new and higher AWP.

72.    On May 23, 1999, *The Chicago Tribune* reported that a spokesman for the publisher of the *Red Book*, Medical Economics Co., stated that the AWP for Lupron® that appears in the *Red Book* is supplied by TAP. In fact, in a June 1996 Dow Jones News Article, it was reported that Phil Southerd, an associate product manager of the *Red Book*, stated that the *Red Book* merely publishes prices that are faxed right from the manufacturer.

73.    There are significant discrepancies between the AWP set by the Manufacturer Defendants for Lupron® in the *Red Book* for reimbursement under Medicare and the prices charged

23

for Lupron® by the Manufacturer Defendants to physicians, like the Doctor Defendants. The AWP for Lupron® set by the Manufacturer Defendants is neither an "average" nor "wholesale."

74.    Therefore, since Medicare calculated the allowable using the AWP for Lupron, 80% of which allowable Medicare paid, Plaintiffs paid up to 20% of the remainder of the allowable for all Medicare beneficiaries for which Plaintiffs provided Medigap coverage, based upon the AWP for Lupron®.

75.    Thus, Defendants' conspiracy to artificially inflate the AWP for Lupron® above the actual average wholesale price directly caused Plaintiffs to substantially overpay for the Lupron® received by patients for whom Plaintiffs provided Medigap coverage.

## PLAINTIFFS' OTHER PRIVATE ASSISTANCE PROGRAMS' UTILIZATION OF AWP AS A BENCHMARK

76.    In addition to their Medigap programs, respecting which Plaintiffs are obligated to pay based upon AWP since Medicare sets the allowable based upon AWP, Plaintiffs also used AWP as an industry standard benchmark to determine the amount of reimbursement respecting other programs administered by Plaintiffs under which they provided coverage to patients throughout Alabama and elsewhere.

77.    Plaintiffs reasonably relied upon the fact that the government chose AWP as a benchmark for reimbursement of Medicare Part B drugs in relying upon AWP as a benchmark for Plaintiffs' reimbursement of Lupron® and other drugs under their insurance programs.

78.    Thus, respecting non-Medicare insureds of Plaintiffs who were prescribed Lupron®, such as men under the age of sixty-five with prostate cancer, women with endometriosis, fertility

24

problems and anemia caused by uterine fibroids and children with precocious puberty, Plaintiffs similarly overpaid for Lupron® based upon its inflated AWP.

79.    Therefore, the Manufacturer Defendants' fraudulent scheme and conspiracy to artificially inflate the AWP for Lupron® above the actual wholesale price, to sell it to medical providers, like the Doctor Defendants, at substantially lower cost and to market that spread as a financial incentive to medical providers directly caused Plaintiffs to overpay substantially respecting Lupron® received by their non-Medicare insureds.  When the medical providers, like the Doctor Defendants billed Plaintiffs at the AWP for Lupron®, and Plaintiffs paid the inflated AWP, the fraud was complete and Plaintiffs' damage therefrom was realized.

## DEFENDANTS' FRAUDULENT CONDUCT

### ARTIFICIALLY INFLATING THE AVERAGE WHOLESALE PRICE

80.    From at least 1991, through at least January 2005, the Manufacturer Defendants deliberately and intentionally charged medical providers across the United States, including those in Alabama and throughout the country, like the Doctor Defendants, prices for Lupron® substantially less than the AWP that Manufacturer Defendants had reported to *Red Book* for government and private assistance reimbursement.  In conjunction therewith, the Manufacturer Defendants also told medical providers, including the Doctor Defendants, to bill government and private assistance programs, including Plaintiffs, at or above the AWP then published in the *Red Book* and related publications.  The Manufacturer Defendants knew and understood that government assistance programs and private insurers, like Plaintiffs, relied upon the AWP published in *Red Book* and other publications and would reimburse doctors based upon that AWP, if the doctor billed at or above the AWP.

25

81.     By controlling both the cost to the medical provider for Lupron® and the amount which the provider would receive in AWP-based reimbursements, the Manufacturer Defendants were able to control the spread or the profit to the medical providers, like Doctor Defendants, which Defendants dubbed "Return-to Practice" or "RTP."

82.     This profit potential was created and marketed by the Manufacturer Defendants to influence medical providers' decisions to select Lupron® over other similar drugs, like Zoladex®, and other treatments and thereby increase the Manufacturer Defendants' market share and revenues from increased sales and sales at higher prices.

83.     To further incentivize medical providers to prescribe Lupron® – either to encourage them to switch to Lupron® from a competitor drug or to prevent them from switching to a competitor drug – the Manufacturer Defendants, periodically throughout the relevant time period, increased the RTP for medical providers by offering deeper discounts off of AWP to the medical providers and/or by increasing the AWP for Lupron®, as reported in *Red Book*. The Doctor Defendants received such deeper discounts.

84.     The profit to these medical providers, as well as the increased market share and resultant profits to the Manufacturer Defendants, were funded by government assistance programs, like Medicare, private assistance programs, like Plaintiffs, and patients, through their payments of the inflated AWP for Lupron®, resulting from Defendants' overall fraudulent scheme and conspiracy.

85.     According to Criminal Informations filed against several doctors and internal company documents, the Manufacturer Defendants referred to this inflated profit, and the corresponding inducement to the physicians, as their "Return to Practice" program, among other names. The Manufacturer Defendants referred to the profit that the doctor could obtain by

26

prescribing Lupron® and billing the government and private insurers and patients at the published AWP as money going to the doctor from "[Defendants'] Checkbook." These Defendants knew and understood that, because the government and private assistance programs relied upon the *Red Book* to establish AWPs, and because Defendants could precisely control the AWP as published in the *Red Book*, they could increase the AWP whenever they so desired to create greater profit for their physician-customers, like the Doctor Defendants, from the payments by insurers like Plaintiffs. Accordingly, the Manufacturer Defendants could control the amount of the financial incentive, or "Return to Practice," that a physician would receive by prescribing Lupron® to their patients and billing insurers and patients at the AWP established by Defendants. *See, e.g.,* Information of *United States of America v. Spinella* (D. Mass.) at Exhibit "E," at ¶ 15.

86.     For example, the Criminal Information against Dr. Spinella states that, on or about August 24, 1995, in an attempt to get Dr. Spinella to reverse his decision to prescribe Zoladex®, rather than Lupron®, an employee of the Manufacturer Defendants left at his office a document created by the Manufacturer Defendants demonstrating to the doctor the amount of profit that he could earn through Defendants' "Return to Practice" program from the prescription of Lupron®. Specifically, the document showed that Dr. Spinella could earn as much as $7,000 per year more by using Lupron® instead of Zoladex®. *Id.* at ¶ 22.

87.     The increase of $7,000 per year was based on the "spread" between Dr. Spinella's actual costs and the artificially inflated AWP set by the Manufacturer Defendants for Lupron®, as compared to the spread between the doctor's cost for Zoladex® and the AWP for Zoladex®.

88.     The Manufacturer Defendants' marketing and sales documents, which were prepared and disseminated to their employees and agents, calculated the spread for Lupron® as the amount

between the AWP and various discount levels off the already discounted List Price which were being offered to Defendants' customer-doctors. For example, in 1996, the Manufacturer Defendants prepared marketing materials for medical providers showing how they could make money by purchasing Lupron® from Defendants. As their marketing and sales materials indicated, in 1996, the AWP for Lupron® as reported for Medicare reimbursement was $515.63. However, in 1996, the actual price paid by the medical providers, including the Doctor Defendants, to the Manufacturer Defendants for Lupron® ranged from a high of only $412.50 to a low of $350.81, if volume discounts were achieved.

89.     The AWP's reported by TAP to the *Red Book* for monthly injections of Lupron® 7.5 mg were as follows:

|      | AVERAGE WHOLESALE PRICE |
|------|-------------------------|
| 1992 | $418.75 - $437.50       |
| 1993 | $451.25                 |
| 1994 | $463.75                 |
| 1995 | $477.50 - $496.25       |
| 1996 | $496.25 - $515.63       |
| 1997 | $515.63 - $540.63       |
| 1998 | $566.88 - $594.65       |
| 1999 | $596.65 - $623.79       |
| 2000 | $623.79                 |

90.     Other documents created and disseminated by the Manufacturer Defendants compared the AWPs and the actual "costs" for Lupron® and Zoladex® so that medical providers, like

28

the Doctor Defendants, could easily see the different "Return-to-Practice" amounts available for different levels of purchases and so they could see that Lupron® was more profitable.

91.    The Manufacturer Defendants used the artificially inflated AWP as a means of marketing Lupron®. Specifically, when employees of the Manufacturer Defendants talked to providers about their choice of using Lupron®, rather than Defendants' competitor medication, Zoladex®, these Defendants emphasized that, because the AWP for Lupron® was high, the monetary return to the providers was better if they used Lupron®. Internal documents from the Manufacturer Defendants specifically show that they used the spread to create greater demand for Lupron®. One such internal document stated:

> As we have also discussed, Northwest Iowa Urology is very upset about the allowable not going up. I personally met with the doctors to discuss the issue 4/17. The physicians have started using Zoladex but would stop if the allowable issue was taken care of.

92.    During the period covered by this Complaint, the published AWP for Lupron®, and thus the resultant allowable, continued to increase each year. The price paid by the doctors continued to decrease. The published AWP went from $437.57 in 1992 to $623.79 in 2001 (for a one-month equivalent dosage). During this same time period, the actual cost of the drug to the provider decreased substantially. In 1993, the actual average sales price to physicians, like the Doctor Defendants, was $340.00. In 1999, the actual average sales price was only $207.00. The Manufacturer and Doctor Defendants consistently misrepresented to Plaintiffs that the actual average wholesale price for Lupron® was increasing, while in practice, the Manufacturer Defendants consistently and significantly reduced the price to the providers like the Doctor Defendants for the

29

drug. But all Defendants took steps to fraudulently conceal these facts from Plaintiffs, the government and the public.

93.    The scheme achieved its goal for Defendants. In 1991, total Medicare payments for Lupron® were $72 million. By 1998, Medicare paid almost $458 million for Lupron®.

94.    The benefit of Defendants' illegal marketing and sales scheme is shown in increased market share and sales of Lupron®. In 2000, Lupron® sales were nearly $800 million as compared to $584 million in 1998. Most of the revenue obtained from Lupron® was from reimbursement from government and private assistance programs, like Plaintiffs.

## USE OF FREE SAMPLES

95.    The Manufacturer Defendants, through their employees and agents, also provided free samples of Lupron® to medical providers, like the Doctor Defendants, and others, like the Wholesaler Defendants. In some years, sales representatives of TAP were provided with free samples for distribution worth approximately $40,000. These free samples were used to offset the total cost associated with Lupron® purchases, thereby increasing the spread. Moreover, the Manufacturer Defendants specifically told medical providers, like the Doctor Defendants, that they could and should bill government and private assistance programs for the free samples. Thus, the Manufacturer Defendants were aware that medical providers were billing government and private assistance programs for the free samples.

96.    One of the Manufacturer Defendants' sales representatives called on Dr. Joseph Spinella in 1995 and reported to a District Manager employed by Defendants in Massachusetts. That District Manager supervised a number of the Manufacturer Defendants' sales representatives who called upon urologists in Connecticut, Massachusetts, Maine and Rhode Island. From time to time,

30

beginning in or about 1995, that Massachusetts District Manager informed Defendants' sales representatives that free doses of Lupron® could be offered to physicians to induce them to prescribe Lupron® to their patients and to keep them from switching patients to Zoladex®. Defendants' sales representatives, supervised by that same District Manager, sent to the District Manager so-called Weekly Activity Reports and sales call notes, or portions thereof, which contained requests by physicians for samples, and the offer and delivery of samples to physicians to keep and to maintain their Lupron® business. *Id.*

97.    The Criminal Information against Dr. Olstein specifically alleges "the core objective of this conspiracy for all participants was to obtain money from the **patient's health care insurers** through the prescription of Lupron®. It was the objective of [TAP] in this conspiracy to provide free doses or samples of Lupron Depot®, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot®." *See* Information of *United States of America v. Olstein* (D. Mass.) at Exhibit "E," at ¶ 10 (emphasis added).

98.    Upon information and belief, this free sample fraud aspect of the conspiracy was not limited to New England, but, was part of the nationwide conspiracy that included Alabama.

## OTHER FINANCIAL INDUCEMENTS

99.    The Manufacturer Defendants also have provided and/or arranged for many other financial inducements to stimulate sales of Lupron® at the expense of Plaintiffs. Such inducements included, but were not limited to, kickbacks which consisted of free Lupron®, trips to resorts, free consulting services to doctors and other customers, and debt forgiveness, among other things.

100.    These other financial inducements were used in conjunction with the promotion of the spread on Lupron® to persuade doctors to prescribe Lupron® over other drugs and other

31

treatments in order to increase the Manufacturer Defendants' market share, and ultimately, their profits.

101.    Upon information and belief, this aspect of the fraudulent scheme and conspiracy also was perpetrated on a nationwide scale, which included Alabama.

## THE "DIVERSIONARY BLACK MARKET" FOR LUPRON

102.    The Manufacturer Defendants also set up a network to handle the flow of "black market" Lupron. This was done as a stopgap effort to prevent declining sales that would have resulted from the federal government's efforts to rein in the high cost of Lupron® in Alabama and other States. All the Defendants named herein participated in this scheme to further defraud Lupron purchasers, like Plaintiffs.

103.    In around 1998, the federal government began adopting a reimbursement protocol under Medicare known as the "Least Costly Alternative" [or "LCA"] method for determining reimbursement. LCA was first adopted in South Carolina and Florida, but quickly spread to other States, like Alabama. Pursuant to LCA, Medicare carriers would only reimburse the "least costly" of "alternative" medications. In the case of Lupron, the "least costly" alternative medication was Zoladex. Historically, the AWP for Zoladex was at least $100 less than the AWP for Lupron. Consequently, under LCA, since Lupron and Zoladex were therapeutically equivalent drugs, Medicare would only pay for Zoladex in LCA States. In most States, patients were "grandfathered" for their existing therapies such that doctors could continue prescribing Lupron to existing patients and seeking reimbursement at the Lupron AWP.

104.    As soon as LCA began being implemented in southern states, doctors started switching [or threatening to switch] to Zoladex to preserve and/or increase their Return to Practice.

32

TAP, responded to the threat by providing massive amounts of free Lupron to doctors in LCA states, knowing and expecting that the doctors would bill unlawfully for the free Lupron. TAP also provided even deeper discounts to doctors in LCA states, by actively working with doctors to set up buying groups which could achieve the highest contract discounts TAP was offering. Lastly, TAP allowed doctors in LCA states to buy excess Lupron and to re-sell it through a diversion network that TAP orchestrated and approved of via the Wholesaler Defendants.

105.    It is unlawful for doctors to "wholesale" and re-sell prescription drugs without a license. Nevertheless, doctors throughout Alabama and the country bought massive amounts of excess Lupron and re-sold the same to the Wholesaler-Defendants through former TAP employees and others. It is believed and therefore averred that the Doctor Defendants participated in the diversionary black market described herein by buying excess Lupron from TAP and re-selling through the Wholesaler Defendants and others.

106.    This diversionary black market was set up through direct meetings and communications between the Manufacturer Defendants and the Wholesaler Defendants.

107.    The Manufacturer Defendants benefitted from the diversionary black market because it allowed them to overcome the potentially devastating effects of LCA by having them provide excess Lupron as a means to provide further profits to doctors who might otherwise switch to Zoladex because of the greater RTP potential in the wake of LCA. The Manufacturer Defendants policed and controlled the diversionary conduct in an effort to channel the diverted Lupron to the Wholesaler Defendants. The Manufacturer Defendants instituted lawsuits throughout the country against doctors and wholesalers who were not part of their approved network. However, as evidence of the conspiracy alleged herein, the Manufacturer Defendants never sought to sue or otherwise act

33

to stop either the Wholesaler Defendants or any of the Doctor Defendants from engaged in the re-sale of diverted Lupron.

108.    It is believed and therefore averred that the Doctor Defendants benefitted from the diversionary black market by being able to re-sell Lupron for substantial profit.

109.    It is believed and therefore averred that the Wholesaler Defendants benefitted from the diversionary black market by being able to purchase Lupron at substantial discounts, far below the "wholesale acquisition cost" TAP would otherwise sell the Lupron to them for, and then re-selling the Lupron at higher prices for substantial profit.

110.    Plaintiffs were harmed by this aspect of the fraudulent scheme and conspiracy because, *inter alia*, the diversionary black market kept doctors in Alabama and other LCA States buying Lupron and seeking reimbursement at the inflated Lupron AWP [via the grandfather provision of LCA], as opposed to switching to the lower priced and lower reimbursed Zoladex. Had doctors in LCA States switched to Zoladex, as would be expected a as result of LCA, Plaintiffs would have saved at least $100 per injection of Zoladex as opposed to Lupron.

## DEFENDANTS' CONSPIRACY AND CONCEALMENT

111.    In order to prevent the discovery of their unlawful marketing, sales and diversionary practices, the Defendants conspired and agreed among themselves and with others [i.e., other doctors who were reaping the benefits of such fraudulent marketing tactics, and other pharmaceutical companies who were employing similar marketing tactics] to prevent the government, private insurance programs, like Plaintiffs, and patients from discovering their scheme so that they could maintain their profits from Lupron.

112.    While the medical providers, like the Doctor Defendants, were a necessary component of Defendants' scheme, they did not control the setting of the AWP or certain other aspects of the scheme. For example, in April 2001, Dr. Joel Olstein, a Lewiston, Maine urologist, was charged with conspiring with TAP to bill insurance companies for free samples of Lupron®. In a telephone interview with Dr. Olstein, conducted by Chicago Tribune reporter Bruce Japsen on April 11, 2001, Dr. Olstein said that he planned to plead guilty in exchange for his cooperation in the investigation. He explained, "my plea is a conspiracy with TAP.... Did they tell me what to do? On some level there was some understanding.... For every new patient I started on Lupron®, they provided me a free dose of the drug." He added, "they wanted me to carefully track how many new patients I started on Lupron® and we kept lists. Anybody in practice knows how to bill for free samples."

113.    TAP, in its training materials for its sales representatives, instructed its representatives to warn physician customers not to discuss the discounts off of AWP and contract pricing with other doctors because doing so could potentially put their profits in jeopardy.

> Doctor, by discussing your costs of Lupron with other physicians, you run the risk of that information getting back to HCFA. If HCFA then realizes that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amount you may charge.

TAP realized the importance of concealing its fraudulent marketing scheme, expressly recognizing that "[i]f word is leaked back to HCFA/Medicare that the cost of Lupron is going down, they very well may take steps in reducing [the] allowable." *See* excerpt from "Big Mac Attack," Exhibit "L."

114.    Additionally, Defendants conspired with other pharmaceutical companies to conceal the fraudulent marketing tactics being employed. As noted by the federal government in its Sentencing Memorandum of the United States, filed in *United States of America v. TAP Pharmaceutical Products, Inc.*, No. 01-CR-10354-WGY (D. Mass.), TAP concealed both its fraudulent marketing and that of its competitor.

> [I]n 1995, TAP, in a moment of delicious irony, accused its competitor, the manufacturer of Zoladex, with providing inducements to physicians in violation of the Medicare fraud and abuse laws, to include the fact that employees of the competitor were giving free samples to doctors to encourage them to switch from Lupron to Zoladex. The competitor, in turn, accused TAP of the very same conduct. Top employees from the two companies met in a summit meeting to discuss this exchange of criminal allegations. Did the serious allegations curb TAP's conduct? Did TAP, aware of allegations that its employees had engaged in criminal conduct, undertake expeditiously to stop the behavior, to train its employees in the rules and to enforce their adherence to the rules? Did either company, in possession of information that a competitor was violating the rules, report the conduct to prosecutive authorities in an effort to clean up the industry? Unfortunately, the answer to all of these questions is no: TAP, cognizant of the rules and having been accused of violations, simply carried on its business as it always had, full criminal speed ahead.

*See* Sentencing Memorandum of the United States, Exhibit "M," at pp. 62-63.

36

115.    Defendants conspired and agreed to accomplish the fraudulent scheme set forth herein in order to increase the sales of and profitability from Lupron®, and committed acts in furtherance of this conspiracy which are outlined in this Complaint.

116.    Defendants actively concealed their conduct, thereby precluding Plaintiffs from uncovering Defendants' wrongdoing sooner.

117.    In furtherance of this scheme to defraud government and private assistance programs, like Plaintiffs, Defendants created a centralized national marketing and sales plan which was implemented through their employees and agents throughout the country, including those in Alabama, in the following manner, among others:

1.    Setting actual prices at which Lupron® was sold;

2.    Setting the AWP in the *Red Book* and other similar publications which was materially greater than the actual price to physicians for Lupron®;

3.    Contacting the *Red Book* and other industry publications for the purpose of setting and controlling the listed AWP;

4.    Sending information to or otherwise contacting medical providers about both the *Red Book* quoted AWP and the actual cost to the providers for Lupron®;

5.    Creating and disseminating marketing and sales materials that showed the spread between the actual cost to the provider and the reported AWP for Lupron®;

6.    Creating and disseminating marketing and sales materials that demonstrated the spread or profit to the provider from prescribing Lupron® as compared to the profit from other competitor drugs and treatments;

37

7.    Creating and disseminating marketing and sales materials for medical providers discussing how the use of free samples could increase their profits;

8.    Creating and disseminating marketing and sales materials for medical providers discussing other financial inducements available from Defendants in connection with the providers choosing to prescribe Lupron®;

9.    Inducing Plaintiffs to pay inflated co-payments for Lupron® based upon the inflated AWP;

10.    Engaging in the diversionary black market for Lupron®;

11.    Receiving the proceeds and benefits of their fraudulent scheme in the form of increased market share and resultant profits; and

12.    Distributing portions of the proceeds and benefits of their fraudulent scheme to medical providers in the form of free samples, deep discounts off of the AWP for Lupron® and other financial inducements.

118.    Defendants concealed their fraudulent conduct from the Plaintiffs by controlling the process by which the AWP was set and the actual reported AWPs. Defendants also prevented Plaintiffs from knowing what the actual costs were for Lupron® to the providers which Plaintiffs were reimbursing, and they failed to inform Plaintiffs of the usage of free samples, the existence of the diversionary scheme, and of their providing other financial incentives to medical providers to induce them to use Lupron® rather than other less costly, but equally viable treatments. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing.

119.    Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint. Through no fault of their own, they did not receive inquiry notice or learn of the factual

38

bases for any of their claims in this Complaint or their injuries suffered therefrom until TAP's guilty plea and until the cases of which Plaintiffs formerly were class members were filed. With respect to the diversionary scheme alleged herein, Plaintiffs did not know of this scheme or their injuries suffered therefrom until less than a year ago. In addition, by the tolling principles applicable in class action cases of which Plaintiffs were a part [before opting out], the statutes of limitations that apply to the claims asserted herein have been tolled such that these claims are timely asserted by Plaintiffs.

## INDICTMENTS AND GUILTY PLEAS

### INDICTMENT AND GUILTY PLEA OF TAP AND RELATED AGREEMENTS REACHED WITH THE GOVERNMENT BY ABBOTT AND TAKEDA

120.    As noted above in late September, 2001, TAP agreed to plead guilty to a Criminal Information charging it with a conspiracy to violate the PDMA. *See* Plea Agreement, with attached Criminal Information, Exhibit "A." The Information to which TAP pled guilty provides, *inter alia*, as follows:

> 5.    At all times material to this Information, it was a crime, in violation of Title 21, United States Code, Sections 331(t) and 333 (b) for an employee of a company engaged in the lawful distribution of drugs to provide a drug sample free of charge to a physician, with the intention and expectation that the physician would use that sample in the treatment of a patient and thereafter seek and receive reimbursement for that drug sample which had been provided to the physician free of charge.

> 6.    Beginning in or about 1991 and continuing to in or about 1998, the defendant TAP, through its employees, provided to certain physicians thousands of free samples of the drug Lupron®, knowing and expecting that those physicians would prescribe and administer those drug samples to their patients

and thereafter seek and receive reimbursement for those free
samples.

*See* Exhibit "A," at Information at ¶¶ 5-6.

121.    This Plea Agreement provides that TAP agreed to plead guilty to the crime charged

in the Information, and that TAP "expressly and unequivocally admit[ted] that it knowingly,

intentionally and willfully committed the crime charged...." *Id.* at Plea Agreement at ¶1.   The

government agreed to decline further prosecution of TAP and its parent companies, Abbott and

Takeda, in consideration for the guilty plea. *Id.* at ¶ 4.

122.    The Judgment entered in the criminal case against TAP expressly prohibits TAP, as

well as Abbott and Takeda, as shareholders of TAP, from disparaging TAP's guilty plea. *See*

Judgment at Exhibit "N."  Specifically, under "Continuation of Conditions of Probation," the

Judgment provides:  "[n]either the defendant corporation nor the principal shareholders are to

disparage the sentence of this Court." *Id.* at 3 (emphasis added)

123.    The Plea Agreement also states that Abbott and Takeda entered into "Side Letter

Agreements" with the government regarding their own liability for the charged conspiracy. *See* Plea

Agreement, at Exhibit "A," at ¶¶ 4, 10. These Side Agreements evidence that Abbott and Takeda

were subject to the federal criminal investigation and were parties to the guilty plea and settlement.

*See* Side Letter Agreements of Abbott and Takeda at Exhibits "B" and "C." Indeed, Abbott's and

Takeda's consent to the guilty plea was clearly required because TAP's Board of Directors was

comprised of an equal number of executives from both Abbott and Takeda.  This consent was

codified in a formal consent executed by the Board of Directors. *See* Action taken by Unanimous

Consent of the Directors of TAP Pharmaceutical Products, Inc., dated September 13, 2001, at Exhibit

"O."

124.    Moreover, in exchange for cooperation from Abbott and Takeda in the ongoing

investigation and any criminal trial, the government agreed not to prosecute Abbott and Takeda. *See*

Exhibits "B" and "C," at ¶ b. The language was identical in each Side Letter Agreement. Abbott's

Side Letter Agreement reads as follows:

> The United States hereby declines prosecution of Abbott Laboratories
> for the following:

> \*    \*    \*

> (3)    **for conduct by, or attributable to, Abbott** not
> otherwise described in this paragraph which was
> known to the U.S. Attorney in Massachusetts or
> Connecticut prior to the date of execution of this letter
> and which concerned the sale, pricing and marketing
> of the drug Lupron® in all of its dose forms....

> \*    \*    \*

> It is understood among the parties to this Side Letter
> Agreement that the United State's promise not to
> prosecute Abbott is dependent upon and subject to
> TAP fulfilling its obligations in the Settlement
> Agreement and in the TAP plea agreement.

*See* Exhibit "B," at ¶ a (emphasis supplied).

125.    The Plea Agreement also provided that the government would be relieved of its

promise not to prosecute Abbott or Takeda if TAP breached any material provision of the Plea

Agreement. *See* Exhibit "A," at Plea Agreement, at ¶ 4. These documents clearly establish the direct

roles that Abbott and Takeda played in the resolution of the criminal charges against both them and

TAP, and their intimate involvement in the federal criminal investigation and proceedings.

41

126.    The Plea Agreement also indicates that "[c]ontemporaneous with the execution of this agreement, TAP shall enter into a Corporate Integrity Agreement...." *See id.*, at Plea Agreement, at ¶ 2. This Corporate Integrity Agreement ("CIA") was executed by TAP on September 28, 2001 and provides, *inter alia*, that by January 31, 2002, TAP was required to implement a "Code of Conduct" and "Policies and Procedures" regarding, among other things, "the calculation and reporting of accurate prices for Government Reimbursed Products [including Lupron®] to certain entities, including the Centers for Medicare & Medicaid Services ("CMS"), the State Medicaid Programs, and drug price reporting services on which the government agencies rely (*e.g.*, First Data Bank Inc., the *Red Book*, etc.)." *See* CIA, ¶ 2, Exhibit "P." These new "Policies and Procedures," mandating that Defendants report accurate prices going forward, demonstrate the inaccuracy of the prices previously reported by Defendants, as alleged herein.

127.    The "Policies and Procedures" also required "the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 353 ...." *See* CIA, at Exhibit "P," at Section III B,¶1, ¶ 2d. These new "Policies and Procedures," mandating that TAP properly track drug samples going forward, demonstrate the insufficiency and inaccuracy of TAP's drug sample tracking policies and procedures in the past, as alleged herein.

128.    On December 6, 2001, the criminal court entered judgment on TAP's guilty plea, and placed TAP on probation for five years. *See* Judgment at Exhibit "N." Consistent with TAP's plea, the Judgment held that TAP pled guilty to a one-count criminal offense – conspiracy under 18 U.S.C. § 371 to violate the PDMA [21 U.S.C. §§ 331(t) and 333(b)] by causing the sale of drug samples.

*Id.* at Exhibit "N"; *see also* Plea Agreement, at Exhibit "A," ¶ 1 (wherein TAP waived indictment and pled guilty to the Information charging TAP with conspiracy to violate the PDMA).

129.    Specifically, TAP agreed to plead guilty to a conspiracy in violation of the PDMA and ultimately to pay in excess of $900 million. These Defendants agreed that the fraudulent pricing and marketing of Lupron® took place during the period 1991 through 1998.

130.    The fines paid consisted of a $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to be paid to the fifty (50) states and the District of Columbia, plus interest.

131.    Indeed, in a related Lupron® case, *Walker v. TAP Pharmaceutical Products, Inc.*, C.A. No. CPM-L-682-01 (Super. Ct., Law Div., Cape May Co., NJ), in response to allegations in that Complaint regarding TAP's plea, TAP admitted as follows:

> [O]n or before October 3, 2001, TAP Pharmaceutical Products Inc., agreed to plead guilty to a one-count Information for conspiracy to violate the PDMA and to pay a $290 million criminal fine. TAP further admits that representatives of the United States Department of Justice have stated that the $290 million paid by TAP is the largest criminal fine in a U.S. health care fraud prosecution. TAP further admits that it entered into a civil settlement agreement with the United States in which it paid approximately $559.5 million to the United States. TAP admits that it entered into a civil settlement agreement with the fifty states and the District of Columbia in which it agreed to pay approximately $25.5 million. TAP further admits that it agreed to pay the government interest on the civil settlement amount commencing on September 4, 2001, and that the amounts it has paid to the federal and state governments total approximately $884 million.

*See* TAP's Answer in *Walker*, ¶ 8, at Exhibit "Q."

132.   The financials of Abbott and Takeda reveal that they actually set aside reserves and ultimately paid the fine for TAP's guilty plea. *See* excerpts from various financial reports of Abbott and Takeda, Exhibits "R" and "S," respectively.

133.   In exchange for Defendants' agreement to settle the government's claims, the government agreed not to further prosecute TAP or to exclude TAP from participating in Medicare and other government assistance programs.

134.   In addition to the fines, and as a further condition of the settlement, Defendants Abbott, Takeda and TAP agreed to report the true price of Lupron® to the government and to allow regular auditing of their sales and marketing practices.

## INDICTMENTS AND GUILTY PLEAS OF DOCTORS

135.   The following medical providers have all pleaded guilty to participation in the conspiracy to which TAP pled guilty:

1.    Dr. Joseph S. Olstein of Lewiston, Maine;

2.    Dr. Rodney Mannion of LaPorte and Michigan City, Indiana;

3.    Dr. Jacob Zamstein of Bloomfield, Connecticut; and

4.    Dr. Joseph Spinella of Bristol, Connecticut.

*See* Exhibit "E" and ¶¶ 8, 10, 83-85, 93-96, 110, *supra*.

136.   Each of these doctors admitted to participating in the nationwide conspiracy with Defendants to bill government and private insurance programs and patients for free Lupron®, including so-called free samples, free goods and/or Lupron® provided to providers at no cost as part of a volume discount, *i.e.*, TAP's "Buy 10, get 1 free" and "Buy 5, get 1 free" programs.

137.    According to the Informations to which these doctors pled guilty, they received anywhere from $15,000 to $70,000 from billing for the free samples of Lupron® provided by Defendants.

138.    Upon information and belief, Plaintiffs submit that hundreds of other doctors around the country, including the Doctor Defendants and others throughout Alabama, also participated in the fraudulent scheme and conspiracy respecting billing for free Lupron®, which conspiracy was self-concealing due to the nature of the conduct and Defendants' failure to properly label Lupron® given to providers at no cost.

## DEFENDANTS' UNLAWFUL CONDUCT IN ALABAMA AND THROUGHOUT THE COUNTRY

139.    By virtue of Defendants' agreement to plead guilty to a conspiracy to violate the PDMA, and to pay fines to resolve both criminal and civil charges against them, it is clear that their conduct had a nationwide effect both upon residents and consumers in Alabama and throughout the country and thus, such conduct had an effect upon their insurers, like Plaintiffs.

140.    Defendants' guilty plea and settlement included the sum of $25.5 million to be paid to the 50 states and the District of Columbia to resolve civil liabilities. Accordingly, Defendants have agreed that their unlawful conduct and conspiracy has affected residents and consumers and their insurers throughout the 50 states and the District of Columbia, including Alabama.

141.    In addition, a number of urologists in the states of Indiana, Connecticut, and Maine have all pleaded guilty to participating in the conspiracy to which TAP pled guilty. In addition, several other urologists and doctors have told newspapers that TAP representatives contacted them and explained to them how much money they could make by charging the AWP for Lupron®. These

45

doctors and medical care providers practice in states such as South Carolina, Kentucky, Illinois, and Wisconsin, among others.

142.    In January, 2001, the United States Attorney's Office in Connecticut filed charges against two (2) Florida doctors who ordered excess supplies of Lupron® and then resold them at higher prices in other states, according to court papers. The two urologists agreed to forfeit $1.1 million to the federal government.

143.    Finally, it is believed and therefore averred that sales presentations made by TAP employees included a company-supplied program that listed how much doctors could collect if they billed government and private insurance programs and patients for free samples. It is further believed, and therefore averred, that such presentations were given to doctors and medical care providers throughout the country, including those in Alabama, by sales employees of TAP.

## TOLLING OF THE STATUTE OF LIMITATIONS

144.    Plaintiffs had no knowledge of the conspiracy, concerted action, or any other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until early October, 2001 when it was announced that TAP agreed to plead guilty to a conspiracy to violate the PDMA. With respect to the diversionary scheme alleged herein, Plaintiffs did not know of this scheme or their injuries suffered therefrom until less than a year ago. Plaintiffs could not have discovered the conspiracy, concerted action or any other unlawful conduct alleged herein at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy. These techniques of secrecy included, but were not

46

limited to, secret meetings and communications, misstatements about the AWP, and other conduct alleged herein.

145.    Further, Plaintiffs were members of the nationwide Class in *In re Lupron Marketing and Sales Practices Litigation*, MDL 1430 (D. Mass.), which was certified in conjunction with a proposed settlement on November 24, 2004. Plaintiffs timely opted out of that Class, and elected, as they were permitted under the certification of that Class pursuant to Fed. R. Civ. P. 23(b)(3) and pursuant to the terms of the settlement, to exclude themselves from the Class and the settlement and to pursue their own action against Defendants.

146.    In addition, Plaintiffs were members of the nationwide Class that was certified on April 24, 2003 in *Stetser, et al. v. TAP Pharmaceutical Products, Inc., et al.*, No. 1-CV-5268 (Gen'l Ct. of Justice, Super. Ct. Div., New Hanover Co., N.C.) and the nationwide Class that was certified in *Clark, et al. v. TAP Pharmaceutical Products, Inc., et al.*, No. 5-02-0316 (Circuit Ct, Williamson Co., Ill.) on March 12, 2002.

147.    Plaintiffs' claims against Defendants were tolled from the filing in May 2001 of the first nationwide Class Action Complaint related to the alleged fraud concerning Lupron® until Plaintiffs' timely opt outs of the certified Settlement Class in MDL 1430 were deemed effective *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351-52 (1983); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974); *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974).

148.    By reason of the foregoing, the claims of Plaintiffs are timely under any applicable statute of limitations (as tolled by the filing of the nationwide class action complaints or otherwise), pursuant to the discovery rule and the doctrine of fraudulent concealment.

149.    The Defendants have been aware of their unlawful conduct and conspiracy since at least 1991, and probably prior thereto.

150.    Despite this knowledge and awareness, the Defendants continued to promote and sell Lupron® at artificially inflated prices.

151.    The Defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein, was and is willful, wanton, malicious, outrageous, and was and continues to be undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of the Plaintiffs and others.

## COUNT I

### UNJUST ENRICHMENT

152.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 151 hereof as if fully set forth here and further allege as follows.

153.    By engaging in the conduct described in this Complaint, Defendants have knowingly obtained benefits, including substantial profits, which were conferred upon Defendants by Plaintiffs, under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

154.    Defendants have collected payments for Lupron® from Plaintiffs that vastly exceeded the payments to which Defendants were entitled as a matter of law.  Moreover, Defendants have admitted that they unlawfully inflated the price of Lupron® paid by Plaintiffs and supplied medical providers with free samples of Lupron® and encouraged them to charge Plaintiffs and patients for such samples, in violation of the PDMA and other federal and state laws.

48

155.    These payments made by Plaintiffs for this benefit to the Defendants were erroneously made, and would not have been made under the terms of the plans administered by Plaintiffs had the true facts regarding the inflation of Lupron®'s AWP been known to Plaintiffs.

156.    Defendants should not, in equity and good conscience, be allowed to retain the profits they reaped from these payments.

157.    Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them by Plaintiffs.

158.    Defendants should therefore be required to disgorge their profits from the overpayment for Lupron® by Plaintiffs in an amount to be determined at trial, through the Court's imposition of a constructive trust or otherwise.

159.    Plaintiffs have no remedy at law to prevent Defendants from continuing the inequitable conduct alleged herein.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT II

### FRAUD

160.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 159 hereof as if fully set forth here and further allege as follows.

161.    By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the Plaintiffs and others.

162.    These Defendants intended that Plaintiffs and others would rely on their statements and representations with respect to the inflated AWP, among other things, to the detriment of Plaintiffs. Plaintiffs did in fact reasonably and justifiably rely on the false representations and

49

statements of these Defendants and suffered injury and damages thereby, as more fully set forth herein.

163.    These Defendants urged and encouraged medical providers to bill Plaintiffs at or above the AWP for Lupron® rather than at a price related to the amount which the provider paid for the Lupron®.

164.    In addition, these Defendants concealed and suppressed material facts about their unlawful agreements and discussions with one another and others, and they concealed and suppressed their unlawful acts and omissions as set forth more fully herein. Among other things, these Defendants concealed and suppressed the fact that the AWPs upon which the amounts paid for Lupron® by Plaintiffs were based were artificially inflated, thereby causing Plaintiffs to pay more for Lupron® than they otherwise would have.

165.    Plaintiffs were unaware of the above-referenced facts, and would not have paid the artificially inflated prices for Lupron® that they did had they known of the facts Defendants concealed and suppressed.

166.    As a direct and proximate result of Defendants' fraudulent conduct, and the concealment and suppression of material facts by Defendants, Plaintiffs have suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT III

### VIOLATION OF CONSUMER PROTECTION STATUTES

167.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 166 hereof as if fully set forth here and further allege as follows.

168.    Plaintiffs are "persons" as defined by Ala. Code § 8-19-3(3). Alabama laws provides that persons have a private right of action under Ala. Code § 8-19-10 for monetary damages caused by other person(s) who have committed one or more of the acts or practices declared unlawful at Ala. Code § 8-19-5.

169.    As described above, in the conduct of trade or commerce, the Defendants have engaged in unfair methods of competition or unfair and deceptive acts or practices in violation of Alabama's Deceptive Trade Practices Act, *Alabama Code* § 8-19-5, including, but not limited to, the following:

   a.    representing to Plaintiffs, their insureds, members, beneficiaries and participants, and the general public that the Lupron was safe and fit for their intended, prescribed and foreseeable uses, knowing that these representations were false;

   b.    marketing, advertising and selling Lupron through the use of misleading, incomplete and deceptive advertising, promotion and product information; and

   c.    engaging in conduct likely to deceive Plaintiffs, their insureds, members, beneficiaries, and participants, and the general public, and by engaging in acts and practices with the intent to induce Plaintiffs, their insureds, members, beneficiaries, participants, and the general public to prescribe and use Lupron.

170.    The conduct described above constitutes deceptive and unfair methods of competition, all impacting the public interest, in violation of *Alabama Code* § 8-19-5.

171.   As a direct and proximate result of such wrongful activity, Plaintiffs' insureds, members, beneficiaries and participants have suffered and will continue to suffer substantial damages.

172.   Plaintiffs have complied with the written demand requirements of *Alabama Code* § 8-19-10(e).

173.   Pursuant to *Alabama Code* § 8-19-10, Plaintiffs are entitled to recover three times the amount of actual damages sustained, the costs of bringing this action and reasonable attorneys' fees.

174.   In addition, as described above, the Defendants have violated the Michigan Consumer Protection Act, *Michigan Compiled Laws* 445.901, *et seq.*, by knowingly, or with reason to know, engaging in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

175.   Plaintiff BCBS Michigan is a "person" as defined in *Michigan Compiled Laws* 445.902(c).

176.   The Defendants are "persons" as defined in *Michigan Compiled Laws* 445.902(c).

177.   The Defendants' above-described conduct constitutes unfair, unconscionable or deceptive methods, acts or practices in the conduct of trade or commerce as defined by *Michigan Compiled Laws* § 445.903 including, but not limited to the following:

   a.   engaging in misrepresentation, suppression and misinformation concerning Lupron;

   b.   suppressing, misrepresenting and failing to reveal material facts related to the Lupron (§ 445.903(1)(s));

   c.   suppressing, misrepresenting and failing to reveal material facts related to Lupron(§ 445.903(1)(s));

   d.   charging BCBS Michigan a price that was grossly in excess of the price at which physicians bought Lupron (§ 445.903(1)(z));

e.  failing to reveal facts that were material to the sale of Lupron, particularly regarding its cost, in light of the representations made by the Defendants regarding its cost for its intended, foreseeable uses (§ 445.903(1)(cc)).

178.  As a direct and proximate result of the Defendants' unlawful, unfair and fraudulent acts, Plaintiff BCBS Michigan suffered significant losses and will continue to do so.

179.  The Defendants' above-described conduct was a willful and knowing violation of Michigan's Consumer Protection Act.

180.  As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff BCBS Michigan is entitled to an award of all damages including, but not limited to its losses, the Defendants' ill-gotten profits, punitive damages, interest and costs of suit including, but not limited to, attorneys' fees and expenses.

181.  By the misrepresentations and non-disclosure of material facts alleged above, the Defendants deceived and continue to deceive Plaintiffs. This conduct constitutes unlawful, unfair, deceptive and fraudulent business practices within the meaning of the aforementioned state consumer protection statutes.

182.  In addition, the Defendants' use of media to promote the sale of Lupron® through false and deceptive representations as alleged above constitutes unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of the aforementioned state consumer protection statutes.

183.  As part of their guilty plea and payment of fines and money for civil liabilities, Defendants Abbott, Takeda and TAP agreed to pay the sum of $25.5 million in civil liabilities to fifty states and the District of Columbia. Such admission of liability and payment of civil liabilities

to the states and the District of Columbia warrants the application of the laws of the states of Alabama and Michigan to Defendants in this Court.

184.    As a result of the Defendants' unfair and deceptive trade practices in Alabama and Michigan, Plaintiffs have and will continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT IV

### CIVIL CONSPIRACY

185.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 184 hereof as if fully set forth here and further allege as follows.

186.    Beginning at least as early as 1991, the exact date being unknown to Plaintiffs, and continuing thereafter until at least October, 2001, Defendants and their co-conspirators engaged in a continuing conspiracy to violate the PDMA and to defraud the Plaintiffs by causing Plaintiffs and others to pay more for Lupron® than they otherwise would have in the absence of Defendants' conspiracy.

187.    According to the United States Department of Justice, on or before October 3, 2001, Defendant TAP agreed to plead guilty to a federal conspiracy to violate the PDMA and to pay a $290 million criminal fine, the largest criminal fine ever in a U.S. health-care fraud prosecution case up until that time.  Additionally, these Defendants agreed to settle the government's claims for a total of $875 million, plus interest, which consisted of the $290 million criminal fine, $559.5 million in civil liabilities for filing false and fraudulent claims, and $25.5 million in civil liabilities to fifty states and the District of Columbia.

54

188.    Pursuant to their widespread conspiracy alleged herein and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to defraud the Plaintiffs and others. Those activities include the following:

(a)    Defendants discussed and agreed among themselves and with their co-conspirators that they would inflate the AWP for Lupron®;

(b)    Defendants discussed and agreed among themselves and with their co-conspirators that they would provide free samples to medical providers and encourage medical providers to charge for such samples;

(c)    Defendants discussed and agreed among themselves and with their co-conspirators that they would provide other financial inducements and incentives to medical providers to prescribe Lupron® instead of competitor drugs, such as Zoladex;

(d)    Defendants discussed and agreed among themselves that they would market and promote the spread or the RTP between the AWP and the actual cost for Lupron® as an incentive for medical providers to prescribe Lupron® instead of competitor drugs, such as Zoladex; and

(e)    Defendants discussed and agreed among themselves and with their co-conspirators that they would conceal all of these fraudulent marketing tactics.

189.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy, and an agreement, with knowledge of the injury and damage it would cause to Plaintiffs and others and with intent to cause such injuries or with reckless disregard for the consequences.

55

190.    As a direct and proximate result of Defendants' conspiracy as alleged herein, Plaintiffs have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT V

### AIDING & ABETTING/FACILITATING

191.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 190 hereof as if fully set forth here and further allege as follows.

192.    Defendants acted with knowledge of their wrongdoing, and that of medical providers throughout the country, as set forth in this Complaint, and they provided substantial assistance or encouragement to medical providers in the commission of the fraud on Plaintiffs.

193.    Defendants' conduct was a substantial factor in causing the resulting fraud and other tortious conduct alleged herein.

194.    Defendants had actual knowledge of the fraud and other tortious conduct being effectuated on Plaintiffs, and of their respective roles in furthering such fraud and tortious conduct.

195.    TAP's Plea Agreement and the Side Letter Agreements entered into by Abbott and Takeda represent their respective acknowledgments of their wrongdoing.

196.    Through discovery in the cases of Stetser and MDL 1430, the knowledge of TAP and other Defendants of the fraud and other tortious conduct alleged herein has been revealed.

197.    As a direct and proximate result of Defendants' aiding and abetting/facilitating as alleged herein, Plaintiffs have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

56

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that Court:

a.      Enter judgment against all Defendants for the violations alleged herein;

b.      Award the actual damages incurred by Plaintiffs as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

c.      Award treble damages or multiple damages by operation of law;

d.      Award an amount equal to the amount that Defendants have been unjustly enriched;

e.      Award Plaintiffs the costs of this action, including reasonable attorney's fees, and, where applicable, expert fees; and

f.      Award such other and further relief as the Court may deem just under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this cause.

This the **16th** day of **May, 2006**.

Respectfully submitted,

Pamela B. Slate
**SLATE KENNEDY LLC**
166 Commerce Street, Suite 350
Montgomery, AL 36104

57

(334) 262-3300 telephone
(334) 262-3301 facsimile



*Kimberly R. West*

Kimberly R. West
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
P.O. Box 530910
Birmingham, AL 35298
(205) 870-0555 telephone
(205) 871-7534 facsimile

Shanin Specter, Esquire
Donald E. Haviland, Jr., Esquire
KLINE & SPECTER
A PROFESSIONAL CORPORATION
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000 telephone
(215) 735-0957 facsimile

ATTORNEYS FOR PLAINTIFFS
BLUE CROSS AND BLUE SHIELD OF ALABAMA AND
BLUE CROSS AND BLUE SHIELD OF MICHIGAN


PLEASE SERVE THE FOLLOWING DEFENDANTS BY CERTIFIED MAIL AT THE LISTED ADDRESSES:

TAP Pharmaceutical Products, Inc.
675 N Field Drive
Lake Forest, IL 60045-4832

Abbott Laboratories
100 Abbott Park Road
Abbott Park, IL 60064-3500

Takeda Pharmaceutical Co. Ltd.
475 Half Day Road

Suite 500
Lincolnshire, IL 60069-2934

Takeda America Holdings, Inc.
767 3rd Ave
New York, NY 10017-2023

Oncology Supply Compnay
2801 Horace Shepard Drive
Dothan, AL 36303-1038

Amerisource Bergen Specialty Group
4006 Belt Line Road, Suite 115
Addison, Texas 75001

Amerisource Bergen Corporation
1300 Morris Drive Suite 100
Chesterbrook, PA 19087

PURSUANT TO ALA. CODE § 8-19-10(D), PLEASE ALSO MAIL A COPY OF THIS FIRST AMENDED COMPLAINT TO:

Troy King, Attorney General
Office of the Attorney General
Alabama State House
11 South Union Street, Third Floor
Montgomery, AL 36130

and

Ellen Brooks, District Attorney
Office of the District Attorney of Montgomery County, Alabama
P.O. Box 1667
Montgomery, AL 36102-1667