## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement ("Agreement") is entered by and between the United States of America, acting through its Department of Justice and the United States Attorney's Office for the District of Massachusetts, and on behalf of the Office of Inspector General of the United States Department of Health and Human Services ("HHS-OIG"); TRICARE Management Activity ("TMA")(formerly known as the Office of the Civilian Health and Medical Program of the Uniformed Services), a field activity of the Office of the Secretary of Defense, the United States Department of Defense, acting through its General Counsel; TAP Pharmaceutical Products Inc. (formerly known as TAP Holdings Inc. and TAP Pharmaceuticals Inc.), a Delaware corporation with a principal place of business in Lake Forest, Illinois ("TAP"); and Douglas N. Durand, Joseph Gerstein, M.D., and Tufts Associated Health Maintenance Organization, Inc. (the "Relators"); through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

### PREAMBLE

A.    WHEREAS, this Agreement addresses the United States' civil claims against TAP for the conduct described in filings in <u>United States of America v. TAP Pharmaceutical Products Inc.</u>, Criminal Action No. [to be assigned](District of Massachusetts)(the "Criminal Action"), for the conduct alleged in Preamble Paragraph H below, and for the conduct alleged in <u>United States ex rel. Joseph Gerstein and Tufts Associated Health Maintenance Organization, Inc. v. TAP Holdings Inc. and TAP Pharmaceuticals Inc.</u>, Civil Action No. 98-10547-GAO (D.Mass) and in <u>United States ex rel. Douglas N. Durand v. TAP Holdings Inc.</u>, Civil Action No. 00-12618-GAO (originally filed in

 C  .405


EXHIBIT
B

May, 1996 in the Eastern District of Pennsylvania and later transferred to the District of Massachusetts)(the "Civil Actions").

    B.    WHEREAS, on or before September 26, 2001, or such other date as may be determined by the Court, TAP has agreed to enter a plea of guilty pursuant to Fed. R. Crim. P. 11(e)(1)(C) to a one count Information alleging a violation of Title 18, United States Code, Section 371, namely, a conspiracy to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 333(b) and 331(t) by causing the billing of free drug samples.

    C.    WHEREAS, at all relevant times; TAP marketed and sold the drug Lupron in various dosages to physicians, health maintenance organizations; hospitals, wholesalers, distributors and others for use in treatment of prostate cancer;

    D.    WHEREAS, the United States alleges that TAP caused to be submitted claims for payment for Lupron to the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg, which is administered by the United States Department of Health and Human Services.

    E.    WHEREAS, the United States alleges that TAP caused to be submitted claims for payment to the Medicare program for individuals eligible under the Railroad Retirement Act of 1974, 45 U.S.C. §§ 231-231v.

    F.    WHEREAS, the United States alleges that TAP caused to be submitted claims for payment to the TRICARE Program (formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")), 10 U.S.C. §§ 1071-1106, which is administered by the Department of Defense through the TMA.

2

C   466

G.    WHEREAS, the United States alleges that TAP caused to be submitted claims for payment to the Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, of all fifty states and the District of Columbia ("the "Participating States").

H.    WHEREAS, the United States contends that it has certain civil claims against TAP under the False Claims Act, 31 U.S.C. §§ 3729-3733, and other federal statutes and/or common law doctrines as specified in Paragraph 2 below for engaging in the following alleged conduct from January 1991 through the present, involving the marketing, sale and pricing of Lupron for treatment of prostate cancer:

(i)    The United States contends that certain employees of TAP provided free samples of the drug Lupron to certain physicians, knowing and expecting that those physicians would prescribe and administer the free drug samples to their patients and thereafter illegally bill those free samples to the patients and to the Medicare, Medicaid and TRICARE programs.

(ii)    The United States contends that TAP knowingly and willfully offered and paid illegal remuneration to certain physicians, physicians' practices, health maintenance organizations and others in various forms including, for example, grants, free Lupron, debt forgiveness, travel and entertainment, consulting and audit services, administration fees, nominally priced drug, and VCRs and TVs to unlawfully obtain orders to purchase the drug Lupron for treatment of prostate cancer from TAP, which drug TAP knew was paid for by the Medicare, Medicaid and TRICARE programs, as well as by private insurers, payers of copays, and copay insurers.

(iii)    The United States contends that TAP knowingly and willfully offered and paid illegal remuneration to physicians by marketing TAP's "Return-to-Practice" program to physicians to unlawfully induce orders to purchase the drug Lupron for treatment of prostate cancer, which drug

3

C   467

TAP knew was largely paid for by the Medicare program. The United States further contends that TAP's Return-to-Practice program consisted of inflating the Average Wholesale Price ("AWP") used by Medicare and others for reimbursement of the drug Lupron, deeply discounting the price paid by physicians to TAP for the drug ("the discounted price"), and marketing the spread between the AWP and the discounted price to physicians as additional profit to be returned to the physician's practice from Medicare reimbursements for Lupron. The United States further contends that TAP concealed the discounted price from Medicare and governmental agencies by omitting material information in response to Medicare carriers' requests for information about physicians' actual cost, by falsely advising physicians that the discounted price could not and should not be reported to Medicare, and by auditing physicians to ensure the claims for payment were submitted at the inflated AWP rather than the discounted price paid by the physician.

(iv)    The United States contends that TAP engaged in a marketing scheme where it set AWPs of Lupron at levels far higher than the majority of its physician customers actually paid for the drug when purchasing either directly from TAP or through a wholesaler or distributor. As a result, the United States contends that TAP's customers received reimbursement from Medicare and state Medicaid programs and others at levels significantly higher than the physicians' actual costs or the wholesalers' average price.

(v)    The United States contends that TAP knowingly misreported and underpaid its Medicaid rebates for Lupron used for treatment of prostate cancer, i.e., the amounts that it owed to the states under the federal Medicaid Rebate Program, 42 U.S.C. § 1396r-8. The United States further contends that TAP was generally required on a quarterly basis to rebate to each state Medicaid program the difference between the Average Manufacturer Price ("AMP") and its "Best

4

C   4 0 8

Price," as defined by 42 U.S.C. § 1396r-8(k)(1) and 1396r-8(c)(1)(C). The United States alleges that TAP falsely reported to the Health Care Financing Administration its Best Price for Lupron used for treatment of prostate cancer because TAP calculated its Best Prices for Lupron without accounting for "off-invoice" price concessions provided in various forms including, for example, cash discounts, free goods contingent on any purchase requirement, volume discounts and rebates. As a result, the United States contends that TAP misreported and underpaid its Medicaid rebates to the states under the Medicaid Rebate Program.

TAP's conduct described in the Criminal Action and the conduct alleged in Preamble Paragraph H are hereafter referred to as the "Covered Conduct." The United States contends that the Medicare, Medicaid and TRICARE programs were damaged as a result of the Covered Conduct.

I.       WHEREAS, HHS-OIG represents that it does not have an administrative claim against TAP under the provisions for mandatory exclusion from the Medicare, Medicaid and other federal health care programs, 42 U.S.C. § 1320a-7(a), for TAP's conviction in the Criminal Action, but states that it does have certain administrative claims against TAP under the provisions for permissive exclusion from the Medicare, Medicaid and other federal health care programs, 42 U.S.C. § 1320a-7(b), and the provisions for civil monetary penalties, 42 U.S.C. § 1320a-7a, for the Covered Conduct.

J.       WHEREAS, other than such admissions as TAP makes in connection with its plea to the Information to which TAP has agreed to enter a plea of guilty, which TAP admits, TAP denies the remaining allegations of the United States as set forth herein and in the Civil Actions.

5

C    469

K.    WHEREAS, to avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement as set forth below.

## TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    TAP agrees to pay to the United States and the Participating States, collectively, the sum of five hundred eighty five million dollars ($585,000,000), plus interest in an amount of ninety six thousand one hundred sixty four dollars and thirty eight cents ($96,164.38) for each day beginning September 4, 2001 and continuing until and including the day before complete payment is made (the "Settlement Amount"). This sum shall constitute a debt immediately due and owing to the United States and the Participating States on the effective date of this Agreement. This debt is to be discharged by payments to the United States and the Participating States, under the following terms and conditions:

A.    TAP shall pay to the United States the sum of five hundred fifty nine million four hundred eighty three thousand five hundred sixty dollars ($559,483,560), plus interest in an amount of ninety one thousand nine hundred sixty nine dollars and ninety cents ($91,969.90) for each day beginning September 4, 2001 and continuing until and including the day before complete payment is made (the "Federal Settlement Amount"). The Federal Settlement Amount shall be paid no later than seven business days after TAP receives written payment instructions from the United States and following the latest of the dates on which the following occurs: (1) this Agreement is

6

C  410

fully executed by the Parties and delivered to TAP's attorneys, (2) the stipulated dismissals described in Paragraph 10 of this Agreement are filed and copies provided to TAP's attorneys, or (3) the Court accepts the Fed. R. Crim. P. 11(e)(1)(C) guilty plea in connection with the Criminal Action and imposes the agreed upon sentence.

        B.      TAP shall pay to the Participating State Medicaid programs the sum of twenty five million, five hundred sixteen thousand, four hundred forty dollars ($25,516,440), plus interest in an amount of four thousand one hundred ninety four dollars and forty eight cents ($4194.48) for each day beginning September 4, 2001 and continuing until and including the day before complete payment is made (the "State Settlement Amount"), under the terms and conditions agreed on by TAP and the Participating State Medicaid programs (the "State Settlement Agreement"). This State Settlement Amount shall be paid to an escrow account pursuant to the State Settlement Agreement no later than seven business days after TAP receives written payment instructions from the negotiating team for the Participating States and following the latest date on which the following occurs: (1) this Agreement is fully executed by the Parties and delivered to TAP's attorneys; (2) the stipulated dismissals described in Paragraph 10 of this Agreement are filed and copies provided to TAP's attorneys, or (3) the Court accepts the Fed. R. Crim. P. 11(e)(1)(C) guilty plea in connection with the Criminal Action as described in Preamble Paragraph B and imposes sentence, or (4) the Participating State Agreement is executed by or on behalf of the Participating States and TAP.

        C.      If TAP's agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(e)(1)(C) in the Criminal Action described in Preamble Paragraph B is not accepted by the Court or the Court does not impose the agreed upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or TAP. If either the United States or TAP exercises this

7

C. 411

option, which option shall be exercised by notifying all Parties, through counsel, in writing within ten business days of the Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, TAP waives any affirmative defense based in whole or in part on the statute of limitations for the period of time between April 17, 2001, and thirty days after recission of this Agreement.

2.      Subject to the exceptions in Paragraph 3 below, in consideration of the obligations of TAP set forth in this Agreement, conditioned upon TAP's payment in full of the Settlement Amount, subject to Paragraph 18 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement), and subject to the acceptance by the United States District Court for the District of Massachusetts of TAP's guilty plea described in Preamble Paragraph B, the United States, on behalf of itself, and its officers, agents, agencies, and departments, releases TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns, and their current and former directors, officers and employees from any civil or administrative monetary claim that the United States has or may have under the False Claims Act, 31 U.S.C. §§ 3729-3733 ; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Medicaid Rebate statute, 42 U.S.C. § 1396r-8; any statutory provision applicable to the federally-funded programs in this Agreement for which the Civil Division, United States Department of Justice, has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part 0, Subpart I, § 0.45(d)(1995); and common law claims for fraud, payment by mistake, unjust enrichment, breach of contract or disgorgement for the Covered Conduct with respect to claims submitted or caused to be submitted to the Medicare program, TRICARE, and/or the Medicaid programs of the Participating States.

8

C   412

3.    Notwithstanding any term of this Agreement, the United States specifically does not herein release TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates, successors and assigns, and their current and former directors, officers, and employees from any and all of the following: (a) any potential criminal, civil or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code); (b) any criminal liability; (c) any potential liability to the United States (or any agencies thereof) for any conduct other than the Covered Conduct; (d) any claims based upon obligations created by this Agreement; (e) except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (f) any express or implied warranty claims or other claims for defective or deficient products and services provided by TAP; (g) any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct; (h) any claim based on a failure to deliver items or services due; or (i) any civil or administrative claims against individuals, including current and former directors, officers, and employees of TAP, its predecessors, subsidiaries, joint venture owners, and their corporate parents and affiliates; who, related to the Covered Conduct, receive written notification that they are the target of a criminal investigation; are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement.

4.    In consideration of the obligations of TAP set forth in this Agreement, conditioned upon TAP's payment in full of the Settlement Amount, and subject to Paragraph 18 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement), the HHS-OIG agrees to release and refrain from instituting, directing, recommending or maintaining any administrative claim or any action seeking exclusion from the Medicare, Medicaid or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against TAP,

C    413

its predecessors, subsidiaries, joint venture owners, their corporate parents and affiliates, successors and assigns under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties law), or 42 U.S.C. § 1320a-7(b)(permissive exclusion), for the Covered Conduct, except as reserved in Paragraph 3 above, and as reserved in this paragraph. The HHS-OIG further agrees to refrain from recommending, causing or attempting to cause any administrative action or sanction, including debarment, by any government agency for the Covered Conduct. The HHS-OIG expressly reserves all rights to comply with any mandatory statutory obligation to exclude TAP from the Medicare, Medicaid or other Federal health care program under 42 U.S.C. § 1320a-7(a)(mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the HHS-OIG from taking action against entities or persons, or for conduct and practices, for which civil claims have been reserved in Paragraph 3, above.

5.    In consideration of the obligations of TAP set forth in this Agreement, conditioned upon TAP's payment in full of the Settlement Amount, and subject to Paragraph 18 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement), TMA agrees to release and refrain from instituting, directing, or maintaining any administrative claim or any action seeking exclusion from the TRICARE program against TAP, its predecessors, subsidiaries, joint venture owners, their corporate parents and affiliates, successor and assigns under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 3 above and as reserved in this Paragraph. The TMA expressly reserves authority to exclude TAP from the TRICARE program under 32 C.F.R. §§ 199.9(f)(1)(i)(A), (f)(1)(i)(B), (f)(1)(i)(D), and (f)(1)(iii), based upon the Covered Conduct. Nothing in this Paragraph precludes the TMA from taking action

10

C  414

against entities or persons, or for conduct or practices, for which civil claims have been reserved in Paragraph 3 above.

6.    Douglas N. Durand, Joseph Gerstein, and Tufts Associated Health Maintenance Organization, Inc. (the "Relators") agree that the settlement of their Civil Actions is fair, adequate and reasonable under all the circumstances and agree that they will not challenge this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B), and expressly waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B).

7.    Upon receipt by the United States of TAP's payment of the Federal Settlement Amount, each of the Relators, on behalf of himself or itself, and his or its heirs, agents, successors and assigns, parent corporations, predecessors, employees, and shareholders, fully and finally releases, waives and forever discharges TAP, its predecessors, subsidiaries, joint venture owners, their corporate parents and affiliates, successors and assigns, and current and former officers, directors and employees from any claims that any of the Relators has asserted, could have asserted, or may assert in the future, relating in any way to the Covered Conduct, except as they relate to a statutory claim for reasonable attorneys' fee and costs pursuant to 31 U.S.C. § 3730(d).

8.    The United States agrees to pay the Relator Douglas N. Durand seventy seven million, nine hundred forty two thousand, two hundred five dollars ($77,942,205)(his Relator's share) from the Federal Settlement Amount, plus 13.9% of the interest paid by TAP to the United States on the Federal Settlement Amount, within 21 days after receipt by the United States of such payment as his share of the proceeds pursuant to 31 U.S.C. § 3730(d). Upon receipt of his Relator's share, Douglas N. Durand, for himself individually, and for his heirs, successors, agents and assigns, fully and finally releases, waives, and forever discharges the United States from any claims pursuant to 31

11

U.S.C. § 3730, including 31 U.S.C. §§ 3730(b), (c), (d) and (d)(1), for a share of the proceeds of the Civil Action, from any claims for a share of the Settlement Amount, from any claims arising from the filing of their Civil Action, and in full settlement of claims under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relator Douglas N. Durand arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

9.    The United States agrees to pay the Relators Joseph Gerstein and Tufts Associated Health Maintenance Organization, Inc. collectively seventeen million, one hundred seventy thousand ($17,170,000)(their Relators' share) from the Federal Settlement Amount, plus 3.1% of the interest paid by TAP to the United States on the Federal Settlement Amount, within 21 days after receipt by the United States of such payment as their share of the proceeds pursuant to 31 U.S.C. § 3730(d). Upon receipt of their Relators' share, Joseph Gerstein for himself individually, and for his heirs, successors, agents and assigns, and Tufts Associated Health Maintenance Organization, Inc., for itself individually, and for its predecessors, successors, parent corporations, agents, assigns, employees and shareholders, fully and finally releases, waives and forever discharges the United States from any claims pursuant to 31 U.S.C. § 3730, including 31 U.S.C. §§ 3730(b), (c), (d) and (d)(1), for a share of the proceeds of the Civil Action, from any claims for a share of the Settlement Amount, from any claims arising from the filing of their Civil Action, and in full settlement of claims under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relators Joseph Gerstein and/or Tufts Associated Health Maintenance Organization, Inc. arising under Title 26, U.S. Code (Internal Revenue Code), or any claims arising under this Agreement.

12

10.    Within three business days after this Agreement is executed, the United States and the Relators will file a stipulation of dismissal with prejudice in the Civil Actions regarding all claims except those involving the Veteran's Administration, which claims the pertinent Relators will dismiss with prejudice and the United States will dismiss without prejudice. The United States and the Relators will notify the Court that all pertinent Parties have stipulated that each of the Civil Actions pending in the District of Massachusetts shall be dismissed as described effective upon receipt by the United States of the Federal Settlement Amount, pursuant to and consistent with the terms of this Agreement, with the sole exception of those statutory claims reserved by the Relators for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d), which shall not be dismissed, unless they are settled and the Court is so informed.

11.    TAP fully and finally releases the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which TAP has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to or arising from the United States' investigation and prosecution of the Civil Actions, the Criminal Action, and the Covered Conduct up to the effective date of this Agreement.

12.    In consideration of the obligations of the Relators set forth in this Agreement, TAP, on behalf of itself and its subsidiaries, its joint venture owners, their corporate parents and affiliates, and their agents, successors and assigns, fully and finally releases, waives, and discharges the Relators and their respective heirs, successors, assigns, parent corporations, predecessors, employees, agents and shareholders from any claims TAP has asserted, could have asserted, or may assert in the future against the Relators or any of them arising from the filing of the Civil Actions, and the United

13

States' investigation and prosecution of the Civil Actions, the Criminal Action, and the Covered Conduct.

13.    TAP waives and will not assert any defenses it may have to any criminal prosecution or administrative action relating to the Covered Conduct which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or Excessive Fines Clause of the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. TAP agrees that this Agreement is not punitive in purpose or effect.

14.    The Settlement Amount that TAP must pay pursuant to Paragraph 1 above will not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare carrier or intermediary, TRICARE, or any State payer, related to the Covered Conduct; and, if applicable, TAP agrees not to resubmit to any Medicare carrier or intermediary, TRICARE, or any State payer any previously denied claims, which denials were based on the Covered Conduct and agrees not to appeal any such denials of claims.

15.    TAP agrees to the following:

(a)    Unallowable Costs Defined:  that all costs (as defined in the Federal Acquisition Regulations (FAR) § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf on TAP, its present or former officers, directors, employees, shareholders, and agents in connection with: (1) the matters covered by this Agreement and the related plea agreement; (2) the United States' audit and civil and criminal investigation of

14

the matters covered by this Agreement; (3) TAP's investigation, defense, and any corrective actions undertaken in direct response to the United States' audit and civil and criminal investigation in connection with the matters covered by this Agreement (including attorney's fees); (4) the negotiation and performance of this Agreement and the plea agreement, (5) the payment TAP makes to the United States pursuant to this Agreement and any payments that TAP may make to relators; (6) the negotiation of the CIA, and the obligations undertaken pursuant to the CIA to: (i) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and (ii) prepare and submit reports to the HHS-OIG, are unallowable costs on Government contracts and under the Medicare Program, Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program (FEHBP). However, nothing in this sub-paragraph that may apply to compliance costs affects the status of costs that are not allowable based on any other authority applicable to TAP. (All costs described or set forth in this Paragraph 15(a) are hereafter, "unallowable costs").

(b)    Future Treatment of Unallowable Costs:  If applicable, these unallowable costs will be separately estimated and accounted for by TAP, and TAP will not charge such unallowable costs directly or indirectly to any contracts with the United States or any State Medicaid Program, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by TAP or any of its subsidiaries to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

(c)    Treatment of Unallowable Costs Previously Submitted for Payment: If applicable, TAP further agrees that within 60 days of the effective date of this Agreement, it will identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and

15

Medicaid, VA and FEHBP fiscal agents, any unallowable costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by TAP or any of its subsidiaries, and will request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. TAP agrees that the United States, at a minimum, will be entitled to recoup from TAP any overpayment plus applicable interest as a result of the inclusion of such unallowable costs on previously-submitted cost reports, information reports, cost statements, or requests for payment. Any payment due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by TAP or any of its subsidiaries on the effect of inclusion of unallowable costs (as defined in this Paragraph) on TAP or any of its subsidiaries' cost reports, cost statements, or information reports. Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or reexamine the unallowable costs described in this Paragraph.

16.     If applicable, TAP agrees that it will not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents or sponsors. TAP waives any causes of action against these beneficiaries or their parents or sponsors based upon the claims for payment covered by this Agreement.

17.     TAP expressly warrants that it has reviewed its financial situation and that it currently is solvent within the meaning of 11 U.S.C. Section 547(b)(3), and will remain solvent following its payment to the United States hereunder. Further, the Parties expressly warrant that, in evaluating

16

whether to execute this Agreement, the Parties (i) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to TAP, within the meaning of 11 U.S.C. Section 547(c)(1), and (2) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

18.    In the event TAP commences, or a another party commences, within 91 days of the effective date of the Settlement Agreement, any case, proceeding, or other action (a) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief of TAP's debts, or seeking to adjudicate TAP as bankrupt or insolvent, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for TAP or for all or any substantial part of TAP's assets, TAP agrees that:

A.    TAP's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. Section 547, and TAP will not argue or otherwise take the position in any such case, proceeding or action that:   (i) TAP's obligations under this Agreement may be avoided under 11 U.S.C. Section 547; (ii) TAP was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the United States hereunder; or (iii) the mutual promises, covenants and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to TAP;

B.    In the event that TAP's obligations hereunder are avoided pursuant to 11 U.S.C. Section 547, the United States, at its sole option, may rescind the releases in this Agreement, and bring any civil and/or administrative claim, action or proceeding against TAP for the claims that would otherwise be covered by the releases provided in Paragraphs 2, 4 and 5 of the Agreement. If

17

the United States chooses to do so, TAP agrees that, for purposes only of any case, action, or proceeding referenced in the first clause of this paragraph, (i) any such claims, actions or proceedings brought by the United States (including any proceedings to exclude TAP from participation in Medicare, Medicaid, or other federal health care programs) are not subject to an "automatic stay" pursuant to 11 U.S.C. Section 362(a) as a result of the action, case or proceeding described in the first clause of this Paragraph, and that TAP will not argue or otherwise contend that the United States' claims, actions or proceedings are subject to an automatic stay; (ii) that TAP will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories, to any such civil or administrative claims, actions or proceeding which are brought by the United States within 30 calendar days of written notification to TAP that the releases herein have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on April 17, 2001; and (iii) the United States has a valid claim against TAP in the amount of five hundred eighty five million dollars ($585,000,000), and the United States may pursue its claim, inter alia, in the case, action or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding; and

      C.     TAP acknowledges that its agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

     19.    This Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity, including but not limited to any individual or entity that purchased Lupron from TAP.

18

20.    Nothing in any provision of this Agreement constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue Laws, Title 26 of the United States Code.

21.    Except as provided in Paragraph 10, each party to this Agreement will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

22.    TAP represents that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

23.    TAP has entered into a Corporate Integrity Agreement with HHS-OIG, attached as Exhibit A which is incorporated into this Agreement by reference. TAP will immediately upon execution of this Agreement begin to implement its obligations under the Corporate Integrity Agreement.

24.    This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement will be the United States District Court for the District of Massachusetts, including any dispute regarding Relators' attorneys' fees reserved in Paragraph 10, except that disputes rising under the Corporate Integrity Agreement incorporated herein by reference shall be resolved through the dispute resolution provisions set forth in the Corporate Integrity Agreement.

25.    The undersigned TAP signatory represents and warrants that he is authorized by his Board of Directors to execute this Agreement. The undersigned United States signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the United States through their respective agencies and departments.

19

C. 422

26.    This Agreement is effective on the date of signature of the last signatory to the Agreement.

27.    This Agreement shall be binding on all successors, transferees, heirs and assigns of the Parties.

28.    This Agreement, together with the Corporate Integrity Agreement incorporated by reference, the Plea Agreement described in Preamble Paragraph B, the Limited Privilege Waiver Letter, and the letter agreements with Abbott Laboratories and Takeda Chemical Industries, Ltd. entered into as part of the resolution of the Criminal Action, constitute the complete agreement between the Parties with regard to the Covered Conduct.  This Agreement may not be amended except by written consent of the Parties, except that only TAP and HHS-OIG must agree in writing to a modification of the Corporate Integrity Agreement.

29.    This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

20

UNITED STATES OF AMERICA

By: _____     Dated: _9/28/01_____

SUSAN G. WINKLER
Assistant United States Attorney
District of Massachusetts

By: _____     Dated: _9/27/01_____

T. REED STEPHENS
Trial Attorney
United States Department of Justice

By: _____     Dated: _____

LEWIS MORRIS
Assistant Inspector General
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services

By: _____     Dated: _____

ROBERT L. SHEPHERD
Deputy General Counsel
TRICARE Management Activity
United States Department of Defense

UNITED STATES OF AMERICA

By: _____

SUSAN G. WINKLER
Assistant United States Attorney
District of Massachusetts

Dated: _____

By: _____

T. REED STEPHENS
Trial Attorney
United States Department of Justice

Dated: _____

By: _____

LEWIS MORRIS
Assistant Inspector General
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services

Dated: 9/25/07

By: _____

ROBERT L. SHEPHERD
Deputy General Counsel
TRICARE Management Activity
United States Department of Defense

Dated: _____

UNITED STATES OF AMERICA

By: _____        Dated:_____

     SUSAN G. WINKLER
     Assistant United States Attorney
     District of Massachusetts


By: _____        Dated:_____

     T. REED STEPHENS
     Trial Attorney
     United States Department of Justice


By: _____        Dated:_____

     LEWIS MORRIS
     Assistant Inspector General
     Office of Counsel to the Inspector General
     Office of Inspector General
     U.S. Department of Health and Human Services

By: _____        Dated:___AUG 1 0 2001___

     ROBERT L. SHEPHERD
     Deputy General Counsel
     TRICARE Management Activity
     United States Department of Defense

21

TAP PHARMACEUTICAL PRODUCTS INC.

By: _____                 Dated: _September 28, 2001_

H. THOMAS WATKINS
President
TAP Pharmaceutical Products, Inc.


By: _____                 Dated: _____

DANIEL REIDY
Jones, Day, Revis & Pogue
77 West Wacker
Chicago, Illinois 60601
Counsel to TAP Pharmaceutical Products Inc.


By: _____                 Dated: _____

JOSEPH SAVAGE
Testa, Hurwitz & Thibeault, LLP
125 High Street
Boston, MA 02110
Counsel to TAP Pharmaceutical Products Inc.

RELATOR DOUGLAS DURAND

By: _____     Dated: ___8/9/c1___
DOUGLAS N. DURAND

By: _____     Dated: ___8/9/c1___
ELIZABETH K. AINSLIE
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Counsel to Relator Douglas N. Durand

C   429

RELATORS JOSEPH GERSTEIN AND TUFTS
ASSOCIATED HEALTH MAINTENANCE ORGANIZATION, INC.

By: _____ Dated: 8/9/01
JOSEPH GERSTEIN, M.D.

By: _____ Dated: 8/9/01
RICHARD HALLWORTH
Senior Vice President and Chief Financial Officer
Tufts Associated Health Maintenance Organization, Inc.

By: _____ Dated: _____
MARY LOUISE COHEN
PETER W. CHATFIELD
Phillips & Cohen
2000 Massachusetts Avenue, N.W.
Washington, D.C. 20036
Counsel to Relators Joseph Gerstein and Tufts Associated HMO, Inc.

C  430

RELATORS JOSEPH GERSTEIN AND TUFTS
ASSOCIATED HEALTH MAINTENANCE ORGANIZATION, INC.


By: _____    Dated:_____
JOSEPH GERSTEIN, M.D.


By: _____    Dated:_____
RICHARD HALLWORTH
Senior Vice President and Chief Financial Officer
Tufts Associated Health Maintenance Organization, Inc.


By: _____    Dated: _Aug   7, 2001_
MARY LOUISE COHEN
PETER W. CHATFIELD
Phillips & Cohen
2000 Massachusetts Avenue, N.W.
Washington, D.C. 20036
Counsel to Relators Joseph Gerstein and Tufts Associated HMO, Inc.


C   451