UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



FILED

FEB 28  1 ᵈ 31 PM '00

USE

UNITED STATES OF AMERICA )
)
)
)
)
V. )
)
)
RODNEY A. MANNION, M.D. )
)
)

CRIMINAL NO. 00-10066-CAO

VIOLATION:

18 U.S.C. §371
Conspiracy to Violate 21 U.S.C. Sections
331(t) and 333(c)

# INFORMATION

The United States Attorney charges that:

## PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### The Defendant

1.      The defendant RODNEY A. MANNION, M.D., (hereinafter referred to as

MANNION) was a physician licensed to practice medicine in the state of Indiana, with practices

located in LaPorte and Michigan City, Indiana.

2.      MANNION has a specialty in urology.  It was a part of MANNION's practice of

medicine that he from time to time diagnosed and treated patients suffering from prostate cancer.

As a part of the treatment of some of his patients suffering from prostate cancer, and beginning

as early as 1992, MANNION prescribed for those patients a drug called "Lupron Depot."

1





MANNION obtained that drug from a company known to the United States Attorney. That company will be referred to in this Information as "Company X"

## Company X

3.     In the 1980s, Company X began marketing the drug Lupron Depot as a treatment for prostate cancer. In the marketing of its drug, Company X employed and maintained extensive marketing and sales departments. Since at least the early 1990s, Company X has sold and provided the drug Lupron Depot to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to the defendant RODNEY MANNION, M.D., practicing medicine in the State of Indiana.

4.     Lupron Depot was administered to patients by intramuscular injection, typically in the buttocks, by a physician or nurse under the supervision of a physician. At various times in the 1980s and continuing on to the present, Lupron was available in daily, one month, three month and four month doses. When Lupron Depot was initially introduced to the marketplace, it was in the form of daily injections that were self injected. Over time, the monthly, three-month, and four-month doses were approved for use and typically, patients would not self-administer these dosage levels. It was typical of a patient whose prostate cancer was being treated with Lupron Depot to receive regular injections of that drug for the remainder of his life. At times material to this Information, the vast majority of patients receiving regular doses of Lupron Depot were administered the one month, three month and/or four month doses.

5.     At all times material to this Information, Company X sold Lupron Depot to physicians and to health maintenance organizations, among other purchasers. At all times material to this Information, an industry reference known as the Red Book published a price,

called the Average Wholesale Price or AWP, for Lupron Depot based upon information supplied to the Red Book's publishers by Company X. At all times material to this Information, the AWP for an injection of a monthly dose of Lupron Depot administered to a patient was as follows:

|  | Average Wholesale Price |
|---|---|
| 1992 | 418.75-437.50 |
| 1993 | 451.25 |
| 1994 | 463.75 |
| 1995 | 477.50 |
| 1996 | 496.25-515.63 |
| 1997 | 540.63 |
| 1998 | 566.88 |

6.    At all times material to this Information, it was a crime, in violation of Title 21, United States Code, Sections 331(t) and 333(c) for an employee of a company engaged in the lawful distribution of drugs to provide a drug dose or sample free of charge to a physician, with the intention and expectation that the physician would use that dose or sample in the treatment of a patient and thereafter bill either the patient, or the patient's health care insurer, for that drug dose or sample which had been provided to the physician free of charge.

7.    Beginning in or about 1993 and continuing into at least July, 1996, the defendant RODNEY MANNION received from Company X for free more than sixty one-month doses of Lupron Depot. Throughout that time period, the defendant RODNEY MANNION prescribed and administered these free dosages to patients and submitted claims to the patient and to the patient's insurer, and was paid, for the prescription of these free dosages. In that time period,

3

the defendant **RODNEY MANNION** received between $40,000 and $70,000, more or less, on billings for these free drugs.

## COUNT 1: 18 U.S.C. §371 (CONSPIRACY TO DEFRAUD)

8.    Paragraphs 1 through 12 of this Indictment are herein realleged and incorporated by reference.

9.    From in or about 1993 through in or about at least July, 1996, in the District of Massachusetts, in the District of Indiana, in the Northern District of Illinois, and elsewhere throughout the United States, the defendant

### RODNEY A. MANNION, M.D.

together with Company X, employees of Company X, urologists practicing medicine in Massachusetts, Maine, Connecticut, Kentucky, South Carolina, New York, and elsewhere, and together with others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire and agree to violate 21 U.S.C. Sections 331(t) and 333(c) by submitting, and by causing to be submitted, claims for payment to patients and to those patients' insurers for the prescription of Lupron Depot which had been provided free of charge to the urologists, including the defendant RODNEY A. MANNION.

### OBJECTIVE OF THE CONSPIRACY

10.    The objectives of the conspiracy varied depending upon the participant. The core objective of this conspiracy for all participants was to obtain money from the patient's health care insurers through the prescription of Lupron.  It was an objective of Company X in this conspiracy to provide free doses or samples of Lupron Depot, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot. It was also an objective of this conspiracy for Company X to give free samples to physicians who had not timely paid Company X for balances due on past purchases of Lupron, in order to

5

provide the physician with a source of money from which the physician could generate funds to pay that past-due balance. It was an objective of the defendant **RODNEY MANNION**, as well as that of other physicians participating in this conspiracy, to bill for the free doses or samples in order to increase his income and in order to obtain money from which to pay off his past debt to Company X

11. By virtue of this conspiracy, the defendant **RODNEY MANNION** would and did obtain from Company X in the time period 1993 through at least July 1996, more than sixty one-month doses of Lupron Depot for free, which he billed to patients and to their health care insurers, as both he and Company X planned and intended at the time he was given those doses.

<u>**OVERT ACTS**</u>

12. In furtherance of the conspiracy, the defendant **RODNEY MANNION** and other conspirators known and unknown to the United States Attorney committed among other acts the following overt acts in the District of Massachusetts and elsewhere:

a.      On various dates in 1993 through at least July, 1996, employees of Company X provided to defendant **RODNEY MANNION** those free doses or samples set forth in paragraph 12 of this Information.

b.      On various dates in 1993 through at least July 1996, **MANNION** submitted bills to patients and to their health care insurers for doses of Lupron Depot which he had received for free from Company X.

c.      On various dates in the time period 1994 through 1998, employees of Company X provided one-month doses of Lupron Depot, without charging therefor, to physicians in the District of Massachusetts, with, among other intents, the intention and

6

expectation that the physician receiving the free drug would use that drug in the treatment of a

patient suffering from prostate cancer and thereafter submit a claim to that patient's insurance

company for that drug.

      All in violation of Title 18, United States Code, Section 371.


DONALD K. STERN
UNITED STATES ATTORNEY for the
DISTRICT OF MASSACHUSETTS

By:

MICHAEL K. LOUCKS
HEALTH CARE FRAUD CHIEF and
ASSISTANT U.S. ATTORNEY

February 28, 2000

7

UNI*ED STATES DI*T*I*T . . */t
DIST. OF MASS.

FILED IN OPEN COURT

UNITED STATES DISTRICT COURT    DATE: 7|1|8| C1
DISTRICT OF MASSACHUSETTS
                                         MM
                                  Deputy Clerk

|                          |     |                                              |
|--------------------------|-----|----------------------------------------------|
| UNITED STATES OF AMERICA | ) ) ) | CRIMINAL NO. 01-10121-NG                   |
|                          | ) ) | VIOLATION:                                     |
|                          | ) ) | 18 U.S.C. §371                                 |
| V.                       | ) ) | Conspiracy to Violate 21 U.S.C. Sections       |
|                          | ) ) | 331(t) and 333(b)                              |
| JOEL OLSTEIN, M.D.       | ) ) ) |                                            |

### SUPERSEDING INFORMATION

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

#### The Defendant

1.    The defendant **JOEL OLSTEIN, M.D.**, (hereinafter referred to as **OLSTEIN**) was a physician licensed to practice medicine in the state of Maine, with a practice located in Lewiston, Maine.

2.    **OLSTEIN** has a specialty in urology.  It was a part of **OLSTEIN'S** practice of medicine that he from time to time diagnosed and treated patients suffering from prostate cancer. As a part of the treatment of some of his patients suffering from prostate cancer, and beginning as early as 1995, **OLSTEIN** prescribed for those patients a drug called "Lupron Depot."

1

## DOCKETED

3

OLSTEIN obtained that drug from a company known to the United States Attorney. That company will be referred to in this Information as "Company X"

### Company X

3.    In the 1980s, Company X began marketing the drug Lupron Depot as a treatment for prostate cancer. In the marketing of its drug, Company X employed and maintained extensive marketing and sales departments. Since at least the early 1990s, Company X has sold and provided the drug Lupron Depot to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to the defendant **JOEL OLSTEIN, M.D.**, practicing medicine in the State of Maine.

4.    Lupron Depot was administered to patients by intramuscular injection, typically in the buttocks, by a physician or nurse under the supervision of a physician. At various times in the 1980s and continuing on to the present, Lupron was available in daily, one month, three month and four month doses. When Lupron Depot was initially introduced to the marketplace, it was in the form of daily injections that were self injected. Over time, the monthly, three-month, and four-month doses were approved for use and typically, patients would not self-administer these dosage levels. It was typical of patients whose prostate cancer was being treated with Lupron Depot to receive regular injections of that drug for the remainder of his life. At times material to this Information, the vast majority of patients receiving regular doses of Lupron Depot were administered the one month, three month and/or four month doses.

5.    At all times material to this Information, Company X sold Lupron Depot to physicians and to health maintenance organizations, among other purchasers. At all times material to this Information, an industry reference known as the Red Book published a price,

2

called the Average Wholesale Price or AWP, for Lupron Depot based upon information supplied

to the Red Book's publishers by Company X. At all times material to this Information, the

AWP for an injection of a monthly dose of Lupron Depot administered to a patient was as

follows:

|  | Average Wholesale Price |
|---|---|
| 1992 | 418.75-437.50 |
| 1993 | 451.25 |
| 1994 | 463.75 |
| 1995 | 477.50 |
| 1996 | 496.25-515.63 |
| 1997 | 540.63 |
| 1998 | 566.88 |

6.    At all times material to this Information, it was a crime, in violation of Title 21,

United States Code, Sections 331(t) and 333(b) for an employee of a company engaged in the

lawful distribution of drugs to provide a drug dose or sample free of charge to a physician, with

the intention and expectation that the physician would use that dose or sample in the treatment of

a patient and thereafter bill either the patient, or the patient's insurance company for that drug

dose or sample which had been provided to the physician free of charge.

7.    Beginning in or about 1993 and continuing into at least July 1996, the defendant

JOEL OLSTEIN received from Company X for free more than eighty-five one-month doses of

Lupron Depot. Throughout that time period, the defendant JOEL OLSTEIN prescribed and

administered these free dosages to patients and submitted claims to the patient and to the

3

patient's insurer, and was paid, for the prescription of these free dosages. In that time period, the defendant **JOEL OLSTEIN** received between $40,000 and $70,000, more or less, on billings for these free drugs.

## COUNT 1: 18 U.S.C. §371 (CONSPIRACY)

8.      Paragraphs 1 through 7 of this Indictment are herein realleged and incorporated by reference.

9.      From in or about 1993 and through at least July 1996, in the District of Massachusetts, in the District of Maine, in the Northern District of Illinois, and elsewhere throughout the United States, the defendant

### JOEL OLSTEIN, M.D.

together with Company X, employees of Company X, urologists practicing medicine in Massachusetts, Maine, Connecticut, Kentucky, South Carolina, New York, and elsewhere, and together with others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire and agree to violate 21 U.S.C. Sections 331(t) and 333(b) by submitting, and by causing to be submitted, claims for payment to patients and to those patients' insurance companies for the prescription of Lupron Depot which had been provided free of charge to the urologists, including the defendant **JOEL OLSTEIN.**

### OBJECTIVE OF THE CONSPIRACY

10.      The objectives of the conspiracy varied depending upon the participant. The core objective of this conspiracy for all participants was to obtain money from the patient's health care insurers through the prescription of Lupron. It was an objective of Company X in this conspiracy to provide free doses or samples of Lupron Depot, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot. It was also an objective of this conspiracy for Company X to give free samples to physicians who had not timely paid Company X for balances due on past purchases of Lupron, in order to

5

provide the physician with a source of money from which the physician could generate funds to pay that past-due balance. It was an objective of the defendant **JOEL OLSTEIN**, as well as that of other physicians participating in this conspiracy, to bill for the free doses or samples in order to increase his income.

11. By virtue of this conspiracy, the defendant **JOEL OLSTEIN** would and did obtain from Company X in the time period 1993 through at least July 1996, more than eighty-five one-month doses of Lupron Depot for free, which he billed to patients and to their insurance companies, as both he and Company X planned and intended at the time he was given those doses.

## OVERT ACTS

12. In furtherance of the conspiracy, the defendant **JOEL OLSTEIN** and other conspirators known and unknown to the United States Attorney committed among other acts the following overt acts in the District of Massachusetts and elsewhere:

a.    On various dates in 1993 and through at least July, 1996, employees of Company X provided to defendant **JOEL OLSTEIN** those free doses or samples set forth in paragraph 7 of this Information.

b.    On various dates in 1993 through at least July 1996, **OLSTEIN** submitted bills to patients, and to their insurance companies, for doses of Lupron Depot which he had received for free from Company X.

c.    On various dates in the time period 1994 through at least 1996, employees of Company X provided one-month doses of Lupron Depot, without charging therefor, to physicians in the District of Massachusetts, with, among other intents, the intention and

6

expectation that the physician receiving the free drug would use that drug in the treatment of a

patient suffering from prostate cancer and thereafter submit a claim to that patient's insurance

company for that drug.

     All in violation of Title 18, United States Code, Section 371.

DONALD K. STERN
UNITED STATES ATTORNEY for the
DISTRICT OF MASSACHUSETTS

By:

MICHAEL K. LOUCKS
HEALTH CARE FRAUD CHIEF and
ASSISTANT U.S. ATTORNEY

July 18, 2001

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) | CRIMINAL NO. *OO -10442-PBS* |
| | ) | VIOLATION: |
| v. | ) ) ) | 18 U.S.C. §371 Conspiracy to Violate 42 U.S.C. §§ 1320a-7b(b)(1) and (b)(2) |
| JOSEPH SPINELLA, M.D. | ) ) ) | |

## I N F O R M A T I O N

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### The Defendant

1.    The defendant JOSEPH SPINELLA, M.D., (hereinafter referred to as

SPINELLA) was a physician licensed to practice medicine in the state of Connecticut, with a

practice located in Bristol.

2.    DR. SPINELLA has a specialty in urology.  It was a part of DR. SPINELLA'S

practice of medicine that he from time to time diagnosed and treated patients suffering from

prostate cancer.  As a part of the treatment of some of his patients suffering from prostate cancer,

and beginning as early as 1992, DR. SPINELLA prescribed for those patients a drug called

1

"Lupron Depot." That drug will be referred to in this Information as "Lupron." **DR.**
**SPINELLA** also from time to time prescribed to some patients suffering from prostate cancer
another drug called "Zoladex." **SPINELLA** obtained the drug Lupron from a company known
to the United States Attorney, which will be referred to in this Information as "Company X"
**SPINELLA** obtained the drug Zoladex from a competing company, also known to the United
States Attorney, which will be referred to in this Information as "Company Y."

3.     As a general medical matter, the hormone testosterone, naturally produced by
men, promotes the growth and spread of prostate cancer. One method of treatment of prostate
cancer has been the suppression or elimination of testosterone in men suffering from that disease.
Testosterone in a man suffering from prostate cancer can be eliminated through the surgical
removal of the testicles by a procedure called an orchiectomy. Alternatively, a man's production
of testosterone can be suppressed through the administration of either Lupron or Zoladex, both of
which chemically suppress production of testosterone. While, as described below, there are
differences in administration as well as other minor differences between the two drugs, at all
times material to this Information the two drugs have been essentially identical in medical
efficacy in the treatment of prostate cancer. At all times material to this Information, doctors
treating men suffering from prostate cancer have prescribed Lupron to some of their patients and
Zoladex to others. Some doctors have alternated prescription of those two drugs, sometimes on a
monthly basis, to the same patient. Some doctors have abruptly switched every patient in their
medical practice from monthly or quarterly administration of one of the two drugs to the other.

### Company X

4.     In the 1980s, Company X began marketing the drug Lupron Depot as a treatment

2

for prostate cancer. In marketing Lupron, Company X employed and maintained extensive marketing and sales departments. Since at least the early 1990s, Company X sold and provided the drug Lupron to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to the defendant JOSEPH SPINELLA, M.D., practicing medicine in the State of Connecticut.

5.     Lupron Depot was administered in liquid form to patients by intramuscular injection, typically in the buttocks or arm, by a physician or nurse under the supervision of a physician. At various times in the 1990s and continuing on to the present, Lupron was available in daily, one month, three month and four month doses. It was typical that a patient whose prostate cancer was being treated with Lupron Depot would receive regular injections of that drug for the remainder of his life. At times material to this Information, the vast majority of patients receiving regular doses of Lupron Depot were administered the one month, three month and/or four month doses.

### Company Y

6.     Company Y has marketed the drug Zoladex as a treatment for prostate cancer throughout the 1990s. In the marketing of that drug, Company Y has employed and maintained extensive marketing and sales departments. Since at least the early 1990s, Company Y has sold and provided the drug Zoladex to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to the defendant JOSEPH SPINELLA, M.D., practicing medicine in the State of Connecticut.

7.     Zoladex was administered in solid form by injection, typically with local anesthetic and in the skin of the patient's abdomen, by a physician or nurse under the supervision

3

of a physician. At various times in the 1990s and continuing on to the present, Zoladex was available in one month and three month doses. It was typical that a patient whose prostate cancer was being treated with Zoladex would receive regular injections of that drug for the remainder of his life. At times material to this Information, the vast majority of patients receiving regular doses of Zoladex were administered the one month or the three month doses.

## The Medicare Program

8.     In 1965, Congress enacted Title XVIII of the Social Security Act ("Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care.

9.     At all times relevant to this Information, the Department of Health and Human Services was an agency of the United States and was responsible for the funding, administration and supervision of the Medicare Program. The Health Care Financing Administration ("HCFA") was a division of that agency of the United States and was directly responsible for the administration of the Medicare Program. HCFA, in discharging those responsibilities, contracted with private insurance companies, known as intermediaries and carriers, to receive, review, and pay appropriate claims for reimbursement for the provision of care to Medicare Program beneficiaries. Doctors who were providers to the Medicare Program could prescribe and administer, or oversee the administration, of a dose of Lupron to a Medicare Program beneficiary and submit a claim for payment to Medicare for that injection.

10.     The defendant JOSEPH SPINELLA, M.D., has at all relevant times been a provider with the Medicare Program and has submitted claims for payment to the Medicare Program for services and items provided to Medicare Program beneficiaries. Those claims have included claims for services and items for the treatment of Medicare Program beneficiaries

4

suffering from prostate cancer.

11.     The Medicare Program as a general matter does not cover the cost of prescription pharmaceuticals which a Medicare Program beneficiary obtains pursuant to a prescription and thereafter self administers (i.e., by swallowing the drug in liquid or pill form). Because Lupron and Zoladex were at all material times injectable drugs, the cost of both drugs was a covered Medicare Program benefit pursuant to 42 C.F.R. section 405.517, which regulation was published in the Federal Register on November 25, 1991 and became effective on or about January 1, 1992.

12.     At all times material to this Information, the Medicare Program reimbursed for injections of Lupron and Zoladex at an amount equal to the lower of the "estimated acquisition cost" or the "national average wholesale price" ("AWP") for the drug.    According to 42 C.F.R. section 405.517, the estimated acquisition cost for a drug could be determined by the Medicare program "based on surveys of the actual invoice prices paid for the drug" and in considering the estimated acquisition cost, the Program could consider "factors such as inventory, waste and spoilage."  On January 1, 1998, this regulation was changed to provide for reimbursement at the lower of the actual charge on the Medicare claim for benefits or 95 percent of the national average wholesale price of the drug.

13.     At all times material to this Information, a pharmaceutical industry publication called the Redbook published average wholesale prices for the various dose forms of Lupron and Zoladex, as well as for many other drugs. The Redbook, in periodically announcing the average wholesale price for Lupron, simply published those prices for Lupron that Company X had previously supplied to the Redbook. At all times material to this Information, Company X knew

5

that fact and knew that it could raise the average wholesale price of Lupron at any time by simply

forwarding to the Redbook a new and higher average wholesale price. At all times material to

this Information, the Medicare Program had publicly announced that it would use as the national

average wholesale price for injectable drugs the average wholesale prices published from time to

time in the Redbook, a fat Company X knew and understood.

14.    At times material to this Information, upon receipt of a claim form from a

physician for the administration of an injectable drug, the Medicare Program paid to the

physician 80% of the billed charge contained on the claim form or 80% of the published average

wholesale price for the drug, whichever was less. The physician was responsible for billing his

or her patient for the remaining 20%. At all times material to this Information, most patients

suffering from prostate cancer were insured through the Medicare program and many of those

patients had supplemental insurance to cover the cost of the copayment for a drug like Lupron or

Zoladex.

15.    At all times material to this Information in connection with the claims submitted

by the defendant JOSEPH SPINELLA, his actual acquisition cost for Lupron sold to him by

Company X, taking into account any costs suffered by him through inventory, waste or spoilage,

was substantially less than the average wholesale price that Company X had reported to the

Redbook. Company X in fact deliberately and intentionally charged JOSEPH SPINELLA, as

well as hundreds of other doctors similarly situated across the United States, a price substantially

less than the average wholesale price that Company X had reported to the Redbook so that DR.

SPINELLA and those other doctors could bill Medicare at the average wholesale price and earn

a profit from the recommendation to a patient that the patient treat his prostate cancer with the

6

drug Lupron. At all times material to this Information, Company X and its employees, as an inducement to purchase Lupron, told DR. SPINELLA to charge the Medicare Program the average wholesale price then published in the Redbook, rather than any lesser amount, including the discounted price that Company X had charged Dr. Spinella, so that he could obtain that profit as a inducement to purchase Lupron. Company X and its employees referred to this profit and the corresponding inducement to the physician as its "Return to Practice" program. At times material to this Information, the Company and its employees referred to the profit that the doctor could obtain by prescribing Lupron and billing the Medicare program at the published average wholesale price as money going to the doctor from "[Company X's] Checkbook." At all times in all parts of the United States prior to May 1997, and thereafter in many parts of the country, Company X knew and understood that, because the Medicare Program relied upon the Redbook to establish average wholesale prices and because Company X could precisely control the average wholesale price as published in the Redbook, Company X could increase whenever it so desired the profit obtained by physicians from the Medicare Program and, accordingly, Company X could control the amount of the financial incentive, or "return to practice" that a physician would receive by prescribing Lupron to his patients and billing the Medicare at the average wholesale price established by company X.

16.    At all times material to this Information, it was a crime, in violation of Title 21, United States Code, Sections 331(t) and 333(b) for an employee of a company engaged in the lawful distribution of drugs to provide a drug dose or sample free of charge to a physician, with the intention and expectation that the physician would use that dose or sample in the treatment of a patient and thereafter bill either the patient, the patient's insurance company, or the Medicare

7

Program, for that drug dose or sample which had been provided to the physician free of charge. At all times material to this Information, Company X knew of this prohibition.

17.    At all times material to this Information, it was a crime, in violation of Title 42 U.S.C. section 1320a-7b(b), for an employee of a company engaged in the lawful distribution of drugs to knowingly and willfully offer and pay any remuneration, including any kickback, bribe or rebate, directly or indirectly, covertly or overtly, in cash or in kind to any physician to induce that physician to order or to recommend the ordering of any drug for which payment was made in whole or in part by the Medicare program. At all times material to this Information, Company X knew of this prohibition.

18.    Beginning in or about 1993 and continuing into 1998, the defendant JOSEPH SPINELLA received from Company X for free, more than one hundred one-month doses of Lupron. Throughout that time period, the defendant JOSEPH SPINELLA prescribed and administered these free doses to Medicare Program beneficiaries and submitted claims to the Medicare Program, and was paid, for the prescription of those free doses.

19.    At all times material to this Information, Company X and its employees knew and understood the following:

(a)    that, because of Company X's Return to Practice program, a doctor who purchased an injection of Lupron and thereafter billed that injection, to Medicare and to the patient, at the published average wholesale price for lupron rather than at the price charged him by Company X, would earn a substantial profit;

(b)    that a doctor who received an injection of Lupron for free earned no profit

8

at all from the receipt of that free dose, if he followed the law and did not bill the dose to anyone; and

(c)    that Lupron was significantly more expensive for patients and their insurers, including the Medicare Program, than was the competing drug Zoladex, at times by more than $150 per one-month dose.

At times material to this Information, Company X undertook to induce physicians to prescribe lupron rather than the less-expensive Zoladex by doing the following things, among others:

By creating, as an inducement, a larger spread between the price that Company X charged doctors for Lupron and the price that Company X told those doctors to bill Lupron to the Medicare Program, so that the doctors would receive a greater Return to Practice through the Medicare Program from Company X than they could get from Company Y; and

By offering, as an inducement, to physicians free doses of Lupron, which the physicians could turn into cash by billings to patients, to the Medicare Program and to other insurers, so that those doctors would have a financial incentive to prescribe the more expensive drug to their patients.

20.    One of the sales representatives of Company X that called on the defendant DR. JOSEPH SPINELLA in 1995 reported to a District Manager employed by Company X in Massachusetts. That District Manager supervised a number of sales representatives of Company X who called upon urologists in Connecticut, Massachusetts, Maine and Rhode Island. From time to time beginning in or about 1995 and continuing through in or about 1997, that District Manager informed those sales representatives that free doses of Lupron could be offered to a

9

physician to induce him to prescribe Lupron to his patients and to keep him from switching his patients to Zoladex. Employees supervised by that District Manager, from time to time, sent to that District Manager so-called Weekly Activity Reports and sales call notes, or portions thereof, and, from time to time, reported in those documents requests by physicians for samples, and the offer and delivery of samples to physicians to keep and to maintain their Lupron business.

### Inducements to DR. JOSEPH SPINELLA

21.     In or about August 1995, an employee of the defendant DR. JOSEPH SPINELLA told an employee of Company X that he had ceased prescribing Lupron to 26 patients, more or less, and had begun prescribing Zoladex to those patients. The employee of Company X reported this in her sales call notes.

22.     On or about August 24, 1995, an employee of Company X, in an attempt to get him to reverse his decision prescribing Zoladex to his patients, left at the office of the defendant JOSEPH SPINELLA a document demonstrating to the doctor that the profits that he could earn, through Company X's Return to Practice program, from the prescription of Lupron exceeded those that he could earn from the prescription of Zoladex by as much as $7,000 per year.

23.     On or about October 26, 1995, DR. SPINELLA informed an employee of Company X that he understood that he could earn a greater profit by prescribing Lupron but that he also wanted free goods in exchange for switching his patients back to Lupron from Zoladex.

24.     On or about November 17, 1995, DR. SPINELLA told an employee of Company X that he then had thirty patients, more or less, on Zoladex and that for every free one month dose of Lupron that he received, Dr. Spinella would switch one patient from Zoladex to Lupron.

10

Both DR. SPINELLA and the employee of Company X knew, understood, and expected that, upon receipt of these free one-month doses, Dr. Spinella would administer them to patients insured by, among other entities, the Medicare program and that he would bill that program in order to turn these free one-month doses of Lupron into cash and that that cash, paid by the Medicare Program and others, including DR. SPINELLA's patients, would be the kickback and bribe paid by Company X to DR. SPINELLA in exchange for his referral of business to Company X.

23.    On or about November 22, 1995, an employee of Company X delivered to the defendant JOSEPH SPINELLA twenty free one-month doses of Lupron.

24.    On or about December 5, 1995, an employee of Company X delivered to the defendant JOSEPH SPINELLA ten free one-month doses of Lupron.

25.    From on and after November 22, 1995, DR. SPINELLA administered the free one-month doses of Lupron to patients insured by the Medicare Program and others, billed the Medicare Program, other insurers, and his patients for those one-month doses, and received in payment from that Program, various insurers, and his patients $15,000, more or less, as a kickback and bribe for the ordering and administration of Lupron to those Medicare beneficiaries.

11

## COUNT 1: 18 U.S.C. §371 (CONSPIRACY TO DEFRAUD)

26.    Paragraphs 1 through 26 of this Indictment are herein realleged and incorporated by reference.

27.    From in or about 1993 through in or about 1998, in the District of Massachusetts, in the District of Connecticut, in the Northern District of Illinois, and elsewhere throughout the United States, the defendant

### JOSEPH SPINELLA, M.D.

together with Company X and employees of Company X, and with others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire and agree to violate 42 U.S.C. §§ 1320a-7b(b)(1) and (b)(2), by causing the Medicare Program and patients insured by the Medicare Program to pay to the defendant **JOSEPH SPINELLA** remuneration, including a kickback and bribe, for the referral by **JOSEPH SPINELLA** to Company X of orders for the drug Lupron as prescribed by him to patients insured by the Medicare program and others, as follows: Company X provided to **JOSEPH SPINELLA** thirty free one-month injections of Lupron to induce him to switch thirty patients, to whom he was then prescribing Zoladex, to the drug Lupron, knowing and intending and conspiring with the defendant **JOSEPH SPINELLA** that , in order for him to receive the intended kickback and bribe for those referrals, he would accept those thirty free samples, administer them to patients and thereafter bill the Medicare Program, other insurers and a number of those thirty patients for the injection of those thirty free samples of lupron.

### OBJECTIVE OF THE CONSPIRACY

28.    The objectives of the conspiracy varied depending upon the participant.  It was an

12

objective of Company X in this conspiracy to provide free doses or samples of Lupron Depot, as well as other things of value, including money, to physicians and others as an inducement to order Lupron Depot. It was an objective of Company X in this conspiracy to sell lupron to physicians at a substantial discount from the published average wholesale price and thereafter urge and recommend to physicians that they conceal and hide that discount from, and not pass it along to, the Medicare Program and their patients, so that Company X could provide an indirect kickback and bribe to physicians as an inducement to them to prescribe Lupron to persons suffering from prostate cancer. It was also an objective in this conspiracy for Company X to give free samples to physicians, including JOSEPH SPINELLA, for the referral of Medicare insured business, knowing and conspiring with the doctor that the doctor would "turn" the free samples into cash by prescribing the samples to persons insured by the Medicare Program and thereafter billing the Medicare Program for the free samples. It was an objective of the defendant JOSEPH SPINELLA, as well as that of other physicians participating in this conspiracy, to bill for the free doses or samples in order to obtain from patients, the Medicare Program, and other insurers, the unlawful inducement provided to him by Company X. It was Company X's objective, in part, to use the Medicare Program as its checkbook for the indirect payment of kickbacks and bribes to physicians like JOSEPH SPINELLA.

## OVERT ACTS

29. In furtherance of the conspiracy, the defendant JOSEPH SPINELLA and other conspirators known and unknown to the United States Attorney committed among other acts the overt acts set forth in paragraphs 21 through 26 of this Information in the District of Massachusetts and elsewhere.

13

All in violation of Title 18, United States Code, Section 371.

DONALD K. STERN
UNITED STATES ATTORNEY for the
DISTRICT OF MASSACHUSETTS

By:

_____
MICHAEL K. LOUCKS
HEALTH CARE FRAUD CHIEF and
ASSISTANT U.S. ATTORNEY

_____
DATE

14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. *00-10394-RCL* |
| | VIOLATION: |
| v. | 18 U.S.C. §371<br>Conspiracy to Violate 21 U.S.C. Sections<br> 331(t) and 333(b) |
| JACOB ZAMSTEIN, M.D. | |

## I N F O R M A T I O N

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### The Defendant

1.     The defendant JACOB ZAMSTEIN, M.D., (hereinafter referred to as

ZAMSTEIN) was a physician licensed to practice medicine in the state of Connecticut, with

practices located in Hartford and Bloomfield, Connecticut.

2.     ZAMSTEIN has a specialty in urology.  It was a part of ZAMSTEIN's practice

of medicine that he from time to time diagnosed and treated patients suffering from prostate

cancer.  As a part of the treatment of some of his patients suffering from prostate cancer, and

beginning as early as 1992, ZAMSTEIN prescribed for those patients a drug called "Lupron

1

Depot." ZAMSTEIN obtained that drug from a company known to the United States Attorney. That company will be referred to in this Information as "Company X"

### Company X

3.      In the 1980s, Company X began marketing the drug Lupron Depot as a treatment for prostate cancer.   In the marketing of its drug, Company X employed and maintained extensive marketing and sales departments.  Since at least the early 1990s, Company X has sold and provided the drug Lupron Depot to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to the defendant JACOB ZAMSTEIN, M.D., practicing medicine in the State of Connecticut.

4.      Lupron Depot was administered to patients by intramuscular injection, typically in the buttocks, by a physician or nurse under the supervision of a physician.   At various times in the 1980s and continuing on to the present, Lupron was available in daily, one month, three month and four month doses.   When Lupron Depot was initially introduced to the marketplace, it was in the form of daily injections that were self injected.  Over time, the monthly, three-month, and four-month doses were approved for use and typically, patients would not self-administer these dosage levels.  It was typical of a patient whose prostate cancer was being treated with Lupron Depot to receive regular injections of that drug for the remainder of his life. At times material to this Information, the vast majority of patients receiving regular doses of Lupron Depot were administered the one month, three month and/or four month doses.

5.      At all times material to this Information, Company X sold Lupron Depot to physicians and to health maintenance organizations, among other purchasers.   At all times material to this Information, an industry reference known as the Red Book published a price,

called the Average Wholesale Price or AWP, for Lupron Depot based upon information supplied
to the Red Book's publishers by Company X.   At all times material to this Information, the
AWP for an injection of a monthly dose of Lupron Depot administered to a patient was as
follows:

|  | Average Wholesale Price |
|---|---|
| 1992 | 418.75-437.50 |
| 1993 | 451.25 |
| 1994 | 463.75 |
| 1995 | 477.50 |
| 1996 | 496.25-515.63 |
| 1997 | 540.63 |
| 1998 | 566.88 |

6.    At all times material to this Information, it was a crime, in violation of Title 21,
United States Code, Sections 331(t) and 333(b) for an employee of a company engaged in the
lawful distribution of drugs to provide a drug dose or sample free of charge to a physician, with
the intention and expectation that the physician would use that dose or sample in the treatment of
a patient and thereafter bill either the patient, or the patient's health care insurer, for that drug
dose or sample which had been provided to the physician free of charge.

7.    Beginning in or about January, 1993 and continuing into at least August, 1998, the
defendant JACOB ZAMSTEIN received from Company X for free more than one hundred one-
month doses of Lupron Depot.  Throughout that time period, the defendant JACOB
ZAMSTEIN prescribed and administered these free dosages to patients and submitted claims to
the patient and to the patient's insurer, and was paid, for the prescription of these free dosages.

3

In that time period, the defendant JACOB ZAMSTEIN received between $30,000 and $40,000,

more or less, on billings for these free drugs.

## COUNT 1: 18 U.S.C. §371 (CONSPIRACY TO DEFRAUD)

8.      Paragraphs 1 through 12 of this Indictment are herein realleged and incorporated by reference.

9.      From in or about 1993 through in or about at least August, 1998, in the District of Massachusetts, in the District of Connecticut, in the Northern District of Illinois, and elsewhere throughout the United States, the defendant

### JACOB ZAMSTEIN, M.D.

together with Company X, employees of Company X, urologists practicing medicine in Massachusetts, Maine, Connecticut, Kentucky, South Carolina, New York, and elsewhere, and together with others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire and agree to violate 21 U.S.C. Sections 331(t) and 333(b) by submitting, and by causing to be submitted, claims for payment to patients and to those patients' insurers for the prescription of Lupron Depot which had been provided free of charge to the urologists, including the defendant JACOB ZAMSTEIN.

### OBJECTIVE OF THE CONSPIRACY

10.     The objectives of the conspiracy varied depending upon the participant. The core objective of this conspiracy for all participants was to obtain money from the patient's health care insurers through the prescription of Lupron.  It was an objective of Company X in this conspiracy to provide free doses or samples of Lupron Depot, as well as other things of value, including money, to physicians as an inducement to those physicians to order Lupron Depot. It was also an objective of this conspiracy for Company X to give free samples to physicians who had not timely paid Company X for balances due on past purchases of Lupron, in order to

5

provide the physician with a source of money from which the physician could generate funds to pay that past-due balance. It was an objective of the defendant JACOB ZAMSTEIN, as well as that of other physicians participating in this conspiracy, to bill for the free doses or samples in order to increase his income.

11. By virtue of this conspiracy, the defendant JACOB ZAMSTEIN would and did obtain from Company X in the time period 1993 through at least August, 1998, more than one hundred one-month doses of Lupron Depot for free, which he billed to patients and to their health care insurers, as both he and Company X planned and intended at the time he was given those doses.

**OVERT ACTS**

12. In furtherance of the conspiracy, the defendant JACOB ZAMSTEIN and other conspirators known and unknown to the United States Attorney committed among other acts the following overt acts in the District of Massachusetts and elsewhere:

        a.      On various dates in 1993 through 1998, employees of Company X provided to defendant JACOB ZAMSTEIN those free doses or samples set forth in paragraph 7 of this Information.

        b.      On various dates in 1993 through 1998, ZAMSTEIN submitted bills to patients and to their health care insurers for doses of Lupron Depot which he had received for free from Company X.

        c.      On various dates in the time period 1993 through 1998, employees of Company X provided one-month doses of Lupron Depot, without charging therefor, to physicians in the District of Massachusetts, with, among other intents, the intention and

6

expectation that the physician receiving the free drug would use that drug in the treatment of a patient suffering from prostate cancer and thereafter submit a claim to that patient's insurance company for that drug.

        d.     On various dates in at least 1997 and 1998, sales representatives and other employees calling on **JACOB ZAMSTEIN** and providing to him free drug, reported on those calls to a district manager for TAP Pharmaceuticals in Massachusetts.

     All in violation of Title 18, United States Code, Section 371.


                        DONALD K. STERN
                        UNITED STATES ATTORNEY for the
                        DISTRICT OF MASSACHUSETTS

By:

                        MICHAEL K. LOUCKS
                        HEALTH CARE FRAUD CHIEF and
                        ASSISTANT U.S. ATTORNEY

                        November 3, 2000

7