1

1                UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2

3                           Criminal No.
                        01-10354-WGY

4                             F I L E D
    * * * * * * * * * * * * * * * *    Clerk's Office
5                      *    U.S.D. Mass.
    UNITED STATES OF AMERICA    *    Date _12 20 01_
6                      *    By _____
    v.                   *  DISPOSITION
7                      *
    TAP PHARMACEUTICAL PRODUCTS,    *
8    INC.,                    *
                        *
9    * * * * * * * * * * * * * * * *

10

11          BEFORE:  The Honorable William G. Young,
                      District Judge
12

13

14

    APPEARANCES:
15
            MICHAEL K. LOUCKS and SUSAN G. WINKLER, Assistant
16    United States Attorneys, 1 Courthouse Way, Suite 9200,
    Boston, Massachusetts 02210, on behalf of the
17    Government

18            TESTA, HURWITZ & THIBEAULT, LLP (By Joseph F.
    Savage, Jr., Esq.), 125 High Street, Boston,
19    Massachusetts 02110-2704
            - and -
20            JONES, DAY, REAVIS & POGUE (By Daniel E. Reidy,
    Esq.), 77 West Wacker, Chicago, Illinois, 60601-1692,
21    on behalf of the Defendant

22

23                            1 Courthouse Way
24                            Boston, Massachusetts

25                            December 6, 2001



EXHIBIT

E

1                    A P P E A R A N C E S  (Cont'd)

2

3         ROSENFELD & ASSOCIATES (By S. Stephen Rosenfeld,
      Esq.), 44 School Street, Suite 410, Boston,
4     Massachusetts 02108
               - and -
5         LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP (By
      Thomas M. Sobol, Esq.), 175 Federal Street, 7th Floor,
6     Boston, Massachusetts 02110-2221
               - and -
7         MILBERG WEISS BERSHAD HYNES & LERACH, LLP (By Sol
      Schreiber, Esq.), One Pennsylvania Plaza, New York,
8     New York 10119-0165, on behalf of Massachusetts Senior
      Action Counsel, Health Care For All, Inc., et al.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE CLERK:  Calling Criminal Action No. 01-10354,

2     the United States v. TAP Pharmaceutical.

3               (Whereupon the Court and the Clerk conferred..)

4           THE COURT:  Would counsel identify themselves.

5           MR. LOUCKS:  Good afternoon, your Honor.

6     Assistant U.S. Attorney Mike Loucks.

7           MS. WINKLER:  And Assistant U.S. Attorney Susan

8     Winkler.

9           MR. REIDY:  Good afternoon, your Honor.  On behalf

10    of the defendant, Joseph Savage, Daniel Reidy and Ken

11    Greisman are here present in court with the CEO, Mr.

12    Watkins.

13          THE COURT:  Yes.

14          Now, you will have received this letter from Mr.

15    Rosenfeld.  The letter reflects that Mr. Loucks has no

16    objection to his being heard.

17          Do you have any objection to his being heard?

18          MR. REIDY:  To his being heard, we do not, your

19    Honor.

20          THE COURT:  Very well.  And so would you introduce

21    yourself, Mr. Rosenfeld.

22          MR. ROSENFELD:  Thank you, your Honor.  I'm

23    Stephen Rosenfeld with the firm of Rosenfeld and

24    Associates.  With me today are Thomas Sobol and Sol

25    Schreiber.  I would also like, if I may, your Honor, to

4

1   move the admission of Mr. Schreiber, who is licensed to

2   practice in New York, just for purposes of this hearing

3   today.

4           THE COURT:  And he is admitted and he is welcome.

5           I should disclose, seeing Mr. Schreiber here, Mr.

6   Schreiber and I know each other.  And we have taught

7   together for the American Law Institute, American Bar

8   Association Forum, on more than one occasion.  I should

9   also say Mr. Schreiber puts those forum together, he's one

10  of the people who does, and he's been the one who has

11  invited me to speak.  I have known him since he was a

12  United States Magistrate.

13          I see no concern with my going forward, but I

14  acknowledge that I know who, as I know you professionally,

15  also I know Mr. Schreiber both professionally and we have

16  taught together.

17          I hear no objection from anyone to --

18          MR. REIDY:  We share the Court's lack of concern.

19          THE COURT:  Fine.  All right.

20          For a reason that will be immediately apparent,

21  Mr. Loucks, I want to call on Mr. Rosenfeld first.

22          MR. LOUCKS:  That's fine, your Honor.

23          THE COURT:  All right.  And here, if you're going

24  to be the one to speak, Mr. Rosenfeld, I'm sure you know

25  this but let me frame it for you.

1       The posture of this criminal case is this.  TAP,

2   through its present chief executive officer, has entered

3   into this very complex civil and criminal plea agreement

4   and has tendered, after what I think is a thorough

5   colloquy, a plea under Federal Rule of Criminal Procedure

6   11(e)(1)(C).  That means -- he has tendered it, but I

7   haven't acted.  I have not yet accepted the plea.  And I

8   had, before I got your letter I had some questions I wanted

9   to ask Mr. Loucks, and I have had prepared a thorough

10  presentence report, all of which I've read.

11      But my, my first choice this afternoon is whether

12  to accept the plea or reject the plea.  Now, if I reject it

13  I have a pending case of some complexity, that doesn't

14  trouble me, but the parties have negotiated it all out.

15      But it is not open to me -- well, strike that.  It

16  is open to me to accept the plea and then sentence as I see

17  fit.  But the consequence of doing that, if my sentence is

18  in material respects more severe than the tendered plea, is

19  I must give TAP the chance to withdraw the plea.

20      And as a prudential matter the way I proceed is

21  usually I don't go any further than we've gotten, once my

22  questions are answered, if I'm not going to accept the deal

23  that the government and the defendant have worked out.

24      That is if I accept the plea now, it's voluntarily

25  tendered, then that's the sentence that TAP is going to

6

1    get.  If I refuse it, we'll put the case on for trial.

2        Now, I say all that because I want to, I want to

3    know what you're asking for here.  Are you asking for me,

4    in view of what you say here, to reject this plea?

5    Recognizing, and if I'm missing something explain that, if

6    I accept it, the maximum sentence is what they've

7    negotiated and it does not have the restitution order that

8    you're talking about, and I would think that that would be

9    a material change in the deal between TAP and the

10    government such that they could withdraw their plea, and

11    I'm not likely to do it.

12        So, that's why I call on you first.  What is your

13    counsel to the Court on the accept or reject the plea?

14        MR. ROSENFELD:  Well, your Honor, let me start by

15    saying I regret that we were not able to come into this

16    case at an earlier point so that the first time we're

17    appearing is today.  I wish we had been here earlier.  It

18    was not really an effort to wait until the last minute.

19        About two months ago we filed civil actions in

20    Illinois on behalf of really a very large class.  And then

21    it occurred to us, as our letter attempts to make clear,

22    that there is a disconnect between, on the one hand, having

23    essentially restitution of a sort to the government in this

24    civil, as you say, civil and criminal sentence on the,

25    civil and criminal arrangement on the one hand, while

1   leaving a very large class of people who unquestionably

2   were affected in what I'll say is precisely the same or

3   certainly an equivalent way by the conduct which underlay

4   this case.

5          So, our goal, and let me start by our goal, and

6   then I would like to then, if I might, from that indicate

7   what we would request from the Court, our goal is to ensure

8   that whatever litigation, whatever process that needs to

9   occur in the Court in order to gain restitution to

10  individuals who paid that 20 percent co-payment, take as

11  short a time as humanly possible.  Typically these cases

12  take up to four years.  They can take more, but they can

13  take a very long time.

14         One of the things that happens, your Honor, is

15  when they take four years, of necessity, just as one

16  element, the attorneys' fees can tend to gobble up a lot of

17  that restitution to the clients.  However, if we were able

18  to figure out a system to shorten that period so that

19  restitution could be made in short order through really the

20  complexities of figuring out who gets the money rather than

21  a lot of litigation beyond that, the consumers here, who we

22  represent, would receive the maximum amount possible from

23  the 20 percent that we believe is almost certain to be

24  adjudicated that they are owed.

25         THE COURT:  Let me ask you a follow-up question.

1    If I accept the plea and impose sentence and confirm the

2    sentence imposed by a judgment, as soon as that judgment

3    enters it operates as issue, it operates issue preclusive

4    as to all factual admissions essential to reaching the

5    judgment in the criminal case.

6         Why isn't that a significant leg up in your class

7    action?  You say in your papers you expect that TAP will

8    vigorously defend.  Well, if they have other defenses,

9    fine.  But if the liability civilly turns on the admission

10   of the criminal conduct which will, it's more than an

11   admission, it will be adjudicated by the imposition of a

12   sentence, a judgment, I imagine you want that judgment.

13   Even if you know that if I go forward under 11(e)(1)(C), I

14   want to ask Mr. Loucks a little bit about it, but if I go

15   forward, I'm not going to impose an additional restitution.

16   I'm not going to engage in accountings or the like.  In

17   essence, I'm going to accept the deal, because that's the

18   way it's proffered to me, and say no more than that.

19        Now, if I go forward that's how I'm going to

20   behave.  And I'm asking you, wouldn't you rather that,

21   because then you have your judgment out of this Court and

22   you can go ahead with your litigation.

23        MR. ROSENFELD:  Well, to get to the bottom line of

24   your initial question, what -- I've told you what our goal

25   is.  And if we were to have some indication today, and I'm

9

1   not saying we expect it, but just to understand what's in

2   our mind, if we had some indication today from TAP

3   Pharmaceutical that they were interested in setting up a

4   process that within a short period of time would resolve

5   these issues, in a sensible way, we would probably retire

6   from the scene subject to, you know, a little bit of

7   writing and all.

8           So, I want to be clear, we are absolutely not of a

9   mind to interfere in any inappropriate way in this, what I

10  think is an amazing result and an amazing process that has

11  occurred here.

12          THE COURT:  Well, then, giving you the chance to

13  speak further, I think probably I should talk with the

14  litigants, and before I go further I'll ask you again.

15          MR. ROSENFELD:  Right.  But could I say one more

16  thing?

17          THE COURT:  Yes.

18          MR. ROSENFELD:  That absent that, that kind of

19  indication from the defendant, we would ask your Honor to,

20  to put off the final judgment for a short period of time so

21  that we could make a showing of a process before your Honor

22  that could satisfy the goals of the criminal proceeding on

23  the one hand and satisfy the needs of consumers on the

24  other.

25          Really, the letter I wrote, you know, we wrote two

1   days ago, if I may say, was to attempt to get your Honor's

2   attention --

3           THE COURT:  Oh, it did that.

4           MR. ROSENFELD:  -- to the issues.

5           THE COURT:  It did that.

6           MR. ROSENFELD:  And with the hope that we could

7   think this through together.

8           THE COURT:  All right.  Well, perhaps you should

9   hear the views of the litigants, and I'll give you a chance

10  to speak further before I take any action.

11          Well -- but now the last thing you said, before I

12  jump to Mr. Loucks.  When you say put off for a short

13  period of time while we sort some things through, you mean

14  put off the determination whether to accept the plea?

15          MR. ROSENFELD:  That's right, your Honor.

16          THE COURT:  All right.

17          MR. ROSENFELD:  Because one of the --

18          THE COURT:  I understand.

19          MR. ROSENFELD:  Because you should know, just by

20  way of background, Mr. Sobol, my colleague, did speak with

21  Mr. Savage, I think it's about, oh, I think it was about a

22  week to ten days ago.  Our goal really is to engage the

23  defendant in what I hope would be productive conversations

24  about how to do this right.

25          THE COURT:  All right.

11

1         MR. ROSENFELD:  Thank you.

2         THE COURT:  Thank you.

3         Now, Mr. Loucks, recognizing I have to go through

4  the sentencing process, you will aid me if we talk about, a

5  little bit, I need to ask you about whether to accept the

6  plea, and let me just focus it.

7         Though the parties were willing and there were

8  various financial reasons for going directly to sentencing,

9  I refused and my refusal was out of an institutional

10  concern for fact bargaining.  That concern has been

11  entirely put to rest.  There's been none of that here.  Not

12  that I suspected it.  It was an institutional concern.  I

13  am satisfied that the bargain that the government drove

14  here is, at least for the government's concerns, fully

15  consistent with the nature of the offense and so that's

16  simply not an issue.

17         So my issue before I got Mr. Rosenfeld's letter

18  was going to, and you can address these in whatever order

19  you see fit, my only issue about this, I just wanted to

20  hear you a little bit about what's in this agreement that

21  pins TAP down.  But also its stock is not publicly traded,

22  there's only two big outfits that own TAP.  That's correct

23  right?

24         MR. LOUCKS:  That's correct.

25         THE COURT:  I'm very concerned once we get, in the

12

1    corporate world they say this unpleasantness over in the

2    courts, that there will be on the corporate business end

3    some effort to, well, not sweep this under the rug but say,

4    well, you know, that was some sort of proceeding in the

5    courts.  Millions and millions of dollars, yes, but you

6    know the government.  And I don't want any of that.

7          MR. LOUCKS:  Nor do we.

8          THE COURT:  I understand.  I don't want it on the

9    part of TAP, but I don't want it on the part of the,

10   they're not technically the parents, but the two major

11   stockholders, either.

12          This has been a gross abuse of the

13   Medicare/Medicaid repayment system, knowing, intelligent.

14   You have demonstrated, and it's all been confirmed in open

15   court, and I don't want anyone forgetting about the fact

16   that this company, not under its present management,

17   knowingly abused the public trust in a most, and I use my

18   words carefully, despicable way.

19          Now, how are you going to protect against that?  I

20   don't want some PR flak saying that this is all just a big

21   misunderstanding and we don't want to have bleeding with

22   the government over the years so we pay $900 million.

23          Now, how are you going to protect against that?

24          MR. LOUCKS:  Well, your Honor, I think it's

25   protected in a number of different ways.  And I'll start

1  first and foremost with the criminal fine.  I know of only

2  two larger criminal fines in any context.  I know of no

3  larger criminal fine in a health care case.  That's one.

4          Second, there is an indictment pending of a number

5  of individuals.  Now, obviously that's not before the

6  Court.  But it's clearly a part of the U.S. Attorney's law

7  enforcement in these kinds of cases that we don't just take

8  a plea and make the company pay some money; that to the

9  extent that there are individuals who can be held

10  accountable where there is proof that is present that can

11  be demonstrated that they personally engaged in criminal

12  activities we pursue that.

13          THE COURT:  I certainly don't criticize or impugn

14  that, but I must be cautious.  The individuals whom the

15  government have indicted are, as we speak, innocent and

16  nothing I do or refrain from doing here today is any

17  expression by this Court as to the merits of that case,

18  because that would be improper and I have no such view.

19  I'm talking TAP, the corporation.  If I accept the plea,

20  it's guilty.  And so, yes, there's a major fine.

21          Go ahead.

22          MR. LOUCKS:  Third, the corporate compliance

23  program that's been applied here as to TAP will have a

24  major impact, we believe, going forward on TAP's conduct.

25  It requires a change in the reporting of drug pricing by

14

1   TAP as to the two drugs that it markets and sells to the

2   Medicaid and Medicare programs.   That is a substantial

3   change, your Honor.

4        Already the investigation and the prosecution of

5   TAP has had a change, significant change in TAP's business

6   behavior, and I believe a change in the behavior of one of

7   its two parents, Abbott Laboratories.

8        In the course of the investigation TAP -- and as

9   the Court can see from the presentence materials that we

10  filed and the sentencing memorandum that we filed, TAP used

11  to hand out millions of dollars worth of free drugs to its

12  sales reps, virtually unchecked to use as they wanted to.

13  Lots of upper management and direct management urging on

14  how they should be used, some of it criminal the methods of

15  use.

16       In the course of the investigation and almost

17  immediately upon the plea, announcement of the plea of Dr.

18  Rodney Mannion from Indiana that stopped.   Sales reps don't

19  get the millions of dollars of samples that they formerly

20  received.

21       So in one significant respect the conduct of this

22  corporation was substantially affected simply by activities

23  in the investigation, not to mention the corporate

24  compliance agreement or the plea incentives that we

25  proposed.

1          Secondly, about six months ago, or within the past

2     six months Abbott Laboratories announced, or quietly, I

3     guess is the way of saying it, filed new prices for a lot

4     of their products.  The NAWP for a lot of products that had

5     been previously, or the best price that had been previously

6     reported to the Medicaid program for a lot of their

7     products was suddenly dramatically lower, in some respects

8     by a factor of five or six times lower.

9          That's a change in behavior, your Honor, that I

10    believe, and I think Ms. Winkler shares this, and everybody

11    who worked on the investigation shares this, was a direct

12    result of this four and-a-half year investigation.

13          I don't -- you know, it occasionally happens, and

14    I guess it's happened once in my career, that a corporate

15    offender has been back with new offenses.  I make no

16    prediction today whether TAP will be back.  I do believe

17    that the complicated package that's before the Court goes

18    about as far as we can go short of putting the company out

19    of business.

20          And, frankly, those were two alternatives for the

21    government to consider here.  Put the company out of

22    business, or try to corral the company and its future

23    behavior, cabin it in with current management expressing an

24    interest in reformed behavior.  It is always significant

25    for the government that those who were a part of the

16

1    problem are not a part of the continuing control group at

2    the corporation.

3         And so it's our belief that the arrangement that

4    the Court has before it, the plea, the civil settlement

5    agreement, the 50 state agreement with Medicaid, Medicaid

6    programs, and the District of Columbia Medicaid program,

7    and the Corporate Integrity Agreement with the Department

8    of Health and Human Services, addresses the Court's

9    concern.

10        THE COURT:  What do you say to Mr. Rosenfeld's

11   letter now that we have it.

12        MR. LOUCKS:  Your Honor, if, if we could provide

13   relief for the co-payments -- there clearly were losses

14   suffered by some individuals as a result of having to pay

15   co-payments that they shouldn't have paid, or inflated

16   co-payments -- then we would have included it.

17        I can't even begin to tell the Court how many

18   different Medicare program beneficiaries received Lupron in

19   the 1990's.  I can't begin to tell the Court how many

20   different insurance companies paid supplemental co-payments

21   on their behalf; how many of those individuals paid

22   co-payments out of their pocket; how many of those

23   individuals had their co-payments waived by their doctor.

24   It's also impossible to identify the free sample and track

25   the free sample to the individual who had to pay the

17

1   co-payment on the free sample.

2          In every other global resolution like this that we

3   have worked on, from Copley Pharmaceuticals through

4   National Medical Care, the Bard case, Damon Clinical

5   Laboratories, it is a relatively, and I don't want to use

6   the word simple, but it is a controlled matter to identify

7   the Medicare programs' losses.  But as the Court can see

8   from the materials that we filed here it was

9   extraordinarily complicated to anticipate and evaluate the

10  true losses suffered by Medicare.

11         THE COURT:  But in a way that gives me pause.  I

12  recognize what you say, it was very difficult.  And you've

13  done a masterful job.

14         Now, in light of that, and recognizing that the

15  least advantaged people here, this class, are going to have

16  a very difficult job of proof, even if judgment enters and

17  the company is precluded globally from denying that in fact

18  they engaged in this illegal procedure over a lengthy

19  period of time, I'm not even sure that class treatment will

20  work here.  But for all the reasons you say then that

21  makes, if I go forward, it makes the resolution less just,

22  doesn't it?

23         MR. LOUCKS:  Your Honor, what I think it does,

24  without question, do is not wholly address the losses

25  caused by the criminal conduct.  We do not question that.

1   There is -- undoubtedly some individuals paid co-payments

2   that they shouldn't have paid.

3        I do think these things are true as well.  I think

4   that the Court can accept the plea and find as a matter of

5   fact that the losses to the Medicare program were

6   $145 million.  That will establish that the losses the

7   federal government suffered were $145 million.  That will

8   establish as a fact, that I believe will be difficult for

9   TAP to contest in future proceedings, the range, if you

10   will, for resolution in a class action or otherwise, the

11   scope of the money that has to be paid to Medicare program

12   beneficiaries.

13        It was not an easy decision, neither in this case

14   nor in any other case, to proceed and go forward with a

15   proposed global resolution that does not include money for

16   specific program beneficiaries.

17        THE COURT:  All right, thank you.

18        MR. LOUCKS:  I will tell the Court anecdotally

19   that we made that decision in the National Medical Care

20   prosecution a couple of years ago.  And before making that

21   decision we had a number of conversations with counsel

22   representing insurance companies who had themselves

23   suffered losses as they had told us by National Medical

24   Care's conduct.

25        I happened to speak with them in the last three or

1    four months in connection with this case, the prosecution

2    of TAP Pharmaceuticals.  And I asked them how their, how

3    their proof had gone in the two years in establishing their

4    own losses.  And they conceded to me that our judgment that

5    it would have unduly complicated the federal sentencing

6    proceedings was accurate, that they still had been unable

7    to evaluate and determine their own losses.

8            THE COURT:  From your own point of view, does TAP

9    have data that would assist in making this resolution?

10           MR. LOUCKS:  Your Honor, I don't think so.  We

11   have had through process access to a lot of TAP's data.  We

12   also have access to Medicare program database.  And TAP

13   knows to whom they sold the products.  TAP does not know,

14   to my knowledge, the supplemental insurance carriers or the

15   patients of the doctors who received Lupron throughout the

16   1990's.

17           And that's really the nub of the issue.  There are

18   two categories of other victims, insurance companies and a

19   small number of individuals who had no supplemental

20   insurance.  We calculated that number of individuals

21   without supplemental insurance at being roughly less than

22   five percent of the total number of individuals who

23   received Lupron throughout the 1990's.  So the bulk of the

24   unaddressed co-payments were moneys that would have been

25   paid to doctors by other insurers besides Medicare and

1   Medicaid.

2          THE COURT:  And, bottom line, Mr. Loucks, you are

3   recommending that I should accept the plea and proceed this

4   afternoon to impose a judgment?

5          MR. LOUCKS:  Yes, I am, your Honor.  You know, I

6   hadn't heard this request for a short delay before just

7   now.  I had a brief conversation earlier this week

8   regarding this.

9          But I want to make this clear.  I think that

10  whether we do it today, or on the date that was originally

11  scheduled, I think it's a week from next Tuesday, we will

12  make the same recommendation to you; that nothing is going

13  to change regarding the fact that it would unduly

14  complicate the sentencing proceeding.

15         THE COURT:  And, in fact, if I understand the

16  procedure, you're bound.  I mean, he's tendered a plea.

17  You can't now, you, the government, can't be changing it.

18  Private individuals can seek whatever they can seek.  But

19  there's a mutuality as between the government and --

20         MR. LOUCKS:  That's correct.

21         THE COURT:  -- the defendant here.  So this is the

22  deal you negotiated.  Am I not correct?  A week from now

23  you'll have to say the --

24         MR. LOUCKS:  We will say the same thing.

25         THE COURT:  So long as they'll plead you'll take

1   it.

2          MR. LOUCKS:  Absolutely.  I mean, we spent two

3   years negotiating through --

4          THE COURT:  Right.  I understand.

5          Now, Mr. Rosenfeld, I'm disposed to accept the

6   plea.  I can't see what this delay is going to, how it's

7   going to benefit.

8          I am concerned about your other case.  Mr. Loucks'

9   response seems direct and to the point.  I can see that you

10  have significant problems of proof.  But once you get over

11  the problems of proof as to individual beneficiaries one

12  would think that a judgment in this case, adjudicating them

13  beyond a reasonable doubt guilty, adjudicating TAP beyond a

14  reasonable doubt guilty of this offense, can be very

15  helpful to you.  And I don't know what more I can do in

16  this proceeding.

17         MR. ROSENFELD:  All right, your Honor, I do want

18  to respond and I appreciate the opportunity to do so.

19         First of all, I'm troubled by Mr. Loucks' response

20  in this sense.  The primary obstacle he sees to our being

21  able to get satisfaction for consumers is the complexity

22  involved.

23         There's no question there's unjust enrichment

24  here.  The individual consumers who had to pay and the,

25  and, after all, even when insurance companies paid, they

1   paid because consumers pay premiums to those, those

2   supplemental insurers.  The consumers here have suffered

3   and TAP Pharmaceutical has realized an unjust enrichment.

4   That is inherent in the result that's being reached here

5   today.  And the argument is it's too complex and therefore

6   we'll just have to find our way.

7           I'm also troubled by Mr. Loucks' recounting of the

8   conversation he had with insurers' counsel who in another

9   case have sought to gain civilly what was in that case

10  gained criminally.  And essentially what those counsel said

11  is, you know, you're right, it's so complex, we're having

12  trouble, two years later, getting our hands around the

13  facts.  That's a deplorable situation, if you pardon me for

14  saying, your Honor, because we are going to have to deal

15  with those complexities.

16          My view is that TAP Pharmaceutical, which brought

17  this problem into existence, that is, created these

18  complexities by the conduct they carried on for years and

19  years, should be charged with the responsibility of

20  unscrambling those eggs, unsnarling the situation, rather

21  than being defendants who say we can't pay because, after

22  all, it's so complex we don't know who to pay.

23          I have been involved in enough complex litigation,

24  your Honor, and you have as well, to know that when you

25  have an engaged defendant who wants to get to the bottom of

1    these facts somehow it can be done.

2          Just two years ago in a settlement, involving

3    hundreds of thousands of consumers, and equally complex,

4    health care litigation, we reached a settlement that

5    resulted in more than $8 million, it's a much smaller set

6    of circumstances than this, and $8 million being sent out

7    to consumers, a very modest fee for counsel under those

8    circumstances, because the defendants had participated, in

9    this case it was Blue Cross/Blue Shield of Massachusetts,

10   had, had cooperated with us in finding who it was that

11   should get the money back and sending out the checks.

12          So, everything here really cries out for some more

13   process before at the end of the day this Court cedes its

14   authority over the case.

15          I just would add one more point, your Honor.  Mr.

16   Sobol, who is my colleague here, reviewed the information,

17   the criminal information in detail.  I did not.  And he

18   assures me that as a matter of fact the information is

19   sufficiently narrowly drawn that we are going to have a

20   very tough task ahead of us in any event.  But I wouldn't

21   even go there in terms of just what Mr. Loucks concedes in

22   terms of how complex the situation is.  We need this

23   Court's help, we need the defendant's help, in being able

24   to make sure that at some point in the reasonable future

25   the consumers who paid what they shouldn't have paid get

1  satisfaction.  And if this goes forward today without

2  provision for that, as good as it will be, some of the most

3  vulnerable people affected, the government was affected

4  deeply, but the government is not as vulnerable in a

5  proportionate way as the consumers we're dealing with,

6  people who had prostate cancer, got Lupron treatment and

7  paid money they shouldn't have had to pay in the first

8  place.  And I do believe that justice in this situation

9  demands that their needs be taken into account in your

10  sentencing decision.

11          THE COURT:  Thank you.

12          MR. ROSENFELD:  Thank you.

13          THE COURT:  I do determine that TAP, through its

14  authorized representative, knowingly, intelligently and

15  voluntarily offers to plead guilty to the charge before the

16  Court and the Court, in the interests of justice,

17  determines to accept the plea.  The plea is accepted under

18  11(e)(1)(C).

19          So now we'll move to the sentencing.  As is my

20  usual practice, I will recite the guideline calculations.

21  If anyone differs with any of the calculations I make, I'll

22  ask you to interrupt me.  When I have made the

23  calculations, I will hear the recommendation of the

24  government, it seems to me we might be able to do something

25  for you, Mr. Rosenfeld, on probation terms, and I'll hear

25

1   you, and then I'll hear the defense.

2         Here the base offense level is six.  Because of

3   the size of the loss, which I find as to be appropriately

4   calculated, the base fine calculation is $145 million.  And

5   that is, I find that to be the loss, I add 18 levels.  The

6   offense involved more than minimal planning, I add another

7   two levels, for a total adjusted offense level of 26.

8         With a corporate defendant you do this culpability

9   score.  The culpability starts at base level five.  In this

10  case, given the size of the organization and the fact that

11  there was tolerance of the offense by substantial authority

12  personnel, persuasive throughout the organization, I add

13  four levels.  But I subtract one level because of

14  affirmative acceptance of responsibility for its criminal

15  conduct by TAP, giving a total culpability score.

16        That yields a guideline fine range of not less

17  than $232 million, nor more than $290 million, a special

18  assessment of $400, and a period of probation of not less

19  than one nor more than five years.

20        Mr. Loucks, I'll hear your recommendation.

21        MR. LOUCKS:  Well, your Honor, our recommendation

22  is as set forth in the plea agreement, the maximum of the

23  guideline range.  I don't think at least from our

24  perspective there's any question that this company should

25  be punished at the maximum.

26

1        THE COURT:  Let me cut to the probation because

2   that, I've determined to go ahead under 11(e)(1)(C).  I am

3   disposed to have as conditions of probation, one, that

4   there be, I impose, I'm disposed to impose probation of

5   five years, that there be no disparagement of the findings

6   of the Court with respect to the criminal conduct either by

7   TAP or its two major stockholders, and that if there is the

8   Court retains the jurisdiction as part of the probation to,

9   to impose affirmative advertising, acknowledgement and the

10  like.  I want to make sure this corporate responsibility

11  adoption actually works.

12        Second, it may be a wise thing in probation to

13  require cooperation in the disclosure of financial or other

14  data, to prohibit, as part of the probation, any documents

15  destruction by TAP for the five years, at least documents

16  with respect to the period of the criminality, and

17  cooperation in at least providing document data.

18        You say that won't help much.  I don't know

19  enough, but at least I might require that.

20        What do you think of those things?

21        MR. LOUCKS:  Well, your Honor, our plea agreement

22  does not allow us to --

23        THE COURT:  Speak to it.

24        MR. LOUCKS:  -- speak to it.

25        THE COURT:  Fine.  Then you need not.

27

1          What do you think of those things, Mr. Rosenfeld?

2          MR. ROSENFELD:  Well, as far as they go they're

3    helpful rather than hurtful, your Honor.

4          THE COURT:  Well, what else can I do?

5          MR. ROSENFELD:  Well, I think as a condition of

6    probation you can, and this is under of course the

7    jurisdiction of the probation office, require that the,

8    that the defendants cooperate with the efforts of the

9    plaintiffs, and I have to say I'm dancing as fast as I can

10   here, to achieve a fair settlement of the claims.

11         THE COURT:  I don't, I don't -- that would be in

12   effect taking a position in a civil matter over, one, over

13   which I have no jurisdiction.  It does seem to me in the

14   interests of justice, because we so routinely provide that

15   financial data be provided, that I charge the probation

16   office with, one, I fix the data that's out there, I tell

17   them no documents destruction for a period of the

18   criminality, and two, I tell my probation office that I

19   want the probation office as a condition of probation to

20   make sure that helpful data be turned over, turned over so

21   that it is available, to the extent that it proves

22   anything, in civil litigation.

23         That seems to me to do as complete justice as I

24   can do under the circumstances.

25         MR. ROSENFELD:  Well --

1          THE COURT:  Well, except -- I'll take

2    responsibility for what I can do.  I can enter restitution

3    orders.  I'm not going to.  Because if I did that then they

4    could take back the plea and I don't want them taking back

5    the plea.

6          MR. ROSENFELD:  All right, your Honor, let me say

7    I do appreciate the effort that you're making and I want to

8    be responsive.

9          What I hear the Court saying, and I just want to

10   have it on the record, that if the plaintiffs in a civil

11   action were to feel, were to believe reasonably that the

12   defendants were not following the probation order insofar

13   as disclosure of information is concerned, one opportunity

14   we have, of course, is to, as we so often do, fight these

15   discovery battles out in the civil court.

16          THE COURT:  Well, I see no reason for fighting

17   discovery battles.  If I require things to be disclosed as

18   a condition of probation they'll be disclosed.  But I'm not

19   debating with you to get it on the record.  My order will

20   be my order.

21          MR. ROSENFELD:  I apologize, your Honor.

22          THE COURT:  No, no apology is necessary.  But I

23   simply can't handle you restating it.  I have to state it.

24          MR. ROSENFELD:  No, no.

25          THE COURT:  And that's the order.

29

1    MR. ROSENFELD:  My, my question is, I guess two

2   parts, your Honor.  Do we have recourse to the probation

3   department if we feel that your order is not being complied

4   with?

5    THE COURT:  Well, we'll have to see what the order

6   is.  And then any interested party I imagine would have

7   such recourse.

8    MR. ROSENFELD:  And my second, my second question,

9   your Honor, is whether it wouldn't be appropriate to simply

10  have those documents turned over at this point for

11  examination.

12   THE COURT:  I don't even know what documents there

13  are.

14   MR. ROSENFELD:  Well, that's, that's --

15   THE COURT:  And so -- and that's why I have a

16  skilled probation officer.  All right.

17   MR. ROSENFELD:  Okay.  Thank you, your Honor.

18   THE COURT:  Let's hear the defense.  We're just

19  discussing the sentence.  I've not arrived at the sentence,

20  but that gives you something to address and I'll be pleased

21  to hear you.

22   MR. REIDY:  I appreciate that, Judge.

23   Judge, with respect to the probation, we do have

24  an 11(e)(1)(C) agreement that does not provide for a

25  probationary period.  And so I have not fully contemplated

30

1    that.  I'm thinking about that as we talk here.

2        I guess, Judge, one reason I would urge the Court

3    not to impose a probationary period along the lines it has

4    is, I think we can assure the Court, and I think Mr. Loucks

5    has assured the Court, that with respect to the

6    disparagement of the Court's order here that TAP has been

7    under its current management very forward looking with

8    respect to this, has a CIA, a Corporate Integrity

9    Agreement, that I think provides for it to go forward in an

10   appropriate way, as well as has hired people and made

11   changes on its own with respect to this, as well as changes

12   in management, and I think that as a company does not need

13   probation to keep it from disparaging.

14       But set that aside because that's not the most

15   troubling aspect of the probation order, Judge.  And one

16   thing is -- we are dealing, Judge, I think on the civil

17   side with three or four different, and I don't mean this in

18   a disparaging way, but rival groups of plaintiffs' lawyers

19   some of whom, not including the ones in court here today,

20   have maneuvered for, you know, various positions with

21   respect to primacy and settlement.  And of course, Judge,

22   we have provided with respect to, we have MDL litigation

23   here and we, of course, will produce things and will not

24   destroy things as that would be inappropriate even under

25   civil.

1              What I would like to avoid, Judge, because I don't

2    think it does the probation office any good, nor do I think

3    it does this Court any good, would be to turn the discovery

4    issues such as they may be, and we're preparing a

5    depository of records to be put in so the plaintiffs have

6    access to them, from the various rival, there are fourteen

7    lawsuits right now, Judge, some of which are grouped,

8    several defendants' groups have brought more than one

9    lawsuit, sometimes in more than one venue.

10             THE COURT:  Is there, is there a single judge

11   designated by the Multi-District Panel?

12             MR. REIDY:  No, but we had the Multi-District

13   Panel argument last week.

14             THE COURT:  I see.

15             MR. REIDY:  And the only issue was which venue

16   should the MDL be in, not whether there should be MDL.  The

17   panel clearly is going to make an MDL appointment and it's

18   just up to them to pick a judge as to where it goes.

19             So I believe, Judge, that it would actually be

20   quite counterproductive to have discovery issues as to

21   whether or not we're making available whatever it is we

22   should be making available being answered in two courts and

23   in two ways.  One as part of a argument with respect to

24   whether or not we're living up to what is necessarily a

25   general sort of probation injunction, and secondly, with

32

1    respect to the normal discovery process.

2          As you know, Judge, a case like this of this

3    magnitude, the Multi-District Panel is going to reach out

4    and assign it to an experienced judge and I think that it

5    would be better for everybody and for the administration of

6    justice if we're not answering discovery questions in two

7    forums, dragging the probation office into it at the same

8    time as we have an MDL proceeding going.

9          And so particularly with respect to that aspect of

10   this, Judge, we would have to object to probation.

11          And I guess, Judge, if the Court would permit, I

12   would like just a five minute recess to discuss this

13   probation issue if the Court would allow that.

14          THE COURT:  I think that makes sense.  We'll

15   recess for five minutes.  We'll recess.

16          MR. REIDY:  Thank you.

17          THE COURT:  All rise.

18          (Recess.)

19          THE CLERK:  All rise.  Court is in session, please

20   be seated.

21          THE COURT:  Counsel, I'll hear you further if you

22   wish to say anything further.

23          MR. REIDY:  I do.  Thank you, your Honor.

24          THE COURT:  Go ahead.

25          MR. REIDY:  Judge, I want to address a couple of

33

1   things because I think there are other aspects, or aspects

2   of what the Court has in mind here that are satisfying in

3   other places.

4           First, I guess I've already addressed the

5   disparaging point, Judge. Obviously we speak only for TAP

6   Pharmaceutical, but I can assure the Court that Mr. Watkins

7   is in contact with his board which is in fact made up of

8   individuals from both Abbott and Takeda, so we will

9   certainly make sure that is communicated to them. I don't

10  think that's going to be any problem with respect to any

11  disparagement. Obviously they're not before the Court as

12  such, only TAP is.

13          As far as the preservation of records go, Judge,

14  and let me see what I can do with respect to that because

15  I'm very concerned with this additional aspect of the

16  sentence that's not provided for in the 11(e)(1)(C)

17  agreement.

18          But first of all, Judge, with respect to the

19  preservation of records, Mr. Loucks reminded me during the

20  break, the CIA requires TAP to maintain records for a

21  period of eight years, many of the records that are

22  relevant to what we're talking about here today, I believe.

23  So that's already provided for.

24          And I want to talk about the CIA a little bit

25  more, Judge, because I think that if we take the probation

1   order, for example, if it includes the normal conditions of

2   probation, we're going to have probation reporting, we're

3   going to have something that theoretically if somebody at

4   TAP commits some violation of some small law totally

5   unrelated to pricing we'll have a condition of probation

6   that's in effect been violated that we could be bought back

7   before the Court in a way that I don't think that anybody

8   intends should happen.

9        And so, with respect to the record-keeping in

10  particular, we'll obviously be keeping the records in any

11  event, because we would keep them in the civil cases, but

12  also because we're required to under the CIA.  But we can

13  and will, Judge, take every record that, in which there was

14  no claim of privilege that we produced to Mr. Loucks, and

15  put it in a room in relatively short order and make

16  available to all the plaintiffs' counsel from the various

17  rival plaintiffs' groups.  And I think, Judge, that you can

18  reasonably rely that if there are documents that were

19  pretty relevant to this issue they've already been taken

20  from TAP by the grand jury, and I think you'll find out if

21  you inquire that TAP was very careful in its productions

22  with respect to the grand jury and straightforward with

23  them.

24        I do believe, Judge, that this probation order

25  would be a material change for us and would not be

1  efficient in the way the Court wants.  Because I think it

2  will cause us to be responding in two different places and

3  causing some friction potentially with the MDL judge, tying

4  up the resources of the probation department.

5         And I want to make one thing clear, Judge, with

6  respect to the records.  As I say, we'll take everything

7  that Mr. Loucks has gotten over his four years of

8  investigation and put them in a room the way I've

9  described.  And secondly, Judge, the kinds of records that

10 we've been talking about, figuring out for the purposes of

11 these insurance companies that cover 95 percent of this

12 issue at least, we don't have those records.  As Mr. Loucks

13 has already indicated to the Court those records are not in

14 TAP's possession.  So that this is not a probation order

15 that needs to be given either to preserve those records or

16 to cause them to be produced voluntarily as opposed to, in

17 response to a document production order.

18        THE COURT:  Well, I can't require you civil or as

19 part of probation to produce what you don't have.

20        MR. REIDY:  No, I understand that.  The only point

21 I wish to make to the Court with respect to that is, that

22 we're not talking about the key documents underlying who it

23 is who might have some claim with respect to a co-pay,

24 whether or not they made a co-pay or not.  Those aren't

25 records that TAP has.  Those might be in the possession of

36

1   the insurance companies, they might be in the possession of

2   doctors.  They are not -- and might be in the possession of

3   the government in some measure.  But they are not in the

4   possession of TAP.  So we don't have to worry in essence

5   about protecting those records.

6        So for all of those reasons, Judge, we would

7   object to the imposition extra the plea agreement of a

8   probation period and believe that it would be a much more

9   efficient use of the criminal side of this case as opposed

10  to the civil side of the case not to impose that period of

11  probation.

12       THE COURT:  Thank you.

13       Mr. Watkins, as the chief executive officer,

14  before I impose sentence you have the right to address the

15  Court directly.  You are not required to, but if you wish

16  to I'll hear you now.

17       MR. WATKINS:  Your Honor, I have nothing further

18  to say.

19       THE COURT:  Fine.

20       With respect to TAP Pharmaceutical Products,

21  Incorporated, in consideration of the information provided

22  by the United States Attorney, the probation office and the

23  defense, the Court imposes the following sentence.

24       The Court fines TAP $290 million.  The fine shall

25  be paid within 14 days of the imposition of the sentence.

37

1    The fine is to be continued to be paid until the full

2    amount, including any interest required by law, has been

3    paid.

4         The Court also imposes the special assessment of

5    $400 to be paid forthwith.

6         The Court places TAP on probation for a period of

7    five years with all the general conditions of probation and

8    the following special conditions:  Neither TAP, nor its

9    principal shareholders, shall engage in any way in

10   disparaging the sentence of this Court or those matters to

11   which it has admitted in the plea colloquy and in the

12   actual imposition of sentence.

13        TAP shall, as a condition of probation, maintain

14   those records as it is required to maintain under the

15   Corporate Integrity Agreement.

16        TAP shall provide requested financial information

17   to the probation office when the probation office so

18   requests.  Financial information and other document

19   information as the probation office requests.

20        There is no charge to the probation office in this

21   district of monitoring the conduct of civil litigation to

22   take place in this or any other district.  That would be

23   counterproductive.  Nevertheless, as part of this probation

24   requirement, TAP will provide to the probation office in

25   this district copies of its responses to any document

38

1    requests involved in related civil litigation. They don't

2    have to provide the documents. We don't need to file

3    those. But if documents are withheld and arguments are

4    made as to why they're withheld, I want a copy of that. I

5    want it in the probation office.

6        Now, let me explain this sentence. The most

7    important part of the sentence, it overshadows everything

8    else, is the penal fine of $290 million. The high end of

9    the guidelines. A fine that on the basis of the record

10   here, given the egregious, long-standing and contemptuous

11   flouting of the medical repayment statutes of the United

12   States is fully warranted, and it is also fair to say, has

13   been ably, resourcefully and skillfully documented,

14   advocated on the part of the office of the United States

15   Attorney here in Massachusetts. And I convey to Mr. Loucks

16   and to all his people the appreciation on behalf of the

17   people of the United States for such thorough and careful

18   work.

19       The Court imposes the fine, but if ever such a

20   fine was justified it is in this case.

21       Now, let me say something about this probation

22   order. I don't think it's a material difference, not given

23   the representations that are made here. And it is fully

24   justified in the interests of justice here, and I expect it

25   to be followed absolutely and carefully.

39

1       Let me deal with some of the arguments that have

2 been made.

3       Well, it's said suppose there's a minor criminal

4 violation having nothing to do with these financial

5 matters.  There best not be any criminal violations on the

6 part of TAP.

7       The maintenance of records they've already agreed

8 to.  I'm just making it a condition of probation.

9       The disparagement has already been agreed to and

10 been reiterated over and over.  If the representations made

11 to the Court are truthful it's a condition of probation.

12 We'll see.  Five years.  They better be followed out.

13       I'm not going to interfere in civil litigation.

14 But we will from a distance look it over.  It's a condition

15 of probation.  Courts cooperate.  This Court has a standing

16 policy of accepting jury waived cases from other

17 jurisdictions.  There won't be any problem in coordinating

18 the response of the federal courts to see that justice is

19 done in each of the cases.

20       I take no position in these other cases.  It's

21 matters of proof with respect to that.  But the interests

22 of justice here require and require this Court to impose a

23 sentence that takes into account all the various interests.

24 This is such a sentence.  That's the sentence of the Court.

25       I think I ought not recess without asking if there

40

1    are any questions.  And I will do that.

2              Any questions, Mr. Loucks?

3              MR. LOUCKS:  No, your Honor.  Thank you.

4              THE COURT:  Any questions?

5              MR. REIDY:  Judge, if I might, could I ask the

6    Court just to set this over for finality for a few days

7    until next week.  Because I have not briefed the board with

8    respect to the conditions of probation that the Court has

9    imposed, and I would like an opportunity to do that.

10             THE COURT:  No, you go ahead but that's the

11   sentence of the Court.  You can ask me to reconsider.  But

12   that's the sentence.  You get the transcript and see what

13   I've told them.  I don't think this is any material change.

14   I think that's -- that is the sentence of the Court.

15             I advise you, you have the right to appeal from

16   any findings or rulings the Court has made against TAP.

17             Mr. Rosenfeld, any questions?

18             MR. ROSENFELD:  No questions.  I want to thank you

19   again, your Honor, for giving us the opportunity to speak.

20             THE COURT:  That's the order of the Court.  We'll

21   recess.

22             MR. LOUCKS:  Thank you, your Honor.

23             THE COURT:  All rise.

24             (Whereupon the matter concluded.)

25

41

## C E R T I F I C A T E

I, Donald E. Womack, do hereby certify that the above proceedings were reported by me stenographically and this transcript represents a true and accurate transcription of said proceedings.

DONALD E. WOMACK
Official Court Reporter
P.O. Box 1062
Boston, Massachusetts 02205-1062
(617) 439-8877