```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 2
                                    Criminal No.
 3                                  01-10354-WGY

 4
    * * * * * * * * * * * * * * *  *
 5                                 *
    UNITED STATES OF AMERICA       *
 6                                 *
    v.                             *  ARRAIGNMENT
 7                                 *  and PLEA
    TAP PHARMACEUTICAL PRODUCTS,   *
 8  INC.,                          *
                                   *
 9  * * * * * * * * * * * * * * *  *

10

11        BEFORE:  The Honorable William G. Young,
                    District Judge
12

13

14
    APPEARANCES:
15
          MICHAEL K. LOUCKS and SUSAN G. WINKLER, Assistant
16    United States Attorneys, 1 Courthouse Way, Suite 9200,
      Boston, Massachusetts 02210, on behalf of the
17    Government

18        TESTA, HURWITZ & THIBEAULT, LLP (By Joseph F.
      Savage, Jr., Esq.), 125 High Street, Boston,
19    Massachusetts 02110-2704
            - and -
20        JONES, DAY, REAVIS & POGUE (By Daniel E. Reidy,
      Esq.), 77 West Wacker, Chicago, Illinois, 60601-1692,
21    on behalf of the Defendant

22

23
                                   1 Courthouse Way
24                                 Boston, Massachusetts

25                                 October 16, 2001
```



EXHIBIT

1          THE CLERK: All rise. Court is in session, please

2     be seated.

3          Calling Criminal Action No. 01-10354, the United

4     States v. TAP Pharmaceutical.

5          THE COURT: Good afternoon. Would counsel

6     identify themselves.

7          MR. LOUCKS: Assistant United States Attorney

8     Michael Loucks.

9          MS. WINKLER: Susan Winkler.

10          THE COURT: Excuse me?

11          MS. WINKLER: Susan Winkler.

12          THE COURT: Yes, Ms. Winkler.

13          MR. SAVAGE: Joseph Savage, Testa, Hurwitz and

14     Thibeault. I represent TAP. To my far right, your Honor,

15     is Kevin Greisman who is the senior counsel and assistant

16     secretary of TAP. To his left is H. Thomas Watkins, the

17     president of TAP. And also representing TAP today is Dan

18     Reidy.

19          MR. REIDY: Good morning.

20          MR. SAVAGE: And we filed a motion pro hac vice.

21          THE COURT: You did and that motion is allowed.

22     Mr. Reidy, you are welcome to this session of the Court.

23          MR. REIDY: Thank you very much, your Honor.

24          THE COURT: Before we go any further I need to put

25     something on the record.

1   On the day that the civil matter was wound up

2   before Judge O'Toole and it all went in the press, I

3   received a call from a good friend of mine, an attorney in

4   Philadelphia by the name of Elizabeth K. Ainslie.

5   Ms. Ainslie and I practiced law together at Bingham, Dana

6   and Gould. And Bingham, Dana and Gould was a smaller firm

7   in those days but it was of some size. But I will say that

8   we practiced law closely together. We were associated on a

9   number of cases, and she's a friend.

10  And she called to say she was in the building.

11  And so I said fine, come see me. And she did, and she was

12  all happy. And I said: What brings you here? And she

13  said that she represents one of the relators -- I don't

14  remember the name -- and that the matter had just been

15  concluded before Judge O'Toole for a great deal of money,

16  and she recited the amount. I don't remember the amount

17  but I was struck by its size. And I said, oh, isn't that

18  wonderful, and you get a piece of it? And she said, yes, I

19  do. And she then said, and what's more, there's a criminal

20  piece, or six people are indicted or something like that.

21  At that stage in the conversation I said, well,

22  don't tell me anymore, I don't know who's drawing those

23  indictments, the matter is not concluded, and she did not.

24  And we talked about our families and we talked about her

25  practice apart from this case and I had to go back on the

1   bench and she left.

2       Now that I have drawn this it's a matter

3   appropriate to put on the record.  I see no reason as a

4   matter of substance to recuse myself and I see no reason

5   how my impartiality could fairly be questioned, but this is

6   a communication about this case from an attorney who had no

7   reason to believe I would -- I don't think she did anything

8   wrong.  In fact, I asked her:  What are you doing here?

9   What's happening?  Nevertheless it happened and I put it on

10  the record.

11      If anyone, if you want to confer about this or the

12  like, I'm happy to recess and let you confer about it, but

13  otherwise I'm prepared to go forward.  You don't even need

14  to state your position.  If you want a recess simply say

15  you want to recess.

16      Mr. Loucks?

17      MR. LOUCKS:  We're ready to proceed, your Honor.

18      THE COURT:  Mr. Savage?

19      MR. SAVAGE:  Your Honor, Mr. Reidy is --

20      MR. REIDY:  Yes, we think even judges are allowed

21  to have old friends.  I've had a chance to confer with Mr.

22  Watkins and we don't have any problem with what the Court

23  recited.

24      THE COURT:  Very well.  All right.  Now, this

25  matter is before the Court -- do I understand that TAP

1  intends in its corporate capacity to plead guilty to a one

2  count information?  Is that right?

3            MR. REIDY:  That is correct.

4            MR. LOUCKS:  Yes, your Honor.

5            THE COURT:  And who will actually tender the plea

6  on behalf of TAP?

7            MR. REIDY:  That would be Mr. Watkins, the

8  president of the company, who's here at my side, Judge.

9            THE COURT:  And do you have materials

10  demonstrating his authorization on behalf of the company to

11  act in that capacity?

12            MR. REIDY:  We do, your Honor.  Mr. Loucks will, I

13  believe, hand up to the Court the original certified copy

14  of a board resolution to that effect.

15            MR. LOUCKS:  Your Honor, this is the original plea

16  agreement with all the original signatures, and attached to

17  it is precisely what Mr. Reidy identified.

18            THE COURT:  Thank you.  Give me a moment with

19  this.

20            (Pause in proceedings.)

21            THE COURT:  Let's talk about some practical

22  aspects of this.  This plea is tendered under 11(e)(1)(C)

23  which prevents me from imposing a greater fine than agreed

24  to without allowing TAP to withdraw the plea.  But I don't

25  have a presentence report.  Where it's corporate misconduct

10/18/01  10:52 FAX 011 240 7100

6

1   perhaps that's less important, especially where, and

2   correct me if I have this wrong, the fine to be determined

3   is a multiple of the loss calculation.

4        I also know from reading a letter the Court has

5   received from some state organization, the National

6   Association of Medicaid Fraud Control Units, that there are

7   interested parties that want to get this over with so that

8   TAP can comply with its obligations under the plea

9   agreement.

10       But I'm -- well, let's see, let's just talk this

11  through in this sense.  Suppose we were to go forward and I

12  were to determine that Mr. Watkins knowingly, intelligently

13  and voluntarily, and as authorized by TAP itself, tenders

14  the plea which is agreed to between the United States and

15  TAP; and I were further to believe that based upon the

16  record I have before me that the, this all seemed in order,

17  it seemed properly to discharge the public interest which

18  ultimately is my responsibility on the criminal side of

19  Court; and then I were to set this down for a disposition.

20  So I were to accept the plea but set it down for

21  disposition at a later time when I can be advised by the,

22  my probation officer just to make sure that these

23  calculations are right, and that based upon what we know

24  the loss information is correct.

25       If I were to do that, Mr. Loucks, accept the plea

7

1    but not impose the sentence, do the various benefits

2    follow?

3                MR. LOUCKS:  Your Honor, I think ultimately, yes,

4    all the benefits follow.  It's just a question of --

5                THE COURT:  Ultimately, but it's delayed while

6    probation is dealing with --

7                MR. LOUCKS:  Certainly it would be delayed, but I

8    think all the benefits from the agreement would ultimately

9    follow.

10               THE COURT:  What's the United States position --

11   how would you like to see this proceed?

12               MR. LOUCKS:  Your Honor, we're content to proceed

13   with a plea and sentence today if that's what the Court, if

14   the Court would agree with that as well.  We're also

15   content if the Court needs time and wants to have a

16   probation officer take a look at it to take the time to do

17   that.

18               THE COURT:  No, that's a direct answer and you've

19   always given me direct answers and I appreciate it.  I

20   mean, my problem is an institutional problem.  It's not so

21   much a problem in this case but it's an institutional

22   problem of not being crowded into disposition.  Only here I

23   can see significant public interest in resolving this

24   matter.

25               MR. LOUCKS:  Your Honor, there is -- if I can just

1    take a moment to address this issue.

2           THE COURT:  Yes.

3           MR. LOUCKS:  The investigation here began about

4    four and-a-half years ago.  We began negotiations with TAP

5    in earnest about 18 months ago.  I would say they actually

6    began before that, but it got serious in the spring of 2000

7    with parties actually genuinely exchanging interested

8    positions on either side.

9           The agreement, the plea agreement as the Court can

10   see from the stack of materials that Mr. Savage sent over

11   to you, includes the civil settlement agreement of two

12   whistleblower suits, it also includes a corporate integrity

13   agreement prepared by the Office of the Inspector General

14   for the Department of Health and Human Services, and it

15   includes as well agreements by all 50 states and the

16   District of Columbia.

17          It has been an enormous undertaking to pull all

18   these complex pieces together over the last year.  I would

19   say most of the agreement, an agreement had been reached in

20   principle by about the 1st of April of this year and since

21   then the negotiating team for the Medicaid Fraud Control

22   Units kicked in and started doing their piece of it and the

23   negotiating team and the Office of Inspector General began

24   negotiating a corporate integrity agreement with TAP.  It's

25   a very fairly complicated piece.  There are provisions of

9

1    reporting requirements that are imposed on TAP.  And the

2    corporate integrity agreements aren't triggered until after

3    the effective date or acceptance by the Court of the

4    sentencing agreement.  Those affect, those reporting

5    requirements affect TAP's obligations on reporting prices

6    for the Medicaid program to go forward.  There is, you

7    know, certainly it is in the interests of those programs to

8    get the new pricing reporting requirement imposed as soon

9    as practicable, but I don't stand here and tell the Court

10   that a delay to allow the Court to do what the Court thinks

11   is the right thing here is going to substantially impair

12   anyone's interest.

13              THE COURT:  Well, let me ask the defense.

14              Mr. Reidy, there's another way I could approach

15   this, I suppose.  And that would be to -- of course TAP is,

16   as it stands before the Court right now, innocent, though,

17   so we'll assume that, but we'll just talk the procedure

18   first.

19              If TAP were to plead guilty here today, and I take

20   it you're prepared to go forward with the sentencing as

21   agreed, you would just as soon do that.

22              MR. REIDY:  Yes.  And I would only add, as you're

23   thinking, and obviously from our standpoint, Judge, you're

24   not going to do anything you're not satisfied has to be

25   done anyway, we would like to do it as soon as possible.

1  Today, if possible.

2      We also have an interest obligation, a big chunk

3  of this money that basically costs this company net

4  somewhere around a hundred thousand dollars a day between

5  now and when this payment is made and the payment can't be

6  made until you have completed your disposition.

7      So from a practical standpoint and an economic

8  standpoint, we would be eager to move this along as quickly

9  as you can.  So, yes, we're prepared to go forward.

10     THE COURT:  All right, I'm sensitive to that, but

11 again I've got to truly be satisfied that I've discharged

12 appropriately the judicial role here.  And I propose the

13 following.

14     I can always correct a judgment of the Court

15 within 30 days.  Suppose I get you to agree that I can

16 correct it within 60 days, we go forward here today, I tell

17 the probation officer I want a report within 60 days.  If

18 I'm satisfied with that report you need not hear from me.

19 If I correct it, I then correct it and people, it's an

20 11(e)(1)(C) plea, I've taken it in that sense, and we'll

21 see where we stand then.

22     How do you feel about that?

23     MR. REIDY:  Judge, just thinking about it now, the

24 only problem I think people will encounter if we do that is

25 the actual distribution of the money.  From our standpoint,

1    Judge, I would have to consult for just a moment.  I

2    believe we would be prepared to go ahead with something

3    like that, and I suppose if the government was content to

4    leave the money in some sort of an escrow or agree to

5    return it to us.  I'll check on that.  Although they're

6    very eager to have it paid out.  I think the logistics of

7    getting 50 states and the District of Columbia 60 days from

8    now might be problematic.  But if we could agree on that,

9    Judge, I think that, that your proposal to give yourself

10   time to become comfortable, I would certainly be

11   recommending that positively to my client.

12          THE COURT:  Mr. Loucks, what do you say?

13          MR. LOUCKS:  Your Honor, I think there's some

14   complicating factors in terms of handling of the money.  In

15   other words, if the money comes to the general treasury it

16   gets disbursed, it's very hard to undo that event should it

17   happen.

18          THE COURT:  Why don't we have it paid into the

19   registry of the Court.  That's completely liquid.

20          MR. REIDY:  We would agree to do that, Judge.  We

21   have done a little research on Rule 67 and the ability to

22   pay into the Court and we would be prepared to do that if

23   that solves this problem.

24          THE COURT:  I'm not trying to make problems for

25   either one of you here.  I'm trying to responsibly do the

1  judicial job.  Now, I got these materials this morning.

2  And I've looked at them.  But -- and I mean no disrespect

3  to you, Mr. Loucks, personally, but I've been in this

4  situation before where I've been given an information and

5  everything was agreed to and all of this was fine, come to

6  find out once I talked to probation we haven't even got the

7  right guideline calculations here.

8       I'm not suggesting that's so here.  And I see lots

9  of reasons to go forward.  But I'm certainly going to take

10  the time to figure out, to be sure that I've done what's

11  right.  And I think 60 days is not an unreasonable time to

12  do that.  But I'm trying to get us into a position where

13  both sides can get the fruits of their agreement which in

14  all candor is largely a commercial matter.  It's, it's

15  based upon criminal sanctions and it's a most significant

16  criminal matter.  But you've negotiated this out all very

17  carefully.  I don't want to mess that up, I simply want to

18  do my job.

19       What do you think?

20       MR. LOUCKS:  I understand that, your Honor.  If I

21  could just have one moment, please.

22       THE COURT:  Sure.

23       MR. REIDY:  Excuse me just a moment, your Honor.

24       (Pause in proceedings.)

25       MR. LOUCKS:  Your Honor, we have absolutely no

13

1   objection to the Court taking 60 days to review this

2   agreement. What we do think is the right thing to do,

3   though, is the normal process, which is do the plea hearing

4   today, accept the plea conditional upon the presentence

5   report, then schedule a sentencing date.

6           THE COURT:  Fine.

7           MR. LOUCKS:  There are two -- the escrow

8   provisions, the --

9           THE COURT:  No, I'm --

10          MR. LOUCKS:  -- settlement agreement has a

11  provision for handling of $875 million, your Honor, and

12  there's some lurking issue that those of us in the --

13          THE COURT:  No, no, you're the one who represents

14  the public interest.  If there's, if there's -- that's

15  fine.  I'll accelerate things with probation so we can get

16  it all done in 60 days.

17          If, if TAP is ready to proceed, Mr. Watkins may

18  come forward and be sworn.

19          MR. REIDY:  Judge, if I could have one second?

20          THE COURT:  Sure.

21          MR. REIDY:  I take it that we may come back to the

22  Court because that 60 days is $6 million from our

23  standpoint, we may come back to the Court on the Rule 67

24  idea at some time in the future?  I just want to --

25          THE COURT:  Indeed you can, immediately.

1    MR. REIDY:  Fair enough.

2    THE COURT:  But so long as we've got everything up

3  front.  And as soon as I'm done here, assuming a voluntary

4  plea, I'm getting on the phone to probation and say I've

5  got a special situation here, do the best you can for me,

6  sensitive to the individual defendants who they must

7  equally serve along with TAP.

8    I haven't -- I hear you, but I haven't explored

9  that, and where everyone's not agreed, I'm not just

10  imposing my own sense.

11    MR. REIDY:  I understood that.

12    THE COURT:  And so for today we'll see if we've

13  got a voluntary plea.  If we do, we'll schedule the

14  disposition on the assumption I'm going to accept it.  In

15  the meantime, we'll get, now maybe they'll work faster than

16  60 days.  And God willing, I'm not going anywhere.  There's

17  no magic in the 60 days.  So as soon as I am comfortable,

18  or I'm satisfied under Rule 67 we'll just go forward as

19  fast as seemly.

20    MR. REIDY:  I appreciate that, your Honor.

21    THE COURT:  All right, he may come forward to be

22  inquired of.

23    THE CLERK:  Right this way, sir.

24    Sir, would you raise your right hand.

25    Do you solemnly that the answers you will give to

1  this Court will be the truth, the whole truth, and nothing

2  but the truth, so help you God?

3          MR. WATKINS:  I do.

4          THE COURT:  Please be seated.

5                    INQUIRY BY THE COURT

6          THE COURT:  Would you state your full name,

7  please?

8          MR. WATKINS:  Thomas Watkins.

9          THE COURT:  Mr. Watkins, my name is Bill Young.

10  I'm the judge who is responsible for presiding in this

11  session of the Court.  Now, on behalf of TAP Pharmaceutical

12  Products Incorporated you're the person with whom I must

13  discuss whether TAP is going to plead guilty to a most

14  serious information.  I will ask you some personal

15  questions about your personal capacity to enter that plea.

16  I am satisfied with the corporate certifications that you

17. have the corporate authority to enter the plea.

18          When it is a corporation before the Court the

19  corporation necessarily must act through individuals.  And

20  so, I am approaching this that you have the power to bind

21  TAP.  But because I must explore the voluntariness of the

22  plea, in a very real sense you and I are talking.

23          MR. WATKINS:  I understand, your Honor.

24          THE COURT:  And I want it to be clear, I will ask

25  you questions.  If you don't understand any question I ask

1    stop me.  If, at any time, you want to talk to Mr. Reidy,

2    Mr. Savage or any of your attorneys, that's fine.  Just

3    stop.  I've made statements about this being fully

4    negotiated and the like.  But those negotiations don't, nor

5    should they, include me and I'm not part of any bargain

6    that TAP has struck with the government.  And if as you

7    listen to me you should have second thoughts about this

8    being in TAP's best interests, you can simply stop the

9    procedure.  I'm not the least disturbed by that.  I will

10   put this information then in order to be tried.  And I will

11   never punish TAP for going to trial.  It's one of its

12   rights, and I have to go over the rights, of the

13   corporation.

14           So with that in mind these areas I must explore.

15   Do you know what you're doing.  I'm satisfied that the

16   corporation has empowered you, but do you as an individual

17   know what you're doing.  Does the corporation understand

18   what it's giving up, what rights it has and what it's

19   giving up.  Does the corporation understand what may happen

20   to it on the criminal side if it pleads guilty to this

21   information.  Does the -- and is it doing it voluntarily.

22           And then, lastly, and I'll ask Mr. Loucks about

23   this, is there enough evidence from which the corporation

24   could be found guilty of this information.

25           Do you understand that's what we'll cover?

1    MR. WATKINS: Yes, your Honor, I understand.

2    THE COURT: First is personal to you because I

3    recognize that the corporation has given you authority to

4    act for it in this manner.

5    How old are you, sir?

6    MR. WATKINS: Forty-eight years old.

7    THE COURT: How far did you go in school?

8    MR. WATKINS: I have a master's in business

9    administration degree.

10    THE COURT: Have you ever been treated for any

11    mental illness?

12    MR. WATKINS: No, sir.

13    THE COURT: Are you aware of any mental illness of

14    any sort that you may have?

15    MR. WATKINS: No, your Honor.

16    THE COURT: Are you taking any medication?

17    MR. WATKINS: Only cholesterol reducing

18    medication.

19    THE COURT: And how does it affect you?

20    MR. WATKINS: Not at all, sir.

21    THE COURT: And you feel normal today?

22    MR. WATKINS: Normal.

23    THE COURT: Are you under the influence of

24    alcohol?

25    MR. WATKINS: No.

1    THE COURT: Are you under the influence of any

2  drug?

3    MR. WATKINS: No, your Honor.

4    THE COURT: Do you understand what TAP is charged

5  with?

6    MR. WATKINS: Yes, I do.

7    THE COURT: Tell me.

8    MR. WATKINS: The company is charged with

9  conspiracy to violate the prescription drug sampling laws.

10  And we agree that the company did conspire with certain of

11  its customers to provide free samples of Lupron to those

12  customers knowing that customers would seek reimbursement

13  for those free samples.

14    THE COURT: Now, before the company could be found

15  guilty of that charge, notwithstanding your agreement, the

16  government would have to prove at a trial that the

17  company -- now, let's start figuring out who the company

18  is.  Companies exist in the law and they're not people, and

19  so the, but companies only act through people.  So the

20  people acting on behalf of the company have to be so

21  situated relative to the company, and usually that's high

22  enough up in the corporate structure that they're agents,

23  that is, they can be considered the agents of the company

24  itself.  This is a different concept in the law than the

25  normal tort liability.  If you have an employee and that

1    employee while on the business of TAP negligently injures

2    someone, TAP may be responsible under the doctrine of

3    respondeat superior.  It's your employee going about the

4    business of the company and, therefore, you have to pay for

5    the injury that they caused because a TAP truck ran over

6    someone.

7         That's not what we're talking about here.  We're

8    talking about people so situated with respect to the

9    company that when they act misguided, but they act on

10   behalf of the company, those acts are taken as the acts of

11   the company.

12        Do you understand that?

13        MR. WATKINS:  Yes, I do, your Honor.

14        THE COURT:  Now, conspiracy requires that these

15   people, or at least one of them, conspired.  And that means

16   agree with someone outside the company.  Because this is

17   TAP's corporate liability.  So there may be people within

18   TAP who are planning, agreeing to do something illegal.

19   That's not this conspiracy, until TAP through these people,

20   or person, agrees with at least one other person outside

21   the company, someone who is not an undercover government

22   agent but someone who is a co-conspirator to do something

23   that the law forbids.

24        That's the first part of a conspiracy charge.

25   Well, with a company the first thing is are the people

1    involved so situated with respect to the company that it's

2    the company who is guilty of the criminal offense.

3        Second, did those people conspire with at least

4    one person or more than one outside the company.

5        Third, the conspiracy is not just some general

6    conspiracy.  The government charges this specific

7    conspiracy to violate this specific requirement of the law

8    so that they, which is designed to prevent the government

9    from paying out the taxpayers money for medical

10   prescription drugs and devices and the like unless there

11   are actual costs incurred by the person who's getting paid.

12   So the conspiracy has to have specifically in mind not that

13   they're going to violate a specific law and whatever

14   numbers that law has, but to do the acts which violate that

15   law.  To get these drugs knowing, as you say, the people

16   are going to seek reimbursement under the Medicare/Medicaid

17   system for those drugs which they didn't pay for.

18       Now, you understand that?

19       MR. WATKINS:  Yes, I do understand it, your Honor.

20       THE COURT:  Conspiracy, this type of conspiracy

21   requires one other thing.  It requires that someone, it

22   doesn't have to be the person or persons within TAP, but it

23   requires someone to act upon the conspiracy, what we call

24   an overt act, to do something to make the conspiracy come

25   about.  It doesn't mean it has to be accomplished but

1    someone's got to try to do it. And that person can be a

2    co-conspirator outside of TAP.

3            Do you understand that?

4        MR. WATKINS: Yes, I do, your Honor.

5        THE COURT: Now, the government's got to prove

6    those things beyond a reasonable doubt; got to prove that

7    there are people within TAP so situated that TAP itself is

8    guilty, that those people conspired with someone outside of

9    TAP, or more than one, that that conspiracy was to do acts

10   which violate the federal law as I've described it, and

11   that somebody did something to make that conspiracy come

12   about.

13           Do you understand that?

14       MR. WATKINS: Yes, I do, your Honor.

15       THE COURT: Now, with that in mind, let's call for

16   what TAP's rights are.

17           TAP has the right to a trial on these charges. A

18   fair and an impartial trial. That's why I try to be so

19   scrupulously careful to put on the record, for instance, if

20   someone spoke to me about this case. At least in general I

21   can understand what I read in the paper. And I will be

22   just as careful with respect to the jury. You have a right

23   to a jury on this case. You'll have some say, through your

24   attorneys, in picking who that jury will be. So will the

25   government.

1    At that trial you have the right to confront the

2    witnesses against you, which means you or your

3    representatives can be right here in court when the

4    government puts on its evidence.  You can look at the

5    people testifying.  But more than that, your attorneys can

6    examine them, can cross-examine them.  You can put on

7    evidence yourself.  People within TAP can testify.

8         Equally, no one within TAP has to do anything.

9    The government has charged you under this information and

10   therefore the government's got to prove those things beyond

11   a reasonable doubt.  To the extent TAP is silent or it

12   doesn't explain, I tell the jury that TAP starts innocent.

13   And I really mean innocent.  Not some halfway thing.  But

14   you start innocent.  And the government's got to prove the

15   case beyond a reasonable doubt.

16        And lastly, TAP is entitled to be taken as

17   innocent of this charge up until the time when a valid

18   guilty plea is tendered.

19        Now, when I explain these things I'm not giving

20   TAP anything.  TAP is, at law, considered a person and

21   these are its rights.

22        Do you understand you have those right?

23        MR. WATKINS:  Yes, I do.

24        THE COURT:  Do you understand the company has

25   those rights?

MR. WATKINS:  Yes, we do, your Honor.

THE COURT:  If you plead guilty all those rights are gone.  Now, that means there's never going to be a trial.  We'll never get to see the strength of the government's evidence against TAP.  You'll never have a chance to test that evidence in open court.  TAP's right to be silent about these things -- I see in this plea agreement a cooperation agreement.  But wholly part from that, once I impose sentence, then, as to this charge, if they've, if they've done or are doing something criminal elsewhere, they don't have to give that up, but as to this charge, this information, they're guilty of that charge, information, and so the government has every right to inquire if they're, if they're investigating further or if there are these individuals, I don't know, specific individuals who have been charged here, TAP, the corporation, has to provide everything it knows about its own guilt.

Do you understand that?

MR. WATKINS:  Yes, I do, your Honor.

THE COURT:  If you plead guilty here today, as you are authorized to do, you go from being innocent in my eyes, because I must take you as innocent, and I do, you haven't gotten through this, but if you plead guilty then I'm going to take you as guilty, I'm going to take the

10/18/01  10:57 FAX 617 248 7100    TESTA,HURWITZ&THIBEAULT

24

1    company as guilty and, therefore, all that remains then is

2    for me to calculate, to figure out the appropriate

3    sanction.

4           Now, with the company that sanction is a fine.

5    It's a monetary sanction.  And it's up to me to figure out

6    what that sanction is.  And I'm going to do it, I'll do it

7    as fast as I can, but I'm not going to do it until I'm

8    satisfied that it is the appropriate sanction.

9           So if you plead guilty, then you're guilty and

10   then TAP is guilty, and the only question then is what's

11   the sanction.

12          Do you understand that?

13          MR. WATKINS:  Yes, I do understand, your Honor.

14          THE COURT:  Let's now talk about what may happen

15   here.

16          I've been given a plea agreement with everyone's

17   signatures on it.  And is that your signature there?

18          MR. WATKINS:  Yes, it is, your Honor.

19          THE COURT:  And you've read this before you've

20   signed it?

21          MR. WATKINS:  Yes, sir, I have.

22          THE COURT:  Did you talk it all over with Mr.

23   Reidy and your other attorneys?

24          MR. WATKINS:  I have, your Honor.

25          THE COURT:  This plea is tendered to me under 11,

1    the Rule 11(E)(1)(c). And that means that I cannot impose

2    a fine greater than what you and the government agree here,

3    which is $290 million, without letting you take back the

4    plea.

5          That's how you understand it?

6          MR. WATKINS: Yes, sir, it is. Yes, your Honor.

7          THE COURT: You also understand that despite my

8    willingness to explore different ways we might procedurally

9    and properly get through this plea business, I am not part

10   of your bargain with the government in any way.

11         You understand that?

12         MR. WATKINS: Yes, we do understand, your Honor.

13         THE COURT: And so I have an obligation to impose

14   a sentence, in this case it will be a fine, a sentence in

15   keeping with what I think the public interest requires

16   under the law. And I'm going to do that.

17         You understand that?

18         MR. WATKINS: Yes, I do, your Honor.

19         THE COURT: And of course in imposing that

20   sentence I'll listen to the government, I'll listen to your

21   attorneys, at the time of sentencing I will listen to you,

22   I'll listen to my probation officer. And I will, I must

23   follow the sentencing guidelines. But within what those

24   guidelines tell me, and perhaps without, if the conduct is

25   extraordinarily evil or extraordinarily redeeming, I will

1    determine what the sentence is.

2            You understand that?

3            MR. WATKINS:  I understand, your Honor.

4            THE COURT:  And your protection under the rules

5    insofar as under these rules is we know from this plea

6    agreement I can't go over $290 million without giving, I

7    could go over and say, and TAP could say, well, we're going

8    to live with it anyway, but I have to give you a chance to

9    take back the guilty plea, then the charge doesn't go away,

10   then we get ready for trial.

11           Do you understand that?

12           MR. WATKINS:  I understand, your Honor.

13           THE COURT:  Now, explain something to me, Mr.

14   Loucks and Mr. Reidy.  In this specific crime, looking at

15   this plea agreement, there isn't a maximum fine, the fine

16   is a product of some calculations that deal with the loss.

17   Is that right?

18           MR. LOUCKS:  Correct, your Honor.  Under Section

19   3571(d), or (c) that kicks in subsection (d), the fine is

20   based in the alternative of the greater gross gain or gross

21   loss and it can be up to twice that.

22           THE COURT:  All right.  Well, when you say it can

23   be up to twice that, here you've agreed, maybe I want

24   someone else to look at it, but the likelihood is there's

25   going to be someone else, my probation officer is going to

1    be looking at data that you've developed, the fine is twice

2    what you calculate the loss.  Right?

3                THE COURT:  Yes, it's twice what we calculate the

4    loss to be.

5                THE COURT:  Well, then why, up here I'm looking at

6    Page 2 of the plea agreement and this one, the thing that

7    gives me pause in going ahead today, it says the applicable

8    range for a multiplier is 1.6 to 3.2.  And then you say

9    because you've agreed the appropriate multiplier to be

10   applied to TAP is 2.  But you're telling me the maximum is

11   2.

12               MR. LOUCKS:  Your Honor, the sentencing guidelines

13   apply for a fine of range multiplier of 1.6 to 3.2.

14   Section 3571 allows for a fine up to the maximum of the

15   greater gross gain or gross loss.  The definitions gain and

16   loss are different between Section 3571 and the sentencing

17   guidelines.  The sentencing guidelines talk about net

18   pecuniary gain and net loss.

19               THE COURT:  Thank you.  Thank you.

20               So, just so I can grasp this, if I assume, and I

21   have no reason to impugn it, if I assume that your

22   estimate, and I can see why it would have to be an

23   estimate, that the estimate of the loss here is $145

24   million, this is the, if that's accurate, this is the

25   maximum fine I can impose under the law.  Correct?

1    MR. LOUCKS: I think so, your Honor. I will say

2    this. That the estimate of loss is exactly that. I think

3    that counsel here would all be in agreement that if we were

4    to litigate the issue of loss it would be months of

5    litigation.

6         The defendant did not agree with the government

7    that the loss is equal to 145 million. They have agreed, I

8    think the language in the plea agreement is not to contest

9    that. It's an issue open to some estimation. And I use

10   the word some in a broad sense. And I can give the Court a

11   for instance if you would like at this point.

12        THE COURT: No, no, as I'm having my colloquy with

13   him I -- I don't mean to talk to them and not to you.

14        MR. WATKINS: I understand.

15        THE COURT: You're the person who's decided. At

16   the same time, as is frequently the case, I need the advice

17   of the lawyers. And I turn to the government lawyer first

18   certainly out of no distrust of your lawyer but on the

19   theory that the government's going for the most severe

20   sanction. And while TAP is still innocent we need to know

21   what the government's position is.

22        MR. WATKINS: I understand.

23        THE COURT: And we're talking now about what may

24   happen to TAP.

25        The government tells me, these papers confirm,

1    that if we estimate the loss at 145 million, the maximum

2    sentence, the maximum fine I can impose upon you is a fine

3    of 290 million.  That's what's negotiated here.

4         Now, if the loss is higher than that, I can, I

5    can, but it's up to me, impose a fine higher than that, but

6    this plea agreement limits the fine I can impose to 290

7    million or else you get to take back the plea.

8         Do you understand that?

9         MR. WATKINS:  Yes, I understand it.

10        THE COURT:  In addition, I must impose a $400

11   special assessment required by the law.  And you understand

12   that?

13        MR. WATKINS:  I understand.

14        THE COURT:  Now, other than the promises made to

15   TAP in this plea agreement, has anyone promised TAP

16   anything in order to get it to plead guilty?

17        MR. WATKINS:  No, your Honor, they have not.

18        THE COURT:  Has anyone threatened TAP with

19   anything to get it to plead guilty?

20        MR. WATKINS:  No, your Honor, they have not.

21        THE COURT:  Is TAP, the corporation, covering up

22   for someone else in pleading guilty here?

23        MR. WATKINS:  No, your Honor, they are not.

24        THE COURT:  Have you and others, directors at TAP,

25   have you fully explored TAP's options with your attorneys?

1   Now, what passes between TAP and its attorneys, that's

2   private. And so my question is, I don't want to know the

3   substance, I want to know have you seriously and thoroughly

4   talked all this through with Mr. Reidy, Mr. Savage, who are

5   identified here, but with TAP's corporate attorneys?

6          MR. WATKINS: Yes, your Honor, we have.

7          THE COURT: Are you satisfied with respect to the

8   attorneys who have appeared here, Mr. Reidy, Mr. Savage,

9   are you satisfied what their appearance, with their, the

10   arguments that they have made, with their counsel to TAP

11   with respect to this matter?

12          MR. WATKINS: Yes, your Honor, I am.

13          THE COURT: Do you think they have been good

14   lawyers for TAP in this matter?

15          MR. WATKINS: Yes, I do.

16          THE COURT: Now, is TAP prepared to plead guilty

17   to this one count information?

18          MR. WATKINS: Yes, your Honor.

19          THE COURT: Why?

20          MR. WATKINS: As I stated a moment ago, we agree

21   that we did conspire with certain of our customers to

22   provide the free samples of Lupron to them knowing that

23   they would seek reimbursement of these free samples.

24          THE COURT: And so as I understand it, after fully

25   talking this over with your in-house attorneys and with Mr.

1   Reidy, Mr. Savage, and the attorneys who work with them,

2   TAP is prepared to plead guilty to this one count

3   information to get whatever benefits it believes it can get

4   from getting this behind it and through the plea agreement,

5   because in fact it is guilty of this charge.  Is that

6   correct?

7        MR. WATKINS:  Yes, your Honor, that is correct.

8        THE COURT:  Mr. Loucks, I have read these

9   materials in the sense that I have looked them over to

10  prepare myself for this hearing.  So, briefly, if you could

11  give us an outline that would satisfy the elements of this

12  offense, I'll ask you to do so.

13       MR. LOUCKS:  Thank you, your Honor.

14       I'm going to assume that the Court is not familiar

15  with Medicaid reimbursement and other insurance company

16  reimbursement on products.

17       THE COURT:  As long as you're brief please make

18  that assumption.

19       MR. LOUCKS:  I will be brief, your Honor.

20       The drug here is Lupron which is used for prostate

21  cancer treatment.  It's used in treating individuals who

22  are suffering from advanced prostate cancer.  The drug is

23  in essence a chemical castration.  It suppresses the male

24  sex hormone testosterone.  It's an alternative treatment to

25  a procedure called orchiectomy which is the removal of the

1    testicles.  Lupron competes with a drug product called

2    Zolodex which essentially does the same thing as Lupron.

3         The Court's familiar with the relevant statute.

4    TAP itself is a joint venturer between Takeda Chemical

5    Industries and Abbott Labs and has sales of about $3

6    billion and employs more than 2000 people.

7         Medicare and other insurance companies base their

8    payment in many respects for Lupron for prostate cancer

9    based off published industry pricing done in a Red Book, a

10   book called the Red Book.  And it's premised on the

11   published average wholesale price for the product.  The

12   published average wholesale price for Lupron in the 1990's

13   ranged from in the mid 300's to almost $600.

14        Insurance companies for the most part paid 80

15   percent of that.  A lot of patients have supplemental

16   insurance to cover their own copayment.  Most of the Lupron

17   was paid for by insurance companies throughout the 1990's.

18   And there's roughly a small percentage of people who don't

19   have insurance coverage but there are copayment

20   obligations.

21        TAP in the early 1990's was trying to push its

22   product to urologists and others in lieu of doctors

23   recommending to their patients other treatment for prostate

24   cancer.  To get doctors to switch from their treatment

25   modes from surgery to the pharmaceutical product TAP began

Case 2:06-cv-00536-MEF-TFM    Document 9-8    Filed 06/15/2006    Page 33 of 43
10/18/01  11:00 FAX 617 248 7100    TESIA,HORRITZ&HILLDRAUER

33

1   offering doctors free samples.  In the early 1990's, '91,

2   '92, '93, it was a fairly institutionalized program.  If a

3   doctor bought ten, he would get one free sample.  For the

4   really good customers, if the doctor bought five he would

5   get one free sample.  It was the expectation of those in

6   TAP's management who set up this program that the doctor

7   would take the free sample, prescribe it, and bill it to

8   the patient.

9           THE COURT:  And it's when you come to that

10  sentence that the criminality exists.

11          MR. LOUCKS:  Correct.

12          THE COURT:  I mean, doctors get free samples and

13  indeed give free samples to, for a variety of beneficent

14  reasons.

15          MR. LOUCKS:  Absolutely.  But there's a big

16  difference between this drug and most pharmaceuticals, and

17  that is this.  Most pharmaceuticals are oral

18  pharmaceuticals.  A doctor hands you a prescription, you go

19  get it filled somewhere, you buy your drug somewhere else.

20  Lupron was an injected drug.  To get the drug you got it

21  from your doctor or you got it from a hospital.  But

22  urologists in private practice had the ability, and indeed

23  this was the system, they sold the product to the

24  urologist, the urologist then resold it to his patient, the

25  patient then had the insurance company pay for it.  So

1    that's a little different context than the little box of

2    Ibuprofen that the Court's familiar with or that I'm

3    familiar with that many people have gotten from their

4    doctors.  Because they're given to the doctor, the doctor

5    takes the free sample, he injects it, then he bills

6    Medicare for his office procedure, which is lawful, and for

7    the cost of the drug, which is unlawful.

8            THE COURT:  I have it.  I have it.

9            MR. LOUCKS:  In about 1993, your Honor, one of the

10    top officers in the American Urology Association met with

11    one of the top executives at TAP.  There had just been

12    publicity or an FBI undercover operation called Operation

13    Gold Pill in which pharmacists and others were prosecuted

14    for selling samples.  This top officer at the American

15    Urology Association informed the top executives at TAP's

16    program of providing free samples to doctors as an

17    inducement for doctors to purchase and prescribe greater

18    amounts of Lupron that they were at risk of prosecution

19    because doctors were taking free drugs and prescribing them

20    to their patients and then billing the patients and their

21    insurers for it.

22            THE COURT:  Let me stop you there.  And that's

23    what Mr. Watkins did not know.

24            MR. LOUCKS:  None of this is, nothing I say in

25    this applies to Mr. Watkins.

Case 2:06-cv-00536-MEF-TFM    Document 9-8    Filed 06/15/2006    Page 35 of 43
10/18/01  11:01 FAX 617 240 7100    TDJ1A,MORNILL&&RINIDSAULL

35

1          THE COURT:  All right.

2          MR. REIDY:  I should say, Judge, that Mr. Watkins

3   began to work at TAP in 1998.

4          THE COURT:  Thank you.

5          MR. LOUCKS:  Nothing I say today did he know in

6   his capacity as president of the company, and I want to

7   make that clear.

8          THE COURT:  Go ahead.

9          MR. LOUCKS:  At that point the AUA official urged

10  TAP to stop the free sample program.  TAP modified the

11  procedure but didn't stop it.

12          TAP at that point had a practice of selling the

13  product to a doctor 80 percent of the list price so the

14  doctor would automatically get 20 percent profit and

15  collected his copayment from his patient.  TAP's volume

16  discount program before 1993 was a free product.  After

17  1993 TAP implemented a volume discount program of price

18  where they discounted the price below 80 percent but they

19  continued to provide the free product.  And from 1993

20  forward and into 1999, your Honor, TAP provided each sales

21  rep roughly 80 samples a year to hand out to urologists as

22  they saw fit.  Eighty samples of Lupron was roughly $500

23  per month during that period, so each sales rep was given

24  roughly $40,000 worth of drug to use as the sales rep saw

25  fit, to increase the sales rep's sales or for whatever

1    purpose the sales rep wanted to use it for.  Many sales

2    reps, the government would prove at trial, used it to give

3    to doctors and subsequently doctors would purchase more

4    product.  Many sales reps used the product to help doctors

5    who were having problems paying their bills with the clear

6    expectation that the doctor would take the free drug, bill

7    it, and then use the money that the doctor received from

8    the patient's insurance company to pay off the bill to TAP.

9            THE COURT:  I understand.  All right.  Mr.

10   Watkins, did you hear what Mr. Loucks had to say?

11           MR. WATKINS:  Yes, I did, your Honor.

12           THE COURT:  Do you understand it?

13           MR. WATKINS:  Yes, I do, your Honor.

14           THE COURT:  Is that true?

15           MR. WATKINS:  Yes, it is, your Honor.

16           THE COURT:  All right.

17           MR. REIDY:  Your Honor, I would just like to say

18   that we certainly have disagreement with some of the things

19   Mr. Loucks said, but the essence of the company selling

20   samples we have no objection to.

21           THE COURT:  Well, I mean, it's not just selling

22   the samples, it's with the knowing, it's the essence of the

23   conspiracy, knowing that the physicians who got the samples

24   would improperly bill the insurers for a product that they

25   got free.

1    MR. REIDY:  And I want to make absolutely clear,

2  Judge, the company acknowledges that certain of the sales

3  staff did in fact supply them with free samples knowing and

4  understanding that they would bill those free samples which

5  they had received.

6    THE COURT:  Fine.  But they knew enough here so

7  that this was the corporate policy of TAP.

8    MR. REIDY:  We would agree that the activities of

9  the individuals who did this implicated and bound TAP with

10  respect to their conduct.  We would certainly agree with

11  that.  I just didn't -- there are certain -- I just didn't

12  want the Court to have a longer recitation.

13    THE COURT:  I don't want a longer recitation

14  either.  But where a corporation pleads guilty to a severe

15  misconduct of fraud in the millions of dollars, I'm not

16  going to quibble about the essential elements of the claim.

17  Because I don't want to see anything from their PR

18  department saying, well, we don't admit or deny but this

19  was better as a corporate thing so we could get on and earn

20  more profits.  I don't want to see that to shareholders.

21  And also I don't want to see any of that from Abbott Labs

22  or the other joint venturer here.  TAP is either going to

23  plead guilty to an extraordinary lapse, a deliberate fraud

24  on the people of the United States, or we're going to have

25  a trial on that.

1            Now, are they going to plead guilty?

2            MR. REIDY:  Yes, absolutely, Judge.  I think what

3    I've said, Judge, completely fits your bill.  We

4    acknowledge the company did those things and the company

5    will acknowledge it.  I won't correct that.

6            THE COURT:  Very well.  And again, Mr. Watkins,

7    you're the one who's under oath here.  You adopt the

8    statements of your counsel?

9            MR. WATKINS:  Yes, I do, your Honor.

10           THE COURT:  And you do make that acknowledgement?

11           MR. WATKINS:  Yes, I do acknowledge that, your

12   Honor.

13           THE COURT:  All right, I find that TAP

14   Pharmaceutical Products Incorporated through its -- you're

15   the president, sir?

16           MR. WATKINS:  Yes I am.

17           THE COURT:  -- through its president, Mr. Watkins,

18   knowingly, intelligently and voluntarily exercises TAP's

19   right to plead guilty.

20           There are two other procedural things, let's just

21   be clear on them because they're your rights.  The

22   government proceeds against you by way of what they call an

23   information.  That's a valid charge, the government has to

24   prove it, but it's a valid charge if you agree that they

25   can come after TAP by way of information.  And I inform you

1    you have a right to have TAP indicted.

2           Now, to indict, indict TAP the government has to

3    spill out its evidence first before a grand jury.  And I

4    see here, here's a waiver of indictment, that's what I'm

5    talking about.

6           MR. WATKINS:  Yes.

7           THE COURT:  But I want to go over it.  At a grand

8    jury they meet in secret.  You can't be there and your

9    attorneys can't be there.  The grand jurors hear the

10   government's presentation of the case.  They only vote by

11   majority vote.  And they don't vote whether TAP is guilty

12   or not guilty, they simply vote that there's probable cause

13   to believe that TAP is guilty.

14          The reason that indictment is important to you,

15   and giving it up is an important thing, if they were to

16   return a no bill and they were to say there is no probable

17   cause, then the government cannot proceed against you on

18   this charge.

19          Do you understand that?

20          MR. WATKINS:  Yes, I do understand, your Honor.

21          THE COURT:  And this is the waiver of indictment,

22   that's your --

23          MR. WATKINS:  That's correct.

24          THE COURT:  -- signature there?

25          MR. WATKINS:  Yes, it is.

10/18/01  11:02 FAX 617 248 7100    IESIA.BURN.TIZ&THIBEAULT

40

1    THE COURT:  You've talked this all over with your
2    attorneys?
3         MR. WATKINS:  Yes, I have, your Honor.
4         THE COURT:  You're prepared to waive indictment?
5         MR. WATKINS:  I am prepared to waive indictment.
6         THE COURT:  I find that TAP through its president,
7    Thomas Watkins, knowingly, intelligently and voluntarily
8    exercises its right to waive indictment and be proceeded
9    against by way of information.
10        The only other thing is, so that everyone knows
11   what the charges are, you have the right to have Ms. Smith
12   now read this information here in open court.  Again you
13   can waive that.  If you have read it and you know what the
14   charge is, that's fine.  But that's a right of yours.  Now
15   that you're going to respond formally to this charge, you
16   have the right to have it read before you respond.
17        Do you want her to read it in open court?
18        MR. WATKINS:  That's not necessary.  Thank you.
19        THE COURT:  He waives the reading of the
20   information.
21        All right.  And now from Thomas Watkins, the
22   president of TAP, the clerk may -- this is the arraignment.
23   It's the formal arraigning of TAP.  She'll ask you how you
24   plead on TAP's behalf, guilty or not guilty.  If you plead
25   guilty then you've tendered a plea of guilty.  We don't

1   know yet whether I'm going to accept it because I'm going

2   to talk to my probation officer.  But you can't take it

3   back unless I were to go over the sanctions that are in

4   this plea agreement.  So long as I stay within those

5   sanctions, TAP's guilty, that's it, there's no taking it

6   back.

7           Do you understand that?

8           MR. WATKINS:  Yes, I do, your Honor.

9           THE COURT:  There is, of course, no pressure on

10  you to plead guilty, though that's what we've talked about.

11  This is the arraignment.  If you plead not guilty that's

12  fine, we'll take it the next step to get ready for trial.

13          The clerk may arraign TAP through its president,

14  Mr. Watkins.

15          THE CLERK:  TAP Pharmaceutical Products, Inc. has

16  been charged in a criminal information with violating 18

17  U.S.C., Section 371, conspiracy to violate Title 21 U.S.C.,

18  Sections 331(t) and 333(b).  How does TAP Pharmaceutical

19  Products, Inc. plead, guilty or not guilty?

20          MR. WATKINS:  Guilty.

21          THE COURT:  Thank you.  You may step down.

22          (Whereupon Mr. Watkins stepped down.)

23          THE COURT:  Now, I'm going to set disposition here

24  for, we're going to go forward for disposition on the

25  assumption that I accept the plea.  All we have now is a

1    tender of a plea.  But I'm going to set disposition for

2    Monday, the 17th of December at 2:00 p.m.  And Mr. Loucks,

3    Ms. Winkler, Mr. Savage, Mr. Reidy, I charge you now, and I

4    mean right now, go from here to the probation office and

5    you spell out what the situation is, and this is only two

6    months, not the usual twelve weeks, but I would be eager to

7    do it in less than two months assuming that I am satisfied

8    with the independent advice of a probation officer that the

9    matter is all in order.  And I in no way suggest that it's

10   not.  I just want to go through the normal procedure.

11        All right.  That's the order of the Court.  Thank

12   you very.

13        MR. LOUCKS:  Thank you, Judge.

14        MR. SAVAGE:  Thank you, your Honor.

15        MR. REIDY:  Thank you, your Honor.

16        (Whereupon the matter concluded.)

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


I, Donald E. Womack, do hereby certify that the above proceedings were reported by me stenographically and this transcript represents a true and accurate transcription of said proceedings.


DONALD E. WOMACK
Official Court Reporter
1 Courthouse Way, Suite 5510
Boston, Massachusetts 02210
(617) 439-8877