MAR-18-2002  15:37        R  ER DANZIG                          973 538 1984    P.21/49

*3/18/02*

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Defendant
TAP Pharmaceutical Products Inc.

|  |  |
|---|---|
| BERNARD WALKER, individually, and on behalf of those similarly situated, 122 Reef Drive Ocean City, NJ 08226,<br><br>        Plaintiff,<br><br>v.<br><br>TAP PHARMACEUTICAL PRODUCTS, INC., ABBOTT LABORATORIES AND TAKEDA CHEMICAL INDUSTRIES, LTD.,<br><br>        Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION CAPE MAY COUNTY<br><br>DOCKET NO. CPM-L-682-01<br><br>Civil Action<br><br>TAP PHARMACEUTICAL PRODUCTS INC.'S ANSWER AND SEPARATE DEFENSES TO PLAINTIFF'S COMPLAINT |

## TAP PHARMACEUTICAL PRODUCTS INC.'S ANSWER AND SEPARATE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant TAP Pharmaceutical Products Inc. ("Defendant TAP"), having its principal

place of business at 675 North Field Drive, Lake Forest, Illinois 60045, for its Answer and

Separate Defenses to Plaintiff Bernard Walker's ("Plaintiff") Complaint states as follows:

### AS TO THE NATURE OF ACTION

1. Defendant TAP admits that Plaintiff purports to bring a claim on his behalf and on the

behalf of the putative class against the three named Defendants. Defendant TAP denies that

Plaintiff is entitled to any of the relief sought in his Complaint. Defendant TAP admits that

Abbott Laboratories and Takeda America Holdings, Inc., a wholly owned subsidiary of Takeda



Chemical Industries, Ltd., are each 50 percent shareholders of TAP Pharmaceutical Products Inc., known as TAP Holdings Inc., prior to April 2000. Defendant TAP further admits that it sells Lupron® through its wholly owned subsidiary TAP Pharmaceuticals Inc. Defendant TAP admits that it pled guilty to a one-count Information for conspiracy to violate the Prescription Drug Marketing Act ("PDMA"). Defendant TAP denies that it pled guilty to any charges relating to the pricing of Lupron®. Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

2. Defendant TAP admits that it pled guilty to a one-count Information for conspiracy to violate the PDMA. Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

3. Defendant TAP admits that, on or before October 3, 2001, TAP Pharmaceutical Products Inc., agreed to plead guilty to a one-count Information for conspiracy to violate the PDMA and to pay a $290 million criminal fine. Defendant TAP further admits that representatives of the United States Department of Justice have stated that the $290 million paid by Defendant TAP is the largest criminal fine in a U.S. health care fraud prosecution. Defendant TAP further admits that it entered into a civil settlement agreement with the United States government in which it paid approximately $559.5 million to the United States. Defendant TAP admits that it entered into a civil settlement agreement with the fifty states and the District of Columbia in which it agreed to pay approximately $25.5 million. Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

4. Defendant TAP denies the allegations in paragraph 4 to the extent they are directed toward it.

2

5.    Defendant TAP admits that any difference between the price a physician pays for a kit of Lupron® and the amount of reimbursement he may receive from Medicare, a Medicare beneficiary, or a third-party payor for the same kit of Lupron®, to the extent that any reimbursement received is greater than the price paid, may be referred to as a physician's return-to-practice ("RTP").   Defendant TAP further admits that some of its employees may have compared the RTP of Lupron® to the RTP of Lupron®'s competitor, Zoladex.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

6.    TAP denies the allegations in paragraph 6.

7.    Defendant TAP admits that four urologists have pled guilty to criminal informations charging them with conspiracy.  Defendant TAP responds that Plaintiff purports to characterize the allegations of these Informations.  Defendant TAP denies the allegations in this paragraph to the extent they are directed toward it.

8.    The allegations in paragraph 8 are not directed toward Defendant TAP, and therefore Defendant TAP makes no response thereto.

9.    Defendant TAP denies the allegations in paragraph 9 to the extent they are directed toward it.

10.    Defendant TAP admits that Plaintiff purports to assert claims under the common law and statutes of New Jersey and other states, as well as the District of Columbia.  Defendant TAP denies that Plaintiff is entitled to any relief sought under the various states' common law and statutes of New Jersey and other states, including the District of Columbia.

### AS TO JURISDICTION AND VENUE

11.    Defendant TAP admits that Plaintiff purports to bring this action pursuant to consumer protection statutes and common law.  Defendant TAP denies that Plaintiff is entitled to any relief under any consumer protection statute or common law.

3

12.    The allegations in paragraph 12 constitute a legal conclusion to which no response is required.

13.    Defendant TAP lacks knowledge or sufficient information to form a belief as to the truth of the allegations regarding Plaintiff's residence.  The remaining allegations in this paragraph constitute a legal conclusion to which no response is required.

## AS TO PARTIES

14.    Defendant TAP lacks knowledge or sufficient information to form a belief as to the truth of the allegations regarding Plaintiff's residence, his diagnosis and the treatment of his prostate cancer, and his Medicare payments. Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

15.    The allegations in paragraph 15 are not directed toward Defendant TAP, and therefore Defendant TAP makes no response thereto.

16.    The allegations in paragraph 16 are not directed toward Defendant TAP, and therefore Defendant TAP makes no response thereto.

17.    Defendant TAP admits that Abbott Laboratories and Takeda America Holdings, Inc., a wholly owned subsidiary of Takeda Chemical Industries, Ltd., are each 50 percent shareholders of TAP Pharmaceutical Products Inc.  Defendant TAP further admits that it develops and markets pharmaceutical products for the United States and Canada.  Defendant TAP further admits that "Lupron®" (as that term is defined by Defendant TAP) is used for the palliative treatment of advanced prostate cancer, the management of endometriosis, in combination with iron for treating uterine fibroids, and central precocious puberty.  Defendant TAP denies the remaining allegations in this paragraph.

18.    Defendant TAP admits that Lupron® is sold directly to physicians, retailers, wholesalers, certain health care facilities and various government entities in the United States.

4

Defendant TAP admits that its marketing efforts focus on educating customers regarding the benefits, efficacy, and superiority of Lupron® as well as are directed toward securing the prescription of Lupron® by physicians. Defendant TAP denies that its total net sales in 1998 was $2.06 billion. Defendant TAP lacks knowledge or sufficient information to form a belief as to the truth of the remaining allegations in this paragraph to the extent they are directed toward it.

## AS TO PLAINTIFF'S CLASS ALLEGATIONS

19.    Defendant TAP admits that Plaintiff purports to bring this action on behalf of himself and on behalf of a purported class as Plaintiff has the defined the class. Defendant TAP lacks knowledge or sufficient information to form a belief as to truth of whether Plaintiff would qualify as a member of the class he purports to represent. Defendant TAP further denies that class certification is appropriate or that the purported class is entitled to any relief sought in the Complaint.

## AS TO NUMEROSITY

20.    To the extent the allegations in paragraph 20 constitute a legal conclusion, no response is required, but Defendant TAP denies that Plaintiff's allegations satisfy the requirements for class certification, that class certification is appropriate or that the purported class is entitled to any relief. Defendant TAP admits that thousands of patients each year are prescribed Lupron®. Defendant TAP lacks knowledge or sufficient information to form a belief as to the truth of the allegation regarding whether patients pay for the Lupron® they are prescribed.

## AS TO COMMON QUESTIONS OF LAW AND FACT

21.    The allegations in paragraph 21, including its subparts, constitute a legal conclusion to which no response is required, but Defendant TAP denies that Plaintiff's allegations satisfy the requirements for class certification, that class certification is appropriate or

5

that the purported class is entitled to any relief. Defendant TAP denies the remaining allegations
in this paragraph to the extent they are direct toward it.

## AS TO TYPICALITY

22.     The allegations in paragraph 22 constitute a legal conclusion to which no response
is required, but Defendant TAP denies that Plaintiff's allegations satisfy the requirements for
class certification, that class certification is appropriate or that the purported class is entitled to
any relief. Defendant TAP denies the remaining allegations in this paragraph to the extent they
are directed toward it.

## AS TO ADEQUACY OF REPRESENTATION

23.     The allegations in paragraph 23 constitute a legal conclusion to which no response
is required, but Defendant TAP denies that Plaintiff's allegations satisfy the requirements for
class certification, that class certification is appropriate or that the purported class is entitled to
any relief.

## AS TO SUPERIORITY

24.     The allegations in paragraph 24 constitute a legal conclusion to which no response
is required, but Defendant TAP denies that Plaintiff's allegations satisfy the requirements for
class certification, that class certification is appropriate or that the purported class is entitled to
any relief.

## AS TO FACTUAL ALLEGATIONS

25.     Defendant TAP admits the allegations in paragraph 25.

26.     Defendant TAP admits that TAP Pharmaceutical Products Inc., began marketing
Lupron® for the palliative treatment of advanced prostate cancer after it obtained marketing
approval for Lupron® from the United States Food and Drug Administration in 1985. Defendant
TAP admits that TAP Pharmaceuticals Inc., maintains and employs a sales department.

6

Defendant TAP admits that TAP Pharmaceutical Products Inc., maintains and employs a marketing department. Defendant TAP further admits that Lupron® is sold to medical providers across the country. Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

27.    Defendant TAP admits that Lupron® is administered to patients in liquid form by intramuscular injection, typically in the buttocks or arm, by a physician or a nurse under a the supervision of a physician. Defendant TAP further admits that at various times in the 1990's and continuing to the present, Lupron® was available in daily, one month, three month and four month doses. Defendant TAP denies that every patient whose prostate cancer is being treated with Lupron® receives regular injections of Lupron® for the remainder of his life.

## AS TO THE MEDICARE INSURANCE PROGRAM

28.    The allegations in paragraph 28 constitute a legal conclusion to which no response is required.

29.    Defendant TAP lacks knowledge or sufficient information to form a belief as to the truth concerning HCFA's responsibilities and contracts with private insurance companies. The remaining allegations in this paragraph constitute a legal conclusion to which no response is required.

30.    The allegations in paragraph 30 constitute a legal conclusion to which no response is required.

31.    The allegations in paragraph 31 constitute a legal conclusion to which no response is required.

32.    To the extent that the allegations in paragraph 32 constitute a legal conclusion, no response is required thereto. To the extent that the remaining allegations in this paragraph are directed as claims against Defendant TAP, Defendant TAP denies all such allegations.

33.    TAP denies that any co-payment amount was inflated and therefore denies that any member of the purported class paid some or all of an "inflated" co-payment. To the extent that the allegations in this paragraph constitute a legal conclusion, no response is required thereto. To the extent that the remaining allegations in this paragraph are directed as claims against Defendant TAP, Defendant TAP denies all such allegations.

34.    To the extent that the allegations in paragraph 34 constitute a legal conclusion, no response is required thereto. To the extent that the remaining allegations in this paragraph are directed as claims against Defendant TAP, Defendant TAP denies all such allegations.

35.    Defendant TAP admits that pricing compendia such as the <u>Red Book</u> published an AWP for the various doses of Lupron®, as well as Zoladex® and many other pharmaceutical products. Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

36.    Defendant TAP lacks knowledge or sufficient information to form a belief as the truth of the allegations in paragraph 36.

37.    Defendant TAP denies the allegations in paragraph 37 to the extent they are directed toward it.

38.    Defendant TAP denies the allegations in paragraph 38 to the extent they are directed toward it.

## AS TO DEFENDANTS' FRAUDULENT CONDUCT

## AS TO ARTIFICIALLY INFLATING THE AVERAGE WHOLESALE PRICE

39.    Defendant TAP denies the allegations in paragraph 39 to the extent they are directed toward it.

40.    Defendant TAP denies the allegations in paragraph 40 to the extent they are directed toward it.

8

41.     Defendant TAP responds that, in this paragraph, Plaintiff purports to summarize the allegations contained in Criminal Informations.  To the extent that the allegations in this paragraph are directed toward it, Defendant TAP admits that any difference between the price a physician pays for a kit of Lupron® and the amount of reimbursement he may receive from Medicare, a Medicare beneficiary, or a third-party payor for the same kit of Lupron®, to the extent that any reimbursement received is greater than the price paid, may be referred to as a physician's RTP.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

42.     Defendant TAP responds that, in this paragraph, Plaintiff purports to summarize the allegations contained in the Criminal Information against Dr. Spinella.  Defendant TAP admits that certain of its employees created certain documents which compared the RTP's of Lupron® and Zoladex.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

43.     Defendant TAP denies the allegations in paragraph 43 to the extent they are directed toward it.

44.     Defendant TAP admits the allegations in paragraph 44.

45.     Defendant TAP admits that certain of its employees created certain documents which compared the AWP's and prices of Lupron® and Zoladex.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

46.     Defendant TAP admits that certain of its employees created certain documents which compared the AWP's and prices of Lupron® and Zoladex.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

47.     Defendant TAP admits that certain of its employees created certain documents
which compared the AWP's and prices of Lupron® and Zoladex. Defendant TAP further admits
that the language cited purports to be from a TAP internal document, although Plaintiff fails to
attach said document to his Complaint. Defendant TAP denies the remaining allegations in this
paragraph to the extent they are directed toward it.

48.     Defendant TAP denies that any alleged "illegal" sales and marketing scheme is
shown in increased market share and sales or Lupron® and therefore, Defendant TAP denies the
allegations in this paragraph to the extent they are directed toward it.

### AS TO USE OF FREE SAMPLES

49.     Defendant TAP admits that it provided samples of Lupron® to medical providers.
Defendant TAP further admits that it pled guilty to a one-count Information for conspiracy to
violate the PDMA. Defendant TAP denies the remaining allegations in this paragraph to the
extent they are directed toward it.

50.     Defendant TAP responds that, in this paragraph, Plaintiff purports to summarize
allegations in the Information of *United States of America v. Spinella*. Defendant TAP admits
that certain sales representatives provided Weekly Activity Reports to their District Managers,
which typically described their communications with physicians or their office staff. Defendant
TAP further admits that samples may have been a subject of such communications. Defendant
TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

51.     Defendant TAP admits that Dr. Joel Olstein was charged with conspiring to bill
insurance companies for free samples of Lupron®. Defendant TAP lacks knowledge or
sufficient information to form a belief as to the truth of the conversation that allegedly took place
between Dr. Olstein and Mr. Japsen. Defendant TAP denies the remaining allegations in this
paragraph to the extent they are directed toward it.

52.    Defendant TAP responds that the language cited in this paragraph by Plaintiff purports to be from the Criminal Information against Dr. Olstein.

## AS TO OTHER FINANCIAL INDUCEMENTS

53.    Defendant TAP denies the allegations in paragraph 53 to the extent they are directed toward it.

54.    Defendant TAP denies the allegations in paragraph 54 to the extent they are directed toward it.

55.    Defendant TAP denies the allegations in paragraph 55, including each and every subpart, to the extent they are directed toward it.

56.    Defendant TAP denies the allegations in paragraph 56 to the extent they are directed toward it.

57.    Defendant TAP denies the allegations in paragraph 57 to the extent they are directed toward it.

58.    Defendant TAP lacks knowledge or sufficient information to form a belief as to the truth of the allegations in paragraph 58.

## AS TO TOLLING OF THE STATUTE OF LIMITATIONS

59.    Defendant TAP is without sufficient information to form a belief as to the truth of the allegations relating to Plaintiff's knowledge.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

60.    Defendant TAP denies the allegations in paragraph 60 to the extent they are directed toward it.

61.    Defendant TAP denies the allegations in paragraph 61 to the extent they are directed toward it.

62.     Defendant TAP denies the allegations in paragraph 62 to the extent they are directed toward it.

63.     Defendant TAP denies the allegations in paragraph 63 to the extent they are directed toward it.

64.     Defendant TAP denies the allegations in paragraph 64 to the extent they are directed toward it.

## AS TO COUNT I

### UNJUST ENRICHMENT

65-70. Defendant TAP denies the allegations of Count I of Plaintiff's Complaint, paragraphs 65 through 70. Defendant TAP further states that Count I of Plaintiff's Complaint, paragraphs 65 through 70, has been dismissed by Judge Joseph C. Visalli's order entered on May 7, 2001.

## AS TO COUNT II

### FRAUD

71.     Defendant TAP repeats and incorporates its answers to paragraphs 1 through 70 as its answer to paragraph 71.

72.     Defendant TAP denies the allegations in paragraph 72 to the extent they are directed toward it.

73.     Defendant TAP denies the allegations in paragraph 73 to the extent they are directed toward it.

74.     Defendant TAP denies the allegations in paragraph 74 to the extent they are directed toward it.

75.     Defendant TAP denies the allegations in paragraph 75 to the extent they are directed toward it.

76.    Defendant TAP denies the allegations in paragraph 76 to the extent they are directed toward it.

## AS TO COUNT III

## CIVIL CONSPIRACY/CONCERT OF ACTION

77.    Defendant TAP repeats and incorporates its answers to paragraphs 1 through 76 as its answer to paragraph 77.

78.    Defendant TAP admits that it pled guilty to a one-count Information for conspiracy to violate the PDMA.  Defendant TAP denies the remaining allegations of this paragraph to the extent they are directed toward it.

79.    Defendant TAP admits that, on or before October 3, 2001, TAP Pharmaceutical Products Inc., agreed to plead guilty to a one-count Information for conspiracy to violate the PDMA and to pay a $290 million criminal fine.  Defendant TAP further admits that it entered into a civil settlement agreement with the United States government in which it paid approximately $559.5 million to the United States.  Defendant TAP admits that it entered into a civil settlement agreement with the fifty states and the District of Columbia in which it agreed to pay $25.5 million.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

80.    Defendant TAP admits that it occasionally provided samples of Lupron® to some medical providers.  Defendant TAP denies the remaining allegations in this paragraph, including each and every subpart, to the extent they are directed toward it.

81.    Defendant TAP denies the allegations in paragraph 81 to the extent they are directed toward it.

## AS TO COUNT IV

## VIOLATION OF CONSUMER PROTECTION STATUTES

82.     Defendant TAP repeats and incorporates its answers to paragraphs 1 through 81 as its answer to paragraph 82.

83.     Defendant TAP lacks knowledge or sufficient information to form a belief as to the allegations relating to Plaintiff and the purported class.  The remaining allegations in this paragraph constitute a legal conclusion to which no response is required.

84.     To the extent the allegations in this paragraph constitute a legal conclusion, no response is required.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

85.     To the extent the allegations in this paragraph constitute a legal conclusion, no response is required.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

86.     Defendant TAP admits that it reached a civil settlement agreement of $25.5 million with the fifty states and the District of Columbia.  Defendant TAP denies the remaining allegations in this paragraph to the extent they are directed toward it.

87.     Defendant TAP denies the allegations in paragraph 87 to the extent they are directed toward it.

To the extent that any allegation in this Complaint has not been specifically admitted or denied, it is hereby denied.

WHEREFORE, Defendant TAP demands judgment in its favor, together with costs, interest and attorneys' fees.

14

## SEPARATE DEFENSES

### FIRST SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth against Defendant TAP fails to state a claim upon which relief can be granted.

### SECOND SEPARATE DEFENSE

This action may not be maintained or certified as a class action for the following reasons, among others:  (1) the putative class is not so numerous that joinder of all members is impracticable; (2) questions of fact or law common to the putative class do not predominate over questions affecting only individual members of the putative class; (3) the representative parties will not fairly and adequately protect the interest of the putative class; and (4) a class action is not an appropriate method for the fair and efficient adjudication of the controversy.

### THIRD SEPARATE DEFENSE

The claims of Plaintiff and of each alleged member of the purported class are barred to the extent that Plaintiff and/or any alleged member of the purported class have waived said claims.

### FOURTH SEPARATE DEFENSE

Plaintiff's Complaint and each of the purported causes of action set forth therein against Defendant TAP are barred, in whole or in part, by the provisions of any applicable statute of limitations.

### FIFTH SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth therein against Defendant TAP are barred to the extent that Plaintiff and/or any alleged member of the purported class is guilty of laches.

15

## SIXTH SEPARATE DEFENSE

Plaintiff and each member of the purported class are estopped from obtaining relief from Defendant TAP due to Defendant TAP's reasonable reliance upon their conduct and the conduct of third parties to Defendant TAP's detriment.

## SEVENTH SEPARATE DEFENSE

Plaintiff's claims are barred by the filed-rate doctrine.

## EIGHTH SEPARATE DEFENSE

Any damage to which Plaintiff or any individual member of the purported class is found to be entitled must be decreased by the extent to which said individual's own acts or omissions or the acts or omissions of persons or entities acting for or on behalf of said individual were the cause of said damage, if any.

## NINTH SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth therein against Defendant TAP are barred because each of Defendant TAP's alleged acts and/or omissions were justified, fair, lawful, and/or not fraudulent.

## TENTH SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth therein against Defendant TAP are barred because Plaintiff or any member of the purported class lacks standing or capacity to bring some or all of the claims raised in this suit.

## ELEVENTH SEPARATE DEFENSE

Defendant TAP alleges, in the alternative and without admitting any liability whatever, and without admitting that Plaintiff or any member of the purported class has suffered or will suffer any loss, damage, or injury whatever, that if such persons have suffered, or will in the future suffer, any loss, damage or injury, as alleged in Plaintiff's Complaint or otherwise, the

16

same is the direct and proximate result, either entirely or partly, of the acts of third parties, and that said acts should proportionately reduce the recovery of such persons and the allocation of any fault attributed to Defendant TAP.

### TWELFTH SEPARATE DEFENSE

Defendant TAP alleges that any injury, damage or loss, if any, that Plaintiff or any member of the purported class has suffered or will in the future suffer as alleged in Plaintiff's Complaint or otherwise, resulted from the acts of an intervening cause, which breaks and negates any and all liability of Defendant TAP.

### THIRTEENTH SEPARATE DEFENSE

Defendant TAP alleges that it is or may be entitled to set-off against any sum awarded to Plaintiff or any member of the purported class of any and all sums that are owed to Defendant TAP by Plaintiff or any member of the purported class.

### FOURTEENTH SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth therein against Defendant TAP are barred to the extent they are preempted by federal law, including without limitation the Federal Employment Retirement Income and Security Act of 1974, the Federal Medicare Act, and the Federal Medicaid Act, including all amendments to the same and all regulations promulgated thereunder.

### FIFTEENTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant TAP adhered to customary and reasonable standard industry practices with respect to pricing and discounting pharmaceuticals.

17

### SIXTEENTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant TAP adhered to customary and reasonable standard industry practices with respect to AWP.

### SEVENTEENTH SEPARATE DEFENSE

The application of New Jersey law to the claims of individual members of the purported class, if any, who are non-residents of New Jersey, would violate the Due Process Clause and the Full Faith and Credit Clause of the Constitution.

### EIGHTEENTH SEPARATE DEFENSE

Defendant TAP alleges that a nationwide class action as Plaintiff purports to represent in his Complaint is not properly brought and heard in the State of New Jersey.

### NINETEENTH SEPARATE DEFENSE

In the event of a determination that this action, or some part thereof, is governed by the substantive law of one or more states other than New Jersey, Defendant TAP asserts all defenses available to it under those states' common laws and/or consumer protection statutes.

### TWENTIETH SEPARATE DEFENSE

The claims of Plaintiff and the purported class are barred, in whole or in part, by their failure to mitigate damages.

### TWENTY-FIRST SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth therein against Defendant TAP are barred, in whole or in part, by the doctrine of ratification.

### TWENTY-SECOND SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Defendant TAP did not owe a duty to Plaintiff or any member of the purported class.

## TWENTY-THIRD SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, because of the lack of privity between Defendant TAP and Plaintiff or any member of the purported class.

## TWENTY-FOURTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the voluntary payment doctrine.

## TWENTY-FIFTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the learned intermediary doctrine.

## TWENTY-SIXTH SEPARATE DEFENSE

Plaintiff's Complaint and each purported cause of action set forth therein against Defendant TAP are barred, in whole or in part, by the doctrine of consent to the extent that Plaintiff or any member of the putative class have received and paid for Lupron® after the filing of Plaintiff's Complaint.

## TWENTY-SEVENTH SEPARATE DEFENSE

Defendant TAP intends to rely upon, reserves its rights to assert, and hereby pleads such other and related defenses which are available under the New Jersey consumer protection statute, N.J.S.A. 56:8-1 et seq.

## TWENTY-EIGHTH SEPARATE DEFENSE

Defendant TAP states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, separate defenses available. Defendant TAP reserves the right to assert additional separate defenses in the event that discovery indicates that they would be appropriate. Defendant TAP reserves the right to amend this answer if necessary.

WHEREFORE, having fully answered Plaintiff's Complaint, Defendant TAP prays for judgment as follows:

1.      That Plaintiff take nothing by his Complaint;

2.      That Plaintiff's Complaint and each purported cause of action set forth therein be

dismissed with prejudice;

3.      That Defendant TAP be awarded its costs of suit incurred herein;

4.      That Defendant TAP be awarded its attorneys' fees incurred herein; and

5.      That the Court grant Defendant TAP such other and further relief as it deems just

and equitable.

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI LLP
Attorneys for Defendant
TAP Pharmaceutical Products Inc.

By:  _Anne M. Patterson_____
           Anne M. Patterson

Dated: March 18, 2002

Daniel E. Reidy
Lee Ann Russo
Tina M. Tabacchi
Mark P. Rotatori
JONES DAY REAVIS & POGUE
77 West Wacker
Suite 3500
Chicago, Illinois 60601

Attorneys for Defendant
TAP Pharmaceutical Products Inc.

## DEMAND FOR TRIAL BY JURY

Defendant TAP demands a trial by jury for all issues so triable.

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI LLP
Attorneys for Defendant
TAP Pharmaceutical Products Inc.


By: _Anne M. Patterson_____
    Anne M. Patterson

Dated: March 18, 2002

Daniel E. Reidy
Lee Ann Russo
Tina M. Tabacchi
Mark P. Rotatori
JONES DAY REAVIS & POGUE
77 West Wacker
Suite 3500
Chicago, Illinois 60601

Attorneys for Defendant
TAP Pharmaceutical Products Inc.

21

MAR-18-2002  15:41        RIKER DANZIG                    973 538 1984    P.42/49

## CERTIFICATION PURSUANT TO R. 4:5-1

I hereby certify, to the best of my knowledge, that this Answer is served within the time

permitted by the Rules of Court and governing case management orders.  I further certify that

this matter in controversy also is the subject of other actions currently pending in other state and

federal courts around the country.  A list of other actions pending at the time of the filing of

plaintiff's complaint in this matter is attached to this Answer as Exhibit A.

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI LLP
Attorneys for Defendant
TAP Pharmaceutical Products Inc.


By: _Anne M. Patterson_____
        Anne M. Patterson

Dated:  March 18, 2002

Daniel E. Reidy
Lee Ann Russo
Tina M. Tabacchi
Mark P. Rotatori
JONES DAY REAVIS & POGUE
77 West Wacker
Suite 3500
Chicago, Illinois 60601

Attorneys for Defendant
TAP Pharmaceutical Products Inc.

22

## DEMAND FOR A STATEMENT OF DAMAGES

Defendant TAP demands a written statement of damages pursuant to R.4:5-2 within five

days of the date of service of this Answer.

RIKER, DANZIG, SCHERER, HYLAND &
PERRETTI LLP
Attorneys for Defendant
TAP Pharmaceutical Products Inc.


By: _Anne M. Patterson_____
        Anne M. Patterson

Dated:  March 18, 2002

Daniel E. Reidy
Lee Ann Russo
Tina M. Tabacchi
Mark P. Rotatori
JONES DAY REAVIS & POGUE
77 West Wacker
Suite 3500
Chicago, Illinois 60601

Attorneys for Defendant
TAP Pharmaceutical Products Inc.

23

## DESIGNATION OF TRIAL COUNSEL

Defendant TAP hereby designates Anne M. Patterson as trial counsel pursuant to Rule

4:25-4.

> RIKER, DANZIG, SCHERER, HYLAND &
> PERRETTI LLP
> Attorneys for Defendant
> TAP Pharmaceutical Products Inc.
>
>
> By: _Anne M. Patterson_
>      Anne M. Patterson

Dated: March 18, 2002

> Daniel E. Reidy
> Lee Ann Russo
> Tina M. Tabacchi
> Mark P. Rotatori
> JONES DAY REAVIS & POGUE
> 77 West Wacker
> Suite 3500
> Chicago, Illinois 60601
>
> Attorneys for Defendant
> TAP Pharmaceutical Products Inc.

24

MAR-18-2002  15:42      RIKER DANZIG                                973 538 1984    P.45/49

## CERTIFICATION OF SERVICE

I hereby certify that on this date I caused a copy of the attached Answer, Defenses and

Jury Demand, with attachments, to be filed with the Deputy Clerk, Superior Court of New

Jersey, Cape May County Court House, Nine North Main Street, Cape May Court House, NJ

08210  I further certify that a copy of the above-referenced documents were served as set forth

below:

> Lewis B. April, Esq.
> COOPER PERSKIE APRIL NIEDELMAN
> WAGENHEIM & LEVENSON, PA
> 1125 Atlantic Avenue – Third Floor
> PO Box 1125
> Atlantic City, New Jersey 08404-1125
> *Counsel for Plaintiff, by Fax & Hand Delivery*

| | |
|---|---|
| Donald E. Haviland, Jr., Esq. | Bryan L. Clobes, Esq. |
| Kline & Specter | Miller Faucher Cafferty & Wexler |
| 1525 Locust St. – 19th Flr. | One Penn Square West, Suite 2500 |
| Philadelphia, PA 18102 | 30 South 15th St. |
| *Counsel for Plaintiff, by Fax & Fed. Exp..* | Philadelphia, PA 19202 |
| | *Counsel for Plaintiff, by Fax & Fed. Exp.* |

Copies of the above-referenced documents were also sent to all defense counsel of

record, and upon the appointed Special Master, Honorable Philip A. Gruccio, by facsimile and

Federal Express.

Kelly S. Crawford

Dated:  March 18, 2002

25

# EXHIBIT 'A'

## PENDING ACTIONS FILED PRIOR TO PLAINTIFF'S COMPLAINT

- Beacon Health Plans, Inc. v. TA Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Inc., No. 01-CV-10897, United States District Court for the District of Massachusetts.

- Maczak v. TAP Pharmaceutical Products, Inc. Abbott Laboratories and Takeda Chemical Industries, Ltd., No. 01-CV-11053, United States District Court for the District of Massachusetts.

- Porter v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd., No. 01-CV-10861, United States District Court for the District of Massachusetts.

- Russano and Russano v. Abbott Laboratories, Takeda Chemical Industries, Ltd. and TAP Pharmaceutical Products, Inc., No. 01-CV-6982, United States District Court for the Northern District of Illinois.

- Townsend v. TAP Pharmaceutical Products, Inc., Abbott Laboratories, and Takeda Chemical Industries, Ltd., No. 01-CV-4435, United States District Court for the Northern District of Illinois.

- Mechanical Contractors-UA Local 119 Welfare Plan, by and through its Trustees, Danny Price, William Morrison, Phillip Holloway, J. Bradley Donaghey, Glen Reed, Jr. and Stanley Small, and IBEW-NECA Local 505 Health & Welfare Plan, by and through its Trustees, Donnie Adams, Terry N. Adams, Fred J. Moore, Charles S. Belk, Charles Freeman, and Larry Smith v. Abbott Laboratories, Takeda Chemical Industries, Ltd. and TAP Pharmaceutical Products, Inc., No. 01 C 7401, United States District Court for the Northern District of Illinois.

- Jarman v. TAP Pharmaceutical Products, Inc. and TAP Pharmaceuticals, Inc., No. 01-L-1019, Circuit Court, Madison County.

- Campbell-Hubbard v. Abbott Laboratories, Inc., Takeda Chemical Industries, Ltd., TAP Pharmaceuticals, Inc.; Doe Corporations 1-20; Does 1 to 100 Inclusive, No. 322451, Superior Court San Francisco.

- Clark v. TAP Pharmaceutical Products, Inc., TAP Pharmaceuticals, Inc. and Abbott Laboratories, No. 01-L-132, Circuit Court, Williamson County.

## PENDING ACTIONS FILED AFTER PLAINTIFF'S COMPLAINT

- Goetting v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd., No. 01-L-CV-703, United States District Court for the Southern District of Illinois.

- Brickey v. TAP Pharmaceutical Products, Inc. TAP Pharmaceuticals, Inc. Takeda Chemical Industries, Ltd. and Abbott Laboratories, Inc., No. 01-CV-2770, United States District Court for the Northern District of Alabama.

- Twin Cities Bakery Workers Health and Welfare Fund v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, No. 01-2023 DWF/AJB, United States District Court for the District of Minnesota.

- Empire Healthchoice, Inc. d/b/a Empire Blue Cross and Blue Shield v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd., No. 02 CV, United States District Court for the District of Massachusetts.

- Blue Cross and Blue Shield of Florida, Inc., Health Options, Inc., Trigon Insurance Co., d/b/a Trigon Blue Cross Blue Shield, Healthkeepers, Inc., Priority Health Care, Inc., and Peninsula Health Care, Inc. v. TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Chemical Industries, Ltd., No. 02-10139 RGS, United States District Court for the District of Massachusetts.

- Farris v. Abbott Laboratories, Inc., Takeda Chemical Industries, Ltd., Takeda American Holdings, Inc., Takeda Pharmaceuticals America, Inc. and TAP Pharmaceutical Products, Inc., and Does 1-100, No. 402591, Superior Court San Francisco.

- Stetser, Nelson and deMontbrun v. TAP Pharmaceutical Products Inc., Abbott Laboratories, Takeda Chemical Industries, Ltd., Johnson & Johnson, Ethicon Endo-Surgery, Inc., Indigo Laser Corp., Jett, Coleman, Hidalgo and Hack, No. 1 CV 5268, Superior Court, New Hanover County, North Carolina.

- Sullivan v. TAP Pharmaceutical Products, Inc. and Does 1-50, Superior Court of California, County of San Diego.

- State of Nevada v. Abbott Laboratories, Baxter Pharmaceutical Products, Inc., Bayer Corp., Bristol-Myers Squibb Co., Dey, Inc., GlaxoSmithKline Corp., Glaxo Wellcome, Inc., Pharmacia Corp., Pharmacia & Upjohn Co., Smith Kline Beecham Corp., TAP Holdings, Inc., Warrick Pharmaceuticals Corp., and Does 1 - 100, Second Judicial District Court of the State of Nevada in and for Washoe County

- Board of Trustees of Carpenters and Mill Wrights of Houston and Welfare Trust Fund, et al. v. Abbott Laboratories, Inc., Baxter International, Baxter Healthcare Corp., Baxter Pharmaceutical Products, Inc., Bayer Corp., Bristol-Myers Squibb Co., GlaxoSmithKline Corp., Glaxo Wellcome, Inc., Pharmacia Corp., Pharmacia & Upjohn Co., Smith Kline Beecham Corp., TAP Holdings, Inc. and Does 1-100, No. 501 CV 339, United States District Court for the Eastern District of Texas.

- Citizens for Consumer Justice, et al. v. Abbott Laboratories, Inc., Allergan Worldwide, Alpha Therapeutic Corp., American Bioscience, Inc., American Home Products, Amgen, Inc., Astrazeneca US, Aventis Pharma, Bayer AG, Baxter International, Inc., Bristol-

Myers Squibb Co., Chiron, Fugisawa Healthcare, Inc., GlaxoSmithKline, PLC, Gensia Sicor Pharmaceuticals, Inc., Glaxo Wellcome, PLC, Immunex Corp., ICN Pharmaceuticals, Inc., Hoescht Marion Roussel, Inc., Eli Lilly and Co., Oncology Therapeutics Network, Corp., Pharmacia Corp. Schering-Plough, Corp., Sicor, Inc., Smithkline Beecham Corp., Takeda Chemical Industries, Ltd., TAP Pharmaceutical Products, Inc., and John Does 1-200, No. 01-12257 PI, United States District Court for the District of Massachusetts.

- Geller v. Abbott Laboratories, Inc., Baxter International, Baxter Healthcare Corp., Baxter Pharmaceutical Products, Inc., Bayer Corp., Bristol-Myers Squibb Co., GlaxoSmithKline Corp., Glaxo Wellcome, Inc., Pharmacia Corp., Pharmacia & Upjohn Co., Smith Kline Beecham Corp., TAP Holdings, Inc., and Does 1-100, No. BC 260549, United States District Court Central District of California.

- Benoit v. Takeda Chemical Industries, Ltd., TAP Pharmaceutical Products, Inc. and Abbott Laboratories, No. B166742, District Court of Jefferson County, Texas.

**KLINE & SPECTER**
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

THE NINETEENTH FLOOR
1525 LOCUST STREET
PHILADELPHIA, PENNSYLVANIA 19102

DONALD E. HAVILAND, JR.
Direct Fax 215-735-0937

215-772-1000

FAX: 215-772-1359

Donald.Haviland@klinespecter.com

March 18, 2002

## VIA FEDERAL EXPRESS OVERNIGHT DELIVERY

Honorable Phillip A. Gruccio, Special Master
1592 Fairmount Avenue
Vineland, NJ 08361-2923

Re:    *Bernard Walker v. TAP Pharmaceutical Products, Inc., et al.*; C.A. No.: CPM-L-682-01;
       Lupron NJ Litigation; Our File No.: 200201

Dear Judge Gruccio:

        Per your discussion with Lewis April and the agreement of counsel in the above litigation, and in order to assist you in your preparation for serving as Special Master in this case, I am providing you with a brief background summary of this litigation. *See* Background attached hereto as Attachment "A." In addition, I am providing you with a summary of Plaintiff's Opposition to Defendants' Motion for a Protective Order which details the particular concerns plaintiff has with the language in Defendants' draft Proposed Consent Protective Order. *See* Attachment "B."

        On behalf of my co-counsel, we look forward to seeing you on March 26, 2002.

Respectfully,

DONALD E. HAVILAND, JR.

DEH:ks
Attachments

cc:    Anne M. Patterson, Esquire (via facsimile, w/o Attachments)
       Gerald J. Corcoran, Esquire (via facsimile, w/o Attachments)
       Lewis B. April, Esquire (via facsimile, w/o Attachments)
       Bryan L. Clobes, Esquire (via facsimile, w/o Attachments)
       Lee Ann Russo, Esquire (via facsimile, w/o Attachments)
       Joshua T. Buchman, Esquire (via facsimile, w/o Attachments)

# Attachment "A"

## ATTACHMENT "A"

### BACKGROUND OF LUPRON® CONSUMER FRAUD LITIGATION

This case involves a widespread consumer fraud perpetrated by the manufacturers and distributors of a prescription drug known as Lupron®. Lupron® is a hormonal therapy that is used to treat prostate cancer in men, endometriosis and infertility in women, and central precocious puberty in children. Lupron® suppresses the production of testosterone which, among other things, aids in the spread of prostate cancer.

Lupron® is manufactured, sold, and distributed by TAP Pharmaceutical Products, Inc. ("TAP"), Abbott Laboratories ("Abbott") and Takeda Chemical Industries, Ltd. ("Takeda") [collectively referred to herein as "Defendants"].

In October, 2001, Defendants, through TAP, agreed to plead guilty to federal criminal and civil fraud charges for, among other things, conspiring to violate the Prescription Drug Marketing Act by, *inter alia*, providing free samples of Lupron® to physicians "knowing and expecting that those physicians would prescribe and administer those drug samples to their patients and thereafter seek and receive reimbursement for those free samples." *See* Criminal Information dated October 3, 2001, p. 4, attached hereto as Exhibit "1." This conspiracy was in violation of the federal conspiracy statute, 18 U.S.C. § 371. *See* Criminal Information, Letter Agreement dated September 28, 2001, Judgment dated December 6, 2001, and Corporate Integrity Agreement dated September 28, 2001 ("CIA") [collectively referred to herein as the "Guilty Plea Documents"] at Exhibit "1." Although in the Guilty Plea Documents Defendants only agreed to plea guilty to the unlawful provision of free samples, the government's investigation was much broader. As reflected in the CIA, as a result of the government's investigation and Defendants' guilty plea, TAP agreed that, by

1

January 31, 2002, it would implement Policies and Procedures which addressed, among other things, the calculation and reporting of accurate AWPs and the proper uses and tracking of drug samples. *See* CIA, p. 5. Accordingly, as widely reported in the news media, the government investigated a wide range of unlawful marketing and sales practices employed by Defendants in selling Lupron®.

This case was filed on October 9, 2001 by Bernard Walker, an individual resident of Cape May County who has been prescribed and paid for Lupron® for the treatment of his prostate cancer. Mr. Walker seeks to represent a Class consisting of the following:

> All persons and entities in New Jersey and throughout the United States who paid any portion of the cost of Lupron®.

Included in this nationwide class are men, women and children who paid all or any part of the cost of Lupron®, either as part of their required co-payments under Medicare (or other government or private insurance program) or otherwise (for those not covered by insurance). Mr. Walker's claims are based on three basic theories: common law fraud, conspiracy/concert of action, and violations of the New Jersey Consumer Fraud Act. Any one of these theories will be sufficient to effectuate the result Mr. Walker seeks - the reimbursement of all overcharges paid by the plaintiff Class as a result of Defendants' fraudulent scheme. All of these theories have been sanctioned by the Court as viable bases for recovery. *See* Order of the Court dated March 7, 2002.

Defendants' fraudulent scheme was designed to promote sales of Lupron® to patients nationwide and consisted of the following three major elements:

1.    The artificial inflation of the average wholesale price (or "AWP") for Lupron® (as reported by Defendants in such industry publications as the *Red Book* and as used as the basis for reimbursement under Medicare and other insurance programs) in order to create a "spread" between the AWP and the actual cost to the medical provider for Lupron®. This "spread" was marketed to medical providers as a way for them to make money by overcharging

2

medical assistance programs (such as Medicare) and their insureds (such as Mr. Walker) for Lupron®;

2.    The unlawful distribution of free samples of Lupron® to medical providers with knowledge that such medical providers would bill medical assistance programs and their insureds for such free samples in violation of federal law; and

3.    The provision of other financial inducements, such as cash payments, free trips, free services, and free Continuing Medical Education courses, among other things, in order to get medical providers to prescribe Lupron® over competitor drugs. Such inducements, undisclosed to either Medicare or the patient class, constituted unlawful compensation to these medical providers and served to advance the scheme of promoting Lupron® sales.

Each of these elements was part of a coordinated scheme employed by Defendants, working with medical providers and others throughout the country, to defraud medical assistance programs (like Medicare) and their insureds (like Mr. Walker) by causing them to pay for a more expensive drug, Lupron® [as compared with competitor drugs].

The Court in this case has recognized the merit of this case. Indeed, despite the pendency of other cases in state courts (Illinois and California) and in federal court (the MDL in Boston), the Court has recognized that this case involves distinct parties, claims and legal theories. *See* Order, p. 20 ("This Court holds that the parties, claims and legal issues are not the same and that the plaintiff will not have the opportunity for adequate relief in the prior jurisdiction"). Since the filing of the Complaint, counsel for plaintiff have been trying to expedite discovery in this matter to prepare this case for trial. Despite substantial discovery roadblocks by Defendants, plaintiff's counsel have reviewed over 150 boxes of documents in a Chicago depository and expect to complete such initial review in the coming weeks. Plaintiff's counsel trust that Your Honor will work with them to continue to expedite discovery so that this case may be expeditiously concluded.

3

Exhibit "1"

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) <br><br> ) <br> V. ) <br><br> **TAP PHARMACEUTICAL** ) <br> **PRODUCTS INC.** ) <br><br> Defendant ) | CRIMINAL NO. <br> 1:01cr 10354 ᴡᴏɢ-1 <br> VIOLATION: <br><br> 18 U.S.C. §371 <br> Conspiracy to Violate Title 21 U.S.C. <br> Sections 331(t) and 333(b) |



### INFORMATION

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### The Defendant

### TAP PHARMACEUTICAL PRODUCTS INC.

1.     TAP Pharmaceutical Products Inc., hereinafter "TAP", is a Delaware corporation

with its principal place of business in Lake Forest, Illinois.  TAP's shares are not publicly traded;

TAP's shares are equally owned by Abbott Laboratories, an American corporation with a

principal place of business in Abbott Park, Illinois, and Takeda Chemical Industries, Ltd., a

Japanese corporation with a principal place of business in Osaka, Japan.  At various times during

1



the 1990s, TAP was known as "TAP Pharmaceuticals Inc." and "TAP Holdings Inc."

2.    From in or about 1989 through the date of this Information, TAP sold a drug called Lupron in several different formulations. Like any drug, distribution of Lupron for human use was subject to the requirements of the Federal Food, Drug and Cosmetic Act. At all times material hereto, TAP had approval to distribute Lupron in a number of different formulations for a specific list of approved uses, including for the treatment of prostate cancer in men suffering from that disease.   In the marketing of Lupron, TAP employed and maintained extensive marketing and sales departments. Since at least the early 1990s, TAP has sold and provided the drug Lupron Depot to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to, among other physicians, Dr. Joseph Spinella, practicing in the State of Connecticut, Dr. Joel Olstein, practicing in the State of Maine, Dr. Jacob Zamstein, practicing in the State of Connecticut, and Dr. Rodney Mannion, practicing in the State of Indiana.

3.    Lupron Depot was administered to patients by intramuscular injection, typically in the buttocks, by a physician or nurse under the supervision of a physician.  At various times in the 1980s and continuing to the present, Lupron was available in daily, one month, three month and four month doses.  When Lupron was initially introduced to the marketplace, it was in the form of daily injections that were self injected.  Over time, the monthly, three-month, and four-month doses of Lupron Depot were approved for use and typically, patients would not self-administer these dosage levels.  It was typical that a patient whose prostate cancer was being treated with Lupron Depot would receive regular injections of that drug for the remainder of his life. At times material to this Information, the majority of patients receiving regular doses of

2

Lupron Depot were administered the one month, three month and/or four month doses.

4.    At all times material to this Information, TAP sold Lupron Depot to physicians and to health maintenance organizations, among other purchasers.  At all times material to this Information, an industry reference known as the Red Book published a price, called the Average Wholesale Price or AWP, for Lupron Depot based upon information supplied to the Red Book's publishers by TAP.  At all times material to this Information, the AWP for an injection of a monthly dose of Lupron Depot administered to a patient was as follows:

|      | Average Wholesale Price |
|------|-------------------------|
| 1992 | 418.75-437.50           |
| 1993 | 451.25                  |
| 1994 | 463.75                  |
| 1995 | 477.50                  |
| 1996 | 496.25-515.63           |
| 1997 | 540.63                  |
| 1998 | 566.88                  |

5.    At all times material to this Information, it was a crime, in violation of Title 21, United States Code, Sections 331(t) and 333(b) for an employee of a company engaged in the lawful distribution of drugs to provide a drug sample free of charge to a physician, with the intention and expectation that the physician would use that sample in the treatment of a patient and thereafter seek and receive reimbursement for that drug sample which had been provided to the physician free of charge.

6.    Beginning in or about 1991 and continuing to in or about 1998, the defendant TAP,

3

through its employees, provided to certain physicians thousands of free samples of the drug

Lupron, knowing and expecting that those physicians would prescribe and administer those drug

samples to their patients and thereafter seek and receive reimbursement for those free samples.

4

## COUNT 1: 18 U.S.C. §371 (CONSPIRACY)

7.      Paragraphs 1 through 6 of this Information are herein realleged and incorporated by reference.

8.      From in or about 1993 through in or about 1998, in the District of Massachusetts, and elsewhere throughout the United States, the defendant

### TAP PHARMACEUTICAL PRODUCTS INC.

together with certain of its employees, certain urologists practicing medicine in Massachusetts and elsewhere, and together with others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire and agree to violate Title 21 U.S.C. Sections 331(t) and 333(b) by submitting, and by causing to be submitted, claims for payment for Lupron Depot which had been provided as free samples to the urologists.

## OBJECTIVE OF THE CONSPIRACY

9.      The objectives of the conspiracy varied depending upon the participant.  The core objective of this conspiracy for all participants was to obtain money from the reimbursement for samples of Lupron.  It was an objective of TAP in this conspiracy to provide free samples of Lupron Depot, as well as other things of value, including money, to certain physicians as an inducement to those physicians to order Lupron Depot.  It was also an objective of this conspiracy for TAP to give free samples to physicians who had not timely paid TAP for balances due on past purchases of Lupron, in order to provide the physician with a source of money from which the physician could generate funds to pay that past-due balance.  It was an objective of some of the physicians participating in this conspiracy to bill for the free samples in order to increase their income.

5

## OVERT ACTS

10. In furtherance of the conspiracy, the defendant TAP and other conspirators known and unknown to the United States Attorney committed among other acts the following overt acts in the District of Massachusetts and elsewhere:

a.    On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Rodney Mannion for free more than sixty-one samples of Lupron Depot.

b.    On various dates in beginning in 1993 and continuing through at least July 1996, Dr. Mannion sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

c.    On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Jacob Zamstein for free more than eighty samples of Lupron Depot.

d.    On various dates beginning in 1993 through continuing through at least July 1996, Dr. Zamstein sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

e.    On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Joseph Spinella for free more than fifty samples of Lupron Depot.

f.    On various dates in 1993 through at least July 1996, Dr. Spinella sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

6

g.    On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Joel Olstein for free more than sixty-one samples of Lupron Depot.

h.    On various dates in 1993 through at least July 1996, Dr. Olstein sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

i.    On various dates in the time period 1994 through at least 1996, employees of TAP provided one-month samples of Lupron Depot, without charging therefor, to certain physicians in the District of Massachusetts, with, among other intents, the intention and expectation that the physician receiving the free samples of drug would use those samples in the treatment of a patient suffering from prostate cancer and thereafter seek and receive reimbursement for that drug.

All in violation of Title 18, United States Code, Section 371.

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

By:

MICHAEL K. LOUCKS
HEALTH CARE FRAUD CHIEF and
ASSISTANT U.S. ATTORNEY

October 3, 2001

7



**U.S. Department of Justice**

F I L E D
Clerk's Office
USDC, Mass.
Date _10-16-01_
By _____
Deputy Clerk

*United States Attorney*
*District of Massachusetts*

*1 Courthouse Way, Suite 9200*
*Boston, Massachusetts 02210*

September 28, 2001

Daniel E. Reidy, Esquire
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601

Joseph F. Savage, Jr., Esquire
Testa Hurwitz & Thibeault, LLP
125 High Street
Boston, MA 02110

Re:   TAP Pharmaceutical Products Inc.

Dear Mr. Reidy and Mr. Savage:

This letter sets forth the Agreement between the United States Department of Justice and the United States Attorney for the District of Massachusetts (the "U.S. Attorney") (collectively, the United States Department of Justice and the U.S. Attorney referred to as the "United States"), and your client, TAP Pharmaceutical Products Inc., and its subsidiaries ("TAP"), a Delaware corporation, (collectively referred to as "the Parties") as follows:

1.   Change of Plea

On or before September 26, 2001, or such other date as the Court may set, TAP shall waive indictment and plead guilty to the Information attached hereto as Exhibit A, which Information charges TAP with a conspiracy to violate Title 21 United States Code Sections 333(b) and 331(t), by causing the sale of drug samples, all in violation of Title 18 United States Code Section 371. TAP expressly and unequivocally admits that it knowingly, intentionally and willfully committed the crime charged in the attached information.

2.   Sentencing Guidelines

The United States and TAP agree that the following provisions of the United States Sentencing Guidelines ("U.S.S.G.") apply to sentencing of TAP with respect to the Information:

(a)   as indicated at the end of this section on the Sentencing Guidelines, pursuant to U.S.S.G. § 8C2.4(a) and 18 U.S.C. § 3571(d) the loss to the United States

DOCKETED    6

from this offense for criminal sentencing purposes is $145,000,000;

    (b)    pursuant to U.S.S.G. § 8C2.5, the culpability score is 8, calculated as follows:

          (1)    base score of 5 pursuant to § 8C2.5(a);

          (2)    add 4 points pursuant to § 8C2.5(b)(2)(A)(i) and/or (ii);

          (3)    deduct 1 point pursuant to § 8C2.5(g)(3).

    (c)    pursuant to § 8C2.6, the applicable range for a multiplier is 1.6 to 3.2, and the appropriate multiplier to be applied as to TAP is 2.0.

    (d)    the Parties agree that there is no basis for a departure under the Sentencing Guidelines, either upward or downward.

The United States represents and for purposes of this Plea Agreement, TAP does not object that, pursuant to U.S.S.G. § 8C2.4(a) and 18 U.S.C. § 3571(d), the loss to the United States from this offense for criminal sentencing purposes is $145,000,000. TAP and the United States both acknowledge that the loss figure cannot be determined with precision and that the loss figure of $145,000,000 for criminal sentencing purposes is an estimate.

3.    <u>Agreed Disposition</u>

The United States and TAP agree pursuant to Fed. R. Crim. P. 11(e)(1)(C) that the following sentence is the appropriate disposition of the Information:

    (a)    a criminal fine in the amount of two hundred ninety million dollars, ($290,000,000), to be paid within fourteen days of sentencing; and

    (b)    a mandatory special assessment of $400 pursuant to 18 U.S.C. § 3013, which shall be paid to the Clerk of Court on or before the date of sentencing.

In light of the pending civil actions, <u>United States ex rel. Douglas N. Durand v. TAP Holdings Inc.</u>, Civil Action No. 00-12618-GAO (D. Mass.), and <u>United States ex rel. Joseph Gerstein and Tufts Health Maintenance Organization, Inc. v. TAP Holdings Inc. and TAP Pharmaceuticals Inc.</u>, Civil Action No. 98-10547-GAO (D. Mass.), and the Civil Settlement Agreement between TAP and others and the United States relating to the civil actions which is being signed contemporaneous with this Plea Agreement (the "Civil Settlement Agreement"), the parties agree that the complication and prolongation of the sentencing process that would result from an attempt to fashion a proper restitution order outweighs the need to provide restitution to the victims in this case, where, as here, the loss suffered by each of the federal health care programs will be recompensed fully from amounts paid as part of the Civil Settlement Agreement. <u>See</u>, 18 U.S.C. §

3663(a)(1)(B)(ii). Therefore, the United States agrees that it will not seek a separate restitution order as to TAP as part of the resolution of the Information and the Parties agree that the appropriate disposition of this case does not include a restitution order.

4. **No Further Prosecution of TAP**

The United States agrees that, other than the charge in the attached Information, it shall not further prosecute TAP as follows:

      (a)    for conduct which falls within the scope of the conspiracy which is charged in the Information;

      (b)    for conduct falling within the scope of the grand jury investigation conducted by the U.S. Attorneys in Massachusetts and in Connecticut of conduct by TAP with respect to (1) the marketing, sale, and pricing of the drug Lupron in all of its dose forms for the treatment of prostate cancer, (2) the resale by physicians and others of those drugs to the Medicare, Tricare, Railroad Retirement Medicare and state Medicaid programs; (3) TAP's contractual obligations to the state Medicaid Programs regarding reporting of "best price"; (4) provision of remuneration in cash or in kind to customers to induce the purchase or prescription of, or the recommendation to anyone that they purchase or prescribe, the drug Lupron for the treatment of prostate cancer; and (5) violation of any provision of the Prescription Drug Marketing Act in the marketing and sale of the drug Lupron in all of its dose forms;

      (c)    for conduct not otherwise described in this paragraph which was known to the U.S. Attorneys in Massachusetts or Connecticut prior to the date of execution of this letter and which concerned either the sale and marketing of the drug Lupron in all of its dose forms or the sale and marketing of the drug Prevacid.

The United States does not decline criminal prosecution of TAP, Abbott Laboratories, or Takeda Chemical Industries, Ltd., or any of those corporations' related entities for any other conduct beyond that specifically described above, including, but not limited to, conduct involving the manufacture, sale or marketing to anyone of any other pharmaceutical product.

The U.S. Attorney expressly reserves the right to prosecute any individual, including but not limited to present and former officers, directors, employees and agents of TAP, in connection with the conduct encompassed by this Plea Agreement or within the scope of the grand jury investigation.

This declination is contingent on (1) the guilty plea of TAP being accepted by the Court, and not withdrawn, and (2) upon TAP's performance of all of its obligations as set forth in this Agreement, the attached Civil Settlement Agreement, the attached Side Letter Agreements with

Abbott Laboratories and Takeda Chemical Industries, Ltd., and the attached agreement regarding the limited waiver of the attorney-client privilege (which agreement shall be referred to in this Plea Agreement as the "Limited Privilege Waiver Letter"). If TAP's guilty plea is not accepted by the court or is after acceptance withdrawn for any reason, or if TAP or a related entity should fail to perform an obligation under any of these agreements, this declination of prosecution shall be null and void. The United States may, at its sole option, be released from its commitments under this Agreement, including, but not limited to, its agreement that paragraph 3 constitutes the appropriate disposition of this case, if at any time between its execution of this Agreement and sentencing, TAP:

      (a)    Fails to admit a complete factual basis for the plea;

      (b)    Fails to truthfully admit its conduct in the offenses of conviction;

      (c)    Falsely denies, or frivolously contests, relevant conduct for which TAP is accountable under U.S.S.G. § 1B1.3;

      (d)    Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which TAP is accountable under U.S.S.G. § 1B1.3;

      (e)    Engages in acts which form a basis for finding that TAP has obstructed or impeded the administration of justice under U.S.S.G. § 3C1.1; and/or

      (f)    Attempts to withdraw its plea.

    TAP expressly understands that it may not withdraw its plea of guilty, unless the Court rejects this Agreement under Fed. R. Crim. P. 11(e)(4).

    5.    <u>Payment of Mandatory Special Assessment</u>

    TAP agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing.

    6.    <u>Cooperation</u>

    TAP agrees to cooperate completely and truthfully with the U.S. Attorney in connection with his on-going investigation and prosecution of others for alleged violations of federal criminal law arising out of his investigation. TAP understands and agrees that such cooperation shall include the following, if requested by the U.S. Attorney:

      (a)    prompt production to the U.S. Attorney of any document or record in the possession, custody or control of TAP relating to the subject matter of the investigation;

4

(b)    taking all reasonable measures available to TAP to ensure that present and former officers, directors, agents and employees of TAP cooperate truthfully and completely with the U.S. Attorney in connection with his on-going investigation and prosecutions; and

(c)    taking all reasonable measures available to TAP to make all present and former officers and employees of TAP available for interviews by law enforcement personnel, upon reasonable notice.

Provided, however, notwithstanding any provision of this agreement, that: (1) TAP is not required to request of its present or former officers, directors, employees or agents that they forego seeking the advice of an attorney nor that they act contrary to that advice; (2) TAP is not required to take any action against its officers, directors, employees, or agents for following their attorney's advice; and (3) TAP is not required to waive any privilege or claim of work product, except to the extent required in the previously signed Limited Privilege Waiver Letter.

7.    Probation Department Not Bound By Agreement

. The sentencing disposition agreed upon by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the United States Probation Office. TAP's plea will be tendered pursuant to Fed. R. Crim. P. 11(e)(1)(C). TAP cannot withdraw its plea of guilty unless the sentencing judge rejects this Agreement or fails to impose a sentence consistent herewith. If the sentencing judge rejects this Agreement, this Agreement shall be null and void at the option of either the United States or TAP, and the United States will promptly return all documents (and all copies thereof) which were provided by TAP to the United States pursuant to the Limited Privilege Waiver Letter. In this regard, TAP hereby waives any defense to any charges which it might otherwise have under any statute of limitations or the Speedy Trial Act and agrees that the time relevant to any defense it might have under the statute of limitations is tolled beginning with the effective date of this Agreement and continuing until this Agreement is no longer in full force and effect.

TAP intends to seek a sentencing by the District Court immediately following the Rule 11 plea hearing. The United States does not object to the Court proceeding to sentence TAP immediately following the Rule 11 plea hearing or in the absence of a Presentence Report in this case. TAP understands that the decision whether to proceed immediately following the plea hearing with the sentencing proceeding, and to do so without a Presentence Report, is exclusively that of the United States District Court.

8.    Civil Liability

TAP's civil liability to the United States in connection with the matters under investigation by the United States, as set forth in paragraph 4(a), 4(b), and 4(c) of this agreement, is resolved as set forth in the attached Civil Settlement Agreement, according to the terms set forth in that agreement.

5

9.    Withdrawal of Plea by TAP

Should TAP move to withdraw its guilty plea at any time, this Agreement shall be null and void at the option of the U.S. Attorney.

10.    Breach of Agreement

If the U.S. Attorney determines that TAP has failed to comply with any material provision of this Agreement, the United States may, at its sole option, be released from its commitments under this Agreement in their entirety by notifying TAP, through counsel or otherwise, in writing. The United States may also pursue all remedies available to it under the law, irrespective of whether it elects to be released from its commitments under this Agreement. TAP recognizes that no such breach by it of an obligation under this Agreement shall give rise to grounds for withdrawal of its guilty plea. TAP understands that, should it breach any provision of this agreement, the U.S. Attorney will have the right to use against TAP before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by it and any information, materials, documents or objects which may be provided by it to the government subsequent to this Agreement, without any limitation. Provided, however, that any use by the government of the materials or information received by the government as a result of the Limited Privilege Waiver Letter shall be limited only by the terms of that letter. In this regard, TAP hereby waives any defense to any charges which it might otherwise have under the Speedy Trial Act and agrees to a tolling of the statute of limitations beginning on the date this agreement becomes effective and continuing until this agreement is no longer in full force and effect.

TAP understands and agrees that this 11(e)(1)(C) plea agreement and its agreed upon criminal disposition:

(1)    are wholly dependent upon TAP's timely compliance with the provisions of the attached Civil Settlement Agreement, including the requirement in that agreement that TAP pay to the United States and to the various state Medicaid Programs the amount of five hundred eighty-five million dollars ($585,000,000) within thirty days of the date of execution of this plea agreement ; and that

(2)    failure by TAP to comply fully with the terms of either this agreement, the attached Civil Settlement Agreement, or the attached Limited Privilege Waiver Letter, will constitute a breach of this plea agreement.

In the event that TAP at any time hereafter breaches any material provision of this plea agreement, TAP understands that (1) the United States will as of the date of that breach be relieved of any obligations it may have in this agreement, the attached Civil Settlement Agreement, the attached Limited Privilege Waiver Letter, or the attached Side Agreements with Abbott Laboratories and Takeda Chemical Industries, Ltd., including but not limited to the promise not to further prosecute

6

TAP, as set forth in paragraph 4 of this plea agreement, and the promise not to prosecute Abbott Laboratories or Takeda Chemical Industries, Ltd., as set forth in the Side Agreements with both of those entities; and (2) TAP will not be relieved of its obligations to make the payments set forth in this plea agreement and in the attached Civil Settlement Agreement, nor will it be entitled to any return of any monies already paid.

11.    Corporate Integrity Agreement

Contemporaneous with the execution of this agreement, TAP shall enter into a Corporate Integrity Agreement with the Office of Inspector General ("Inspector General") for the United States Department of Health and Human Services.

12.    Corporate Authorization

TAP shall provide to the U.S. Attorney and the Court a certified copy of a resolution of the Board of Directors of TAP, affirming that the Board of Directors of TAP has authority to enter into the Plea Agreement and has (1) reviewed the Information in this case and the proposed Plea Agreement; (2) consulted with legal counsel in connection with the matter; (3) voted to enter into the proposed Plea Agreement; (4) voted to authorize TAP to plead guilty to the charges specified in the Plea Agreement; and (5) voted to authorize Thomas Watkins to execute the Plea Agreement and all other documents necessary to carry out the provisions of the Plea Agreement.

TAP agrees that a duly authorized corporate officer or member of the board of directors, and not an attorney, will appear on behalf of TAP and will enter the guilty plea and will also appear for the imposition of sentence.

13.    Who is Bound by Agreement

This Agreement is binding upon the Attorney General of the United States, the Department of Justice, and all United States Attorneys on the matters as set forth in paragraph 4 but can not and does not bind the Tax Division of the U.S. Department of Justice or the Internal Revenue Service of the U.S. Department of the Treasury.  TAP also understands that this agreement does not bind any state or local prosecutive authorities.

14.    Complete Agreement

This letter, together with the attached Civil Settlement Agreement, the Civil Side Letter to TAP, the attached Limited Privilege Waiver Letter, and the attached Side Letters with Abbott Laboratories and Takeda Chemical Industries, Ltd., set forth the complete and only agreement between the parties relating to the disposition of this case.  No promises, representations or agreements have been made other than those set forth in this letter, and the five attached and referenced documents.  This Agreement supersedes prior understandings, if any, of the parties, whether written or oral, with the exception of those promises and representations set forth in the

7

attached documents.   This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the Agreement between the U.S. Attorney and TAP, please have TAP sign the Acknowledgment of Agreement below.  Please also sign below as Witness. Return the original of this letter to Health Care Fraud Chief Michael K. Loucks of the District of Massachusetts.

Very truly yours,

MICHAEL CHERTOFF
Assistant Attorney General
for the Criminal Division
United States Department of Justice

MICHAEL J. SULLIVAN
United States Attorney
District of Massachusetts

MICHAEL K. LOUCKS
Health Care Fraud Chief
District of Massachusetts

8

## Corporate Acknowledgment of Plea Agreement

The Board of Directors has authorized me to execute this Plea Agreement and the attached Civil Settlement Agreement, as well as the attached Limited Privilege Waiver Letter, on behalf of TAP Pharmaceutical Products Inc. The Board has been well informed regarding these documents in their entirety, as well as the attached Side Letters with Abbott Laboratories and Takeda Chemical Industries, Ltd., and has discussed them fully with TAP Pharmaceutical Products Inc.'s attorney. The Board acknowledges that these documents fully set forth TAP's agreements with the United States. The Board further states that no additional promises or representations have been made to the Board by any officials of the United States in connection with this matter, other than those set forth in this plea agreement and in the attached Civil Settlement Agreement, the Civil Side Letter Ancillary thereto, the attached Limited Privilege Waiver Letter, and the attached Side Letters with Abbott Laboratories and Takeda Chemical Industries, Ltd.

 

H. THOMAS WATKINS
President
TAP Pharmaceutical Products Inc.

Dated: 9/28/01

DANIEL E. REIDY, ESQUIRE
Jones Day Reavis & Pogue

Dated: 9/28/01

JOSEPH F. SAVAGE, JR. ESQUIRE
Testa Hurwitz & Thibeault, LLP

9

## Corporate Acknowledgment of Plea Agreement

The Board of Directors has authorized me to execute this Plea Agreement and the attached Civil Settlement Agreement, as well as the attached Limited Privilege Waiver Letter, on behalf of TAP Pharmaceutical Products Inc. The Board has been well informed regarding these documents in their entirety, as well as the attached Side Letters with Abbott Laboratories and Takeda Chemical Industries, Ltd., and has discussed them fully with TAP Pharmaceutical Products Inc.'s attorney. The Board acknowledges that these documents fully set forth TAP's agreements with the United States. The Board further states that no additional promises or representations have been made to the Board by any officials of the United States in connection with this matter, other than those set forth in this plea agreement and in the attached Civil Settlement Agreement, the Civil Side Letter Ancillary thereto, the attached Limited Privilege Waiver Letter, and the attached Side Letters with Abbott Laboratories and Takeda Chemical Industries, Ltd.

Dated: September 28, 2001

_____
H. THOMAS WATKINS
President
TAP Pharmaceutical Products Inc.


Dated:

_____
DANIEL E. REIDY, ESQUIRE
Jones Day Reavis & Pogue


Dated:

_____
JOSEPH F. SAVAGE, JR. ESQUIRE
Testa Hurwitz & Thibeault, LLP

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. |
| | ) | 1:01cr 10354 ūog-1 |
| | ) | VIOLATION: |
| | ) | |
| | ) | 18 U.S.C. §371 |
| v. | ) | Conspiracy to Violate Title 21 U.S.C. |
| | ) | Sections 331(t) and 333(b) |
| | ) | |
| TAP PHARMACEUTICAL | ) | |
| PRODUCTS INC. | ) | |
| | ) | |
| Defendant | ) | |

## INFORMATION

The United States Attorney charges that:

### PRELIMINARY ALLEGATIONS

At all times material hereto, unless otherwise alleged:

### The Defendant

### TAP PHARMACEUTICAL PRODUCTS INC.

1.       TAP Pharmaceutical Products Inc., hereinafter "TAP", is a Delaware corporation

with its principal place of business in Lake Forest, Illinois.  TAP's shares are not publicly traded;

TAP's shares are equally owned by Abbott Laboratories, an American corporation with a

principal place of business in Abbott Park, Illinois, and Takeda Chemical Industries, Ltd., a

Japanese corporation with a principal place of business in Osaka, Japan.  At various times during

1

the 1990s, TAP was known as "TAP Pharmaceuticals Inc." and "TAP Holdings Inc."

2.      From in or about 1989 through the date of this Information, TAP sold a drug called Lupron in several different formulations. Like any drug, distribution of Lupron for human use was subject to the requirements of the Federal Food, Drug and Cosmetic Act. At all times material hereto, TAP had approval to distribute Lupron in a number of different formulations for a specific list of approved uses, including for the treatment of prostate cancer in men suffering from that disease.   In the marketing of Lupron, TAP employed and maintained extensive marketing and sales departments. Since at least the early 1990s, TAP has sold and provided the drug Lupron Depot to urologists across the country, including to urologists practicing medicine in the Commonwealth of Massachusetts, and to, among other physicians, Dr. Joseph Spinella, practicing in the State of Connecticut, Dr. Joel Olstein, practicing in the State of Maine, Dr. Jacob Zamstein, practicing in the State of Connecticut, and Dr. Rodney Mannion, practicing in the State of Indiana.

3.      Lupron Depot was administered to patients by intramuscular injection, typically in the buttocks, by a physician or nurse under the supervision of a physician. At various times in the 1980s and continuing to the present, Lupron was available in daily, one month, three month and four month doses.  When Lupron was initially introduced to the marketplace, it was in the form of daily injections that were self injected.  Over time, the monthly, three-month, and four-month doses of Lupron Depot were approved for use and typically, patients would not self-administer these dosage levels. It was typical that a patient whose prostate cancer was being treated with Lupron Depot would receive regular injections of that drug for the remainder of his life. At times material to this Information, the majority of patients receiving regular doses of

2

Lupron Depot were administered the one month, three month and/or four month doses.

4.    At all times material to this Information, TAP sold Lupron Depot to physicians and to health maintenance organizations, among other purchasers.   At all times material to this Information, an industry reference known as the Red Book published a price, called the Average Wholesale Price or AWP, for Lupron Depot based upon information supplied to the Red Book's publishers by TAP.   At all times material to this Information, the AWP for an injection of a monthly dose of Lupron Depot administered to a patient was as follows:

|  | Average Wholesale Price |
|---|---|
| 1992 | 418.75-437.50 |
| 1993 | 451.25 |
| 1994 | 463.75 |
| 1995 | 477.50 |
| 1996 | 496.25-515.63 |
| 1997 | 540.63 |
| 1998 | 566.88 |

5.    At all times material to this Information, it was a crime, in violation of Title 21, United States Code, Sections 331(t) and 333(b) for an employee of a company engaged in the lawful distribution of drugs to provide a drug sample free of charge to a physician, with the intention and expectation that the physician would use that sample in the treatment of a patient and thereafter seek and receive reimbursement for that drug sample which had been provided to the physician free of charge.

6.    Beginning in or about 1991 and continuing to in or about 1998, the defendant TAP,

3

through its employees, provided to certain physicians thousands of free samples of the drug

Lupron, knowing and expecting that those physicians would prescribe and administer those drug

samples to their patients and thereafter seek and receive reimbursement for those free samples.

4

## COUNT 1: 18 U.S.C. §371 (CONSPIRACY)

7.    Paragraphs 1 through 6 of this Information are herein realleged and incorporated by reference.

8.    From in or about 1993 through in or about 1998, in the District of Massachusetts, and elsewhere throughout the United States, the defendant

### TAP PHARMACEUTICAL PRODUCTS INC.

together with certain of its employees, certain urologists practicing medicine in Massachusetts and elsewhere, and together with others known and unknown to the United States Attorney, did knowingly and willfully combine, conspire and agree to violate Title 21 U.S.C. Sections 331(t) and 333(b) by submitting, and by causing to be submitted, claims for payment for Lupron Depot which had been provided as free samples to the urologists.

### OBJECTIVE OF THE CONSPIRACY

9.    The objectives of the conspiracy varied depending upon the participant. The core objective of this conspiracy for all participants was to obtain money from the reimbursement for samples of Lupron.  It was an objective of TAP in this conspiracy to provide free samples of Lupron Depot, as well as other things of value, including money, to certain physicians as an inducement to those physicians to order Lupron Depot. It was also an objective of this conspiracy for TAP to give free samples to physicians who had not timely paid TAP for balances due on past purchases of Lupron, in order to provide the physician with a source of money from which the physician could generate funds to pay that past-due balance.  It was an objective of some of the physicians participating in this conspiracy to bill for the free samples in order to increase their income.

5

## OVERT ACTS

10. In furtherance of the conspiracy, the defendant TAP and other conspirators known and unknown to the United States Attorney committed among other acts the following overt acts in the District of Massachusetts and elsewhere:

a.      On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Rodney Mannion for free more than sixty-one samples of Lupron Depot.

b.      On various dates in beginning in 1993 and continuing through at least July 1996, Dr. Mannion sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

c.      On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Jacob Zamstein for free more than eighty samples of Lupron Depot.

d.      On various dates beginning in 1993 through continuing through at least July 1996, Dr. Zamstein sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

e.      On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Joseph Spinella for free more than fifty samples of Lupron Depot.

f.      On various dates in 1993 through at least July 1996, Dr. Spinella sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

6

g.    On various dates beginning in 1993 and continuing into at least July, 1996, employees of TAP provided to Dr. Joel Olstein for free more than sixty-one samples of Lupron Depot.

h.    On various dates in 1993 through at least July 1996, Dr. Olstein sought and received reimbursement for samples of Lupron Depot which he had received for free from TAP.

i.    On various dates in the time period 1994 through at least 1996, employees of TAP provided one-month samples of Lupron Depot, without charging therefor, to certain physicians in the District of Massachusetts, with, among other intents, the intention and expectation that the physician receiving the free samples of drug would use those samples in the treatment of a patient suffering from prostate cancer and thereafter seek and receive reimbursement for that drug.

All in violation of Title 18, United States Code, Section 371.

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

By:

MICHAEL K. LOUCKS
HEALTH CARE FRAUD CHIEF and
ASSISTANT U.S. ATTORNEY

October 3, 2001

7

AO 245B Sheet 1 - Judgment in a Criminal Case - D. Massachusetts (10/01)

# United States District Court
## District of Massachusetts

UNITED STATES OF AMERICA
v.
**TAP PHARMACEUTICALS**

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

**Case Number:  1: 01-10354-001-WGY**

Joseph Savage
Defendant's Attorney

☐

**THE DEFENDANT:**

☒ pleaded guilty to count(s): 1
☐ pleaded nolo contendere to counts(s)_____ which was accepted by the court.
☐ was found guilty on count(s)_____ after a plea of not guilty.

Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 371 USC § | Conspiracy to Violate  21 USC Sections 331(t) and 333(b) | 12/31/98 | 1 |

☐ See continuation page

The defendant is sentenced as provided in pages 2 through ___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on counts(s) _____ and is discharged as to such count(s).

☐ Count(s) _____ is  dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.:  n/a

Defendant's Date of Birth:  n/a

Defendant's USM No.:  n/a

Defendant's Residence Address:
675 North Field Drive
Lake Forest, IL 60045

Defendant's Mailing Address:
Same as above

12/06/01

Date of Imposition of Judgment

*William L. Young*

Signature of Judicial Officer

The Honorable William G. Young

Name and Title of Judicial Officer

Chief Judge, U.S. District Court

Date

*Dec. 10, 2001*

DOCKETED    /4

AO 245B  Sheet 4 - Probation - D. Massachusetts (10/01)
CASE NUMBER: 1:01-10354-001-WGY                                    Judgment - Page    of
DEFENDANT: TAP PHARMACEUTICALS

## PROBATION

The defendant is hereby sentenced to probation for a term of          5    year(s)

[x] See continuation page

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13,1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as directed by the probation officer.

[ ]      The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check if applicable.)

[x]      The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of probation that the defendant pay any such fine or restitution in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page (if indicated above).

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependants and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Continuation Page - Supervised Release/Probation

CASE NUMBER: 1:01-10354-001-WGY
DEFENDANT: TAP PHARMACEUTICALS

Judgment - Page          of

## Continuation of Conditions of ☐ Supervised Release ☒ Probation

Neither the defendant corporation nor the principal shareholders are to disparage the sentence of this Court.

TAP shall maintain all records according to the CIA

TAP is to provide Probation access to any requested financial information and any documents requested by Probation.

TAP will provide to Probation for the District of Massachusetts copies of any responses to document requests in any civil litigation.

AO 245B    Judgment in a Criminal Case - D. Massachusetts (10/01)
        Sheet 5, Part A — Criminal Monetary Penalties

Judgment - Page    of

CASE NUMBER:   1: 01-10354-001-WGY
DEFENDANT: TAP PHARMACEUTICALS

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|          | **Assessment** | **Fine** | **Restitution** |
|----------|----------------|----------|-----------------|
| **TOTALS** | $400.00 | $290,000,000.00 | |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---------------|-----------------------|-------------------------------|-----------------------------------------|
| | | | ☐ See Continuation Page |
| **TOTALS** | $0.00 | $0.00 | |

☐ If applicable, restitution amount ordered pursuant to plea agreement _____

☐ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the   ☐ fine and/or   ☐ restitution.

☐ the interest requirement for the   ☐ fine and/or   ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO 245B   Judgment in a Criminal Case - D. Massachusetts (10/01)
         Sheet 5, Part B — Criminal Monetary Penalties

Judgment - Page        of

CASE NUMBER:  1: 01-10354-001-WGY
DEFENDANT: TAP PHARMACEUTICALS

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  [X]  Lump sum payment of      $290,000,400.00    due immediately, balance due

        [X] not later than    12/20/01        , or
        [ ] in accordance with [ ] C,     [ ] D, or     [ ] E below; or

B  [ ]  Payment to begin immediately (may be combined with C, D, or E below); or

C  [ ]  Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  [ ]  Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
        _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
        term of supervision; or

E  [ ]  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ] Joint and Several

    Case Number, Defendant Name, and Joint and Several Amount:

[ ] The defendant shall pay the cost of prosecution.                    [ ] See Continuation
                                                                            Page
[ ] The defendant shall pay the following court cost(s):

[ ] The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

## CORPORATE INTEGRITY AGREEMENT
### BETWEEN THE
### OFFICE OF INSPECTOR GENERAL
### OF THE
### DEPARTMENT OF HEALTH AND HUMAN SERVICES
### AND
### TAP PHARMACEUTICAL PRODUCTS INC.

I.    **PREAMBLE**

TAP Pharmaceutical Products Inc. ("TAP") hereby enters into this Corporate Integrity Agreement ("CIA") with the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS") to promote compliance by its officers, directors, employees, contract workers, and agents working at TAP's facilities with the statutes, regulations and written directives of Medicare, Medicaid and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f))("Federal health care program requirements"). All persons identified in the preceding sentence shall collectively be referred to as the "Covered Persons".[1] Contemporaneously with this CIA, TAP is entering into a Settlement Agreement with the United States, and this CIA is incorporated by reference into the Settlement Agreement. Contemporaneously with this CIA, TAP is also entering into settlement agreements with various States, and TAP's agreement to this CIA is a condition precedent to those agreements.

Prior to the effective date of this CIA, TAP initiated certain voluntary compliance measures, which as represented by TAP, include regular training to all Covered Persons concerning TAP's Code of Conduct and Operational Guidelines and include review and disciplinary procedures aimed, in part, at ensuring that TAP's activities are in compliance with all Federal health care program requirements and meeting TAP's goals of continuing to promote high ethical standards in the conduct of TAP's business practices. TAP agrees to continue the operation of its compliance measures in accordance with the terms set

---

[1]Specifically excluded from the definition of "Covered Persons" are the marketing, sales or other personnel of entities with which TAP has agreements to co-promote its products. TAP shall, however, in good faith seek to obtain assurances that such personnel have received appropriate training on proper marketing and sales techniques. The term "Covered Persons" specifically includes all other personnel, apart from those acting under co-promotion agreements, who comprise TAP's contract sales force, if any.

Corporate Integrity Agreement
TAP Pharmaceutical Products Inc.                    1

forth below for the term of this CIA. TAP may modify its voluntary compliance measures as appropriate, but, at a minimum, TAP will ensure that during the term of this CIA, it shall comply with the integrity obligations enumerated in this CIA.

## II.   TERM OF THE CIA

The period of the compliance obligations assumed by TAP under this CIA shall be seven (7) years from the effective date of this CIA (unless otherwise specified). The effective date ("Effective Date") of this CIA shall be the date on which the final signatory of this CIA executes this CIA.

Sections VII, VIII, IX, X and XI shall remain in effect until OIG has completed its review of the final Annual Report submissions and any additional materials submitted by TAP pursuant to OIG's request, which review OIG agrees to complete without unreasonable delay.

## III.   CORPORATE INTEGRITY OBLIGATIONS

TAP hereby agrees to maintain a Compliance Program that includes the following elements:

### A. Compliance Officer and Committee.

1. *Compliance Officer.* TAP presently has a Compliance Officer and Compliance Committee with responsibility for administering TAP's Compliance Program. TAP shall continue to employ an individual to serve as its Compliance Officer during the term of this CIA. The Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements. The Compliance Officer shall be a member of senior management of TAP, shall make periodic (at least semi-annual) reports regarding compliance matters directly to the Board of Directors of TAP, or its designated subcommittee, in such form or manner as the Board of Directors of TAP determines, and shall be authorized to report on such matters to the Board of Directors at any time. The Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by TAP as well as for any reporting obligations created under this CIA.

Any changes in the identity of or any material changes in the position description of the Compliance Officer, or any material actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, must be reported to OIG, in writing, within 15 days of such a change.

2. *Compliance Committee.* TAP shall maintain a Compliance Committee during the term of this CIA. The Compliance Committee shall, at a minimum, include the Compliance Officer and any other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of each major department, including the heads of those departments responsible for sales, marketing, and human resources). The Compliance Officer shall chair the Compliance Committee and the Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of TAP's risk areas and shall oversee monitoring of internal and external audits and investigations).

Any material changes in the composition of the Compliance Committee, or any material actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, must be reported to OIG, in writing, within 15 days of such a change.

B. Written Standards.

1. *Code of Conduct.* To the extent not already accomplished, TAP shall revise and redistribute its Code of Business Conduct (hereafter "Code of Conduct") to all Covered Persons within 120 days of the Effective Date of this CIA. TAP shall revise its Code of Conduct to reflect the items specified below. TAP shall continue to make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct shall, at a minimum, set forth:

a. TAP's commitment to full compliance with all Federal health care program requirements, including its commitment to report prices for and market and sell its pharmaceutical and other products for which the Federal health care programs provide reimbursement ("Government Reimbursed Products") in accordance with Federal health care program requirements;

b. TAP's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program

requirements and with TAP's own Policies and Procedures as implemented pursuant to section III.B.2. (including the requirements of this CIA);

c.  the requirement that all of TAP's Covered Persons shall be expected to report to the Compliance Officer or other individual designated by TAP (such as district managers or other supervisory personnel) suspected violations of any Federal health care program requirements or of TAP's own Policies and Procedures;

d.  the possible consequences to both TAP and Covered Persons of failure to comply with all Federal health care program requirements and with TAP's own Policies and Procedures or of failure to report such non-compliance; and

e.  the right of all individuals to use the Disclosure Program described in section III.F., and TAP's commitment to maintain confidentiality, as appropriate, and non-retaliation with respect to disclosures made in accordance with the terms of the Disclosure Program.

On or before January 31, 2002, or within 120 days of the Effective Date of this CIA, whichever is later, each Covered Person who has not already done so within 180 days prior to the Effective Date of this CIA shall certify, in writing or electronically, that he or she has received, read, understood, and will abide by TAP's Code of Conduct. New Covered Persons shall receive the Code of Conduct and shall complete the required certification within 30 days after becoming a Covered Person or by January 31, 2002 or within 120 days of the Effective Date of this CIA, whichever is later.

TAP shall annually review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such a review. Any such revised Code of Conduct shall be distributed within 30 days of finalizing such changes. Covered Persons shall certify that they have received, read, understood and will abide by the revised Code of Conduct within 60 days of the distribution of such revisions.

2. *Policies and Procedures.* By January 31, 2002, TAP shall implement written Policies and Procedures regarding the operation of TAP's compliance program

and its compliance with Federal health care program requirements. At a minimum, the Policies and Procedures shall address:

a. the subjects relating to the Code of Conduct identified in section III.B.1.;

b. the calculation and reporting of accurate prices for Government Reimbursed Products to certain entities, including the Centers for Medicare & Medicaid Services ("CMS"), the State Medicaid programs, and drug price reporting services on which government agencies rely (e.g., First DataBank Inc., the Red Book, etc.);

c. the proper calculation and reporting of all data and information reported to CMS and/or the State Medicaid programs in connection with the Medicaid Drug Rebate program, codified at 42 U.S.C. § 1396r-8;

d. the proper uses and tracking of drug samples in accordance with all applicable requirements, including, but not limited to, the Prescription Drug Marketing Act, codified in 21 U.S.C. §§ 331, 333 and 353; and

e. measures designed to promote marketing and sales practices that conform with all statutes, regulations and requirements applicable to Government Reimbursed Products. The Policies and Procedures shall specify that TAP shall refrain from violating the Federal anti-kickback statute, codified at 42 U.S.C. §§ 1320a-7b(1) & (2), and other applicable statutes, regulations or requirements.

On or before January 31, 2002, or within 120 days of the Effective Date of this CIA, whichever is later, the relevant portions of the Policies and Procedures shall be distributed to all Covered Persons whose job functions are related to those Policies and Procedures. Appropriate and knowledgeable staff should be available to explain the Policies and Procedures.

At least annually (and more frequently if appropriate), TAP shall assess and update as necessary the Policies and Procedures. Within 30 days of the effective date of any revisions, the relevant portions of any such revised Policies and Procedures shall be

Corporate Integrity Agreement
TAP Pharmaceutical Products Inc.

5

distributed to all Covered Persons whose job functions are related to those Policies and Procedures.

## C. Training and Education.

1. *Training Requirements, General Description.* The training and education required under section III.C. of this CIA may be provided by supervisory employees or outside consultant trainers selected by TAP and/or through electronic means. Persons providing the training must be knowledgeable about the subject areas of their training. TAP may provide the training required under this CIA through appropriate computer-based approaches. In that event, all applicable references to "hours" in this section III.C. shall mean "normative hours" as that term is used in the computer-based training industry. If TAP chooses to provide computer-based training, it shall also make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the Covered Persons who are receiving such training. To the extent a Covered Person is on a leave of absence when the required training is offered, the Covered Person shall receive the training within 60 days of the conclusion of the leave of absence.

New Covered Persons shall receive the training outlined below in sections III.C.2. and III.C.3. within 60 days of the beginning of their employment or becoming Covered Persons or on or before January 31, 2002, whichever is later. A TAP employee who has completed the training shall review a new Covered Person's work, to the extent that the work relates to the promotion, marketing or sales of Government Reimbursed Products; the calculating or reporting of prices for Government Reimbursed Products; or the fulfilment of any responsibilities relating to the Medicaid Drug Rebate program until such time as the new Covered Person completes the applicable training.

2. *Training Provided to Covered Persons.* On or before January 31, 2002, TAP shall provide at least four hours of training to each Covered Person. This training, at a minimum, shall explain:

a. TAP's CIA requirements;

b. TAP's Compliance Program (including the Code of Conduct and the Policies and Procedures as they pertain to general compliance issues);

c. proper methods of promoting, marketing and selling Government Reimbursed Products in accordance with all applicable statutes, regulations and requirements, including, but not limited to, the Federal anti-kickback statute and the Prescription Drug Marketing Act (to the extent such Covered Person's responsibilities involve handling drug samples);

d. the personal obligation of each individual involved in marketing and sales of Government Reimbursed Products to ensure that those products are marketed and sold in accordance with all applicable requirements;

e. all applicable legal rules (including the sanctions for violations) relating to promotion, marketing and sales of Government Reimbursed Products (including, but not limited to, the Federal anti-kickback statute; the Civil Monetary Penalties law, 42 U.S.C. § 1320a-7a; the civil False Claims Act, 31 U.S.C. §§ 3729-3733; the Medicaid Drug Rebate statute, and the Prescription Drug Marketing Act (to the extent such Covered Person's responsibilities involve handling drug samples); and

f. examples of proper and improper promotion, marketing and sales practices.

After receiving the initial training described above, each Covered Person shall receive at least three hours of training on the topics outlined above each calendar year.

3. *Additional Training for Certain Covered Persons.* In addition to the training outlined in section III.C.2. above, on or before January 31, 2002, TAP shall provide ninety (90) minutes of additional training (the "Additional Training") to those Covered Persons: 1) whose job responsibilities include responsibility for complying with any requirements of the Medicaid Drug Rebate program; or 2) who are involved in the calculation or reporting of any pricing data or other related information for Government Reimbursed Products. To the extent that TAP has provided training that satisfies the Additional Training requirements set forth below within 180 days prior to the Effective Date of this CIA, the OIG shall credit that training for purposes of satisfying TAP's Additional Training obligations for the first year of the CIA.

This Additional Training shall include a discussion of:

 a. the calculation and reporting of accurate pricing data and other information to CMS, the State Medicaid programs and drug price reporting services for Government Reimbursed Products;

 b. the calculation and reporting of accurate pricing data and other information as required by the Medicaid Drug Rebate program;

 c. the personal obligation of each individual involved in the calculation or reporting of drug pricing data or other information to ensure that prices are accurately calculated and reported;

 d. all applicable legal rules (including the sanctions for violations) relating to proper price and information calculation and reporting for Government Reimbursed Products (including, but not limited to, the Federal anti-kickback statute; the Civil Monetary Penalties law; the civil False Claims Act; and the Medicaid Drug Rebate statute); and

 e. examples of proper and improper drug price calculation and reporting practices.

After receiving the initial training described in this section, every Covered Person required to receive Additional Training shall receive at least one hour of Additional Training each calendar year.

 4. *Certification.* Each individual who is required to attend training shall certify, in writing, or in electronic form, that he or she has received the required training. The certification shall specify the type of training received and the date received. The Compliance Officer (or his or her designee) shall retain the certifications, along with all course materials. These shall be made available to OIG, upon request.

 D. Reporting Requirements.

 1. *General Statement of Purpose and Intent.*

On a quarterly basis, TAP shall report to the entities identified below in section III.D.2.b. certain pricing information, as specified below in section III.D.2.a., for the

purpose of furnishing those entities with true pricing information that accurately reflects prices at which actual purchasers buy the Government Reimbursed Products sold by TAP. Such information shall be provided to the OIG subject to section IX and other conditions of this CIA, and TAP shall comply with section V.D. in providing the data. The OIG agrees that if, and when, it shares the confidential pricing information with government agencies other than the OIG, it will encourage that the information not be used in a way that would competitively disadvantage TAP in relation to any of its competitors.

2.  *Specific Reporting Requirements.*

a.  *Average Sale Price Defined.*

For purposes of this CIA, "Average Sale Price" means, with respect to each dosage form, strength and volume of the Government Reimbursed Product (without regard to any special packaging, labeling, or identifiers on the dosage form or product or package) the average of all final sales prices charged by TAP for the product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Drug Rebate purposes, pursuant to 42 U.S.C. § 1396r-8, and excluding direct sales to hospitals. (Those purchasers for which the sales are included in the calculation of Average Sale Price are hereafter referred to as the "Relevant Purchasers".) The prices identified in the calculation of the Average Sale Price should be net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates;[2] and all other price concessions provided by TAP to any Relevant Purchaser that result in a reduction of the ultimate cost to the purchaser. Notwithstanding the foregoing, the Average Sale Price shall not include the value of bona fide charity care or grants.

TAP shall report the Average Sale Price by National Drug Code ("NDC") for each Government Reimbursed Product identified by TAP's NDC. The Average Sale Price reported shall be properly weighted to reflect the volume of sales at each sale price, *i.e.,* for each NDC, the price reported shall be an average per unit price determined by dividing the sum of all final prices charged by TAP to a Relevant Purchaser, net of all price reductions identified above, for a Government Reimbursed Product in a quarter by the total number of units of that product sold in that quarter.

---

[2] The term "rebate" as used in this paragraph does not include any payments made by TAP to the States pursuant to the Medicaid Drug Rebate program (42 U.S.C. § 1396r-8).

Corporate Integrity Agreement
TAP Pharmaceutical Products Inc.                    9

### b. *Reporting Obligations for Government Reimbursed Products.*

Except as otherwise noted below, thirty (30) days after the last day of each calendar quarter, TAP shall report, in accordance with section III.D.2.a. above, the Average Sale Prices of each of its Government Reimbursed Products identified by TAP's NDC to: 1) the Medicaid programs of those States who have executed a state settlement agreement with TAP; 2) to First DataBank Inc.[3] solely for the purpose of reporting pricing information based on those Average Sale Prices to the Medicaid programs of those States that have executed a state settlement agreement; 3) to CMS; and 4) to the OIG. The first report of Average Sale Prices shall be made no later than 30 days after the end of the first full calendar quarter following the Effective Date of the CIA.

### c. *Certification Requirement.*

In connection with each report of Average Sale Price, TAP shall also provide the OIG, CMS, and the applicable States a detailed description of the methodology used to calculate the Average Sale Prices. An appropriate employee or agent of TAP will certify that the Average Sale Prices reported are calculated in accordance with the described methodology. Said certifications shall be made in the form attached hereto as Attachment A. TAP agrees that this certification by an appropriate employee or agent of TAP constitutes a certification by TAP. To the extent that TAP's methodology involves accruing for the impact of future events, TAP shall include a description of its accrual methodology, including underlying assumptions, with its certification, and shall, on a quarterly basis, evaluate such accrual methodology in light of its actual experience and make any appropriate adjustments.

### d. *Confidentiality and Use of Reported Information.*

TAP and the OIG (on behalf of itself and CMS) acknowledge that the pricing information provided by TAP is considered to be confidential commercial information and proprietary trade secrets that if disclosed may cause substantial injury to the competitive position of TAP. On behalf of itself and CMS, the OIG agrees to afford the pricing information disclosed by TAP the maximum degree of confidentiality permitted

---

[3] If appropriate to reflect changes in the sources from which the State Medicaid programs receive their pricing information, TAP agrees that, upon the receipt of a written request by any of the States, it will report the required information to a drug pricing reporting source other than, and in addition to, First DataBank Inc., subject to reasonable provisions equivalent to those agreed to by First DataBank Inc. to ensure the confidentiality of that information.

by law. CMS has been advised by the OIG of the purpose and use of the pricing information provided by TAP. The parties acknowledge that this information may be relied upon by CMS in establishing reimbursement rates for TAP products, provided however that CMS will not change reimbursement rates for any TAP product based on this information without conducting meaningful review for all government-reimbursed therapeutically similar products. Similarly, the parties acknowledge that the pricing information may be relied upon by State Medicaid programs in establishing reimbursement rates for TAP's products, subject to the provisions of the settlement agreements entered between TAP and various States as referenced in the Preamble to this CIA.

### e. *Document Retention.*

TAP shall retain all supporting work papers and documentation relating to the Average Sale Price of its Government Reimbursed Products for eight years after the Effective Date of this CIA and, to the extent not protected by appropriately asserted privileges, shall make such documentation available for inspection by the OIG or its duly authorized representative(s) in accordance with the provisions set forth more fully below in section VII of this CIA.

### E. Review Procedures.

### 1. *General Description.*

### a. *Retention of Independent Review Organization and Consultant.*

TAP shall retain an entity (or entities), such as an accounting, auditing or consulting firm (hereinafter "IRO" or "Consultant"), to perform procedures to assist TAP in assessing and evaluating its drug price reporting practices, sales and marketing systems, policies and practices and compliance practices required pursuant to this CIA. Each IRO or Consultant must have expertise in auditing and the requirements of the Federal health care programs as they relate to the reporting for, reimbursement of and marketing/sales of Government Reimbursed Products. The IRO(s) or Consultant(s) must be retained to conduct the engagements described below for the first year within 120 days of the Effective Date of this CIA. Each IRO or Consultant shall assess, along with TAP, whether it can perform the engagements in a professionally independent fashion taking into account any other business relationships or other engagements that may exist.

*b. Types of Engagements.*

The IRO(s) and, as appropriate, Consultant(s) will conduct three separate engagements.[4] One engagement shall address TAP's drug price reporting practices ("Drug Price Reporting Engagement"). The second engagement shall address TAP's systems, policies and practices with regard to sales and marketing activities ("Sales and Marketing Engagement"). The third engagement shall address TAP's compliance with the obligations assumed under this CIA ("Compliance Engagement").

*c. Frequency of Engagements.*

The Drug Price Reporting and the Sales and Marketing Engagements shall each be performed by the IRO and, as appropriate, Consultant, for each of the seven years of the CIA and cover each of the one-year periods beginning with the Effective Date of the CIA. However, after the IRO and Consultant performs the Drug Price Reporting and Sales and Marketing Engagements for the fourth year of the CIA, TAP, at its option, may request the OIG to permit that the two Engagements be conducted internally and subject only to verification by the IRO and Consultant for the remainder of the term of the CIA. The OIG retains sole discretion over whether to permit the Drug Price Reporting and Sales and Marketing Engagements to be conducted internally by TAP and subject to validation by the IRO and Consultant after the fourth year of the CIA. In making its decision, the OIG will consider, among other factors, the results of the Drug Price Reporting and Sales and Marketing Engagements during the first four years of the CIA and TAP's demonstrated audit capabilities to perform the Engagements internally. If the OIG denies TAP's request to shift the audit responsibilities, TAP agrees to engage the IRO and Consultant to complete the remaining Drug Price Reporting and Sales and Marketing Engagements in accordance with the CIA. The Compliance Engagement shall be performed by the IRO for the first one-year period beginning with the Effective Date of the CIA.

---

[4] As explained below, one component of both the Drug Price Reporting Engagement and the Sales and Marketing Engagement shall be a systems review conducted pursuant to a consulting engagement. TAP may engage a separate Consultant to perform each systems review. Alternatively, at its discretion, TAP may engage a single entity (an IRO) to perform the systems reviews and the other components of the Drug Price Reporting Engagement and the Sales and Marketing Engagement.

d. *Retention and Submission of Records.*

For each year of the CIA, a complete copy of the IRO's and/or Consultant's Drug Price Reporting Engagement and Sales and Marketing Engagement Reports (including the Systems Review Consulting Engagement Reports referenced in Attachments B and C to this CIA) and, for the first year of the CIA only, the IRO's Compliance Engagement Report, shall be included in TAP's Annual Reports to OIG. The IRO and/or, as appropriate, Consultant and TAP shall retain and make available to the OIG upon request (to the extent not protected by appropriately asserted legal privileges) all supporting work papers and documentation, correspondence, and draft reports (those that are exchanged between the IRO or Consultant and TAP) relating to the Engagements.

2. *Drug Price Reporting Engagement.*

The Drug Price Reporting Engagement shall be composed of two separate reviews, a "Reported Prices Engagement" and a "Systems Review Consulting Engagement," both of which are described in detail in Attachment B to the CIA. Prior to conducting the Reported Prices Engagement, the IRO shall submit its Agreed Upon Procedures workplan(s) to the OIG for approval. Prior to conducting the Systems Review Consulting Engagement, the IRO or Consultant may submit its workplan(s) to the OIG for comment. However, any comments or recommendations made by the OIG in connection with a review of the submitted workplan(s) will not preclude the OIG from making further comments or recommendations for future workplan(s) after reviewing the Drug Price Reporting Engagement Report or the Systems Review Consulting Engagement Report.

3. *Sales and Marketing Engagement*

The Sales and Marketing Engagement shall consist of two separate reviews, a "Systems Review Consulting Engagement" and a "Documentation Review," both of which are described in detail in Attachment C to the CIA. Prior to conducting the Systems Review Consulting Engagement, the IRO or Consultant may submit its workplan(s) to the OIG for comment. Prior to conducting the Documentation Review, the IRO shall submit its Agreed Upon Procedures workplan(s) to the OIG for approval. However, any comments or recommendations made by the OIG in connection with a review of the submitted workplan(s) will not preclude the OIG from making further comments or recommendations for future workplan(s) after reviewing the Systems Review Consulting Engagement Report or the Documentation Review Report.

4.     *Compliance Engagement.*

The IRO shall conduct an engagement regarding TAP's compliance activities under which it shall review TAP's adherence to the obligations set forth in sections III through V and section VIII of this CIA ("Compliance Engagement"). The IRO shall prepare a report based upon the Compliance Engagement performed (the "Compliance Engagement Report"), which shall include the IRO's findings, supporting rationale, and a summary of such findings and rationale regarding TAP's compliance with the terms of sections III through V and section VIII of the CIA, as applicable.

5.     *Verification/Validation.*

In the event that the OIG has reason to believe that: (a) any of TAP's IRO or Consultant Engagements (or internal audits, if permitted under section III.E.1.c.) fails to conform to the requirements of this CIA, or (b) the findings of the reports from these Engagements or audits are inaccurate, the OIG may, at its sole discretion, conduct its own review ("Validation Review") to determine whether the Engagement or audit in question complies with the requirements of the CIA and/or the reported findings for the Engagement are inaccurate. TAP agrees to pay for the reasonable cost of any such review performed by the OIG or any of its designated agents so long as it is initiated before one year after the submission the final Annual Report submission or any additional materials requested by the OIG as described in section II.

Prior to initiating a Validation Review, the OIG shall notify TAP of its intent to do so and provide an explanation for believing why such a review is necessary. In order to resolve any concerns raised by the OIG, and upon request by TAP, the OIG agrees to meet with TAP representatives to discuss the results of any Engagement or audit submissions or findings; present any additional or relevant information to clarify the results of the Engagement or audit or to correct any inaccuracies; and/or propose alternatives to the proposed Validation Review. To the extent the information is not protected by appropriately asserted legal privileges, TAP agrees to provide any additional information as may be requested by the OIG under this section in an expedited manner. The OIG will attempt in good faith to resolve any IRO or Consultant Engagement or audit issues with TAP prior to conducting a Validation Review. However, the final determination as to whether to proceed with a Validation Review shall be made at the sole discretion of the OIG.

6.    *Independence Certification.*

Within 120 days from the Effective Date of this CIA, the IRO(s) and, as appropriate, the Consultant(s) shall provide to TAP a certification or sworn affidavit that it has evaluated its professional independence with regard to the Drug Price Reporting, Sales and Marketing and Compliance Engagements and that it has concluded that it is, in fact, independent. Such certification(s) shall be included in TAP's Implementation Report submission.

F.  Disclosure Program.

TAP presently has a disclosure program designed to facilitate communications relating to compliance with law and TAP's policies. During the term of the CIA, TAP shall maintain its Disclosure Program, which includes a mechanism (e.g., a toll-free compliance telephone line) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with TAP's policies, conduct, practices, or procedures with respect to a Federal health care program, believed by the individual to be a potential violation of criminal, civil or administrative law. TAP shall continue to appropriately publicize the existence of the disclosure mechanism (e.g., via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall emphasize a non-retribution, non-retaliation policy, and shall continue to include a reporting mechanism for anonymous, confidential communications. Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual. The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, TAP shall conduct an internal review of the allegations set forth in such a disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews. The disclosure log shall be available to OIG, upon request.

G. Ineligible Persons.

1. *Definition.* For purposes of this CIA, an "Ineligible Person" shall be any individual or entity who: (a) is currently excluded, debarred or otherwise ineligible to participate in the Federal health care programs or in Federal procurement or non-procurement programs; or (b) has been convicted of a criminal offense that is governed by 42 U.S.C. §1320a-7(a) related to the provision of health care items or services, but has not yet been excluded, debarred or otherwise declared ineligible.  For purposes of this section III.G., "Relevant Covered Person" shall be any Covered Persons: 1) whose job responsibilities include responsibility for complying with any requirements of the Medicaid Drug Rebate program; 2) who are involved in the calculating or reporting of any pricing data or other related information for Government Reimbursed Products; and 3) who are involved in the promotion, marketing or sales of Government Reimbursed Products.

2. *Screening Requirements.*  TAP shall not hire or engage as Relevant Covered Persons any Ineligible Person in connection with TAP's business operations related to Federal health care programs.  To prevent hiring or engaging any Ineligible Person, TAP shall screen all prospective Relevant Covered Persons prior to engaging their services by: (a) requiring applicants to disclose whether they are Ineligible Persons; and (b) reviewing the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at http://epls.arnet.gov) and the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.hhs.gov/oig) (these lists will hereinafter be referred to as the "Exclusion Lists").

3. *Review and Removal Requirement.* On or before January 31, 2002, TAP shall review its list of current Relevant Covered Persons against the Exclusion Lists. Thereafter, TAP shall review the list annually.  In addition, TAP shall require Relevant Covered Persons to disclose immediately any debarment, exclusion or other event that makes the individual an Ineligible Person.

If TAP has notice that a Relevant Covered Person has become an Ineligible Person, TAP shall remove such person from responsibility for, or involvement with, TAP's business operations related to the Federal health care programs and shall remove such person from any position for which the person's salary or the items or services rendered, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until

such time as the person is reinstated into participation in the Federal health care programs.

4. *Pending Charges and Proposed Exclusions.* If TAP has notice that a Relevant Covered Person is charged with a criminal offense related to any Federal health care program, or is proposed for exclusion during his or her employment or contract, TAP shall take all appropriate actions to ensure that the Relevant Covered Person's continued performance of his or her responsibilities shall not adversely affect the accuracy of any claims submitted to any Federal health care program.

H. Notification of Government Investigation or Legal Proceedings.

Within 30 days of discovery, TAP shall notify OIG, in writing, of any ongoing investigation or legal proceeding conducted or brought by a governmental entity or its agents involving an allegation that TAP has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. TAP shall also provide written notice to OIG within 30 days of the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the proceedings, if any.

IV. NEW BUSINESS UNITS OR LOCATIONS

In the event that, after the Effective Date of this CIA, TAP establishes or acquires new business units engaged in the contracting for, marketing, sales or price reporting of Government Reimbursed Products, TAP shall notify OIG of this fact as soon as possible, but no later than within 30 days of the date of the establishment or acquisition. This notification shall include the location of the new operation(s), phone number, fax number, Federal health care program provider number(s) (if any), and the corresponding contractor's name and address that has issued each provider number. All new Covered Persons at such business units shall be subject to the applicable requirements in this CIA (e.g., completing certifications and undergoing training).

V. IMPLEMENTATION AND ANNUAL REPORTS

A. Implementation Report. Within 120 days after the Effective Date of this CIA, TAP shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA. This Implementation Report shall include:

1. the name, address, phone number, position description, and summary of other non-compliance job responsibilities of the Compliance Officer required by section III.A.1.;

2. the names and positions of the members of the Compliance Committee required by section III.A.2.;

3. a copy of TAP's Code of Conduct required by section III.B.1.;

4. a copy of all compliance-related Policies and Procedures required by section III.B.2. and a summary of all other Policies and Procedures required by section III.B.2.;

5. a copy of all training materials used or to be used for the training required by section III.C., a description of such training programs and a summary of the activities undertaken in furtherance of these programs, including a schedule, topic outline and a description of the audiences for the training sessions held;

6. a certification by the Compliance Officer that:

   a. the Policies and Procedures required by section III.B.2. have been developed, are being implemented, and have been distributed to all appropriate Covered Persons;

   b. all Covered Persons have completed the Code of Conduct certification required by section III.B.1.;

   c. all Covered Persons have completed the applicable training and executed the certification(s) required by section III.C.; and

   d. in the event that the Compliance Officer cannot certify to these items in their entirety, the Compliance Officer shall provide an explanation of any deficiencies and a timetable for when the deficiencies will be remedied.

The documentation supporting this certification shall be available to OIG, upon request.

7. a description of the Disclosure Program required by section III.F.;

8. the identity of the IRO(s) and Consultants(s); a summary/description of all current engagements between TAP and the IRO or Consultant; and a description of all engagements between TAP and the IRO or Consultant relating to the work of or issues examined by the IRO or Consultant in connection with the Engagements required by this CIA; and the proposed start and completion dates of the first Engagements;

9. a certification from the IRO and, as appropriate, Consultant regarding its professional independence from TAP;

10. a summary of personnel actions (other than hiring) taken pursuant to section III.G.;

11. a list of all of TAP's locations (including locations and mailing addresses) except for home offices, the corresponding name under which each location is doing business, the corresponding phone numbers and fax numbers, and, if applicable, each location's Federal health care program provider identification number(s) and the contractor's name and address that issued each provider identification number;

12. to the extent not already furnished to OIG, or if modified, a description of TAP's corporate structure, including identification of any parent and sister companies, subsidiaries and their respective lines of business; and

13. the certification required by section V.C.

B. **Annual Reports**. TAP shall submit to OIG Annual Reports with respect to the status of, and findings regarding, TAP's compliance activities for each of the seven one-year periods beginning on the Effective Date of the CIA. (The one-year period covered by each Annual Report shall be referred to as "the Reporting Period.")

Each Annual Report shall include:

Corporate Integrity Agreement
TAP Pharmaceutical Products Inc.                    19

1. any change in the identity, position description, or other non-compliance job responsibilities of the Compliance Officer and any change in the membership of the Compliance Committee described in section III.A.;

2. a certification by the Compliance Officer that:

    a. all Covered Persons have completed any Code of Conduct certifications required by section III.B.1.;

    b. all Covered Persons have completed the applicable training and executed the certification(s) required by section III.C.;

    c. TAP has complied with its obligations under the Settlement Agreement: (i) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such denials of claims; (ii) not to charge to or otherwise seek payment from Federal or State payors for unallowable costs (as defined in the Settlement Agreement); and (iii) to identify and adjust any past charges or claims for unallowable costs; and

    d. TAP's Policies and Procedures, including its Operational Guidelines and Standard Operating Procedures (relating to drug samples), and the templates for the Control Documents (as the term is defined in Attachment C) have been reviewed by competent legal counsel and have been found to be in compliance with the requirements of the Federal anti-kickback statute, the Prescription Drug Marketing Act, and other applicable laws. If the applicable legal requirements have not changed, after the initial review of the documents listed above, only material changes to the documents must be reviewed by competent legal counsel. The certification shall include a description of the document(s) reviewed and approximately when the review was completed.

The documentation supporting this certification shall be available to OIG, upon request.

3. a summary of any significant changes or amendments to the Policies and Procedures required by section III.B. and the reasons for such changes (e.g., change in Federal health care program requirements) and copies of any Policies and Procedures;

4. a copy of all training materials used for the training required by section III.C. (to the extent it has not already been provided), a description of such training conducted during the Reporting Period, including a list of attendees, a topic outline of training sessions, and a schedule of when the training sessions were held;

5. a complete copy of all reports prepared pursuant to the IRO's and/or Consultant's Engagements required by this CIA, including, to the extent not already provided, a copy of the methodology used, along with a copy of the IRO's and/or Consultant's engagement letter;

6. TAP's response and corrective action plan(s) related to any issues raised by the IRO(s) or Consultant(s);

7. a revised summary/description of all engagements between TAP and the IRO or Consultant, as described in section V.A.8., if different than what was submitted as part of the Implementation Report;

8. a summary of the disclosures in the disclosure log required by section III.F. that relate to Federal health care programs;

9. a description of any personnel actions (other than hiring) taken by TAP as a result of the obligations in section III.G., and the name, title, and responsibilities of any person that falls within the ambit of section III.G.4., and the actions taken in response to the obligations set forth in that section;

10. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to section III.H. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

11. a description of all changes to the most recently provided list (as updated) of TAP's locations except home offices as required by section V.A.11., the corresponding name under which each location is doing business, the corresponding phone numbers and fax numbers, and, if applicable, each location's Federal health care program provider identification number(s), and the contractor name and address that issued each provider identification number; and

12. the certification required by section V.C.

The first Annual Report shall be submitted to the OIG no later than 120 days after the end of the first Reporting Period except for TAP's response to any issues raised by the IRO(s) or Consultant(s), which shall be submitted to the OIG no later than 150 days after the end of the first Reporting Period. Each subsequent Annual Report shall be submitted to OIG no later than 120 days after the end of each subsequent Reporting Period except for TAP's response to any issues raised by the IRO(s) or Consultant(s), which shall be submitted to the OIG no later than 150 days after the end of each subsequent Reporting Period.

C. Certifications.

The Implementation Report and Annual Reports shall include a certification by the Compliance Officer that: (1) except as otherwise described in the applicable report, TAP is in compliance with all of the requirements of this CIA, to the best of his or her knowledge; and (2) the Compliance Officer has reviewed the Report and has made reasonable inquiry regarding its content and believes that the information therein is accurate and truthful.

D. Designation of Information.

TAP shall clearly identify any portions of any of its submissions under this CIA that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. TAP shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI.   NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date of this CIA, all notifications and reports required under this CIA shall be submitted to the following entities:

OIG:

> Civil Recoveries Branch - Compliance Unit
> Office of Counsel to the Inspector General
> Office of Inspector General
> U.S. Department of Health and Human Services
> Cohen Building, Room 5527
> 330 Independence Avenue, SW
> Washington, DC 20201
> Phone:  202-619-2078
> Fax:     202-205-0604

TAP:

> Compliance Officer
> TAP Pharmaceutical Products Inc.
> 675 North Field Drive
> Lake Forest, IL  60045
> Phone: 800-621-1020
> Fax:     847-582-5006

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, messenger delivery (such as Federal Express, or its equivalent), hand delivery or other means, provided that there is proof that such notification was received.  For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt.

## VII.   OIG INSPECTION, AUDIT AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of TAP's books, records, and other documents and supporting materials (to the extent such items are not protected under appropriately asserted legal privileges) and/or conduct on-site reviews of any of TAP's locations for the purpose of verifying and evaluating:  (a) TAP's

compliance with the terms of this CIA; and (b) TAP's compliance with the applicable requirements of the Federal health care programs. The documentation described above shall be made available by TAP to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of TAP's Covered Persons who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. TAP's employees shall have the right to be represented by counsel and any such employee may, at his or her option, be accompanied by counsel for TAP and/or their personal counsel at any interview by the OIG. TAP agrees to assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. Notwithstanding such agreement, the OIG recognizes that individuals have the right to refuse to submit to interviews, and TAP shall not be obligated to require such individuals to submit to interviews. If any individual decides not to submit to an interview, such refusal shall not constitute a breach of this CIA. TAP's employees may elect to be interviewed with or without a representative of TAP present.

## VIII. DOCUMENT AND RECORD RETENTION

TAP shall maintain for inspection all documents and records relating to reimbursement to TAP from the Federal health care programs, or to compliance with this CIA, for eight years after the Effective Date of this CIA (or longer if otherwise required by law).

## IX. DISCLOSURES

The OIG shall follow all applicable Federal laws concerning privacy and confidentiality, including the Federal Privacy Act, 5 U.S.C. §552a, to the greatest extent allowed by law. Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, the OIG shall make a reasonable effort to notify TAP prior to any release by OIG of information submitted by TAP pursuant to its obligations under this CIA and identified upon submission by TAP as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, TAP shall have the rights set forth at 45 C.F.R. § 5.65(d). The OIG shall provide the pre-disclosure notice required pursuant to 45 C.F.R. §5.65(d) to the Compliance Officer at the address provided in section VI. Nothing in this CIA or any communication or report made pursuant to this CIA shall constitute or be construed as a waiver by TAP of TAP's

attorney-client, work product or other applicable privileges. Except as otherwise stated herein, the existence of any such privilege does not affect TAP's obligation to comply with the provisions of the CIA.

## X.   BREACH AND DEFAULT PROVISIONS

TAP is expected to fully and timely comply with all of its CIA obligations. A breach of this CIA does not constitute a breach of the Settlement Agreement or Plea Agreement between TAP and the United States executed contemporaneously herewith or the settlement agreements with the individual States referred to in the Preamble. Any breach of the terms of those agreements does not constitute a breach of this CIA, except to the extent that such a breach independently also constitutes a breach of this CIA. Section X of this CIA specifies all of the remedies available to the OIG if TAP fails to satisfy its obligations under this CIA. The remedies available to the OIG under this section X do not preempt or limit any actions that individual States may take against TAP under appropriate authorities not specified in this CIA.

A.   Stipulated Penalties for Failure to Comply with Certain Obligations. As a contractual remedy, TAP and OIG hereby agree that failure to comply with certain obligations set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1.   A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day TAP fails to have in place any of the obligations described in section III:

a. a Compliance Officer;

b. a Compliance Committee;

c. a written Code of Conduct;

d. written Policies and Procedures;

e. a requirement that Covered Persons be trained; and

f. a Disclosure Program.

2. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day TAP fails to retain an IRO or Consultant, as required in section III.E.1.a.

3. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day TAP fails to meet any of the deadlines for the submission of the Implementation Report or the Annual Reports to OIG.

4. A Stipulated Penalty of $2,000 (which shall begin to accrue 10 days after the date failure to comply began) for each day TAP engages as a Relevant Covered Person an Ineligible Person and that person: (i) has responsibility for, or involvement with, TAP's business operations related to the Federal health care programs; or (ii) is in a position for which the person's salary or the items or services rendered, ordered, or prescribed by the person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds (the Stipulated Penalty described in this paragraph shall not be demanded for any time period during which TAP can demonstrate that it did not discover the person's exclusion or other ineligibility after making a reasonable inquiry (as described in section III.G.) as to the status of the person).

5. A Stipulated Penalty of $1,500 for each day TAP fails to grant access to the information or documentation as required in section VII of this CIA. (This Stipulated Penalty shall begin to accrue on the date TAP fails to grant access.)

6. A Stipulated Penalty of $1,000 for each day TAP fails to comply substantially with any other obligation of this CIA. (A Stipulated Penalty as described in this paragraph shall not be demanded for any violation for which the OIG has sought a Stipulated Penalty under paragraphs 1-5 of this section.) In its notice to TAP, OIG shall state the specific grounds for its determination that TAP has failed to comply substantially and adequately with the CIA obligation(s) at issue and steps that TAP must take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after the date that OIG provides notice to TAP of the failure to comply.)

B. Timely Written Requests for Extensions.

TAP may, in advance of the due date, submit a timely written request for an extension of time to perform any act or submit any notification or report required by this CIA. Notwithstanding any other provision in this section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for

Corporate Integrity Agreement
TAP Pharmaceutical Products Inc.                    26

failure to perform the act or file the notification or report shall not begin to accrue until one day after TAP fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or submit the notification or report shall not begin to accrue until three business days after TAP receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

C. Payment of Stipulated Penalties.

1. *Demand Letter.* Upon a finding that TAP has failed to comply with any of the obligations described in section X.A. and after determining that Stipulated Penalties are appropriate, OIG shall notify TAP in writing of: (a) TAP's failure to comply; and (b) the OIG's exercise of its contractual right to demand payment of the Stipulated Penalties (this notification is hereinafter referred to as the "Demand Letter"). Such Demand Letter shall specifically state the conduct that the OIG contends constitutes the basis for imposing the Stipulated Penalty.

2. *Response to Demand Letter.* Within 10 days of the receipt of the Demand Letter, TAP shall either: (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties; or (b) request a hearing before an HHS administrative law judge ("ALJ") to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in section X.E. In the event TAP elects to request an ALJ hearing and does not prevail, the Stipulated Penalties shall continue to accrue until TAP cures, to OIG's satisfaction, the alleged breach in dispute. Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under section X.D.

3. *Form of Payment.* Payment of the Stipulated Penalties shall be made by certified or cashier's check, payable to: "Secretary of the Department of Health and Human Services," and submitted to OIG at the address set forth in section VI.

4. *Independence from Material Breach Determination.* Except as set forth in section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that TAP has materially breached this CIA,

which decision shall be made at OIG's discretion and shall be governed by the provisions in section X.D, below.

D. Exclusion for Material Breach of this CIA

1. *Definition of Material Breach.* A material breach of this CIA means:

a. a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in section X.A.;

b. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with section X.C.; or

c. a failure to retain and use an IRO or Consultant in accordance with section III.E.

2. *Notice of Material Breach and Intent to Exclude.* The parties agree that a material breach of this CIA by TAP constitutes an independent basis for TAP's exclusion from participation in the Federal health care programs. Upon a determination by OIG that TAP has materially breached this CIA and that exclusion should be imposed, OIG shall notify TAP of: (a) TAP's material breach; and (b) OIG's intent to exercise its contractual right to impose exclusion (this notification is hereinafter referred to as the "Notice of Material Breach and Intent to Exclude").

3. *Opportunity to Cure.* TAP shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

a. TAP is not in material breach of this CIA;

b. the alleged material breach has been cured; or

c. the alleged material breach cannot be cured within the 30-day period, but that: (i) TAP has begun to take action to cure the material breach; (ii) TAP is pursuing such action with due diligence; and (iii) TAP has provided to OIG a reasonable timetable for curing the material breach.

4. *Exclusion Letter*. If at the conclusion of the 30-day period, TAP fails to satisfy the requirements of section X.D.3., OIG may exclude TAP from participation in the Federal health care programs, subject to TAP's rights set forth in section X.E. OIG will notify TAP in writing of its determination to exclude TAP (this letter shall be referred to hereinafter as the "Exclusion Letter"). Subject to the Dispute Resolution provisions in section X.E., below, the exclusion shall go into effect 30 days after the date of the Exclusion Letter. The exclusion shall have national effect and shall also apply to all other Federal procurement and non-procurement programs. Reinstatement to program participation is not automatic. If at the end of the period of exclusion, TAP wishes to apply for reinstatement, TAP must submit a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

E. Dispute Resolution

1. *Review Rights*. Upon OIG's delivery to TAP of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, TAP shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS Departmental Appeals Board ("DAB"), in a manner consistent with the provisions in 42 C.F.R. §§ 1005.2-1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 business days of the receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days of receipt of the Exclusion Letter.

2. *Stipulated Penalties Review*. Notwithstanding any provision of Title 42 of the United States Code or Chapter 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether TAP was in full and timely compliance with the obligations of this CIA for which the OIG demands payment; and (b) the period of noncompliance. TAP shall have the burden of proving its full and timely compliance with the obligations at issue and the steps taken to cure the noncompliance, if any. If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders TAP to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless TAP requests review of the ALJ decision by the DAB. If the ALJ decision is properly

appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

3. *Exclusion Review.* Notwithstanding any provision of Title 42 of the United States Code or Chapter 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

> a. whether TAP was in material breach of this CIA;

> b. whether such breach was continuing on the date of the Exclusion Letter; and

> c. whether the alleged material breach could not have been cured within the 30 day period, but that:

>> (i) TAP had begun to take action to cure the material breach within that period;

>> (ii) TAP has pursued and is pursuing such action with due diligence; and

>> (iii) TAP provided to OIG within that period a reasonable timetable for curing the material breach and TAP has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for TAP, only after a DAB decision in favor of OIG. TAP's election of its contractual right to appeal to the DAB shall not abrogate the OIG's authority to exclude TAP upon the issuance of an ALJ's decision in favor of the OIG. If the ALJ sustains the determination of the OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that TAP may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. TAP agrees that receipt of the ALJ or DAB decision constitutes notice of exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB.

## XI.  EFFECTIVE AND BINDING AGREEMENT

Consistent with the provisions in the Settlement Agreement, into which this CIA is incorporated, TAP and OIG agree as follows:

A. This CIA shall be binding on the successors, assigns, and transferees of TAP; however, the CIA shall not apply to the individuals or products of an acquiring company or a company merging with TAP except to the extent the individuals associated with that company become involved in the sales, marketing or pricing of, or Medicaid Drug Rebate program obligations associated with, TAP's Government Reimbursed Products (as defined in this CIA);

B. This CIA shall become final and binding on the date the final signature is obtained on the CIA;

C. Any modifications to this CIA shall be made with the prior written consent of the parties to this CIA and the CIA will be subject to modifications if so required by any change in Federal health care program requirements as referenced in the Preamble to this CIA;

D. The undersigned TAP signatories represent and warrant that they are authorized to execute this CIA. The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

ON BEHALF OF TAP PHARMACEUTICALS PRODUCTS INC.


_H. Thomas Watkins_
H. Thomas Watkins
President
TAP Pharmaceutical Products Inc.

September 28, 2001
DATE


_Kenneth D. Greisman_
Kenneth D. Greisman
Senior Counsel and Assistant Secretary
TAP Pharmaceutical Products Inc.

September 28, 2001
DATE


Daniel E. Reidy, Esq.
Jones, Day, Reavis & Pogue

DATE


Joseph F. Savage, Jr., Esq.
Testa, Hurwitz & Thibeault, LLP

DATE

ON BEHALF OF TAP PHARMACEUTICALS PRODUCTS INC.

_____          _____
H. Thomas Watkins                         DATE
President
TAP Pharmaceutical Products Inc.


_____          _____
Kenneth D. Greisman                       DATE
Senior Counsel and Assistant Secretary
TAP Pharmaceutical Products Inc.


_____          9/26/01
Daniel E. Reidy, Esq.                     DATE
Jones, Day, Reavis & Pogue


_____          9/28/01
Joseph F. Savage, Jr., Esq.               DATE
Testa, Hurwitz & Thibeault, LLP

ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

Lewis Morris
Assistant Inspector General for Legal Affairs
Office of Inspector General
U. S. Department of Health and Human Services

9/28/01
DATE

**Attachment A To CIA**
**TAP Pharmaceutical Products Inc.**

### CERTIFICATION

In accordance with the Corporate Integrity Agreement ("CIA") entered between TAP Pharmaceutical Products Inc. ("TAP") and the OIG, the undersigned hereby certifies that the attached Average Sale Price information has been communicated to First DataBank Inc. (and/or other price reporting entity as specified in the CIA); to the State Medicaid programs of those States which executed settlement agreements with TAP, as required; to the OIG; and to the Centers for Medicare & Medicaid Services and that it has been calculated in accordance with the methodology described generally in the CIA and more specifically in the attached document.

_____
Signature

_____
Title

_____
Date

## Attachment B to CIA for TAP Pharmaceutical Products Inc.

### Drug Price Reporting Engagement

## I.  Drug Price Reporting Engagement

Each year during the term of the CIA, an Independent Review Organization ("IRO") or Consultant, as explained below, shall review TAP's systems, policies and practices relating to the calculation and reporting of Average Sale Price and Best Price during each one year period covered by the Drug Price Reporting Engagement ("the Reporting Period"). Consistent with section III.E.1.c. of the CIA, after the fourth Reporting Period, the OIG may, at its discretion and upon request of TAP, permit TAP to perform the engagement described in this Attachment B (subject to validation by the IRO or Consultant, as appropriate). The Drug Price Reporting Engagement shall consist of two separate components: 1) a Reported Prices Engagement, and 2) a Systems Review Consulting Engagement. TAP may engage, at its discretion, a single entity to perform the Systems Review Consulting Engagement and the Reported Prices Engagement, provided that the entity has the necessary expertise and capabilities to perform both.

Prior to performing the Reported Prices Engagement, the IRO and TAP shall design agreed upon procedures as defined in the AICPA "attest standards" for Agreed Upon Procedures Engagements (hereafter "Agreed Upon Procedures") outlining the specific work to be performed by the IRO, and the Agreed Upon Procedures shall be submitted to the OIG for approval. Prior to performing the Systems Review Consulting Engagement, the Consultant and TAP shall design a workplan outlining the specific work to be performed by the Consultant. The Consultant's workplan may be submitted to the OIG for comment. The Engagements are described in general terms below.

## A.  Reported Prices Engagement

The Reported Prices Engagement shall be designed to allow for evaluation of whether TAP is reporting Average Sale Price and Best Price in accordance with its obligations under the CIA and the requirements of the Medicaid Drug Rebate program (codified at 42 U.S.C. § 1396r-8), respectively. The Reported Prices Engagement shall consist of two parts, "Reported Prices Procedures for Average Sale Price" and "Reported Prices Procedures for Best Price."

Attachment B to CIA
TAP Pharmaceutical Products Inc.

## 1. Reported Prices Procedures for Average Sale Price

For each Reporting Period, the IRO shall conduct Reported Prices Procedures for Average Sale Price to determine whether TAP calculated and reported Average Sale Price in accordance with the CIA requirements. The Procedures shall require the IRO to select and test samples of transactions (consisting of sales and sales-related activities, for individual Government Reimbursed Products to individual purchasers or other entities, that are specifically included in or excluded from the Average Sale Price (as defined in section III.D.2.a. of the CIA) (hereafter "Transactions")). The IRO will also select and test samples of Estimated Transactions (as defined below) used in the calculation of Average Sale Prices in order to perform procedures regarding TAP's accrual methodologies as described in the certification referenced in section III.D.2.c. of the CIA.

### a. Grouping and Testing of Transactions

The IRO shall begin its Agreed Upon Procedures by selecting and testing samples of Transactions (as grouped by TAP) from the Reporting Period. All Transactions that were finalized at the time of sale shall be grouped by transaction type (hereafter "Like-Kind Transactions")[1]. All transactions that were estimated (based on TAP's accrual methodology) during at least one quarter of the Reporting Period and were finalized during the Reporting Period shall also be grouped together (hereafter "Estimated Transactions"). The sum of all grouped Like-Kind Transactions and Estimated Transactions shall be deemed to be all Transactions that occurred during the Reporting Period. Each group of Like-Kind Transactions and the Estimated Transactions will be considered a separate universe from which the IRO will test a probe sample and, if required as set forth below, a statistically valid random sample of Transactions.

With regard to all grouped Like-Kind Transactions, the IRO will test for the following attributes: 1) whether the Transaction prices are supported by source

---

[1]     Examples of the Like-Kind Transactions to be tested may include, but not be limited to: sales; volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; replacement goods; cash disbursements to purchasers; and other price concessions or incentives provided by TAP.

-2-

Attachment B to CIA
TAP Pharmaceutical Products Inc.

documents; and 2) whether TAP properly included or excluded each Transaction in the calculation of Average Sale Price under the definition of that term as set forth in section III.D.2.a. of the CIA.

With regard to the Estimated Transactions, the IRO shall test for the following attributes: 1) whether the recorded Estimated Transaction amounts were supported by commercial arrangements or other source documentation; 2) whether the Estimated Transactions were properly included or excluded in the calculation of Average Sale Price; 3) whether after the transactions became final, TAP reviewed the Estimated Transaction amounts in light of actual experience (including TAP's contract(s) with the customer, the customer's purchasing history, TAP's rebate policy or other relevant information); 4) whether the actual experience (as reviewed in Item 3 above) supported the recorded Estimated Transaction amount(s); and 5) if the actual experience did not support the recorded Estimated Transaction amounts, whether TAP adjusted the amounts during the Reporting Period.

### b. *Sampling of Transactions*

The IRO shall initially test a probe sample of Transactions from each group of Like-Kind Transactions and Estimated Transactions. If the error rate for any of the probe samples falls below an identified threshold error rate, no further testing of the universe of Like-Kind Transactions or Estimated Transactions shall be required. If the error rate in any of the probe samples exceeds an identified threshold error rate, the IRO shall test a statistically valid random sample of Transactions or Estimated Transactions from that universe of Transactions. The size of the probe samples, the size of any required statistically valid random sample(s), the allocation of Transactions into universes, and the threshold error rate shall be agreed upon by TAP, the OIG and the IRO as an element of the Agreed Upon Procedures.

The probe samples and, if necessary, any subsequent statistically valid random samples shall be generated through the use of the OIG's Office of Audit Services Statistical Sampling Software, also known as "RAT-STATS" (which is available through the Internet at www.hhs.gov/oas/ratstat.html) or through the use of another method of random sampling acceptable to the OIG.

-3-

Attachment B to CIA
TAP Pharmaceutical Products Inc.

### 2. Reported Prices Procedures for Best Price

For each Reporting Period, the IRO shall conduct the Reported Prices Procedures for Best Price to determine whether TAP calculated and reported Best Price to CMS for Government Reimbursed Products in accordance with the applicable requirements of the Medicaid Drug Rebate program. The Procedures shall require the IRO to select and test samples of transactions (consisting of sales and sales-related activities, for individual Government Reimbursed Products to individual purchasers or other entities, that are specifically included in or excluded from the calculation of Best Price, (hereafter "Best Price Transactions")).

### a. Grouping and Testing of Like-Kind Best Price Transactions

The IRO shall begin its Agreed Upon Procedures by selecting and testing samples of like-kind Best Price Transactions [2] (as grouped by TAP) from the Reporting Period. The sum of all Best Price Transactions in all the like-kind Best Price Transaction groups combined shall equal the sum of all Best Price Transactions that occurred during the Reporting Period. Each group of like-kind Best Price Transactions will be considered a separate universe from which the IRO will review a probe sample and, if required as set forth below, a statistically valid random sample of Best Price Transactions.

With regard to all grouped like-kind Best Price Transactions, the IRO will test whether: 1) the Medicaid Rebate Transaction prices are supported by source documents; and 2) TAP properly included or excluded each Best Price Transaction in the calculation of Best Price in accordance with 42 U.S.C.§ 1396r-8(c)(1)(C) or other applicable Medicaid Drug Rebate program requirements. The IRO shall also identify those instances in which TAP reported adjusted Best Price amounts to CMS based on the IRO's

---

[2]       Examples of like-kind Best Price Transactions to be tested may include, but not be limited to: sales; volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates paid to customers or credited to customers' accounts; replacement goods; cash disbursements to purchasers; and all other price concessions or incentives provided by TAP.

Attachment B to CIA
TAP Pharmaceutical Products Inc.

Reported Prices Procedures for Best Price and shall report the amounts of any adjustments to the reported Best Prices.

    *b. Sampling of Like-Kind Best Price Transactions*

    The IRO shall initially test a probe sample of Best Price Transactions from each group of like-kind Best Price Transactions. If the error rate for any of the probe samples falls below an identified threshold error rate, no further testing of the universe of like-kind Best Price Transactions shall be required. If the error rate in any of the probe samples exceeds an identified threshold error rate, the IRO shall test a statistically valid random sample of Best Price Transactions from that universe of like-kind Best Price Transactions. The size of the probe sample, the size of any statistically valid random sample, and the threshold error rate shall be agreed upon by TAP, the OIG and the IRO as an element of the Agreed Upon Procedures.

    The probe samples and, if necessary, any subsequent statistically valid random samples shall be generated through the use of the OIG's Office of Audit Services Statistical Sampling Software, also known as "RAT-STATS" (which is available through the Internet at www.hhs.gov/oas/ratstat.html) or through the use of another method of random sampling acceptable to the OIG.

## II.    Systems Review Consulting Engagement

    For each Reporting Period, TAP will retain a Consultant to review its price calculation and reporting systems as they relate to Government Reimbursed Products ("the Systems Review Consulting Engagement"). This Systems Review Consulting Engagement shall provide for a review of the following:

    1. TAP's systems and operations relating to the calculation and reporting of Average Sale Price as required by section III.D. of the CIA;

    2. TAP's systems and operations relating to the identification and correction of any inaccurate pricing information (*e.g.* Average Sale Prices), if any, provided to the

Attachment B to CIA
TAP Pharmaceutical Products Inc.

1. for each universe of Like-Kind Transactions and Estimated Transactions tested, the IRO shall describe the procedures performed and state its findings and supporting evidence as to whether the Transactions and Estimated Transactions tested satisfied the corresponding criteria outlined in section I.A.1. above;

2. for each universe of Like-Kind Transactions and Estimated Transactions, the IRO shall state the percentage error rate discovered;

3. for each universe of Like-Kind Transactions or Estimated Transactions for which the error rate exceeded the identified threshold error rate, and the IRO tested a statistically valid random sample, the IRO shall state its findings and supporting evidence based upon the testing of the larger sample;

4. for each universe of like-kind Best Price Transactions, the IRO shall describe the procedures performed and state its findings and supporting evidence as to whether the Best Price Transactions tested satisfied the criteria outlined in section I.A.2. above;

5. for each universe of like-kind Best Price Transactions, the IRO shall state the percentage error rate discovered, describe any instances in which Best Price adjustments were reported to CMS as a result of the IRO's Reported Prices Procedures for Best Price and the amounts of any adjustments to the reported Best Prices; and

6. for each universe of like-kind Best Price Transactions for which the error rate exceeded the identified threshold error rate, and the IRO tested a statistically valid random sample, the IRO shall state its findings and supporting evidence based upon the testing of the larger sample.

## IV. Systems Review Consulting Engagement Report

For each Reporting Period, the Consultant shall prepare a report based upon the Systems Review Consulting Engagement ("Systems Review Consulting Engagement Report"). Each Report shall include the following:

-7-

Attachment B to CIA
TAP Pharmaceutical Products Inc.

State Medicaid programs, CMS, the OIG, and drug price reporting services to which TAP reports prices;

3. TAP's systems and operations relating to the calculation and reporting of Best Price as required under the Medicaid Drug Rebate program; and

4. TAP's systems and operations relating to the identification and correction of any inaccurate pricing information relating to the Medicaid Drug Rebate program, if any, provided to CMS or the State Medicaid programs in accordance with all applicable requirements of the Medicaid Drug Rebate program.

**III.    Drug Price Reporting Engagement Report**

The IRO shall annually prepare a report based upon the Drug Price Reporting Engagement. Each report shall include the following information:

**A. Elements to Be Included:**

1. Engagement Objectives: A statement of the objectives intended to be achieved by the Drug Price Reporting Engagement;

2. Review Protocol: A detailed narrative description of the procedures performed and a description of each sampling unit and universe utilized in performing the procedures; and

3. Sources of Data: A full description of the documentation relied upon by the IRO when performing the Drug Price Reporting Engagement.

**B. Results to Be Included:**

The following results shall be included in each Drug Price Reporting Engagement Report:

-6-

Attachment B to CIA
TAP Pharmaceutical Products Inc.

a) a description of the Systems Review Consulting Engagement performed (including a description of the documentation reviewed);

b) a description of any identified weaknesses in TAP's systems and operations relating to the calculation and reporting of Average Sale Price and Best Price;

c) a description of any identified weaknesses in TAP's systems and operations relating to the identification and correction of any inaccurate pricing information (including, but not limited to, Average Sale Price or Best Price), if any, provided to the State Medicaid programs, CMS, the OIG and to any drug price reporting services to which TAP reports in connection with reimbursement under Federal health care programs;

d) a description of any recommendations the Consultant may have to improve any of TAP's systems and operations relating to the calculation and reporting of Average Sale Price or Best Price;

e) a description of any recommendations the Consultant may have to improve any of TAP's systems and operations relating to the identification and correction of any inaccurate pricing information provided to the State Medicaid programs, CMS, the OIG and to any drug price reporting services to which TAP reports.

The Consultant's Systems Review Consulting Engagement Report will be restricted solely to use by TAP management, and TAP will provide the final Report to the OIG as part of the Annual Report submission.

-8-

Attachment C to CIA
TAP Pharmaceutical Products Inc.

## Attachment C to CIA for TAP Pharmaceutical Products Inc.
## Sales and Marketing Engagement

## I. Sales and Marketing Engagement

Each year during the term of the CIA, an Independent Review Organization ("IRO") or Consultant, as explained below, shall review TAP's systems, policies and practices relating to the sales and marketing of Government Reimbursed Products (as defined in section III.B.1 of the CIA) for the one year period covered by the Sales and Marketing Engagement ("the Reporting Period"). Consistent with section III.E.1.c. of the CIA, after the fourth Reporting Period, the OIG may, at its discretion and upon request of TAP, permit TAP to perform the engagements described in this Attachment C (subject to validation by the IRO or Consultant). TAP may engage, at its discretion, a single entity to perform the Systems Review Consulting Engagement and the Documentation Review, explained below, provided that the entity has the necessary expertise and capabilities to perform both. The two Engagements are described in general terms in sections I.A. and I.B. below.

The Sales and Marketing Engagement shall consist of two separate components. The first (the "Systems Review Consulting Engagement") shall be a review by a Consultant of TAP's sales and marketing systems, policies and practices (including the controls on those systems, policies and practices) as they relate to several specified types of activities. Prior to performing the Systems Review Consulting Engagement, the Consultant and TAP shall design a workplan outlining the specific work to be performed by the Consultant. The workplan may be submitted to the OIG for comment.

The second component of the Sales and Marketing Engagement (the "Documentation Review") shall be a review by an IRO of samples of control documentation used in connection with TAP's sales and marketing related practices during the Reporting Period. Prior to performing the Documentation Review, the IRO and TAP shall design agreed upon procedures as defined in the AICPA "attest standards" for Agreed Upon Procedures Engagements (hereafter "Agreed Upon Procedures") outlining the specific work to be performed by the IRO, and the Agreed Upon Procedures shall be submitted to the OIG for approval.

1

Attachment C to CIA
TAP Pharmaceutical Products Inc.

## A. Sales and Marketing Systems Review Consulting Engagement

For each Reporting Period, the Consultant shall review TAP's sales and marketing related systems, policies and practices pertaining to the following types of activities engaged in with purchasers or prescribers:

a) retention of physicians and other purchasers and/or prescribers of Government Reimbursed Products for consulting, speaking and other advisory fee-for-service arrangements;

b) sponsorship of speaking engagements, meetings or other events (*e.g.*, TAP Speakers Programs, Local Event Programs, *etc.*);

c) awarding or payment of educational grants;

d) awarding or payment of clinical and research grants;

e) expenditures for third party advice about reimbursement or claims submissions for Government Reimbursed Products;

f) provision of gifts;

g) provision of or payment for business courtesies;

h) provision of or payment for customer assistance programs;

i) provision of debt forgiveness, debt reduction, or other like assistance to customers; and

j) provision of drug samples.

This list of activities shall hereafter be referred to as the "Sales and Marketing Related Activities" or the "Activities."

## 1. Review of Sales and Marketing Related Systems, Policies and Practices

For each Reporting Period, the Consultant shall review TAP's systems, policies and practices in connection with each of the Sales and Marketing Related Activities.

In general terms, the Consultant shall review the following for each of the Sales and Marketing Related Activities:

a) whether TAP has instituted control and accountability systems (*e.g.*, documentation and approval requirements) and written policies regarding the Activity;

b) the manner in which the control and accountability systems and the written policies are made known or disseminated within TAP;

c) what disciplinary measures TAP has established for failure to comply

2

Attachment C to CIA
TAP Pharmaceutical Products Inc.

## B. Sales and Marketing Documentation Review

### 1. General Description of Documentation Review

TAP's Policies and Procedures (referenced in section III.B.2. of the CIA), including TAP's Operational Guidelines and Standard Operating Procedures (hereafter collectively "TAP's Policies"), set forth certain requirements relating to control documents used in connection with the Sales and Marketing Related Activities.

#### a. Control Documents to Be Reviewed

For purposes of this Sales and Marketing Documentation Review, the following categories of control documents ("Control Documents") shall be reviewed:

1. Speakers Agreements and related documentation (*e.g.,* Speaker Information Forms and Speaker Expense Forms);
2. Form agreements for consultation or other non-speaking arrangements;
3. Letters of Agreement (used for educational grants);
4. Agreements relating to clinical or research grants;
5. Administrative Check Requests; and
6. Expense Reports (used for gifts, business courtesies, customer assistance programs, *etc.*).

#### b. Attributes to Be Tested

During each Reporting Period, the IRO shall follow the Agreed Upon Procedures and test samples of Control Documents for the following attributes:

1. whether the Control Documents were completed in accordance with the requirements set forth in the TAP's Policies;
2. whether the Control Documents reflect that all required written approvals were obtained in accordance with TAP's Policies; and
3. for each Control Document reviewed, whether all supporting documentation (*e.g.,* receipts) and follow-up documentation (*e.g.,* progress and final reports produced in connection with grants) exists in appropriate files in accordance with TAP's Policies.

4

with the control and accountability systems and written policies; and
d) the number of instances and the circumstances in which TAP took
disciplinary actions for failure to comply with the systems and
policies.

To conduct the review, the Consultant shall review appropriate corporate
documentation and may also interview TAP personnel (*e.g.*, the Compliance Officer) as
appropriate to allow it to report the findings identified in section I.A.2. below.

## 2. Systems Review Consulting Engagement Report

For each Reporting Period, the Consultant shall prepare a report based upon the
Systems Review Consulting Engagement performed ("Systems Review Consulting
Engagement Report"). Each Report shall include the following items for each of the
Sales and Marketing Related Activities:

a) a description of the documentation reviewed and any personnel
interviewed;
b) a general description of TAP's control and accountability systems and
written policies and actual practices;
c) a description of the manner in which the control and accountability
systems and written policies are disseminated or made known within
TAP;
d) a general description of the disciplinary measures TAP has established
for failure to comply with the control and accountability systems and
written policies;
e) a description of the number of instances and a description of the
circumstances in which TAP undertook disciplinary actions for
failure to comply with the systems and policies;
f) the findings and supporting rationale regarding the weaknesses in TAP's
sales and marketing related systems, policies and practices; and
g) any recommendations to improve any of TAP's sales and marketing
related systems, policies or practices.

The Consultant's Systems Review Consulting Engagement Report will be
restricted solely to use by TAP management, and TAP will provide the final Report to the
OIG as part of the Annual Report submission.

Attachment C to CIA
TAP Pharmaceutical Products Inc.

The IRO shall conduct an attribute test of the samples of Control Documents using the three criteria set forth above and shall identify errors in the Control Documents in accordance with the protocols contained in the Agreed Upon Procedures. The IRO and TAP, in consultation with the OIG, will define what constitutes a material error for purposes of triggering the additional review as set forth in section I.B.3. below. Specifically, if the IRO calculates an overall material error rate of five percent (5%) or greater for any universe of Control Documents reviewed, it shall conduct the additional review explained below.

## 2. Sampling of Control Documents

For each Reporting Period, the IRO shall follow the Agreed Upon Procedures to test a total of 800 Control Documents, half of which shall relate to Sales and Marketing Related Activities for Lupron Depot® ("Lupron") and the other half of which shall relate to Sales and Marketing Related Activities for Prevacid® ("Prevacid"). The IRO shall select the Control Documents to be reviewed in the following manner.

### a. Review of Control Documents Relating to Lupron Sales and Marketing

1. The IRO shall select 320 (eighty percent (80%)) of the Control Documents to be reviewed from those Control Documents reflecting transactions involving the largest volume purchasers of Lupron during the Reporting Period (the "Large Volume Purchasers").

2. The IRO, with assistance from TAP, shall identify the Large Volume Purchasers and rank them in descending order according to purchase volume, with the purchaser of the largest volume of Lupron (the "Largest Volume Purchaser") being ranked first.

3. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Volume Purchaser during the Reporting Period.

4. The IRO shall identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Volume Purchasers, in turn, until the IRO has identified a total of 320 Control Documents. (For instance, if transactions involving the Largest Volume Purchaser were

5

reflected in twenty Control Documents, the IRO would then select and review a total of 300 Control Documents relating to transactions with other Large Volume Purchasers.)

5. The remaining 80 (twenty percent (20%)) of the Control Documents to be reviewed shall be selected from among those Control Documents reflecting transactions with purchasers who had the largest percentage increase in the volume of Lupron purchased during the Reporting Period (as compared to the immediately preceding Reporting Period) ("Large Percentage Increase Purchasers").

6. The IRO, with assistance from TAP, shall list the Large Percentage Increase Purchasers and rank them in descending order of percentage volume increase, with the purchaser having the largest percentage volume increase being ranked first ("Largest Percentage Increase Purchaser").

7. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Percentage Increase Purchaser during the Reporting Period.

8. The IRO shall then identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Percentage Increase Purchasers, in turn, until the IRO has identified a total of 80 Control Documents.

9. Each set of Control Documents reviewed (those for the Large Volume Purchasers and those for the Large Percentage Increase Purchasers) shall be considered a separate universe for purposes of calculating an error rate.

10. After selecting the two universes of Control Documents to be evaluated, the IRO shall review the Control Documents using the criteria set forth in section I.B.1. and determine an error rate for each universe.

## b. *Review of Control Documents Relating to Prevacid Sales and Marketing*

For each Reporting Period, the IRO shall follow Agreed Upon Procedures to test 400 Control Documents relating to the sales of Prevacid in a manner similar to that in which the Lupron-related Control Documents were tested.

Attachment C to CIA
TAP Pharmaceutical Products Inc.

1. The IRO shall select 320 (eighty percent (80%)) of the Control Documents to be reviewed from those Control Documents reflecting transactions involving the largest volume prescribers of Prevacid during the Reporting Period (the "Large Volume Prescribers").

2. The IRO, with assistance from TAP, shall identify the Large Volume Prescribers and rank them in descending order according to the volume of Prevacid prescribed, with the largest volume prescriber (the "Largest Volume Prescriber") being ranked first.

3. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Volume Prescriber during the Reporting Period.

4. The IRO shall identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Volume Prescribers, in turn, until the IRO has identified a total of 320 Control Documents.

5. The remaining 80 (twenty percent (20%)) of the Control Documents to be reviewed shall be selected from among those Control Documents reflecting transactions involving prescribers who had the largest percentage increase in the amount of Prevacid prescribed during the Reporting Period (as compared to the immediately preceding Reporting Period) ("Large Percentage Increase Prescribers").

6. The IRO, with assistance from TAP, shall list the Large Percentage Increase Prescribers and rank them in descending order of percentage volume increase, with the prescriber having the largest percentage volume increase being ranked first ("Largest Percentage Increase Prescriber").

7. The IRO shall identify all the Control Documents reflecting transactions between TAP and the Largest Percentage Increase Prescriber during the Reporting Period.

8. The IRO shall then identify all the Control Documents reflecting transactions between TAP and each of the next successive Large Percentage Increase Prescribers, in turn, until the IRO has identified a total of 80 Control Documents.

7

Attachment C to CIA
TAP Pharmaceutical Products Inc.

9. Each set of Control Documents reviewed (those for the Large Volume Prescribers and those for the Large Percentage Increase Prescribers) shall be considered a separate universe for purposes of calculating an error rate.

10. After selecting the two universes of Control Documents to be evaluated, the IRO shall review the Control Documents using the criteria set forth in section I.B.1. and determine an error rate for each universe.

## 3. Additional Review if Material Error Rates Are Five Percent or Greater

If the IRO finds a material error rate in any of the four universes of reviewed Control Documents of five percent (5%) or greater, the IRO shall conduct an additional review of the transactions reflected in the erroneous Control Documents for that universe. The IRO will conduct this additional review by performing Agreed Upon Procedures designed to determine the cause of the errors. As referenced in section I.B.1.b. when establishing the Agreed Upon Procedures, the IRO and TAP, in consultation with the OIG, shall agree what constitutes a material error for purposes of calculating the five percent error rate and shall agree, depending on the nature of the material error, what additional review should be conducted by the IRO to determine the cause of the identified errors. For instance, where necessary, the IRO may need to review additional documentation and/or conduct interviews to identify the cause of the errors.

## 4. Documentation Review Report

The IRO shall annually prepare a report based upon each Documentation Review performed ("Documentation Review Report"). Each Documentation Review Report shall include the following:

*a. Elements to Be Included:*

1. Engagement Objectives: A statement of the objectives intended to be achieved by the Documentation Review;

2. Review Protocol: A detailed narrative description of the procedures performed and a description of each sampling unit and universe utilized in performing the procedures; and

3. Sources of Data: A full description of documentation relied upon by the

8

Dated: _____

_____
Thomas M. Sobol
LIEFF CABRASER HEIMANN & BERNSTEIN
175 Federal St., 7th Fl.
Boston, MA  02110-2221
(617) 720-5000
(617) 720-5015 (facsimile)
PLAINTIFFS' CLASS CO-LEAD COUNSEL AND
PLAINTIFFS' LIASON COUNSEL

Dated: _____

_____
Jeffrey L. Kodroff
SPECTOR, ROSEMAN & KODROFF
1818 Market St., Ste. 2500
Philadelphia, PA  19103
(215) 496-0300
(215) 496-6611 (facsimile)
PLAINTIFFS' CLASS CO-LEAD COUNSEL

Dated: _____

_____
Michael D. Hausfeld
COHEN, MILSTEIN, HAUSFELD & TOLL
1100 New York Avenue, N.W.
Suite 500
Washington, DC 20005
(202) 408-4600
(202) 408-4699 (facsimile)
PLAINTIFFS' CLASS CO-LEAD COUNSEL

Dated: _____

_____
[TO COME]
PLAINTIFFS' CLASS CO-LEAD COUNSEL

Dated: _____

_____
Robert M. Foote
FOOTE, MEYERS, MIELKE AND FLOWERS
13 South 7th Street
Geneva, Illinois  60134

Kathleen C. Chavez
12 South 5th Street, Suite A
Geneva, Illinois  60134
PLAINTIFFS' CO-LIASON COUNSEL FOR THE
COORDINATED STATE COURT CASES

Attachment C to CIA
TAP Pharmaceutical Products Inc.

IRO when performing the Documentation Review.

b. *Results to Be Included*

The following results shall be included in each Documentation Review Report:

1. for each universe of Control Documents reviewed, the IRO shall describe the procedures performed and state its findings and supporting rationale as to whether: a) the Control Documents were completed in accordance with all requirements set forth in the TAP's Policies; b) the Control Documents reflect that all written approvals were obtained in accordance with TAP's Policies; and c) for each Control Document reviewed, all supporting documentation and follow-up documentation exists in accordance with TAP's Policies;

2. for each universe of Control Documents reviewed, the IRO shall state the percentage material error rate discovered; and

3. if the material error rate for any universe is five percent or greater, the IRO shall describe the material errors discovered and the additional procedures it performed and shall state its findings as to the cause of the material errors.

9

Attachment "B"

## ATTACHMENT "B"

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A PROTECTIVE ORDER

The New Jersey Rules provide that it is <u>Defendants' burden</u> to move for a protective order under Rule 4:10-3(g). Counsel for plaintiff have negotiated in good faith with Defendants on a Proposed Consent Protective Order ("Proposed Order")[1], but have been unable to agree to the terms of such an order consistent with the New Jersey Rules. The most significant obstacle has been Defendants' insistence on a provision which allows them, <u>and only them</u>, to examine designated witnesses with purported CONFIDENTIAL INFORMATION. That provision, which appears at paragraph 4(c) of the Proposed Order, permits access only to "[a] witness on behalf of, or a current or former consultant or employee of, <u>the producing party...</u>". Thus, only Defendants, as the producing parties, will have the opportunity to examine witnesses they designate with CONFIDENTIAL INFORMATION. Plaintiff will have no such right. Such a procedure is patently unfair, and is contrary to the liberal discovery rules and the Rules of Evidence in New Jersey.

The New Jersey Rules permit broad discovery and grant the parties substantial latitude with respect to matters subject to discovery, irrespective of ultimate admissibility. *See* Rule 4:10-2. The Comment to Rule 612 of the New Jersey Rules of Evidence indicates that, once the proper foundation has been laid, a witness may examine any document to refresh his memory. In laying the foundation, the witness need not have previously seen the document; all that is required is prior knowledge of the subject matter of the writing.

Regardless of what has been done in other cases, this New Jersey case must be litigated in accordance with New Jersey rules and procedures. Thus, plaintiff submits that paragraph 4(c) should be amended to permit "<u>any party</u>" (as opposed to only "the producing party") to examine witnesses with CONFIDENTIAL INFORMATION. Both sides should be given an equal opportunity to examine witnesses with appropriate documents.

---

[1]    Contrary to Defendants' assertion, the parties to this action began negotiations concerning a Consent Protective Order using a Defendants' draft which was totally unrelated to the Protective Order agreed to by the parties in the MDL action. However, once the MDL Protective Order was agreed to in principle by the parties to the MDL action, in the spirit of cooperation, plaintiff agreed to abandon the prior draft and to begin to negotiate again using the MDL Protective Order as a model. The version of that Order which plaintiff last proposed is attached hereto as Exhibit "1."

Exhibit "1"

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: LUPRON® MARKETING | ) | |
| AND SALES PRACTICES LITIGATION | ) | MDL NO. 1430 |
| | ) | |
| | ) | Master File No. 01-CV-10861 |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Richard G. Stearns |
| ALL ACTIONS. | ) | |


SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - CAPE MAY COUNTY

| | |
|---|---|
| BERNARD WALKER, individually, and on behalf of those similarly situated, 122 Reef Drive Ocean City, NJ 08220, | Civil Action No.: CPM-L-682-01 |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| TAP PHARMACEUTICAL PRODUCTS, INC., ABBOTT LABORATORIES AND TAKEDA CHEMICAL INDUSTRIES, LTD. | |
| Defendants. | |


## STIPULATION AND PROTECTIVE ORDER

IT IS HEREBY STIPULATED AND AGREED, subject to the approval of the Court, as follows:

CH-1205538v4
DRAFT of 2/19/02

1

1.    All information or material, including but not limited to CONFIDENTIAL INFORMATION (as defined herein), disclosed by any party or a third party (hereinafter "producing party") to any other party (hereinafter "receiving party") pursuant to discovery in this action shall be used solely for purposes of this litigation and any other related litigation in which this Stipulation and Protective Order has been entered.

2.    Each page of each document produced pursuant to discovery in this action shall bear a unique identifying number.

3.    As used herein, CONFIDENTIAL INFORMATION refers to information that a producing party claims in good faith to be its confidential business information pursuant to Rule 4:10-3(g) of the New Jersey Rules Governing Civil Practice.  A producing party may designate information as CONFIDENTIAL INFORMATION using the following procedures:

        a.    Information set forth in responses to discovery requests or in documents produced for inspection provided that, prior to delivery to the receiving party, the responses or copies of documents are marked by the producing party with the following legend:

            CONFIDENTIAL OR CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

        b.    Information revealed during a deposition upon oral examination, if the producing party has:  (i)(a) indicated on the record or in writing at the time the deposition was taken or prior to the preparation of the transcript, that portions of the deposition contain CONFIDENTIAL INFORMATION; and (b) has instructed the court reporter prior to preparation of the transcript to indicate on the face page of the deposition that it contains CONFIDENTIAL INFORMATION; or (ii) has notified

opposing counsel in writing within seven (7) business days after the completion of the transcript that the transcript contains CONFIDENTIAL INFORMATION.

4.    Access to information designated as CONFIDENTIAL shall be limited to the following persons:

a.    Counsel of record and in-house counsel for a receiving party, and stenographic, clerical, and legal assistant employees whose functions require access to CONFIDENTIAL INFORMATION;

b.    ~~Outside e~~Experts or consultants for a receiving party whose advice and consultation are being considered or will be used by such party ~~solely~~ in connection with this action, including their stenographic and clerical personnel; provided that disclosure to such experts or consultants and their stenographic and clerical personnel shall be made only on the following condition:

i.    Counsel desiring to disclose CONFIDENTIAL INFORMATION to such experts or consultants shall first obtain a signed Agreement To Abide By Stipulation And Protective Order in the form of Exhibit A attached hereto from each such expert or consultant and each of his stenographic and clerical personnel who would require access to CONFIDENTIAL INFORMATION, and counsel shall retain in his file the original of each such signed Agreement To Abide By Stipulation And Protective Order.

c.  (i) A witness on behalf of, or a current or former consultant or employee of, anythe producing party, or (ii) such other witness who has previously had access to or knowledge of the CONFIDENTIAL INFORMATION, in the course of his or her deposition in this action, provided that, at the request of the producing party, such witness shall first agree on the record to abide by the terms of this Stipulation and Protective Order and shall sign the Agreement attached as Exhibit A before the close of the deposition.

d.  Duplicating services, and auxiliary services of a like nature, routinely engaged by counsel; and

e.  The Court and its authorized staff, court reporters, and the jury.

5.  With regard to persons listed in Paragraph 4(b) above, no CONFIDENTIAL INFORMATION, as designated by the party, may be disclosed to a current employee, contractor, or consultant of a current competitor of that party, until after the expiration of a five (5) business day period commencing with the service by facsimile upon counsel for the producing party a copy of the signed Agreement To Abide By Stipulation And Protective Order from the employee. During the five (5) business day period after such service, counsel for the producing party may object in good faith to such disclosure. In the event of any such objection, there shall be no disclosure of CONFIDENTIAL INFORMATION to such person, except by further order of the Court or by agreement of the parties.

6.  CONFIDENTIAL INFORMATION shall not be made public by the receiving party, and shall be used or disclosed only as provided for in this Stipulation and Protective Order.

7.    If CONFIDENTIAL INFORMATION is to be filed with the Court in connection with any proceedings herein, it shall be filed in a sealed envelope marked with the caption of the case, the title of the pleading or submission, and the following legend:

> "Contains CONFIDENTIAL INFORMATION Pursuant to a Stipulation and Protective Order dated _____ To Be Opened By Or As
> Directed By The Court"

In addition, any document that is to be filed with the Court and that contains CONFIDENTIAL INFORMATION shall be marked "FILED UNDER SEAL" on its cover page.

8.    The acceptance of CONFIDENTIAL INFORMATION by the parties shall not constitute an admission or concession or permit an inference that the CONFIDENTIAL INFORMATION is in fact confidential. Any receiving party may at any time request that the designating party remove the CONFIDENTIAL designation with respect to any document, object or information. Such request shall be made to counsel for the designating party, and shall particularly identify the designated CONFIDENTIAL INFORMATION that the receiving party contends is not confidential and the reasons supporting its contention. If the designating party does not agree to remove the CONFIDENTIAL designation, then the party contending that such documents or information are not confidential may request by motion that the Court remove such information from the restrictions of this Order. The burden of demonstrating that the information is confidential shall be on the designating party.

9.    This Stipulation and Protective Order shall not prevent a party from attempting to examine about CONFIDENTIAL INFORMATION, at depositions and at trial, persons who are authorized to receive CONFIDENTIAL INFORMATION as identified herein in Paragraph 4. This Stipulation and Protective Order shall not prevent counsel from examining a witness to determine whether he or she has prior knowledge of CONFIDENTIAL INFORMATION, so

long as such examination shall be in a manner that does not disclose the details of the CONFIDENTIAL INFORMATION. If a witness denies that he or she had prior knowledge of CONFIDENTIAL INFORMATION and the deposing party has a good faith belief that the witness knew otherwise but the deposing party is precluded from questioning the witness further because it might disclose the details of the CONFIDENTIAL INFORMATION, each party reserves the right to later seek to examine the witness concerning the CONFIDENTIAL INFORMATION.

10.    CONFIDENTIAL INFORMATION may be used in testimony at trial, at any motion hearing, and at depositions, and may be offered in evidence at trial or at any motion hearing, all subject to any further Order regarding confidentiality as this Court may enter, and may be used to prepare for and conduct discovery, to prepare for trial and to support or oppose any motion, all subject to Paragraphs 4 and 7, but may not be used for any other purpose except as expressly provided herein or by further Order of the Court. At the request of a producing party, any person(s) not permitted access to CONFIDENTIAL INFORMATION under Paragraph 4 may be barred from attending any portion of trial, any motion hearing, or depositions at which CONFIDENTIAL MATERIAL is revealed, subject to any further Order regarding confidentiality as this Court may enter.

11.    Nothing in this Order shall bar or otherwise restrict any attorney from rendering advice to a party client in this action and in the course thereof, relying upon such attorney's examination of CONFIDENTIAL INFORMATION; provided, however, that in rendering such advice and in otherwise communicating with such client, the attorney shall not disclose any CONFIDENTIAL INFORMATION to unauthorized persons.

12.    The disclosure by a producing party of CONFIDENTIAL INFORMATION by way of delivering responses to discovery requests, delivering copies of documents, disclosing deposition testimony or otherwise, without the designation required by Paragraph 3, shall constitute a waiver of any claim of confidentiality, except in the situation where: (a) such disclosure resulted from inadvertence or mistake on the part of the producing party; (b) such inadvertent or mistaken disclosure has been brought to the attention of the receiving party promptly after discovery of such disclosure, but not later than ten (10) business days after such discovery; and (c) within ten (10) business days of such discovery, the producing party has provided properly marked documents. Upon such notice, and upon receipt of properly marked documents, the materials shall be treated as confidential and the receiving party shall return said unmarked documents and things to the extent practicable, and shall not retain copies thereof and shall treat information contained in said documents and things and any summaries or notes thereof as CONFIDENTIAL INFORMATION. Nothing in this paragraph is intended to limit the remedies that a party may pursue with respect to such claim of inadvertence or mistake.

renumber11.    Should any CONFIDENTIAL INFORMATION be disclosed, through inadvertence or otherwise, by the receiving party to any person or party not authorized under this Stipulation and Protective Order, then the receiving party shall: (a) use its best efforts to obtain the return of any such CONFIDENTIAL INFORMATION and to bind such person to the terms of this Stipulation and Protective Order; (b) within three (3) business days of the discovery of such disclosure, inform such person of all provisions of this Stipulation and Protective Order; (c) within five (5) business days of the discovery of such disclosure, identify such person to the producing party; and (d) request such person to sign the Agreement To Abide By Stipulation And Protective Order in the form attached hereto as Exhibit A. The executed agreement shall be

served upon counsel of record for the producing party within five (5) business days of its execution by the party to whom CONFIDENTIAL INFORMATION was disclosed. Nothing in this paragraph is intended to limit the remedies that the producing party may pursue for breach of this Stipulation and Protective Order.

12.    Nothing is this Stipulation and Protective Order shall require disclosure of information.

13.    If information subject to a claim of attorney-client privilege or work product immunity is inadvertently or mistakenly produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such information. If a party has inadvertently or mistakenly produced information subject to a claim of immunity or privilege, upon request made by the producing party within seven (7) business days of discovery of such inadvertent or mistaken production, the information for which a claim of inadvertent production is made shall be returned within three (3) business days of such request and, all copies of inadvertently or mistakenly produced document shall be destroyed. The party returning such information may move the Court for an Order compelling production of such information. Nothing in this Stipulation and Protective Order is intended to operate as a waiver of any claim of privilege or immunity or to limit remedies a party may pursue with respect to such claim.

14.    The restrictions and obligations set forth in this Stipulation and Protective Order relating to CONFIDENTIAL INFORMATION shall not apply to any information which: (i) the parties agree, or the Court rules, is already public knowledge; (ii) the parties agree, or the Court rules, has become public knowledge other than as a result of disclosure by the receiving party; or (iii) is in the receiving party's legitimate possession independently of the producing party.

Such restrictions and obligations shall not be deemed to prohibit discussions with any person of CONFIDENTIAL INFORMATION if said person already has legitimate possession thereof and is not otherwise bound to maintain such information as confidential.

15.     The Stipulation and Protective Order shall not prevent any party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders.

16.     This Stipulation and Protective Order shall survive the termination of this action.

17.     After final termination of this action, the counsel designated in Paragraph 4(a) hereof for the receiving party may each retain one archival copy of deposition exhibits, Court exhibits, documents and other materials submitted to the Court, deposition transcripts and transcripts of court proceedings, one copy or sample of the CONFIDENTIAL INFORMATION produced by opposing counsel for reference in the event of a dispute over the use or dissemination of information, and CONFIDENTIAL INFORMATION to the extent it includes or reflects an attorney's work product.    Such material shall continue to be treated as CONFIDENTIAL INFORMATION under this agreement.    After final termination of this action, counsel for the receiving party either shall return all additional CONFIDENTIAL INFORMATION in his possession, custody or control or in the custody of any authorized agents, outside experts and consultants retained or utilized by counsel for the receiving party to counsel for the party who has provided such CONFIDENTIAL INFORMATION in discovery or **shall certify destruction thereof to such counsel.** As to CONFIDENTIAL INFORMATION reflected in computer databases or backup tapes, the receiving party shall delete all such CONFIDENTIAL INFORMATION or shall impose passwords or designate the information in a

manner reasonably calculated to prevent unauthorized access to the CONFIDENTIAL INFORMATION.

18.    If a third party provides discovery to any party in connection with this action, and if the third party so elects, then the provisions of this protective order shall apply to such discovery as if such discovery were being provided by a party.    Under such circumstances, the third party shall have the same rights and obligations under this protective order as held by the parties to this action.

FOR THE PARTIES:
Dated: _____

_____
Joseph F. Savage, Jr.
TESTA, HURWITZ & THIBEAULT
High Street Tower
125 High Street
Boston, MA  02110
(617) 248-7000
(617) 248-7100 (facsimile)
Daniel E. Reidy
JONES, DAY, REAVIS & POGUE
77 West Wacker Drive
Chicago, Illinois  60601-1692
(312) 782-3939
(312) 782-8585 (facsimile)

ATTORNEYS FOR TAP PHARMACEUTICAL PRODUCTS INC. AND TAP PHARMACEUTICALS INC.

Dated: _____

                         _____

Donald R. Frederico
McDERMOTT WILL & EMERY
28 State Street, 34th Floor
Boston, Massachusetts 02109
(617) 535-4000
(617) 535-3800 (facsimile)

Joshua T. Buchman
McDERMOTT WILL & EMERY
227 West Monroe Street
Chicago, Illinois 60606
(312) 372-2000
(312) 984-7700 (facsimile)

Dated: _____

ATTORNEYS FOR ABBOTT LABORATORIES

                         _____

Martin F. Murphy
BINGHAM DANA
150 Federal Street
Boston, MA 02110
(617) 951-8000
(617) 951-8736 (facsimile)

Robert R. Stauffer
JENNER & BLOCK, LLC
One IBM Plaza, 45th Floor
Chicago, IL 60611
(312) 222-9350
(312) 527-0484 (facsimile)

ATTORNEYS FOR TAKEDA CHEMICAL
INDUSTRIES, LTD., APPEARING WITH RESPECT
ONLY TO THE ACTIONS ENTITLED *BEACON
HEALTH PLANS, INC. V. TAP PHARMACEUTICAL
PRODUCTS, INC., ET AL.; PORTER V. TAP
PHARMACEUTICAL PRODUCTS, INC., ET AL.;
RUSSANO, ET AL. V. ABBOTT LABORATORIES, ET
AL.; AND BRICKEY AND TAP PHARMACEUTICAL
PRODUCTS, INC., ET AL.* (TAKEDA CHEMICAL
INDUSTRIES, LTD. RESERVES THE RIGHT TO
CHALLENGE PERSONAL JURISDICTION AND
SERVICE OF PROCESS IN THESE CASES AND ALL
OTHER CASES WHICH ARE OR MAY BE
CONSOLIDATED WITH THESE CASES.)

~~Dated:~~ _____

~~Vincent R. FitzPatrick, Jr.~~
~~DEWEY BALLANTINE LLP~~
~~1301 Avenue of the Americas~~
~~New York, NY 10019~~
~~(212) 259-8000~~
~~(212) 259-6333 (facsimile)~~
~~PLAINTIFFS' LEAD COUNSEL FOR THE PRIVATE~~
~~NON-CLASS CASES~~

~~SO ORDERED:~~


~~February ___, 2002~~


_____
~~The Honorable Richard G. Stearns~~

FOR THE PARTIES:

Dated: _____

LeeAnn Russo, Esquire
JONES, DAY, REAVIS & POGUE
77 West Wacker Drive
Chicago, Illinois 60601-1692
312-782-3939 telephone
312-782-8585 facsimile

Anne M. Patterson, Esquire
Riker, Danzig, Scherer, Hyland & Perretti, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
973-538-0800 telephone
973-538-1984 facsimile

ATTORNEYS FOR TAP PHARMACEUTICAL
PRODUCTS INC. AND TAP PHARMACEUTICALS INC.

Dated: _____

Joshua T. Buchman

CH-1205538v4
DRAFT of 2/19/02

13

McDermott Will & Emery
227 West Monroe Street
Chicago, Illinois 60606
312-372-2000 telephone
312-984-7700 facsimile

Gerald J. Corcoran, Esquire
Youngblood, Corcoran, Aleli, Lafferty, Stackhouse,
Grossman & Gormley, P.A.
Suite 649, 1125 Atlantic Avenue
Atlantic City, NJ 08401
609-645-2201 telephone
609-645-8959 facsimile

Attorneys for Abbott Laboratories

Dated: _____

Donald E. Haviland, Jr., Esquire
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
215-772-1000 telephone
215-735-0937 facsimile

Bryan L. Clobes, Esquire
Miller, Faucher & Cafferty LLP
One Logan Square, Suite 1700
18th & Cherry Streets
Philadelphia, PA 19103
215-864-2800 telephone
215-864-2810 facsimile

Lewis B. April, Esquire
Cooper, Perskie, April, Niedelman,
Wagenheim & Levenson
1125 Atlantic Avenue - Third Floor
P.O. Box 1125
Atlantic City, NJ 08404-1125
609-572-7338 telephone
609-344-0939 facsimile

So Ordered:

March _____, 2002

CH-1205538v4
DRAFT of 2/19/02

14

Honorable Joseph C. Visalli, J.S.C.
SUPERIOR COURT OF NEW JERSEY
LAW DIVISION